NO. _____

APPELLATE COURT FOR THE STATE OF CONNECTICUT

HARTFORD, CONNECTICUT

_____

In Re Theodora F. Antar

_____

Theodora F. Antar, *Petitioner,*

v.

Honorable Judge Jane Kupson Grossman, *1st Respondent*

Matthew John Lodice, *2nd Respondent*

_____

DOCKET NO.: NNH-FA19-5046828-S

Docket NO.: AC 46588

_____

**PETITION FOR WRIT OF MANDAMUS**

_____

Theodora Antar

856 Shagbark Drive, Orange, CT, 06477

Tel: 203 273 8419 | Email: theodoraantar@gmail.com

*Petitioner, Pro Se*

## **Identity of Parties and Counsel**

The following is a list of all parties and all counsel in this matter:

Petitioner in this matter is Theodora F. Antar

Respondent in this matter is the Honorable Judge Jane Kupson Grossman of the New

Haven Superior Court, Presiding Judge, Post-Judgment Family Matters, New Haven, CT

The real parties in interest in this case are identified below, and are represented by counsel

as indicated:

Matthew John Lodice Pro, Se (Defendant in underlying action)

48 Quarry Hill Rd, Waterbury, CT, 06706

T: (203) 919-9528 C: (860) 518-2388 matthewlodice@gmail.com

Theodora F. Antar Pro, Se (Plaintiff in underlying action)

856 Shagbark Drive, Orange, CT, 06477

(203) 273-8419

theodoraantar@gmail.com

Support Enforcement Services (Juris 104033)

SES New Haven

414-A Chapel street, 2nd floor, New Haven, CT, 06511

Attorney General (Family) 46b-55(a) AAG Gail M. Lawrence (401580)

AG-Collections/Child Supp 165 Capital Ave, 4th floor, Hartford, CT, 06106

Office of Child Support Services A (104016) Dept of Social Services

50 Humphrey St, New Haven, CT, 06513

## **Table of Contents**

IDENTITY OF PARTIES & COUNSEL…………………………………………….………...PG. 2

INDEX OF AUTHORITIES…………...……...……………………………………………...…...PG. 5

STATEMENT OF THE CASE……………………………………………...…………………...PG. 7

STATEMENT OF JURISDICTION…...…………………….…………..………..……………...PG. 8

ISSUES PRESENTED…………………………………………………………………………...PG. 9

ISSUE I: Whether the trial court acted improperly by transferring custody to a defendant with an extensive criminal history of violence, abuse and neglect when said defendant failed to show any proper reason or evidence before the Court for said transfer that would also justify imposition of mandated supervised visitation for the Plaintiff with no appointed access schedule, location, or supervisor without any lawful reason?.......................….PG. 9

ISSUE II: Whether the Court acted improperly when it scheduled excessive motions to be heard on the same date, refused to allow Plaintiff to be sworn in or testify as a witness during proceedings, refused to allow her to show, reference, or enter in evidence, and refused to allow her to call or cross-examine witnesses while acting in a Pro Se capacity and thus, denying her the constitutional right to due process?...................................................PG. 9

ISSUE III: Whether Judge Jane Kupson Grossman demonstrated clear bias, harassment, prejudice, and intimidation against Plaintiff and violated and ignored state and federal laws and judicial canons outside of the bounds of legal capacity of her statutory role?.........PG. 9

ISSUE IV: Whether the Judge Jane Kupson Grossman's intentional acts as a trespasser of the law, and her willful and repeated refusals to follow the law, cause her to lose subject matter jurisdiction and render all of her orders void, and of no legal force or affect?.....PG. 9

ISSUE V: Were Judge Grossman's actions, including denying multiple requests for remote testimony, refusing to hear or rule on Plaintiff's motions, and knowingly ignoring Connecticut State statutes, a violation of due process of Law, and a denial of Plaintiff and Plaintiff's minor daughter's equal protection under the law?

ISSUE V: .......................................................................PG. 9

PRELIMINARY STATEMENT……………………………………………………..………...PG. 10

STATEMENT OF FACTS……………..…………………..…………………………………..PG. 54

ARGUMENT AND AUTHORITIES...………………………………………………………...PG. 241

CONCLUSION………………………………...………………….…………………………PG. 272

PRAYER FOR RELIEF………………………………………………………..……………PG. 273

MOTION FOR TEMPORARY ORDER OF MANDAMUS……………..………………PG. 275

CERTIFICATE OF SERVICE……………………………………………..……..……..…..…….PG. 279

## **Index of Authorities**

*Conn. Practice Book §1-22(a)(2022)* …………………………………...………....PG. 10

*Joyner v. Commissioner of Correction, 55 Conn. App. 602,608, 740 A.2d 424(1999)*...PG. 11

*State v. Stanley, 161 Conn. App. 10, 32, 125A. 3d 1078 (2015)*…………………......PG. 10

*Rule 2.11 of the Code of Judicial Conduct* ……………………………...……………PG. 10

*Title 42 United States Code standard 1983*…………………….......................PG. 26

*Connecticut Public Act No.21-78*…..................................................……PG. 45

*Connecticut Substitute Senate Bill #1091*…………………….....………….……PG. 45

*Connecticut General Statute §46b-56-§46b-56a*…………………….....................PG. 47

*Connecticut General Statute §46b-56b* …………………………………….…...………PG. 25

*Seymour v. Seymour, 180 Conn. 705, 712, 433 A.2d 1005(1980)*……………….…...PG. 47

*Connecticut General Statute §46-b1*…............................................................PG. 49

*Connecticut General Statute §46b-120*…………………………………….……PG. 28

*Connecticut General Statute §46b-56c*…………………..…………….....…….....PG. 51

*Conn. Gen. Stat. Chapter 872. § 51-39. Disqualification by relationship*…………….....PG. 17

*Conn. Gen. Stat. Chapter 872a. Removal, suspension, and censure of judges*…….... PG. 44

*Conn. Gen. Stat. § 51-51s. Disqualification of judge, compensation commissioner or family support magistrate*………………………………………………………PG. 44

*Conn. Practice Book (2022)§ 1-22. Disqualification of judicial authority*.....................PG. 44

*Conn. Practice Book (2022) § 1-23. Motion for disqualification of judicial authority*……PG. 44

*Conn. Practice Book (2022)§ 4-8. Notice of Complaint or Action Filed Against Judicial Authority*………………………………………………………....PG. 44

*Conn. Practice Book (2022) Canon 2. A Judge Shall Perform the Duties of Judicial Office Impartially, Competently, and Diligently*……………………………………………………PG. 13

*Code of Judicial Conduct Rule 2.1. Giving Precedence to Duties of Judicial Office*…...PG. 10

*Code of Judicial Conduct Rule 2.3. Bias, Prejudice, and Harassment*..........................PG. 13

*Stanley v. Illinois, 405 U.S. 645 (1972)*.......................................................…… PG. 10

*28 U.S.C. §1292*..................................................................................…... PG. 238

*42 U.S.C. §1983*.................................................................................…… PG. 26

*2005 Connecticut Code - Sec. 52-485. Writ of mandamus*...........................................PG. 238

*Connecticut Practice Book 1-23*....................................................................……PG. 94

*Title II of the Americans with Disabilities Act of 1990*................................................……PG. 19

*Connecticut Public Act No.21-15*..................................................................…….PG. 10

*The United States Constitution Bill of Rights*................................................……PG. 21

*United States v. N.Y. Tel. Co., 434 U.S. 159, 172 (1977)*…………………….…………PG. 8

*All Writs Act, 28 U.S.C. § 1651(a)*……………………………………………………….PG. 8

*Section 52-485 of the Connecticut General Statutes*…………………………………PG. 8

*Federal Rule of Appellate Procedure 21*……………………………………………….PG. 8

*Ramon-Sepulveda v. INS, 824 F.2d 749, 751 (9th Cir. 1987)*…………..………………PG. 8

*In re Appeal of Kindis, 162 Conn. 239, 242, 294 A.2d 316 (1972)*…………….………..PG. 227

*Wilson v. Wilson, 38 Conn. App. 263, 269, 661 A.2d 621 (1995)*………….…………PG. 238

*Schult v. Schult, 241 Conn. 767, 777, 699 A.2d 134 (1997)*……..……………………PG. 224

*Fish v. Fish, 285 Conn. 24, 45, 939 A.2d 1040 (2008)*………….…………………...PG. 224

## <u>Statement of the Case</u>

1. The underlying suit arises out of Cause No. NNH-FA19-5046828-S entitled "Theodora

F. Antar v. Matthew J. Lodice" in the New Haven Superior Court, New Haven, Connecticut

2. The underlying suit is a visitation/custody application filed by the Plaintiff

3. Respondent is Judge Jane Kupson Grossman by assignment as the Presiding Judge;

Post-Judgment Family Matters, New Haven Superior Court, New Haven, Connecticut

4. Judge Grossman, sitting by assignment, abused her discretion by violating due

process and the constitutional rights of Plaintiff and Plaintiff's minor daughter.

## **Statement of Jurisdiction**

This Court has jurisdiction under Section 52-485 of the Connecticut General Statutes. The petitioner brings this case pursuant to Federal Rule of Appellate Procedure 21, which allows parties to petition the Court for a writ of mandamus. Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has jurisdiction to issue a writ of mandamus to "effectuate and prevent the frustration of orders it has previously issued." *United States v. N.Y. Tel. Co., 434 U.S. 159, 172 (1977) (discussing 28 U.S.C. §1651(a)); Ramon-Sepulveda v. INS, 824 F.2d 749, 751 (9th Cir. 1987).*

## **Issues Presented**

**ISSUE I**: Whether the trial court acted improperly by transferring custody to a defendant with an extensive criminal history of violence, abuse and neglect when said defendant failed to show any proper reason or evidence before the Court for said transfer that would also justify mandated supervised visitation for the Plaintiff with no appointed access schedule, location, or supervisor without any lawful reason?

**ISSUE II**: Whether the Court acted improperly when it refused to allow Plaintiff to be sworn in or testify as a witness during proceedings, refused to allow her to show, reference, or enter in evidence, and refused to allow her to call or cross-examine witnesses while acting in a Pro Se capacity and thus, denying her the constitutional right to due process?

**ISSUE III**: Whether Judge Jane Kupson Grossman demonstrated clear bias, harassment, prejudice, and intimidation against Plaintiff and violated and ignored state and federal laws and judicial canons outside of the bounds of legal capacity of her statutory role?

**ISSUE IV**: Whether the Judge Jane Kupson Grossman's intentional acts as a trespasser of the law, and her willful and repeated refusals to follow the law, cause her to lose subject matter jurisdiction and render all of her orders void, and of no legal force or affect?

**ISSUE V**: Were Judge Grossman's actions, including denying multiple requests for remote testimony, refusing to hear or rule on Plaintiff's motions, and knowingly ignoring Connecticut State statutes, a violation of due process of Law, and a denial of Plaintiff and Plaintiff's minor daughter's equal protection under the law?

## **Preliminary Statement**

There is strong and irrefutable evidence of Judge Jane Kupson Grossman's clear bias and evident prejudice against the Petitioner Theodora F. Antar. She has shown consistent violations of the Code of Judicial Conduct, Title II of the Americans with Disabilities Act of 1990, Public Act No.21-15, The United States Constitution Bill of Rights, C.G.S.A §46b-56 (Effective: October 1, 2021), and other relevant state and federal laws and statutes. "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned including, but not limited to the following circumstances: (1) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding; (5) the judge: (a) serves as a lawyer in a the matter in controversy or was associated with a lawyer who participated substantially as a lawyer in the matter during such association." (See Code of Judicial Conduct, Rule 2.11 (2022)).

Judge Grossman has demonstrated personal bias and prejudice against the Plaintiff and has also been associated with Plaintiff's former counsel in the matter. In order to avoid the appearance of bias and impropriety, Judge Grossman should recuse herself from this matter. "The due process clause clearly requires a fair trial in a fair tribunal … before a judge with no actual bias against the defendant or interest in the outcome of his particular case." (See State v. Stanley, 161 Conn. App. 10, 32, 125A. 3d 1078 (2015).)

Judge Jane Kupson Grossman has made it apparent to the Plaintiff, Plaintiff's former counsel Attorney Don Cretella AKA Zingaro & Cretella, LLC, and two other separate witnesses (Peter Jones & Anthony Zuppardi) that she possesses a clear bias and prejudice against and dislike for the Plaintiff Theodora F. Antar who was represented in a Superior

Court Family Matter *(See NNH-FA19-5046828-S)* as well as a Family Support Magistrate IV-D matter *(See NNH-FA19-6096801-S)* pro-se from 09/06/2019 until 8/5/2022 when she retained Zingaro & Cretella, LLC as counsel. The Plaintiff terminated the attorney-client relationship with Don Cretella of Zingaro & Cretella, LLC on 5/16/23 due to Attorney Don Cretella's extreme malpractice, ethical violations, and incompetence in his handling of her case. The Plaintiff has since been attempting to retain replacement counsel to represent her for the remainder of the proceedings and is actively seeking new counsel.

According to the law, "Any factual disputes involved in a claim of judicial bias may require an evidentiary hearing and, if so, it should be conducted before another judge." (See Joyner v. Commissioner of Correction, 55 Conn. App. 602, 608, 740 A.2d 424 (1999). The Plaintiff is requesting that a hearing be conducted in front of another judge in order to maintain the public trust in the judiciary and avoid any additional prejudicial or biased treatment moving forward.

According to the Code of Judicial Conduct, a judge is required to "respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system." and "avoid both impropriety and the appearance of impropriety in their professional and personal lives." Judges must ensure "the greatest possible public confidence in their independence, impartiality, integrity, and competence."  In her involvement in all matters related to the Plaintiff Theodora F. Antar, Judge Jane Kupson Grossman has consistently shown her inability and unwillingness to avoid both impropriety and the appearance of impropriety and has created a lack of public confidence in her impartiality, integrity, and competence. (See E-filed Case Exhibit #46)

Her actions, statements, court orders, and rulings have all been used as means to intimidate and harass the Plaintiff Theodora F. Antar and are all clear evidence of the strong bias and prejudice that she shows against the Plaintiff. Her actions suggest that she is prejudiced and she shows discriminatory animus toward the Plaintiff due to Plaintiff's status as a minority biracial woman with children from two different relationships and as a current law student who has a lengthy history of past self-representation.

She has previously shown prejudice and bias toward others in the past who have been women, pro-se litigants, and individuals who identify as minorities. *(See Meghan Cleary, v. Jane Kupson Grossman et al.; See also Dirubba v. Dirubba NNH-FA16-6060624-S)*

The Code of Judicial Conduct consists of four Canons which include rules that "state overarching principles of judicial ethics that all judges must observe." The rules must also comply and remain consistent with "constitutional requirements, statutes, other court rules, and decisional law, and with due regard for all relevant circumstances." Judge Grossman has failed to honor and abide by these rules and has demonstrated a concerning abuse of power and has acted outside of the bounds of the Code of Judicial Conduct on numerous occasions. This has caused irreparable harm to the Plaintiff and extreme emotional distress to her minor child Angelina.

When a judge violates the Code of Judicial Conduct, disciplinary measures may be imposed and are determined "through a reasonable and reasoned application of the Rules, and should depend upon factors such as the seriousness of the transgression, the facts and circumstances that existed at the time of the transgression, the extent of any pattern of

improper activity, whether there have been previous violations, and the effect of the improper activity upon the judicial system or other persons."

The Code of Judicial Conduct defines the terms "impartial," "impartiality," and "impartially" as "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." (See Canons 1, 2, and 4, and Rules 1.2, 2.2, 2.10, 2.11, 2.13, 3.1, 3.12, 3.13, 4.1, 4.2.)

Furthermore, "impropriety" is defined as "conduct that violates the law or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality." (See Canon 1 and Rule 1.2). "Integrity" is defined as "probity, fairness, honesty, uprightness, and soundness of character." (See Canons 1 and 4 and Rules 1.2, 3.1, 3.12, 3.13, and 4.2)

All judges in the Superior Court of Connecticut are required to "uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." (Rule 2.2) This is expanded upon in Rule 2.3 which states that "a judge shall perform the duties of judicial office … without bias or prejudice."

A judge shall not "by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not condone such conduct by court staff, court officials, or others subject to the judge's direction and control." On numerous occasions, Judge Grossman has exhibited and displayed both words and conduct that manifested her clear and convincing bias and prejudice against The Plaintiff.

She has also repeatedly engaged in conduct that is clearly a manifestation of harassment based upon the Plaintiff's race, sex, gender, religion, national origin, ethnicity, disability, age, marital status, and socioeconomic status. She has made this evident through her statements made during court proceedings, **(See e-filed case exhibits #70, 71, 72, 74, 78, and 79)** court orders, and other procedural evidence.

Some examples of things that qualify as manifestations of bias or prejudice "include but are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and criminality; and irrelevant references to personal characteristics. Even facial expressions and body language can convey to parties and lawyers in the proceeding, jurors, the media, and others an appearance of bias or prejudice. A judge must avoid conduct that may reasonably be perceived as prejudiced or biased."

"Harassment … is verbal or physical conduct that denigrates or shows hostility or aversion toward a person on bases such as race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation."

Judge must "decide cases according to the law and facts, without regard to whether particular laws or litigants are popular or unpopular with the public, the media, government officials, or the judge's friends and family."

Rule 2.5 states that "A judge shall perform judicial and administrative duties competently and diligently." This includes "the legal knowledge, skill, thoroughness, and preparation reasonably necessary to perform a judge's responsibilities of judicial office. A

judge should seek the necessary docket time, court staff, expertise, and resources to discharge all adjudicative and administrative responsibilities. Prompt disposition of the court's business requires a judge to devote adequate time to judicial duties, to be punctual in attending court and expeditious in determining matters under submission, and to take reasonable measures to ensure that court officials, litigants, and their lawyers cooperate with the judge to that end. In disposing of matters promptly and efficiently, a judge must demonstrate due regard for the rights of parties to be heard and to have issues resolved without unnecessary cost or delay. A judge should monitor and supervise cases in ways that reduce or eliminate dilatory practices, avoidable delays, and unnecessary costs."

Moreover, Rule 2.6 guarantees parties the right to be heard, and states that "A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." The rule establishes that "[a]mong the factors that a judge should consider when deciding upon appropriate settlement practices for a case are (1) whether the parties have requested or voluntarily consented to a certain level of participation by the judge in settlement discussions, (2) whether the parties and their counsel are relatively sophisticated in legal matters, (3) whether the case will be tried by the judge or a jury, (4) whether the parties participate with their counsel in settlement discussions, (5) whether any parties are unrepresented by counsel, and (6) whether the matter is civil or criminal." Judge Grossman failed to allow Plaintiff the rights she was entitled to under Rule 2.6 of the Judicial Code of Conduct, and in fact did the opposite, depriving Plaintiff of all her legal rights and silencing her, blocking her from submitting evidence, and ultimately turning the custody action into an opportunity to harshly and strictly scrutinize and criticize the Plaintiff, while holding her up to a very high standard.

Alternately, she did the opposite for the Defendant, making her double-standard bias more evident the longer she presided over the case.

Rule 2.8 states that "a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity." It also says that "A judge serving as a factfinder shall not investigate facts in a matter independently and shall consider only the evidence presented and any facts that may properly be judicially noted." Judge Grossman was rude, smug, sarcastic, and made efforts to embarrass the Plaintiff every chance that she had. She was, alternately, polite, respectful, helpful, and protective over the Defendant, who has a long history of violent crime, domestic violence, substantiations of neglect and abuse with DCF, and multiple criminal convictions. He has done prison time, been on probation, and violated conditions of release on multiple occasions. He has consistently and willfully violated court orders, refused to provide emotional or financial support for the minor child, and has put his sex addiction, substance abuse and alcoholism, and untreated narcissistic personality disorder and antisocial personality disorders above the needs and welfare of Angelina. This has been heavily documented and also shown through motions, testimony, and affidavits of the Plaintiff, along with evidence that she has submitted and presented to the court on numerous occasions.

However, Judge Grossman has ignored the fact that Plaintiff has no criminal convictions, no substantiated abuse or neglect with DCF for either of her two children, has maintained a safe and beautiful home in a nice and safe area for the past 6.5 years, and has provided Angelina with all of her financial, emotional, and physical support for the last four years with little to no help from the Defendant. Judge Grossman has willfully and

maliciously ignored all this evidence pointing to the Defendant's inability to properly parent the child, and has also ignored requests for a custody evaluation, a GAL, and an AMC. Plaintiff showed up for every court-ordered mediation that was set by Family Relations, while Defendant showed up for none. Defendant was not penalized. Plaintiff signed releases as ordered for each mental health provider that she saw since 2019, while Defendant deliberately refused to sign any releases claiming he "didn't recall" the names, despite Plaintiff providing him with the name, address, and contact information for one of the two individuals that he saw for individual therapy.

Moreover, Rule 2.10 states that "a judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court, or make any nonpublic statement that might substantially interfere with a fair trial or hearing." Judge Grossman has made several statements in open court regarding Ms. Antar in which she has made hurtful and biased and discriminatory statements regarding separate and unrelated court actions, in an effort to embarrass and shame Ms. Antar in front of others who were not involved in those actions. She did this unprovoked, on her own accord, and went out of her way on atleast 2 separate occasions to intentionally attempt to embarrass/shame the Plaintiff by bringing up other court actions in which she had little to no knowledge of the facts and details.

Additionally, Rule 2.11 states that "a judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances: (1) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding. … (5) the judge served as a lawyer in the matter in controversy, or was

associated with a lawyer who participated substantially as a lawyer in the matter during such association." Judge Grossman made her personal bias and prejudice against the Plaintiff evidence over the past year, and she also made her personal bias toward Attorney Don Cretella obvious, as well. Judge Grossman worked in the criminal law field in Connecticut for over a decade, and has very close relationships with several of the more prominent criminal law attorneys in the state, including Attorney Cretella. Attorney Cretella stated that he has a close personal relationship with Judge Grossman, and that they "went to law school together at Quinnipiac School of Law" and that they knew each other on a personal level after having worked together for many years.

Her association with Attorney Cretella, who participated substantially as a lawyer in the matter in controversy, gives her a skewed bias toward Attorney Cretella, which became more evident after Plaintiff terminated the attorney-client relationship with Don Cretella. Not only did Judge Grossman refuse to authorize the release of Plaintiff's file—which Attorney Cretella has no legal right to withhold since it contained mandatory disclosure documents that Plaintiff had already seen and accessed and was given copies of—but she also denied Plaintiff the right to retain replacement counsel and denied any plausibility of it being possible that Plaintiff's claims that Attorney Cretella committed malpractice were credible. Plaintiff has never lied in any proceedings and has shown she is credible based on the fact that she is commissioned with the State of Connecticut as a notary and has specialized training in ethics and compliance regarding handling sensitive and privileged information including trust and estate documents, real estate documents, and financial documents. Plaintiff also possesses certification to practice law as 2L day student at the University of Connecticut School of Law, has a clean criminal record with no convictions, and has also

volunteered as a Sunday School teacher at Saint Barbara Greek Orthodox Church, teaching the PreK 3 class that Angelina attended this past year.

Rule 3.5 also states that "A judge shall not intentionally disclose or use confidential information acquired in a judicial capacity for any purpose unrelated to the judge's judicial duties unless the judge is acting on information necessary to protect the health or safety of the judge, a member of the judge's family, court personnel, a judicial officer or any other person if consistent with other provisions of this Code." Rule 3.10 states that "a judge shall not practice law." On several occasions, Judge Grossman intentionally disclosed confidential information that she acquired in a judicial capacity to embarrass, shame, and further harass the Plaintiff due to her prejudice and bias against her. She also practiced law while acting in a judicial capacity by providing the Defendant with legal advice on at least one occasion. Her actions, statements, and retaliatory harassment of the Plaintiff Theodora Antar is a gross abuse and misuse of power, which she has also demonstrated in multiple other proceedings, including when she was presiding in both Bridgeport Superior Court and Milford Superior Court. She has earned a reputation of being irrational, tyrannical, power hungry, and biased against women (particularly those from a lower socio-economic background and those who try to report suspected abuse out of concern for their children). There are multiple lawsuits, court actions, and foundations dedicated to making claims that are similar, if not identical, in nature to the claims that Plaintiff is making regarding the violations of the Judicial Code of Conduct by this judge.

Furthermore, Title II of the Americans with Disabilities Act of 1990 states that "the Judicial Branch will not discriminate against qualified individuals with disabilities on the basis of disability in its services, programs, or activities. … The Judicial Branch will make all

reasonable modifications to policies and procedures to ensure that people with disabilities have an equal opportunity to enjoy all its programs, services, and activities." Judge Grossman has refused to honor the Title II of the Americans with Disabilities Act of 1990, in that she has refused to allow any accommodations to Plaintiff in any court proceedings, denying her right to due process, and holding her up to an unfair and biased standard that she never held the Defendant to.

By doing so, she did not allow Plaintiff the right for an equal opportunity to the services of the court, in that Plaintiff was expected to perform as if she was a licensed attorney who had decades of experience, rather than as a pro-se litigant who was facing a domestic abuser who had subjected her to years of financial, emotional, psychological, and mental abuse. Judge Grossman failed to allow Plaintiff to read from her documents or notes, and criticized and mocked Plaintiff when she attempted to bring in all of the evidence that she spent almost a year organizing and collecting. At the same time, she went above and beyond to accommodate the Defendant, allowing him to break procedural rules such as not complying with properly serving Plaintiff with motions, refusing to grant requests for mandatory disclosure, and allowing Defendant to read from documents not entered into evidence and submit exhibits that were improperly marked. She denied all of these accommodations to Plaintiff.

The Bill of Rights guarantees all citizens the right to having "no law respecting an establishment of religion, or prohibiting the free exercise therof; or abridging the freedom of speech, or of the press, or the right of the people peaceable to assemble, and to petition the Government for a redress of grievances." Judge Grossman denied Plaintiff and Plaintiff's minor child Angelina the right to freedom of religion and also prohibited the free

exercise of religion in the process. Despite the fact that parties agreed for Plaintiff to make "all religious decisions for the child" and despite the agreement stating that parties would be responsible to bring the child to "any religious event in which she is involved"

Judge Grossman still took it upon herself to issue what she referred to as a "temporary order" (which lasted more than 11 months) that went into effect on 6/29/22 and stayed in effect until 5/31/23, which stated that the Defendant was not required to comply with mother's requests to bring the child to religious services and to receive religious sacraments such as Holy Communion, which are important aspects of our faith. Despite receiving multiple letters from our Parish Priest **(See e-filed case exhibit #14),** Angelina's godmother and grandmother **(See e-filed case exhibit #40),** and Angelina's aunt **(See e-filed case exhibit #43)** that all expressed the importance and significance of Angelina being able to freely practice and exercise her religion with her mother and family, Judge Grossman still denied Plaintiff that right, and ultimately stripped Plaintiff of any ability to practice religion with Angelina, by giving Defendant the right to never allow Angelina to come to church again. Defendant subsequently stated that he will no longer allow Angelina to practice the religion that she is baptized her, despite her being an active member of the church and enrolled in the Sunday School program.

Furthermore, Judge Grossman also denied Plaintiff her constitutional right to the "freedom of speech" when she, on numerous occasions, silenced the Plaintiff and refused to allow her to speak or give any testimony or evidence, while allowing the Defendant the right to speak freely until he stated he was done.

The fourth amendment of the United States Constitution Bill of Rights also states that citizens of the United States are entitled to "the right … to be secure in their persons …

against unreasonable searches and seizures … but upon probable cause." which applies to seizure of both "persons or things". In this context, Judge Grossman violated Plaintiff's fourth amendment rights by unreasonably removing the minor child Angelina from her custody, and stripping her of all of her parental rights that she had for four consecutive years. Judge Grossman failed to prove that the Plaintiff was unfit, and all of the evidence, testimony, and the Family Relations report all showed that Plaintiff was more than fit to provide for Angelina. Plaintiff, who has had sole legal and sole physical custody of her 8.5 year old child since 2016, has shown that she is more than capable of providing for the needs of her children, and has given them a home filled with love, safety, and happiness. Judge Grossman violated Plaintiff's constitutional rights by taking away the child based on nothing more than the perjury that the Defendant provided through his testimony, none of which was backed by any evidence or documentation.

Moreover, the fifth amendment of the United States Constitution Bill of Rights states that "no person … shall be deprived of life, liberty, or property, without due process of law." Judge Grossman denied Ms. Antar her constitutional right to due process due to the way that she handled the case. She denied Ms. Antar access to a GAL or AMC for the child, refused to allow her the opportunity to seek counsel when she stated she was in need of counsel and asked for help, and refused to allow Plaintiff the ability to be sworn in, show evidence, testify, or enjoy due process of law in a very contentious custody action that involved a very sociopathic and dangerous criminal who has a long history of violent crime, neglect, and abuse, that has been corroborated and substantiated by multiple courts of law, and has also been verified by the sworn statements of his ex-wife Monica Perez. (See e-filed case exhibits 8 & Case exhibit 30).

Judge Grossman never proved that it was in the best interest of Angelina to go from seeing Ms. Antar 120 hours a week to only 2-3 hours a week under strict supervision, when there was no DCF involvement and Ms. Antar was there asking the court for relief from the abuse and torture that Mr. Lodice had been subjecting her and her children to for years, that countless witnesses can also testify to.

The sixth amendment of the United States Constitution Bill of Rights also states that individuals are allowed "the assistance of counsel for his defense" which Judge Grossman denied Ms. Antar on both 6/28/22 and on 5/25/23, despite it being unconstitutional for her to do so. Not only did she deny Ms. Antar the right to counsel, but she also held Ms. Antar to the same standard of a seasoned attorney, demanding that she follow each rule of civil procedure exactly, while allowing the Defendant to bend the rules and do things as he pleased on numerous occasions.

The eight amendment of the United States Constitution Bill of Rights also guarantees that "cruel and unusual punishments" should not be inflicted upon the people. Judge Grossman's cruel and unusual punishment of removing all of Ms. Antar's parental rights and taking away her daughter and giving her to someone who is documented as being neglectful and abusive toward children was a direct punishment for Ms. Antar "interrupting" her and "interrupting" the Defendant's hearsay perjury-laden testimony during a court proceeding.

The punishment was cruel and unusual given the fact that Ms. Antar was said to have a strong bond with Angelina, and that she had no documentation of substance abuse, mental health issues, or neglect or abuse of her children, while Mr. Lodice had substantial documentation of all of those things. She stated that she was taking away Ms. Antar's four-

year-old daughter because Ms. Antar reported that the child disclosed she was being sexually abused while in the care of her 16.5-year-old half-brother that the Defendant chose as her regular caregiver during his parenting time, and implemented a cruel and unusual punishment by accusing Ms. Antar of lying, and transferring all rights to the Defendant, despite him saying that his minor son would be the full-time caregiver and that he planned to have him watch her for the entirety of the summer, and despite him being under active investigation with the New Britain Police Department based on allegations that Angelina made while being evaluated for abdominal and vaginal pain in the ER on 5/23/23. (See e-filed case exhibits #16, 17, 15, 18, 19, 20, 21, 49, 75)

Moreover, the fourteenth amendment of The United States Constitution also guarantees that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." Judge Grossman failed to allow Plaintiff her constitutional right to the due process of law, and denied her equal protection of the law by refusing to allow her to show evidence, refusing to allow her to be sworn in, refusing to acknowledge any of the e-filed case exhibits that she had previously entered, and accusing her of lying with no legal reason or basis to do so, other than the Defendant's testimony which consisted of perjury. (See e-filed case exhibit #71, 74, 78, 79) She also intentionally scheduled multiple motions on the same hearing and denied the parties access to family relations at each of the hearings.

As a result, the parties were expected to address a multitude of motions that had been pending from 6/28/22 until 4/5/23 in a rushed, 2 hour hearing in which she made

comments such as "I don't want to be here all day". (See e-filed case exhibit #78). She told the parties that they would return almost 2 months later to pick up where they left off, and rather than allowing them to do that, she instead told the parties on the continuance date of 5/25/23 that she was making final decisions at the end of the two hour hearing—which was never marked as a final hearing date or trial date—about who would have sole legal and physical custody to Angelina, despite her having joint custody for the last four consecutive years and both parties being in agreement of it. She denied Ms. Antar the right to adequate and competent counsel and denied her the right to due process by refusing to schedule more than 2 hours for a hearing and forcing the parties to cram too many issues and motions in too little time and then ruling at the end of the 2 hours (regardless of if some or any of the motions were ever even heard).

According to C.G.S.A§46b-56, it states that

"(b) In making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. Such orders may include, but shall not be limited to:

(1) approval of a parental responsibility plan agreed to by the parents pursuant to section 46b-56a; (2) the award of joints parental responsibility of a minor child to both parents, which shall include (A) provisions for residential arrangements with each parent in accordance with the needs of the child and the parents, and (b) provisions for consultation between the parents and for the making of major decisions regarding the child's health, education and religious upbringing; (3) the award of sole custody to one parent with

appropriate parenting time for the noncustodial parent where sole custody is in the best interests of the child; or (4) any other custody arrangements as the court may determine to be in the best interests of the child."

Judge Grossman's treatment of Ms. Antar is a violation of the 42 U.S.C. 1983 Equal Protection "Class of One" claim. In these types of actions, a plaintiff "may bring an equal protection claim, even if he or she does not allege membership in a protected class or group if he or she is intentionally treated differently than others similarly situated and there is no rational basis for the disparate treatment." The drastic, irrational, and unexplainable decision for Judge Grossman to take four-year-old Angelina away from the only home she has ever known was motivated solely by her bias, prejudice, and dislike for the Plaintiff. Angelina's therapist, who Ms. Antar has been in constant communication with and had been participating in parent sessions with, stated that she felt that the judge's decision was "drastic" and didn't seem reasonable given the fact that Angelina has been diagnosed with adjustment disorder, and that she had just gotten used to a new school that she was thriving at, and had just gotten used to therapy.

Judge Grossman was fully aware of the fact that Mr. Lodice has both an extensive domestic violence criminal record with a multitude of convictions (See e-filed case exhibit #36) and of the fact that he had abused and neglected his ex-wife and minor sons (See e-filed case exhibit #30,8) yet she ignored all of this evidence.

She was also fully aware of the fact that Mr. Lodice violated court orders by refusing to pay court ordered child support, arrears, or child care costs. He did this, despite bringing in substantial income over the course of the last four years of Angelina's life. (See e-filed case exhibit#13, 9, 10, 11, 29, 38, 44, 47; See also exhibits from 6/1/22 hearing in which

Defendant was incarcerated). She was also well aware of the fact that Mr. Lodice was using coercive control and manipulation and involving Angelina in the custody dispute regularly, while attempting to harass and torture Ms. Antar due to her unwillingness to continue sexual relations with him. (See e-filed case exhibits 73, 59, 58, 57, 56, 55, 53, 52, 51, 50, 48, 34, 39, 77, 80, 27, 28, 23).

Despite this, she allowed Mr. Lodice to get permanent sole legal and physical custody of Angelina and stripped Ms. Antar from all her parental rights without having any proof of her being unfit as mother, and while seeing that she was perfectly capable and fit to have sole legal and physical custody of her minor daughter Julianna for 8+ years. Judge Grossman allowed Mr. Lodice to remove Angelina from her new school, remove her from her church, and remove her from her home, forcing her to go against her will to live in a dangerous area that has some of the worst schools in the state, in a three family house with no yard that has over 111 registered sex offenders within a one mile radius. (See e-filed case exhibit #22, 24, 26)

The law also states that "(c) in making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so, may consider, but shall not be limited to, one or more of the following factors:

(1) the physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current interaction and relationship of the

child with each parent, the child's siblings, and any other person who may facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (8) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (9) the ability of each parent to be actively involved in the life of the child; (10) the child's adjustment to his or her home, school and community environments; (11) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (12) the stability of the child's existing or proposed residences, or both; (13) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (14) the child's cultural background; (15) the effect on the child of the actions of an abuser, if any domestic violence, as defined in section 46b-1, has occurred between the parents or between a parent and another individual or the child; (16) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (17) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69-b. The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision."

Based on these factors, it is evident that Judge Grossman's ruling to transfer sole legal and physical custody to Mr. Lodice while restricting Ms. Antar to supervised visitation only under terms and circumstances that Mr. Lodice arranges was made under

discriminatory animus, bias, prejudice, and motivated by dislike and disapproval of the Plaintiff. If anyone should be awarded sole legal and sole physical custody of Angelina based on these 17 factors, it should be Ms. Antar.

It should be noted that Ms. Antar has had sole legal and physical custody of her almost 9 year old daughter for her entire life, while Mr. Lodice has never had primary residency or sole custody of his two sons from a previous relationship, and in fact, he has been abusive and neglectful to them in the past, which resulted in him being listed on the DCF abuse and neglect registry. In terms of the first factor, the Plaintiff has provided Angelina with love and care and has always taken into consideration her physical and emotional safety.

Plaintiff has scheduled and taken Angelina to almost all of her appointments since birth, has made sure she stays up to date on vaccines and well-visits, and has been by her side even when faced with frightening situations like when she had to visit the ER for pneumonia and RSV. Ms. Antar attempted to contact Mr. Lodice on the night that Angelina had a concerningly high fever and was taken to the ER for pneumonia and RSV, but he did not respond to any calls or messages in the app until hours later, which shows how unreliable he is. Ms. Antar and Angelina have never been able to count on Mr. Lodice for physical and emotional support and safety. Mr. Lodice also has consistently blocked and refused to consent to Angelina participating in therapy, despite it being recommended by her pediatrician and by DCF, and the social workers from the Yale Child Advocacy Center. (See e-filed case exhibits 19,20,21)

Ms. Antar has many witnesses who can testify to the fact that she is an excellent mother (See e-filed case exhibit#12). On the other hand, Matthew has many people who

have sworn under oath that he is abusive and neglectful, and that he uses coercive control in an effort to involve his children in his disputes.

Matthew's ex-wife, Monica Perez, has faced extensive abuse and domestic violence at the hands of Matthew, as have their two minor children. Matthew was convicted on two counts of reckless endangerment for endangering their sons, which is the reason he was placed on the DCF abuse and neglect registry. His ex-wife has filed for multiple restraining orders against him and multiple emergency ex-parte motions for custody. Monica Perez has stated in several sworn statements and affidavits that Matthew has been inconsistent, unreliable, abusive, and neglectful. In a court filing filed in New Britain Superior court, she has stated that he has "disobeyed court orders on a weekly to biweekly basis by refusing to take the children for his ordered time without making alternative child care arrangements, often breaking promises with the children to see them. This has been occurring since spring 2018."

Monica Perez also sought relief from the court from Mr. Lodice in an attempt to modify their custody plan by stating that "Since the date of the order, the circumstances have changed substantially as follows: My son Dominic has ADHD to a severe degree as well as oppositional behavioral disorder. He is doing well according to school, doctor, and myself, but father without reason is telling the doctor not to prescribe necessary meds." She also complained that Mr. Lodice would not allow her to get the children passports unless she agreed to having sexual intercourse with him.

This seems to be a clear pattern regarding Mr. Lodice and his behavior, as seen by the extensive documentation of court filings, arrests, criminal convictions, and substantiations of neglect and abuse.

Monica Perez also wrote the following in her sworn affidavit that she filed with her application for emergency ex parte order of custody in New Britain Superior Court regarding Matthew's refusal to allow their children access to necessary medical care and his evident inability to parent their children properly:

"I am asking that the court grant me temporary custody and visitation only at mother's discretion. I am asking that respondent may not interfere with my custody or children and may not interfere with the educational program of the children. I am also asking specifically that Matthew Lodice may not tell the children's pediatrician that he can't prescribe Dominic Lodice necessary medication for his ADHD diagnosis. Dominic is doing very well on the medication; he has been on it for several years according to the provider, educational staff, and psych professional at school and according to myself the mother who works closely with Dominic and the children's teachers. Matthew is not seeing the children as instructed per the court order and neglects his responsibilities as a father (this has been ongoing for over one year). I have made due because I know I provide a structured and predictable environment for them. In addition, I have given Matthew ample proof via school's suggestions/evaluation that Dominic should continue the med as well as the doctor himself explaining in several meetings with myself and Matthew that the medication is beneficial for Dominic academic career, focus, and behavior. Matthew argues with the doctor in front of the children at pediatric appointments and I am now out of medication as of today, the doctor has to re order everytime this controlled med is released by the pharmacy. Matthew has called the doctor's office on a few occasions over the past few weeks stating he would "sue the pediatrician" if he filled a new prescription for my son's ADHD medications. I also have seen a big difference which is apparent to me because I

see the children nearly all the time. Matthew neglects his responsibilities relating to the children." (See e-filed case exhibit )

What is most alarming, is that Judge Grossman referenced this court file in her "consideration" of why she decided to give Matthew Lodice sole legal and physical custody of Angelina and to remove all of my parental rights and limit me to strict supervision under terms that Matthew solely controls.

Furthermore, the abuse has been documented to such a great extent in this file, that it is likely that Judge Grossman never actually traveled from New Haven to New Britain Superior Court to retrieve this paper file, because if she did, and if she considered the file as she claimed in her final order dated 5/31/23, she should have also taken into consideration the following:

Monica Perez filed for an application for an issuance of a subpoena in the case in New Britain Superior Court, in which she asked to subpoena "Janelle Hoff MSW" and stated that she felt that testimony from that person was necessary because "It compliments my concerns and offers further documented insight as to the actions of the children's father and repeated lack of stability and safety of the kids and their wellbeing. I believe that the person will testify that the father has left the children in situations where they are unsafe and does not make time to meet their needs and consider the consequences of his actions. I want this person ordered to bring the following items to court: forms related to any reports I have made to DCF from 2013-2017." (See e-filed case exhibit   )

The application for subpoena was granted. Monica Perez made countless reports to both DCF and the police over the four year period from 2013-2017 about Matthew Lodice and his abuse and neglect of her and her children, and Judge Grossman credits these facts

as part of her reasoning as to why Mr. Lodice should be the sole guardian of his four year old daughter who has alleged she has been sexually abused while in the care of his minor son.

Monica Perez has given credible testimony repeatedly about the abusive nature of Matthew, and is has been documented in records in DCF and mental health providers that Matthew has refused to sign releases for.

During his marriage and subsequent divorce from Monica, Matthew was arrested many times, and had multiple restraining orders and protective orders on him. He did 30 days in prison and subsequently was on probation on atleast one occasion. He currently is facing harassment charges and has an open criminal case in Derby GA that has been pending since his arraignment on 1/30/23. (See e-filed case exhibit )

In terms of temperament and developmental needs of the child, Angelina has a diagnosis of Adjustment-disorder, and oftentimes can have some trouble adjusting to new situations. Ms. Antar has worked tirelessly to maintain a normal, stable, consistent environment for Angelina by providing her with a stable home that is safe and loving. Ms. Antar has never had any substantiations of neglect or abuse and works hard to keep her children safe and protected.

In regard to the capacity and the disposition of the parents to understand and meet the needs of the child, Mr. Lodice has consistently shown his inability to understand and meet the needs of Angelina. He has either directly or indirectly caused her to lose her spot at 3 separate daycares as of now, due to his sexual affairs with the teenage daycare providers, his contacting the school and telling them Angelina would no longer be attending without consulting Ms. Antar first, and by immediately withdrawing her as soon as he was

awarded sole legal and physical custody of her on 5/25/23. On 5/25/23, Judge Grossman stated that this would be a temporary arrangement and that we would come back in one week. However, she gave us a court date that as three weeks away, not one week away.

Then, on 5/31/23, without any additional court hearing, she issued orders that denied all of Ms. Antar's motions that had been pending that never had a chance to be heard, and issued a final order that permanently stripped Ms. Antar of all of her parental rights and gave Mr. Lodice, who has shown a consistent pattern of coercive control and emotional and financial and psychological abuse against women, full control to be able to abuse and isolate and alienate Ms. Antar further from their daughter.

The statute states that relevant and material information should be obtained from the child and taken into consideration by the court. Judge Grossman refused to do this. Both I, and my former counsel, demanded the court appoint a GAL for Angelina. Judge Grossman refused, claiming that the fact that she had access to some of Ms. Antar's mental health records and none of Mr. Lodice's mental health or DCF records was enough to evaluate custody. However, this is further proof of her bias and prejudice. On 12/1/22, she ordered that both parties needed to sign releases, however she never held Mr. Lodice in contempt for refusing to sign the releases. She sat during the hearing on 4/5/23 and listened to Annamaria Baranowski state that "It should be noted that Mr. Lodice did not provide any of his respective treatment providers to family services, specifically, Mr. Lodice reports that he engaged in individual counseling once; however, he claims that he can not remember the name of the contact information for that treatment provider." and still chose to ignore the fact that the only records she had were in regard to Ms. Antar. She chose to then heavily

scrutinize and criticize Ms. Antar, even going so far as to ask about her compliance with recommendations from a provider she saw briefly four years prior.

Mr. Lodice has stated repeatedly that he has problems with his memory, which is also a sign of an untreated mental illness. (See e-filed case exhibit   )

Mr. Lodice has also shown through his testimonies and depositions that he has little to no knowledge about his children or their needs, and has on numerous occasions shown that he doesn't know the children's birthdates, ages, or whether or not they take medication. On 3/21/23, Mr. Lodice stated on the record that "Dominic is not taking any medication … He has when he was younger, like, way younger, like, six." (See e-filed case exhibit   )

However, Dominic was a teenager when his mother filed the emergency ex parte motion for custody stating that he was medicated for years and that Mr. Lodice was withholding access to medical care and psychiatric medication from his son after being already found neglectful by DCF and the police.

Mr. Lodice's statements in his deposition are widely different from those that Ms. Perez said in her sworn affidavit, and he says "We did it for a little while. There was no change so we just took him off it." This conflicted with her statements that the medication was working and effective for several years.

Matthew also testified during his deposition while under oath that, during the time period when he told the New Haven Superior Court that he was unemployed, and while he was also collecting unemployment from the State of Connecticut, he actually started and began running his own full-service construction/remodeling company, and was given $10,000 cash from his friend Donna Dicosmo. When asked if any of the $10,000 cash that

Ms. Discosmo gifted him went toward child support, Mr. Lodice stated "No. No, it wasn't for that. ...I knew she had a little nice nest egg, and I was telling her my idea … so she gave me $10,000."

Mr. Lodice admits that although the money was supposed to be for business purposes, that he deposited the $10,000 in cash into his personal checking account. He also states that "I don't think I started falling behind [in child support] until the end of 2021. I think that's when I started missing payments. So I think after unemployment."

The only payments that he made were those that were taken automatically from his unemployment that he received while he worked full time under the table running Whole House Remodeling Company LLC. The other payments were interceptions of his tax returns or a purge that he paid to get out of prison. He would consistently financially abuse Ms. Antar by withholding support, but when he saw her he would flash large sums of cash and attempt to ask her to engage in sexual relations with him and offer to "call off all the motions in court" if she agreed to sexual intercourse with him. He also testified in his March 2023 deposition that, although he can't afford child support, he can afford Netflix, 3 cell phones for him and his son, and rent and utilities and all of his bills without an issue. He has consistently said that he will try to pay child support if he has any "extra money" and has enjoyed being self-employed because he knows that there is no enforcement of child support when someone is self-employed compared to someone who is working for an employer who takes the money out of their paycheck.

Furthermore, Angelina has made it clear that she wants to be home with Ms. Antar and her sister Julianna. Julianna has been heartbroken and sad that, in the last 15 days, she has only been able to see Angelina for a total of 5 hours. Angelina has been begging

Mr. Lodice for more time with Ms. Antar, and Mr. Lodice has insisted on denying her wishes and insisting that Ms. Antar only get 1-2 hours per week, and takes no consideration for her schedule or obligations and sets unrealistic obstacles in place to prevent access to the child.

Both parents had filed motions for sole custody that were pending, however Ms. Antar's wishes to have sole custody like she does of her older daughter were denied. She was told she was unfit, despite all of the evidence to the contrary. As a notary, Ms. Antar is commissioned with the Secretary of the State. Ms. Antar is also a 2L law student at the University of Connecticut School of Law and has, despite the immeasurable amount of challenges she faced over the past year through litigation, was able to finish with a little less than 3.0 GPA and was awarded for receiving the highest grade in the class and a CALI award in her Criminal Law class for spring 2023. Ms. Antar has been able to maintain a stable and consistent home that has a beautiful room for Angelina, a playroom, a big yard, and all of Angelina's belongings and toys.

Mr. Lodice has been inconsistent in Angelina's life. He did not even get her a cake for her birthday or do a party for her. Ms. Antar got Angelina a cake and gifts to make her birthday special, and Angelina was forcibly and unjustly removed from Ms. Antar's custody just four days after her fourth birthday. Some of the gifts Ms. Antar got Angelina includes a new suitcase with "Frozen" characters on it, a new bathing suit, and a new "Frozen" towel. Ms. Antar promised Angelina that, rather than a birthday party like we did when she turned three, that we could go on a trip to Florida to go to Disneyworld and visit the Bippidi Boppidi Boutique and get her a princess makeover. I promised her that once Julianna finished school for the summer that we could go, and she was so excited. Now, Angelina will never

be able to go since she is being forcibly kept away from Ms. Antar for no good reason. This was traumatic and scary for both Ms. Antar and Angelina, who has been sad that she was removed from her school, home, family, church, therapist, and doctor. Mr. Lodice has been denying Angelina access to medical care, similar to how he was acting with his son Dominic as per the court filings of Ms. Perez. (See e-filed case exhibit   )

In terms of the past and current interaction and relationship of the child with each parent, Angelina has always had a strong bond and connection with Ms. Antar. They have an unbreakable bond that nothing can ever come between, and Angelina knows that Ms. Antar will always be there to love her, protect her, and support her no matter what. Ms. Antar has been supportive to both of her children and has always respected them and their needs, validated their feelings, and believed them and showed them love and compassion. In terms of sibling relationship, removing Angelina from Ms. Antar's home has been devastating and a cruel punishment for Angelina, Ms. Antar, and Julianna. Julianna wrote a letter to Judge Grossman asking that she can have her sister back (See e-filed case exhibit ) which no child should have to do.

DCF has stated on multiple occasions that they have no concerns and that there have never been substantiations of abuse or neglect from Ms. Antar, yet Judge Grossman decided to ignore all of the evidence, documentation, and concerning proof that Mr. Lodice is unfit, and decided to allow her prejudice and bias to control her decision to cause Ms. Antar, her family, and Angelina irreparable harm that will end up causing more damage if it is not fixed.

No child deserves to be ripped away from a mother who loves them and never did anything to harm them or anything to jeopardize their emotional or physical safety and to be

forced to go with an abusive individual who has an extensive history of violence and coercion who has shown a huge lack of credibility.

On another application for emergency ex-parte, Ms. Perez stated that she wanted to:

*"change custody agreement to sole custody to mother and supervised visitation to father." There is a pattern that shows that Mr. Lodice is a domestic abuser. Ms. Perez wrote in her affidavit: "I have met several times with DCF due to concerns over my children's safety and well being while they are with their father. He was physically and emotionally abusive to me and I have reported several incidences to DCF involving the two children as well. Most recently, their father left my two boys 11 and 5 years old alone at his girlfriend's condo in Waterbury, CT. I asked for the address in the past since the boys occasionally sleep there, however he refused to tell me. I found a possible address through my son's GPS on his cell and called Waterbury police. My 11 year old who has ADHD was left alone to watch my 5 year old for four hours. My ex-husband also has left my two children alone at night after they go to bed ( on several occasions) while he goes out with his girlfriend for several hours. Due to the incident on 11/22/17, the father was arrested and charged with two counts of risk of injury to a minor. DCF filed paperwork to help ensure a safe, stable, and predictable environment for the children. DCF informed the father of forms and motion being filed. According to the victim's advocate at Waterbury court, the judge ordered a partial protective order of no threatening or harassment for the children and are in agreement of DCF's plan to have me help the children and allow them to visit the father only when supervised by myself or someone I trust. I agree with this because it ensures their safety and well being. Additionally, I explained to DCF that the father had even sent a*

*text to the 11 year old asking him to check the stove because he thought he left it on, when*
*he left them alone for four hours, to which my 11 year old responded "we're too distracted*
*to check right now." He continuously (their father) has proven he does not care about*
*consequences and thinks he is above the law. I also have police reports from instances*
*where he said in order to give my son a medication highly recommended by the doctor, I*
*would have to agree to meet him to have intercourse on a regular basis. In another incident*
*he refused to sign passport documents for my sons unless I agreed to intercourse with him.*
*Nothing seems to be for the children's best interest, every opportunity he has to show*
*interest in their well being turns into using the boys as leverage and selfishly finding ways*
*to try to use them in manipulation."*

   The file also contains documentation from the DCF social worker that was
also filed in the court which states the following in regard to Mr. Lodice's parenting abilities:
"In regard to custody and visitation, the caregiver (Matthew Lodice) does not meet the
child's immediate needs for supervision, food, clothing, and/or medical or mental health
care. Caregiver leaves the child alone. Caregiver makes inadequate or inappropriate
babysitting or childcare arrangements or poor planning for child. Parent or guardian will do
the following: No unsupervised contact between father and the children. Mother will keep
children safe and take appropriate steps to do so. i.e. family court. DCF will do the
following: Assess father, father's girlfriend, and obtain information regarding a protective
order. DCF will also referral family for services."

   All of these things, which can be found in the file in New Britain Superior
Court under the dissolution action of Lodice v. Lodice (FA13-4034032) were taken into
consideration by Judge Grossman when she made the drastic decision to remove Angelina

from Ms. Antar's custody and restrict her to supervised access only. In Matthew's case, he has to be arrested for 2 felony counts of risk of injury to a minor and subsequently found to have substantiated neglect with DCF before he was given supervised visitation. However, due to Judge Grossman's extreme bias and prejudice against the Plaintiff, she ignored all of the disturbing evidence in the Lodice v Lodice file, and instead cited it in her 5/31/23 order as part of her "reasoning" and "consideration" in deciding to award him sole custody.

Furthermore, the statute also says that willingness and ability of each parent to facilitate and encourage a continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders, also shows that Mr. Lodice is unfit. He refused to be reasonable on numerous occasions, and instead would regularly tell Ms. Antar that he would only speak to her during a court hearing, and if she disliked his wilful contempt of court orders that she would be able to "take it up with the judge" and he would constantly send intimidating messages and emails threatening with court action if he didn't get his way. (See e-filed case exhibit   ). The only time that Ms. Antar didn't send Angelina to Mr. Lodice was when she was instructed by the police, DCF, and her former counsel Attorney Cretella that it was in the child's best interest to remain with her throughout the duration of the investigation. Even Mr. Lodice stated that he was in agreement with that, up until 3/10/23 when he decided to intercept Angelina at the daycare and prevent her from attending her first therapy session with Dr. Jessica Mayo, PhD, to whom she received numerous referrals. (See e-filed case exhibit   ).

In terms of the 8th factor, Mr. Lodice has shown extensive manipulation and coercive behavior in an effort to involve the child in the custody dispute, which has been heavily documented through multiple exhibits that have been entered into evidence.

Additionally, Mr. Lodice has consistently shown an inability to be actively involved in the life of the child. He has been unavailable when he only had 2 parenting days per week, consistently leaving Angelina alone for hours and sometimes days at a time with his minor sons who have documented disabilities and take psychiatric medications. Mr. Lodice claims that he has "no choice" but to have his minor sons babysit Angelina during his visitation time, despite Ms. Antar repeatedly stating she would be willing to exercise the right of first refusal and take the opportunity to spend time with Angelina on the weekend, a right that has been deprived of her for the past 2 years since Mr. Lodice started getting her every weekend. The only times that Ms. Antar didn't send her on the weekend were during the investigations, and she did so based on what she was advised to do by her hired counsel at the time.

Angelina has had an excellent adjustment to her home, since it is the only home she has ever known. Mr. Lodice lived in his mother's basement for several years until finally renting the 3 family apartment he rents in New Britain. Angelina has stated repeatedly that she wants to come home and play with her toys and things, and Mr. Lodice has refused. He told her on 6/7/23 that she was "not allowed to go to mommy's house ever again" and that she needed to accept that.

The statute also takes into account the adjustment to school and community environments. Angelina has been a partitioner and member of Saint Barbara Greek Orthodox Church since 2020, which is in the same community that Ms. Antar lives in, and is the same church that Ms. Antar teaches Sunday school at and that she and her daughter Julianna were baptized in. Angelina also was in an excellent school that she was in a K-Prep class that was teaching her and getting her prepared for Kindergarten. Orange has

some of the best schools in the district, which Ms. Antar considered when purchasing her home seven years ago.

This ties into the 11th factor in the statute, which discusses the length of time the child has lived in a stable environment and maintaining continuity. With Ms. Antar, she was able to go to her pediatrician, her therapist, church, Sunday School, and her new school that she loved and was adjusting well to. Now, she has been ripped away from all of that and it has been a drastic change that she has not adjusted to and likely will not adjust to anytime soon. She belongs with Ms. Antar and her sister Julianna, where she has a safe, loving home, in a nice safe town with good schools and a yard and other kids to play. New Britain, in comparison, is flooded with sex offenders, has no yard, and is in a dangerous downtown area that is known for high crime rates, slow police response, and increased drug activity. Ms. Antar feels strongly that none of these factors point in the best interest of her four year old daughter who is diagnosed with adjustment disorder.

Ms. Antar has provided a stable home, that has everything that Angelina needs. Mr. Lodice has shown instability, and at times has moved temporary girlfriends and their children into the home, only to them have them leave months later due to his sex addiction, alcoholism, substance abuse, and mental health issues that he refuses to treat.

Furthermore, Angelina's siblings Sal and Dom have been abused and neglected by Mr. Lodice, which should be considered as the 16th factor of the statute. Mr. Lodice has proven himself to be unfit through his history of coercion, domestic violence, perjury, and abuse and neglect of his children.

The Plaintiff has substantial evidence and documentation to support her claims along with witnesses who have seen that Judge Jane Kupson Grossman has shown clear

and convincing bias and prejudice since the first day she encountered the Plaintiff

Theodora F. Antar in New Haven Superior Court on 4/8/2022[1].

Since then, she has showed an increased level of extreme bias against the Plaintiff

as well as prejudice over the past fourteen months. She has ignored or refused to allow her

testimony, blocked her from presenting or submitting evidence, denied her and her child the

right to counsel[2], and has made rulings and orders that were in direct conflict with the

standards in Connecticut Regarding the Best Interest of the Child Standard and Public Act

No.21-78, which she has adamantly refused to acknowledge or abide by. She has

consistently and obstinately shown a negative and condescending attitude toward survivors

of abuse and those who have been victims of physical, sexual, and psychological

abuse/coercive control.[3]

According to Conn. Practice Book §1-22(a)(2022), "A judicial authority shall, upon

motion of either party or upon its own motion, be disqualified from acting in a matter if such

judicial authority is disqualified from acting therein pursuant to Rule 2.11 of the Code of

Judicial Conduct." Furthermore, the law mandates that "A judge shall disqualify himself or

---

[1] See e-filed case exhibit #70 "Transcript from 4/8/22 hearing."

[2] On 7/25/22, Ms. Antar filed a Motion #201 for a Motion for appointment for Guardian ad Litem, in which she stated the following: "The Plaintiff Theodora F. Antar is requesting that a Guardian ad Litem be appointed in this case for the minor child Angelina Maria Lodice. Given the complexity of this case, I feel that it is necessary that a Guardian ad Litem be appointed to help facilitate the process of the custody dispute." Even though Ms. Antar's motion was filed 319 days ago, Judge Grossman still never ruled on it, and to this day has not made a ruling.[2] **(See item#201 Re: NNH-FA19-5046828-S).**

[3] She also has shown a great bias against pro-se litigants, women, and those who are or come from a lower socio-economic background. She has also shown bias by repeatedly accusing the Plaintiff of lying and saying she isn't credible without any proof or evidence to support that conclusion and has refused to consider the possibility that any of the Plaintiff's claims have merit, despite the Plaintiff's plethora of remarkable evidence to back up each of her claims.

herself in any proceeding in which the judge's impartiality might reasonably be questioned including, but not limited to, the following circumstances:

The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding; (5) The judge served as a lawyer in the matter in controversy or was associated with a lawyer who participated substantially as a lawyer in the matter during such association." Judge Grossman has shown a clear and convincing personal bias and prejudice against the Plaintiff in this case, while also showing a clear and convincing personal bias toward the Defendant, as well as toward the Plaintiff's former counsel, whom she has a long history of association with. Judge Grossman has also consistently ignored and violated the laws and requirements set out by Public Act No.21-78, which went into effect on 10/1/2021 and effectively repealed section 46b-1 of the general statutes which is in regard to court proceedings in Family Relations Matters. Additionally, she ignored Substitute Senate Bill #1091, which states the following:

*"sSB 1091 expands the 'best interest of the child factors in family relations matters to include the child's physical and emotional health" and "creates a general definition for the terms 'domestic violence' and applies it to all provisions related to family relations matters and support. In doing so, it includes coercive control[4]as a form of domestic violence. Under*

---

[4] Under the bill, 'coercive control' includes unreasonably: *Isolating the family or household member from friends, relatives, or other support; Depriving the family or household member of basic necessities, Controlling, regulating, or monitoring the family or household member's movements, communications, daily behavior, finances, economic resources, or access to services; Compelling the family or household member by force, threat, or intimidation, including, but not limited to, threats based on actual or suspected immigration status to (a) engage in conduct from which they have a right to abstain or (b) abstain from conduct that they have the right to pursue, Forcing the performance of sex acts, or making*

the bill, 'domestic violence' means: stalking, including 2nd degree stalking, of a family or household member, a pattern of threatening, including 2nd degree threatening of a family or household member or a third party that intimidates the family or household member, coercive control of a family or household member[5] which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty.

The Bill also defines violence as "an act of threatened violence that constitutes fear of imminent harm, bodily injury, or assault, including, but not limited to, talking or a pattern of threatening, and verbal abuse if there is a present danger and likelihood that physical violence will occur. The bill expands the eligibility criteria to petition the court for a restraining order, allowing domestic violence victims who are subject to coercive control by a family and household member to be eligible petitioners. Public Act #21-78 defines domestic violence as:  "stalking, including but not limited to, stalking, as described in section 53a-181d, of such family or household member; 3)a pattern of threatening, including but not limited to, a pattern of threatening as described in section 53a-62, of such family or household member or a third party that intimidates such family or household member; or 4) coercive control of such family or household member, which is a pattern of

---

threats of a sexual nature, including threatened acts of sexual conduct, threats based on a person's sexuality, or threats to release sexual images.

[5] The bill defines household or family members as: spouses or former spouses, parents or their children, people related by blood or marriage, people not related by blood or marriage living together or who have lived together, people who have a child in common, regardless of whether they are or have been married or have lived together, and people who were recently dating (CGS §46b-38a)

*behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty."*

Additionally, in accordance with 46b-56a, in making decisions regarding custody and visitation of a minor child, the court must use "its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable." The orders must "serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests …per existing 17 factor test."

Furthermore §46b-56b states that "In any dispute as to the custody of the minor child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody." Moreover, "a court has an independent responsibility to assure itself of the suitability of the parent to whom the child is primarily attached." (See Seymour v. Seymour, 180 Conn. 705, 712, 433 A.2d 1005 (1980)).[6]

Connecticut General Statute §46b-56(b) (2022 supplement) also states that "In making or modifying any order as provided in subsection(a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child with the active and consistent

---

[6] The law also states that elements that have been used to illustrate proof as to which parent should be awarded custody of child include: §13. Neighborhood environment, §14. Church attendance, §16. Provision for childcare, §17. Parent's neglect, §18. Parent's poor housekeeping, §19. Parent's mental problems-violent temper, other unusual, §20. Depression and suicidal tendencies, §21. Parent's alcoholism, §24. Child's wishes as to custody

involvement of both parents commensurate with their abilities and interests … in doing they may consider, but shall not be limited to, one or more of the following factors[7]:

1. The physical and emotional safety of the child.

2. The temperament and developmental needs of the child

3. The capacity and the disposition of the parents to understand and meet the needs of the child.

4. Any relevant and material information obtained from the child, including the informed preferences of the child

5. The wishes of the child's parents as to custody

6. The past and current interaction and relationship of the child with each parent, the child's siblings, and any other person who may significantly affect the best interests of the child

---

[7] The court also must consider the following 22 factors in assessing a parent's fitness for custody: Parenting skills, Each person's relationship with the child, emotional ties of each parent with the child, the child's primary psychological parent, Character of parent by reason of willful disobedience of court orders, Willingness to facilitate visitation by the other parent, Past behavior as it relates to parenting ability, Family Relations Division Report recommendations, Independent advice of attorney appointed to represent minor children, Credibility, Manipulative and coercive behavior in efforts to involve children in the marital dispute, A parent's behavior and its effects on the children, Continuity and stability of environment, The flexibility of each parent to best serve the psychological development and growth of the child, Which parent is more willing and able to address medical and educational problems of the child and to take appropriate steps to have them treated and corrected., Children were living in a familiar and stable environment with love and attention from their grandparents, Psychological instability of one parent posing a threat to the children's well-being., Recommendations that one party immediately commence in-patient treatment, Visitation having an adverse effect on the child at times., Remarriage, Parental sexual activity, Consistency in parenting and lifestyle, insofar as these factors might affect the child's growth development and well-being, The time each parent would be able to devote to the child on a day-to-day basis, Untidy condition of home, alcoholism, leaving unattended, emotional problems.

7. The willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders

8. Any manipulation by or coercive behavior of the parents in an effort to involve the child in the parent's dispute

9. The ability of each parent to be actively involved in the life of the child

10. The child's adjustment to his or her home, school, and community environments

11. The length of time that the child has lived in a stable or satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household

12. The stability of the child's existing or proposed residences, or both

13. The mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child

14. The child's cultural background

15. The effect on the child of the actions of an abuser, if any domestic violence, as defined in section 46-b1, has occurred between the parents or between a parent and another individual or the child

16. Whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120

17. Whether the party satisfactorily completed participation in a parenting education

program established pursuant to section 46b-69b.

Additionally, Judge Grossman references in her 5/31/23 order that "The law

applicable to these motions includes Connecticut General Statues §46b-56, §46b-56c,

§46b-62, §46b-87, and Connecticut Practice Book §25-27."[8]

---

[8] For reference, CGS §46b-56 states the following: "(a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may make or modify any proper order regarding the custody, care, education, visitation, and support of the children if it has jurisdiction under the provisions of chapter 815p. Subject to any provisions of section 46b-56a, the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. The court may also make any order granting the right of visitation of any child to a third party to the action, including, but not limited to, grandparents.(b) In making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. Such orders may include, but shall not be limited to: (1) Approval of a parental responsibility plan agreed to by the parents pursuant to section 46b-56a; (2) the award of joint parental responsibility of a minor child to both parents, which shall include (A) provisions for residential arrangements with each parent in accordance with the needs of the child and the parents, and (B) provisions for consultation between the parents and for the making of major decisions regarding the child's health, education and religious upbringing; (3) the award of sole custody to one parent with appropriate parenting time for the noncustodial parent where sole custody is in the best interests of the child; or (4) any other custody arrangements as the court may determine to be in the best interests of the child. (c) In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child;

CGS §46b-56c, which was also cited as one of the "applicable laws" that Judge

Grossman referenced in her order, is irrelevant to the action, and is only regarding

Educational Support Orders for higher education. The minor child to the parties is four

years old, meaning that any laws or statutes relating to educational support orders are

---

(9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers.(d) Upon the issuance of any order assigning custody of the child to the Commissioner of Children and Families, or not later than sixty days after the issuance of such order, the court shall make a determination whether the Department of Children and Families made reasonable efforts to keep the child with his or her parents prior to the issuance of such order and, if such efforts were not made, whether such reasonable efforts were not possible, taking into consideration the best interests of the child, including the child's health and safety (e) In determining whether a child is in need of support and, if in need, the respective abilities of the parents to provide support, the court shall take into consideration all the factors enumerated in section 46b-84.(f) When the court is not sitting, any judge of the court may make any order in the cause which the court might make under this section, including orders of injunction, prior to any action in the cause by the court.(g) A parent not granted custody of a minor child shall not be denied the right of access to the academic, medical, hospital or other health records of such minor child, unless otherwise ordered by the court for good cause shown.(h) Notwithstanding the provisions of subsections (b) and (c) of this section, when a motion for modification of custody or visitation is pending before the court or has been decided by the court and the investigation ordered by the court pursuant to section 46b-6 recommends psychiatric or psychological therapy for a child, and such therapy would, in the court's opinion, be in the best interests of the child and aid the child's response to a modification, the court may order such therapy and reserve judgment on the motion for modification.  (i) As part of a decision concerning custody or visitation, the court may order either parent or both of the parents and any child of such parents to participate in counseling and drug or alcohol screening, provided such participation is in the best interests of the child."

irrelevant currently. The Judge did not explain how the statute is applicable or how she applied it in making her decision, and based on the language, it seems that it does not apply at all. She also did not make any orders regarding or relating to the higher education of the minor child.

CGS §46b-62, which is another statute that was cited as one of the "applicable laws" that Judge Grossman referenced as reasoning for making her order, is also irrelevant to the action, and is only regarding Orders for payment of attorney's fees in certain actions. Nothing in her order mentions anything regarding attorney's fees. The Judge did not explain how the statute is applicable or how she applied it in making her decision, and based on the language, it seems that it does not apply at all.

CGS §46b-87 which is another statute that was cited as one of the "applicable laws" that Judge Grossman referenced as reasoning for making her order, is also irrelevant to the action, and is only regarding awards of attorney's fees in contempt proceedings. Nothing in her order mentions anything regarding attorneys fees. The Judge did not explain how the statute is applicable or how she applied it in making her decision, and based on the language, it seems that it does not apply at all.

Connecticut Practice Book §25-27 states that "In regard to motions of contempt, (a)Each motion for contempt must state (1) the date and specific language of the order of the judicial authority on which the motion is based; (2) the specific acts alleged to constitute the contempt of that order, including the amount of any arrears claimed due as of the date of the motion or a date specifically identified in the motion; (3) the movant's claims for relief for the contempt. (b) Each motion for contempt must state clearly in the caption of the motion whether it is a pendente lite or a post-judgment motion, and the subject matter and

the type of order alleged to have been violated." Judge Grossman referenced this section of the Connecticut Practice book as part of her applicable law to the order that she made on 5/31/23, however nothing in her order states anything about the procedural requirements of filing a motion for contempt. The Judge did not explain how the statute is applicable or how she applied it in making her decision, and based on the language, it seems that it does not apply at all.

# Statement of Facts

This case arises out of an application for visitation and custody of a minor child filed by Plaintiff Theodora F.  Antar. The Plaintiff Theodora F. Antar first filed a custody/visitation application on 9/6/2019 in New Haven Superior Court that was heard on 11/5/19[9] in magistrate court and on 11/7/19 in family court with Judge Daniel Klau (See e-filed case exhibits 9, 10), resulting in an agreement by the parties and final judgment being entered. The 11/7/19 order awarded the parties joint custody and primary residency with the mother with father[10]'s visitation specified through the end of the 2019.[11] During this time, the parties met with Stephanie Janes[12] for couples/coparenting therapy. By December of 2019,

---

[9] See e-filed case exhibit #9 "11/5/2019 transcript from hearing"; See also e-filed case exhibit#10 "11/7/2019 transcript from hearing"

[10] Matthew also has records with DCF showing substantiations of neglect by DCF of his two sons Salvatore Lodice and Dominic Lodice. Matthew was also arrested for 2 counts of felony Risk of Injury to a Minor in relation to this case and subsequently plead guilty and was convicted of 2 counts of reckless endangerment. On 7/25/22, Ms. Antar filed a Motion #202, for order of psychological examination for Mr. Lodice, stating that he has "substantial mental health issues that are currently being left untreated, in addition to significant alcohol and substance abuse issues. He has refused to get therapy and refused to get help for his mental health issues. I am asking that the court order a full psychological examination and a full drugs test to be performed on the defendant to evaluate his fitness to continue to have unsupervised visitation with the child and to continue to take her for weekends at a time." Although Ms. Antar's motion was filed 319 days ago, Judge Grossman never ruled on it, and to this day it remains as a motion that has not received any subsequent ruling or order. **(See item#202 Re: NNH-FA19-5046828-S).**

[11] The agreement stated that visitation would change in January 2020 to being "worked out by the parties on a week-by-week basis" due to the father's erratic work schedule and inability to parent the infant minor child. Father was also ordered to allow Mother to obtain a passport.

[12] Ms. Janes, upon reception of court-ordered signed releases from both Mr. Lodice and Ms. Antar, provided both Annamaria Baranowski of Family Relations and Ms. Antar with a written report regarding nature and details of treatment for both parties in the joint therapy sessions. **(See e-filed case exhibit # 86).** Ms. Janes stated that she gave this information to Ms. Baranowski in January of 2023. However, Ms. Baranowski failed to include any of these records that Ms. Janes provided when she gave her report to the court on 4/5/23. Ms. Antar also sent this documentation to Ms. Baranowski via email on 5/31/23, however Ms. Baranowski stated that she was instructed by her boss, Judge Grossman, that she was not

Mr. Lodice and Ms. Antar decided to get back together, and Mr. Lodice moved back into Ms. Antar's home in Orange, CT, where he resided with her and her two children until 6/21/20. During this time, although Mr. Lodice and Ms. Antar were working on their relationship with therapy and trying to be together as a couple, neither party ever sought to modify any of the court orders that were in effect in New Haven Superior Court at that time. Mr. Lodice continued to pay his court-ordered child support in the amount of $120.00 per week and 50% of all childcare and medical costs. He also contributed significantly to the household expenses and regularly helped Ms. Antar financially. He frequently would threaten that if Ms. Antar did not comply with his demands that he would "take her back to court to lower the child support."

Six months after Mr. Lodice left Ms. Antar's home, In December of 2020, Ms. Antar, after being advised by Officer Jeffrey Fernandez from the Orange Police Department, attempted to file for a civil restraining order against Mr. Lodice after he entered her home in the middle of the night while intoxicated. Ms. Antar attempted to do this pro-se and filled out the application and the affidavit to the best of her abilities. She showed zero exhibits during the hearing and Mr. Lodice showed some exhibits.

A restraining order hearing and family services report was done, which showed that Mr. Lodice has four convictions for violent crimes on his record, including Breach of Peace 2nd degree, Breach of Peace 2nd degree, Violation of Conditions of Release 2nd degree, and reckless endangerment 1st degree. (See State v. Lodice H17BCR120054259S,

---

allowed to accept or take in any documentation or anything unless it was court ordered and specifically ordered by Judge Grossman.[12] On 12/1/22, Judge Grossman ordered that both parties were required to sign releases for their respective therapists, but did nothing when she heard that Mr. Lodice refused to sign releases on his individual therapists. **(See e-filed case exhibit #78).**

H17BCR120054344S, H17BCR130055510S, and U04WCR170448484S) The restraining order hearing family services report also showed that Mr. Lodice had four expired restraining orders on his record from previous relationships. Mr. Lodice's risk assessment gave him a high risk score of 14. Ms. Antar's restraining order application was granted on an ex-parte basis and was subsequently denied after the hearing which took place the next day. The judge stated that "Applicant has failed to met her burden of proof." (See NNH-FA20-5049515-2)

On 3/1/2021, Ms. Antar filed another application for a restraining order against Mr. Lodice after he continued to harass her and her new romantic partner at the time. Mr. Lodice sent hundreds of text messages and emails that included sexual and pornographic images and other disturbing messages, and was begging Ms. Antar repeatedly to take him back. He also continued to stalk her and this was also reported to the police who advised Ms. Antar to file for a restraining order. The restraining order was granted on an ex-parte basis and a hearing was set for 3/8/2021. During the hearing on 3/8/2021, Ms. Antar appeared pro-se and was not prepared for the hearing as a pro-se litigant. Ms. Antar did not have all of the documentation and proof ready to be submitted, although all of it was in her phone and available. The judge informed Ms. Antar that if Mr. Lodice continued to exhibit the harassing and stalking behavior, that she was advising Ms. Antar to apply for another restraining order if the behavior happened again. As soon as Ms. Antar got back in her car after the hearing, she already received multiple emails from Mr. Lodice showing that he had purchased her a bouquet of flowers, and he was once again begging her to be with him and claiming he was in love and wanted to be back together. **(See e-filed case exhibit 96)** Ms. Antar continued to document everything and saved everything as evidence, however did

not immediately seek another restraining order after feeling embarrassed and shamed for applying a second time, despite Mr. Lodice exhibiting the behaviors immediately after the hearing ended.

On 3/5/2021, Mr. Lodice filed a motion #114 for contempt against Ms. Antar that included multiple false allegations against her. He filed this motion 15 months after the final judgment was entered in the case, and he was the first one to file a post-judgment motion in the case. Three days later, on 3/8/21, Mr. Lodice filed another post-judgment motion #116 in the case, this time for a post-judgment motion for modification of child support, custody, and visitation. Mr. Lodice also filed a motion for a fee waiver #117 on 3/5/21 in which he claimed he had a monthly income of $0.00[13] per month. During this time, however, financial records show that Mr. Lodice was continuing to receive unemployment which he received from March 2020-September 2021 consecutively. Child support payments were deducted from the unemployment regularly during this time. Child support only was paid when it was deducted directly from his check by John Casanova from 11/2019-12/2020, and then when it was deducted directly from unemployment from 3/2020-9/2021. Other times when payments were made were when they were taken from his tax return or when he was incarcerated and a purge amount was set.

Over the course of 2021, Mr. Lodice also started his construction company Whole House Remodeling Company LLC, which he started in April 2021. During this time, he also was

[13] During this time, Matthew was receiving unemployment and his child support was being deducted directly from the unemployment. He lied on his fee waiver and claimed to have no income, despite receiving over $900/week in unemployment at the time through the pandemic unemployment assistance program. He also claimed to have $500 a month in rent expenses, despite living in his mother's basement at the time and not paying any rent. His explanation for how he was able to support himself without any income was "I just lost my job and live with mother. Been living off reserves but running out."

also still collecting unemployment. Discovery of his financials show that from 2021-2022 his deposits in his personal and business accounts exceeded $300,000.00. He paid less than $4000.00 in child support during that time. On 3/12/21, Ms. Antar filed her first post-judgment motion in the custody case #118, along with #120 motion for modification.

On 6/18/21, Ms. Antar and Mr. Lodice drafted an agreement outside of court that was later submitted for court approval and entered in as a modified judgment in the case. The court found that the agreement was in the best interest of the child. After unemployment ended and Mr. Lodice stopped paying child support, Ms. Antar filed a motion for contempt #130 and a motion for modification #132 on 11/29/2021. Ms. Antar was seeking that Mr. Lodice be found in contempt for his willful refusal to pay child support, that the child support be increased due to his substantial increase in income, and that the visitation schedule be modified so that the exchange location would be changed.  A hearing was set for 2/10/2022 regarding the motions and was later continued after Ms. Antar filed for a continuance to 4/12/2022.

In January of 2022, Ms. Antar began receiving mental health treatment services with Healing Springs Wellness from a provider Lancia Blatchley, after having had a hard time finding a therapist who was a good fit during the pandemic due to several of them missing zoom appointments. Ms. Antar has been seeing Ms. Blatchley consistently for therapy services over the last 18 months, and has made significant progress and followed all recommendations.

On 2/11/22, Ms. Antar filed her third request for relief from abuse[14] in the form of an application for a temporary restraining order against Mr. Lodice. The application was denied, and a hearing was scheduled. Ms. Antar was unable to attend the hearing due to a schedule conflict and Mr. Lodice attended. This hearing took place in front of Judge Jane Grossman, and her first impression[15] of Mr. Lodice was created when she saw him by himself and spoke to him on an ex-parte basis without Ms. Antar present in February 2022. **(See e-filed case exhibit   )** On 2/14/22, Ms. Antar filed another motion for contempt regarding several court orders that Mr. Lodice was not following. This motion was also set to be heard on the 4/12/22 hearing. On 2/28/22, Support Enforcement Services also initiated a contempt against Mr. Lodice for his failure to pay court-ordered support. On 3/9/22, a hearing[16] was set before the Family Support Magistrate regarding Ms. Antar's motion for contempt and motion for modification of child support.

---

[14] Mr. Lodice continued to use coercive control and emotional/psychological/financial abuse toward Ms. Antar, and they continued to engage in sexual relations on occasion. Mr. Lodice made it clear that he would provide Ms. Antar with additional financial support and provide financially for Angelina if they remained engaging in sexual relations, but made it clear that he would stop all financial support if those relations stopped. Ms. Antar became pregnant with a second child by Mr. Lodice and notified him of this in early December of 2021. At that point, Mr. Lodice became even more emotionally abusive and began to exert even more coercive control and abuse toward Ms. Antar. Ms. Antar eventually lost the baby and was attempting to grieve the lost without being subjected to harassment and continued abuse from Mr. Lodice.

[15] This inevitably may have caused Judge Jane Grossman to develop an initial prejudice or plant a seed of bias against Ms. Antar since Ms. Antar did not appear for this initial hearing which Judge Grossman was assigned for the first time involving the parties. Ms. Antar was the applicant and did not show up, and the restraining order ended up being denied as a result. However, the affidavit that Ms. Antar provided and the information therein was never used against Mr. Lodice or considered by the court in any future proceedings regarding the evaluation of his custodial abilities.

[16] During this hearing, Ms. Antar was 5-10 minutes late to the court room and was delayed by trying to find sufficient parking. The hearing commenced in Ms. Antar's absence, and Mr. Lodice appeared before the Family Support Magistrate with Angelina Lodice, who was 2 years old at the time.

Mr. Lodice lied several times while under oath during the hearing on 3/9/22, including about his address, which he stated was "48 Quarry Hill Rd, Waterbury, CT". He also made additional false allegations on the record while under oath regarding Ms. Antar, such as "her mom just doesn't take her" and was then given legal advice by the Judge Jennifer S. Aguilar who asked "Do you want her to stay in your house full time?" and when Mr. Lodice stated "yes" she directed him to "go downstairs to the first floor" where she instructed him to file motions to modify custody so that he could be the custodial guardian and be exempt from paying child support. However, Mr. Lodice's allegations that Ms. Antar was refusing to take the child were untrue, and he lied under oath and showed no evidence to back it up. The child support hearing was continued to 6/1/22.

After being advised to file for sole custody by Judge Jennifer S. Aguilar **(See e-filed case exhibit 47)**, Mr. Lodice filed motion #142 Motion for Modification in New Haven Superior Court and alleged that "Since the date of the order, the circumstances in this case have changed substantially, as follows: The mother stopped taking child and father has majority of time." And sought to modify custody as follows: "Father to become custodial parent full custody" and to modify visitation as follows: "to be determined when father has custody based on mother's ability." Mr. Lodice's allegations that Ms. Antar was refusing to take Angelina and that he had her full time were baseless allegations that he failed to prove in subsequent hearings. He failed to meet the burden of proof[17] to show that Ms. Antar ever

---

[17] However, despite the overabundance of evidence demonstrating that Mr. Lodice's claims were baseless and untrue, Judge Jane Grossman still entered an order on 5/31/23 which resolved the motion #142 and awarded Mr. Lodice sole legal and physical custody and put Ms. Antar under a restrictive court order that she could only see Angelina under supervision only when Mr. Lodice allowed and solely on his terms. Despite Mr. Lodice failing to prove that Ms. Antar was unfit as a mother or that a significant change had occurred which would

stopped taking the child or that he had her most of the time. He also never presented any

evidence. There were several instances in which Mr. Lodice refused to give Angelina to Ms.

Antar on the scheduled exchange day and police reports were made to document each of

those instances. Mr. Lodice also has several documented instances[18] of abuse, neglect,

and convictions of violent crime on his record with DCF and in his criminal record.


**Evidence of Bias, Fabrications, Harassment, and Prejudice during 4/8/22 hearing**


On April 8, 2022, Judge Jane Grossman first saw both the Plaintiff Theodora F. Antar and

the Defendant Matthew J. Lodice before her regarding Plaintiff's motion #145 that was filed

on 3/17/22 for an application for emergency ex parte order of custody. The hearing took

place on 4/8/22, and prior to that Judge Jane Grossman had never presided over any court

proceeding that involved Ms. Antar ever before. Judge Grossman did, however, previously

see Mr. Lodice alone in February for the TRO hearing and only heard what he had to say

on that day since Ms. Antar was absent. **(See e-filed case exhibit    )**

During the 4/8/22 hearing, Ms. Antar asked Judge Grossman if it would be okay if she read

a statement that she prepared for the court in advance. Ms. Antar felt that, per ADA

---

warrant such a drastic change, Ms. Antar was given no set visitation time or access
schedule with Angelina and was left at the mercy of Mr. Lodice to try to see Angelina.
[18] See e-filed case exhibit #8 "Matthew risk of injury to a minor police report"; See also e-
filed case exhibit #30 "Monica Lodice Emergency ex-parte application against Matthew
Lodice"; See also e-filed case exhibit #36 "Matthew Background Check"; See also e-filed
case exhibit#23- State v. Lodice arraignment hearing transcript; See also e-filed case
exhibit #31 "4/14/23 hearing State v. Lodice"; See also e-filed case exhibit #94 "State v.
Lodice 3/1/23 hearing transcript" See also e-filed case exhibit #28 "transcript from 5/1/23
State v. Lodice hearing"; See also e-filed case exhibit #27 "Police Report Waterbury PD
4/27/21 Re: Matthew withholding Angelina & harassing me.

requirements, that this was a reasonable accommodation and request, especially as a pro-se litigant. Judge Grossman said "if it's easier for you to read, that's fine. It's just that I might interrupt with questions." Judge Grossman then interrupted and said "Ms. Antar, I'm gonna stop you and the reason – Listen. Listen to me. The reason I'm gonna stop you is because you filed a motion telling me there was a present emergency. So what's the – thing that's happening right now?" **(See e-filed case exhibit 70)**

Ms. Antar stated "I thought that to make it more clear for the court because there's multiple things that were filed and I just want to just kind of –" when she was again interrupted by Judge Grossman who said "Okay. I have your file in front of me." However, Judge Grossman had never ruled on any prior motions in our file, and was a newly assigned Judge at that time to New Haven Superior Court.

Ms. Antar offered credible testimony on this date and informed Judge Grossman of the fact that Mr. Lodice was not following court orders, that he was making more money, and that he was refusing me access to Angelina and withholding her from me. Ms. Antar also testified during the hearing and told the court that:

*"Mr. Lodice has also lied to the court about his address. His current address is 23 Lyman St, New Britain, CT. He has lived there since January 1, 2022. He continues to lie to the court and continues to tell them that he lives with his mother at 48 Quarry Hill rd in Waterbury, Connecticut… He has regularly stated that he plans to tell the Court that he has no income and no money and claims that this is the reason why he has not paid a single dollar of his Court ordered child support since November 20, 2021. He has not paid a single cent toward Court ordered childcare payments since January 15, 2022. I have sent him certified letters documenting all childcare payments that I have been paying to our private*

*babysitter who watches our daughter regularly. Matthew has refused to pay his 50 percent portion forcing me to incur 200 percent of all financial responsibility for our daughter and forcing me to pay 100 percent of the childcare cost to be able to work. He has shown great disrespect to the court and has disregarded every court order that has been issued."* **(See e-filed case exhibit 70)**

Ms. Antar also informed Judge Grossman during the hearing that "Mr. Lodice has been abusive to me regularly, calls me names, and disrespects me when I attempt to speak to him via phone. He has done this in the presence of both of my children every time I try to talk on the phone. I notified him that due to this, I would only feel comfortable communicating via email and only regarding the minor child with the exception of an emergency." **(See e-filed case exhibit 70)**

Ms. Antar further testified[19] about several factors which were concerning about Mr. Lodice, including the fact that he had "shown no interest in her education … cancelled [an] appointment for our daughter without my consent and then refused to take her to a dentist appointment … I have made and scheduled every single medical appointment for Angelina since she was born. I have taken the time to sign her up at doctor's offices, follow up with her care, and make sure her health is my priority. Matthew has done none of the above and has shown disregard for her by cancelling her appointments which was necessary for her to attend." Judge Grossman then showed clear bias and ordered Ms. Antar to put away her

---

[19] Ms. Antar continued to try to read about the requests for what she was asking to modify, since the clerk's office stated that the emergency ex-parte motion for custody would be heard along with the motion for modification that they required her to file at the time of filing the ex parte, and since she felt it was a reasonable accommodation to be able to read to have an organized train of thought, but she was once again interrupted by Judge Grossman.

prepared statement that she wanted to present to the court, and said "All right. Ms. Antar, listen to me. I want you to put that away. You're here on an emergency motion.[20]"

Judge Grossman then demanded for a second time that Ms. Antar remove her notes, and said "Put that away. What's the emergency?" At this point, Ms. Antar was feeling that Judge Grossman was discriminating against her for her disabilities as well as for the fact that she was a pro-se litigant. Ms. Antar felt intimidated by Judge Grossman at this point as she was making orders and her tone was demeaning and condescending.

Ms. Antar then testified further about the fact that Mr. Lodice had been withholding Angelina and alienating her from the mother, and said "Well, the emergency … was that he wasn't giving me back my child which is what I stated earlier, that she has now been returned to me. But when I filed that emergency motion, they told me I'd be also filing a new modification with it which was gonna be part of this." Judge Grossman then said, "Right, but I'm – but I'm not hearing that today." She refused to hear any of Ms. Antar's concerns regarding the motion for modification that the clerk's office stated would be heard consecutively with the emergency ex-parte motion, and claimed that those issues would be heard at a future hearing date on 4/12/22. Ms. Antar had never filed an emergency ex-parte order of custody prior to 4/12/22 and was unaware of the procedural requirements and had relied on the clerk's office for information historically prior to that. Ms. Antar further testified and described the emotionally abusive behaviors that Mr. Lodice would subject her to,

---

[20] Judge Grossman didn't take into account the ADA regulations about accommodations and denied Ms. Antar the ability to testify and read off notes while testifying, the same privilege that she allowed Mr. Lodice to enjoy during the future hearing of 5/25/23, during which she silenced Ms. Antar and didn't allow her to testify or produce any evidence or be sworn in.

including that "to try to retaliate against me, he's saying either you meet me at this gas station … or I'm gonna say that you abandoned Angelina, and I'm gonna file for sole custody … and you're gonna pay me child support." **(See e-filed case exhibit 70)**

She then described another incident during which Mr. Lodice told her she could go to the address at 48 Quarry Hill Rd, in Waterbury, CT to retrieve Angelina, but when she arrived nobody was there. A police report was filed and Ms. Antar told Judge Grossman that "They went there. They spoke to the homeowner who is Roy Bowers who is Matthew's stepfather and Roy Bowers stated to the Waterbury Police that Angelina was not there, that Matthew has not lived there, and Angelina has not lived there with Matthew since December." **(See e-filed case exhibit 70)**

Even after Ms. Antar gave credible evidence through testimony that Mr. Lodice had lied both on 3/9/22 and on 4/8/22 while under oath and committed perjury by lying about his address, Judge Grossman still did not hold it against Mr. Lodice in any way. She asked him "where do you live, sir?" after he had already stated for the record that he lived in Waterbury, and he said "I moved to New Britain last month." However, he had moved in January of 2022, which was four months prior, and continued to lie to the judge while under oath. She said "You just moved last month?" and when Ms. Antar tried to say that "under oath he said he lives in Waterbury" Judge Grossman instead said to Ms. Antar "Don't Interrupt, please. Hey. Hey." Which to Ms. Antar seemed as if Judge Grossman was scolding her as if she was a child. Ms. Antar felt intimidated at this point because not only did she point out that Mr. Lodice was committing perjury but Judge Grossman did not

penalize[21] him in any way for doing so, and instead reprimanded Ms. Antar for

"interrupting". **(See e-filed case exhibit 70)**

During this time, Ms. Antar also testified that she was "in the process of signing [Angelina]

up for a daycare located in Thomaston, CT." which she was selecting so that it could be

convenient for both parents in that it was closer to Mr. Lodice's area than her own and she

was trying to be accommodating. Ms. Antar then explained that by changing the drop off

location that it would reduce any "drama of arguing and seeing each other all the time" to

which Judge Grossman then said "Okay. Stop. Stop." And once again interrupted Ms. Antar

and refused to listen to her concerns that were relevant to the issues.

Judge Grossman also said that "your child shouldn't spend hours in the car driving around

the state cause her parents can't agree on the location." **(See e-filed case exhibit 70)**

Then, Mr. Lodice interrupted Ms. Antar in the middle of her testimony and said "So now.

But, your Honor—" and she said "Well, what's—" and then allowed Mr. Lodice to interrupt

her and he said "—she made a lot of allegations against me. I would like to at least be able

to rebut some of those. I mean—" to which Judge Grossman did not scold him in any way

or reprimand him in any way for interrupting her or for interrupting me. She said "There's

no—" and Ms. Antar said "she doesn't care about that" to which Judge Grossman became

enraged and said "Hey. Hey. Ma'am." And scolded Ms. Antar again. Even after Ms. Antar

apologized and said "I'm sorry. I just feel like—" and Mr. Lodice said "I mean –" Judge

Grossman then said "Listen to me" and Ms. Antar tried to say "I didn't get to finish reading

---

[21] Rather than be concerned about any of the testimony that Ms. Antar gave, Judge Grossman instead completely dismissed it all and was seemingly being prejudiced against Ms. Antar for being a woman and for being a pro-se litigant.

all the stuff I was saying about him and he – and he says all this false stuff about me." **(See e-filed case exhibit 70)**

Judge Grossman then was getting more angry and said "Stop. Okay. Listen, there is no emergency. The emergency has been resolved. You two are obviously not behaving very well with each other. That will get addressed on your April court date." Mr. Lodice then proceeded to lie under oath further and made false allegations stating "I'll have issues where she won't be at that—I—there won't be a daycare, and then I'll go there and she'll be, like, I didn't sign her up. You can just keep her. Like, I have papers of her refusing Angelina six different times." And Judge Grossman said "ok" and then allowed Mr. Lodice to continue to interrupt her and he said "—on Mondays. This is why I wanted to, like, say my end. So, like –" **(See e-filed case exhibit 70)**

Judge Grossman was respectful and patient with Mr. Lodice even when he interrupted her, and said "All right. Well, we're not—listen, we're not gonna get into any of that because there is no emergency." Mr. Lodice then made a comment in response to Judge Grossman and said "but there is no daycare yet neither." And she was very nice to him and said "Well, I – I understand that." Ms. Antar attempted to speak and said "Your Honor, may I—may I comment on that—" and Judge Grossman coldly[22] replied "No. No. No. You can stop talking, young lady. You have interrupted me, like, three times. I kick people out of my courtroom for interrupting, so I want you to stop." Even after Ms. Antar again apologized, Judge Grossman still said "Listen to me… you cannot do this to your child. This is a disaster. You two have to get on the same page… I agree that you need a schedule, so

---

[22] Ms. Antar felt extremely intimidated by Judge Grossman at this point since there was a clear discrepancy in the way she dealt with minor interruptions from Mr. Lodice and the way she dealt with them from her.

that you both know when your child is going to be with each one of you. And I agree that you should probably change the pickup and drop off location." Judge Grossman then interrupted Ms. Antar again and said "Don't" and warned her about interrupting, but later allowed Matthew to interrupt her multiple times when he said "yeah. But is her mom—" "What happens when her mom says I'm not taking her today?" **(See e-filed case exhibit 70)**

Mr. Lodice then lied under oath again, and said "I have two other children with my ex wife and I'd have to drop them off. I'm court ordered[23] to drop them off at school on Monday mornings in Southington."

Judge Grossman then allowed Mr. Lodice to interrupt her again without saying a word to him, when he said "but she got to go there to bring her to daycare" and when Ms. Antar said "no. I –your Honor, may I please?" and politely asked for permission to speak, Judge Grossman angrily said "All right. Okay. Okay. Nope. Nope. We're all done." As if she was speaking to a child. Ms. Antar pleaded "I just wanted to say one thing, please" to which Judge Grossman said "No. We're all done. There is no emergency. The emergency motion is denied. And we will see you two in April. And that is it. And I want you to listen to what the –think about the lecture I gave the last family. Do you really want a stranger, another judge, making decisions about when you see your children? You two have to find a way to get on the same page here. Your daughter deserves that from both of you. But you guys are not even really listening to each other, and you can't raise a child like that. So in terms

---

[23] However, there is no court order that he must drop them off and he again lied under oath and was believed at face value despite evidence in court records to the contrary. This again showed bias on Judge Grossman's end toward Mr. Lodice since she never questioned him about anything or asked to see evidence or even validated that he was lying. **( See e-filed case exhibit 93)**

of today, the emergency motion is denied. There's no emergency. Your motion for modification will move forward, ma'am. You have a court date for it. And we'll address those things in the regular course of business. That's it. You folks are excused." **(See e-filed case exhibit 70)**

Ms. Antar felt that there was clear and convincing evidence of the fact that Judge Grossman was biased in favor of the Defendant Mr. Lodice and that she never spoke to him in the manner she spoke to Ms. Antar, nor did she use the tone she did with her or deny him any accommodations per ADA standards for pro-se litigants or those with disabilities.


**<u>Comparison to the April 12, 2022 Hearing with Judge Maureen Price- Boreland</u>**


On April 12, 2022, the parties appeared in front of Judge Maureen Price-Boreland **(See e-filed case exhibit 101)**, after meeting with family relations. A fair and equitable agreement was reached between the parties and it was entered in as a modification of judgment. During this hearing, Judge Maureen Price-Boreland was very fair to both Mr. Lodice and Ms. Antar, and listened and gave sound advice to the parties regarding the case. When Mr. Lodice attempted to be unreasonable during the hearing, she said "Reasonable people—reasonable people realize that circumstances change and make reasonable adjustments. This is gonna be another 16 years that you guys need to work together to basically parent your child. Circumstances are gonna change. If one is reasonable and the circumstances seem reasonable, a minor adaptation to the pick-up place is not a big deal; it's not. And those are things that somehow you guys have to start—got to start working on."

During this hearing, Mr. Lodice attempted to argue with the judge, despite her efforts to be reasonable and fair. Mr. Lodice claimed that all of these issues "come down to the money" to which Judge Maureen Price-Boreland replied "So, listen, young man. When the court enters an order for child support, that's what you pay. You don't get to change it. You don't get to change it until you have asked the court for a modification and the court basically hears the facts under the basis for which its modified. Your obligation for your child is your obligation." **(See e-filed case exhibit 101)**

Ultimately, Mr. Lodice told Judge Price-Boreland that he still wanted to pursue taking Ms. Antar for sole custody, and she stated a half-day hearing would be scheduled in the future for that. No court date was given at that time.


**<u>Evidence of Bias, Harassment, and Prejudice in Judge Grossman's orders and procedural actions</u>**


- On 3/10/22, Mr. Lodice filed a Post-judgment motion for modification of custody and visitation. The motion was never served, and no return of service was ever put on file with the court. On 5/31/23, Judge Grossman entered an order on the motion that stated: "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- 3/17/22, Ms. Antar filed entry#146.10 Post Judgment motion for modification of custody and visitation. The motion was never ruled on.

- On 3/17/22, Ms. Antar filed an application for emergency ex parte order of custody. The hearing was supposed to be scheduled within 14 days. The hearing was scheduled for 4/8/22, which was 22 days later.

- On 3/17/22, Ms. Antar's motion to modify was also coded as entry#148, which was a motion to increase child support. Judge Grossman, despite it being a IV-D case, entered in a final judgment order on the motion on 5/30/23 which states "See Agreement #153." Agreement #153 says absolutely nothing in regard to this. On 5/31/23, Judge Grossman entered a second final judgment order on the motion to increase child support and put "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 3/30/22, Ms. Antar filed entry#152, Motion for order re: discovery motion or request pb ch13 where she asked for mandatory disclosure and financial discovery from Mr. Lodice. On 6/29/22, Judge Grossman put in an order that stated the following: "In light of the order concluding the pending contempt and vacating the July 11, 2022 court date the request for financial discovery is denied[24]."

- On 4/18/22, after being told by the clerk's office that motion#142 was being heard in magistrate court, Ms. Antar filed entry#156 which was a caseflow request, in which she asked that "motion #142 be sent to family and not magistrate since it only involves custody. This motion only involves custody and should be heard in our family docket."

---

[24] She did this, despite having told Ms. Antar that she would put in orders for the discovery request. She denied it after the magistrate clearly continued the 7/11/22 date to 9/12/22 to allow for time for the discovery. Ms. Antar felt this was a clear retaliatory move based on the clear bias that Judge Grossman had shown in the 6/28/22 hearing against her.

Judge Grossman, likely to harass/inconvenience Ms. Antar, immediately denied Ms. Antar's caseflow request and put as her reason on the order that "Motion #142[25] is a request to modify child support." However, it should be noted that motion#142 was not a motion to modify child support. It was the Defendant's post-judgment motion to modify custody in which he asked for "father to become custodial parent and have full custody with mother's visitation determined based on mother's ability."

- On 4/18/22, Ms. Antar filed entry#157 Contempt citation issued post judgment. This was in regard to several instances of Mr. Lodice willfully violating the court orders. On 5/30/23, Judge Grossman issued a final order on the motion that said "The plaintiff has filed to prove, by clear and convincing evidence, that the defendant violated court orders. The motion for contempt is denied." However, Ms. Antar did prove that he violated several of the orders during the 6/28/22 and subsequent hearings. Judge Grossman chose to ignore all of the evidence showing that Mr. Lodice violated all of the orders that Ms. Antar mentioned. Judge Grossman then, the next day, on 5/31/23, put in a second final order on the motion which stated: "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 4/25/22, Ms. Antar filed a second caseflow request entry #158, in which she requested an earlier hearing date because "on 4/12/22 the Judge ordered the defendant to download Our Family Wizard app for all communication regarding the child by

---

[25] This particular motion was also never served on Ms. Antar, nor was there a return of service on file with the court.

4/15/22. Judge also ordered defendant to pay child support by 4/15/22 at 6:00PM. I filed motion for contempt because defendant still has not downloaded the app and is refusing to download or pay for it despite being court ordered to do both. I also filed a motion for modification of custody and child support. It is now 4/20/22 and he as not downloaded the app. Our hearing for both of these motions that I filed on 4/18/22 is set for 6/28/22, however we were also ordered on 4/12/22 to have a joint birthday party and split the costs equally which is to take place on 5/21/22 for our daughter. Defendant is refusing to communicate via the app and I have no way to communicate with him regarding planning the party for the child. I am requesting a date prior to 5/21/22." Judge Grossman denied Ms. Antar's caseflow request, and did not provide a reason or explanation for her denial.

- On 4/25/22, Ms. Antar filed entry# 159 Motion to reargue/reconsider, in which she stated "The Plaintiff Theodora F. Antar moves that the court reconsider the Plaintiff's caseflow request to move the defendant's motion#142 filed on 3/10/22 by the defendant Matthew John Lodice for a Post-Judgment Motion for Modification-Custody, Visitation, to family court because: The defendant's motion for modification asks to modify only custody. In his motion #142, the defendant asks that custody be modified so that he has sole custody and asks that visitation be modified once he gains sole custody and seems mother's ability for visits. This motion does not ask to modify child support or mention child support in any way. My caseflow request to move motion #142 to be heard in family court was denied with the reason for denial stating that the modification involves child support. However, after looking at the motion#142, it does not mention child support at all, and is strictly a motion filed by the defendant to modify custody of the

minor child. I currently have primary residency and father and I share joint custody. His motion #142 has nothing to do with child support at all, and should be heard by a family judge to determine who should have sole custody of the minor child with a trial as stated at our court date in family court on 4/12/2022. I am requesting that motion #142 filed by the defendant be heard in family court at a scheduled half day hearing as we were told, and not on 6/1 in front of the magistrate as it is currently scheduled for. Wherefore the Plaintiff prays judgment granting this action." One month later, on 5/25/22, Judge Grossman denied Ms. Antar's motion to reargue/reconsider. She did not provide a reason or explanation for her denial.

- On 4/29/22, Ms. Antar filed a motion to modify custody asking for sole custody of Angelina. The motion was scheduled to be heard on 6/28/22. On 5/31/23, Judge Grossman entered an order on the motion that stated: "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 5/20/22, Ms. Antar also filed a motion for modification asking for sole custody. Judge Grossman's response to both the motion to modify and the motion to dismiss was to issue an order on 5/31/23 which granted Mr. Lodice's motion #142 and permanently removed all of Ms. Antar's parental rights and restricted her to no access with the child unless under strict supervision and only if and when the Defendant allows, while also allowing him to deny the child access to medical, mental health, religious, and educational care.

- On 5/20/22, Ms. Antar filed a motion for contempt on that contained information regarding Mr. Lodice's willful disobedience of multiple court orders. Judge Grossman denied this motion for contempt on 6/28/22 and put "See order of the court dated 6/28/22" which only referenced one of the many violations that were cited on Ms. Antar' contempt motion.

- On 5/25/22, Ms. Antar also filed a motion to dismiss for insufficiency of process and service of process regarding motion#142 that she was never properly served on. Judge Grossman never acknowledged, ruled on, or scheduled a hearing on this motion, nor did she hold it against Mr. Lodice for his improper service on Ms. Antar.

- On 5/25/22, Ms. Antar submitted a separate application for waiver of fees on that consisted of identical financial information that the one from 5/31/22 included, and it was granted on 5/26/22 by Donald Green, FSM, without asking Ms. Antar for any proof of income.

- On 5/25/22, Ms. Antar filed entry#180 Contempt citation issued post judgment on regarding Mr. Lodice's refusal to follow court orders related to Angelina's religious life and Judge Grossman denied the motion on 6/28/22 immediately after a hearing without any explanation as to why she denied it in the denial. During the clear she made it evident that she was biased and prejudiced against Ms. Antar on the basis of her religion.

- On 5/31/22, Ms. Antar filed a motion for fee waiver in which she put that her monthly income was $1200.00 per month at the time. Judge Grossman then showed extreme bias when she denied the fee waiver and wrote "Denied. Applicant should provide most

recent pay statement[26]. Application does not match testimony from April 8, 2022 hearing." Nobody has ever once required Mr. Lodice[27] to provide pay statements or proof of income, even when he regularly states that his income is $0/month on his fee waivers.

- On 6/27/22, Ms. Antar filed a motion for a continuance requesting that the hearing be postponed to 8/9/22 so that she could have time to get the remaining discovery and transcripts and time to hire counsel. Judge Grossman denied the request immediately and did not list any reason for the denial.

- On 6/28/22, after a hearing, Judge Grossman issued "temporary" orders that stated the following: "The parties appeared before the court on multiple post judgment motions. After receiving testimony and evidence from both parties the court orders as follows. The plaintiff mother's request to modify the custody and access order (#165) is referred to Family Relations for screening as services as recommended. The court declines to hold the father in contempt for issues regarding Our Family Wizard (OFW). The record indicates he downloaded the OFW app and paid the costs for both parties. He did do so several days after the court order, however, the court credits his testimony that the costs were higher then he initially planned for. The court declines to hold the father in contempt for issues regarding the child's birthday party. The evidence indicates the mother told the father the party was cancelled on OFW messages three weeks prior to

---

[26] To Ms. Antar's knowledge, the court has never asked her or anyone else she knows for proof of income ever before until Judge Grossman mandated it for just Ms. Antar, showing a clear bias.

[27] For reference, On 3/9/22, Mr. Lodice put in his fee waiver that his gross income was $500.00 a month. However, 3 months later he testified to Judge Grossman that he spends $600/week on gas and groceries alone. He was never once asked to provide proof of income or documentation.

the party date. Temporary orders[28] regarding the custody and access of the minor child are ordered as follows: The court reiterates that under the existing orders the father is required to bring the child to special religious events and Sunday school but not weekly Sunday church services. Motion #180 is denied. The parties are ordered to respond to Our Family Wizard messages within 24 hours. The nightly phone calls the child makes to the parent they are not with may occur at any time between 7:00 to 7:15. Neither party is permitted to record the child's phone calls with the other party. The mother will bring the child to the home of the paternal grandmother on Fridays between 9:00 and noon. The father will bring the child to day care on Mondays at any time consistent with the day care policies. Motion #163 is denied."

- On 6/29/22, after Family Relations Counselor Lisa Zappone requested that the couple do mediation, Judge Grossman approved the request.

- On 6/29/22, Ms. Antar appeared in front of the magistrate court for the hearing that was set on the conclusion of the purge that was placed on Mr. Iodice on 6/1/22. During that hearing, Ms. Antar asked the magistrate if they could continue the motion for modification to increase child support until September so that it would scheduled after the motion for financial discovery is ruled on, and the magistrate agreed to do so. They moved the hearing date from 7/11/22 to 9/12/22 to give time for the discovery to be received and reviewed. The same day, Judge Grossman put in an order that stated the

---

[28] The orders were biased against the mother in that they restricted her ability to make religious decisions for her daughter by denying her the right to attend the services outside of special occasions, reduced Ms. Antar's parenting time from Friday until 5:30PM to Friday until 12PM at the latest, while also putting an unreasonable restrictive time window on Ms. Antar while allowing Mr. Iodice the freedom to drop the child off at school on Mondays as late as 6:00PM.

following: "In light of the order concluding the pending contempt and vacating the July 11, 2022 court date the request for financial discovery is denied." At this point, Ms. Antar could see a very clear and convincing bias against her, and she made a formal complaint to the state regarding Judge Grossman.

- On 6/29/22, Ms. Antar also filed entry#186 "Motion for recusal of Judge" in which she stated the following: "I am requesting that Judge Jane Grossman recuse herself from my case. She has shown severe bias against me. She has used negative body language, appears smug, smirks, laughs, and ridiculed me in court. She refused to let me speak. I asked multiple times for an attorney and she denied me that right. She allowed the Defendant to make defamatory and malicious statements about me and allowed him to speak uninterrupted, and took his testimony as fact without giving me a fair hearing or the ability to counter his claims. She did not allow me to speak my testimony and denied my claims with no legal right to do so. I believe I am being treated unfairly and am asking that Judge Price-Boreland handle this case as she entered the most recent orders." Judge Grossman's response was to issue an order on 5/31/23 which permanently removed all of Ms. Antar's parental rights and restricted her to no access with the child unless under strict supervision and only if and when the Defendant allows, while also allowing him to deny the child access to medical, mental health, religious, and educational care.

- On 6/29/22, Ms. Antar also filed another motion[29] #187 for contempt for father's failure to pay court ordered child support. In the motion, Ms. Antar wrote "Mr. Lodice was

---

[29] Although Ms. Antar's case is a IV-D Case, and all financial motions must be heard in magistrate court, Judge Grossman still maliciously entered in an order on this motion without it ever being heard on 5/31/23, in which she permanently removed all of Ms. Antar's

ordered to pay his $120 a week in child support along with the #24/a week in arrears on 6/1/22. He was incarcerated and paid a purge. He stated he will not pay anything unless it is a purge. He has paid $0 since 11/20/2021 except for the purge. He is refusing to pay his weekly payments and arrears."

- On 7/5/22, Ms. Antar also filed a second motion to dismiss in regard to Mr. Lodice's failure to properly serve her with the motion or return notice of service to the clerk. Judge Grossman never ruled on the motion.

- On 7/6/22, Ms. Antar also filed a motion for contempt post judgment that referenced several issues in which Mr. Lodice violated the court order. The motion was set to be heard on 9/8/22, and was then continued to October, and then continued to February, and then continued to April. The motion was never heard. On 5/30/23, without ever having heard the motion, Judge Grossman denied the motion and issued a final order stating the following: "The plaintiff failed to prove, by clear and convincing evidence, that the defendant violated court orders. The motion is denied." Ms. Antar never got a chance to argue that motion, and it was never heard at all. Then, still having never heard the motion at all, On 5/31/23, Judge Grossman entered a second final order on the motion that stated: "See Orders of the court re: Post Judgment Motions dated

---

parental rights and restricted her to no access with the child unless under strict supervision and only if and when the Defendant allows, while also allowing him to deny the child access to medical, mental health, religious, and educational care. Her order did not reference anything about Mr. Lodice's contempt for not paying child support, and in fact she stated that Mr. Lodice no longer would be required to pay child support to Ms. Antar and that Ms. Antar would have to come to court on 6/15/23 to have Judge Grossman make the determination of how much child support she would need to pay Mr. Lodice, despite it being a IV-D Case and needing to be heard by magistrate with Support Enforcement Services.

5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 7/7/22, after Judge Grossman denied Ms. Antar's previous request for financial discovery, Ms. Antar filed a second Motion for Financial Discovery. On 7/11/22, Judge Grossman denied the motion, stating that "This identical motion was ruled on previously." She did not give any explanation as to why she denied it the first time or why she was denying Ms. Antar the right to the mandatory disclosure that she stated she had the right to during the 6/28/22 hearing.

- On 7/11/22, Ms. Antar filed a motion for contempt in regard to the fact that on multiple occasions nobody was at the paternal grandmother's home to retrieve Angelina when it was Mr. Lodice's scheduled parenting time. The motion was set for 9/8/22, then continued to October, then February, then April. The motion was never heard. On 5/30/23, without ever having heard the motion at all, Judge Grossman denied the motion and entered into a final order that stated the following: "The plaintiff has filed to prove, by clear and convincing evidence, that the defendant violated court orders. The motion for contempt is denied." Then, still having never heard the motion, on 5/31/23, Judge Grossman entered a second final order on the motion that stated: "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 7/18/22, Ms. Antar filed a motion to compel in regard to the financial discovery and referenced the 9/12/22 hearing that was set for the motion to modify child support. Judge Grossman never ruled on that motion.

- On 7/21/22, Family services officer Lisa Zappone gave notice to the court that stated the following: This matter is being returned to the court for further direction. The parties were referred to Family Relations on June 28, 2022 for a mediation regarding custody and access of their minor child, post judgment. Ms. Antar was the only party to attend the first scheduled mediation and reported that she no longer wishes[30] to participate in the mediation process and would like further direction from the court.[31]

- On 7/25/22, Ms. Antar filed a motion to transfer citing §24-21 that mentioned that New Haven was the improper jurisdiction for the case due to the fact that neither party lived within that district. Judge Grossman never ruled on the motion.

- On 7/25/22, Ms. Antar filed a Motion for Appointment of Guardian Ad Litem for the minor child. Judge Grossman never ruled on the motion.

- On 7/25/22, Ms. Antar filed a Motion for a Mental or Physical exam requesting a mental health evaluation and drug screening be done on Mr. Lodice. Judge Grossman never ruled on the motion.

- On 7/25/22, Ms. Antar filed an application for emergency ex-parte order of custody citing concerning issues regarding Mr. Lodice's inability to proper parent the minor

---

[30] It should be noted that Ms. Antar arrived to the scheduled mediation on time and waited approximately 45 minutes and Mr. Lodice did not show up. Ms. Antar stated that she did not want to wait longer than the 45 minutes since he still did not arrive by then.
[31] Lisa Zappone then put in a request for a recommendation that the parties participate in a comprehensive evaluation and ask for access to all prior sealed CSSD-Family Services report to address the issues of custody and access of the minor child. She requested 120 days as the requested time to complete the referral. Judge Grossman approved this request on 7/22/22.

child.. Judge Grossman immediately denied the application and set it for a hearing on 9/8/22. Judge Grossman scheduled the hearing for 46 days later.[32]

- On 7/25/22, Ms. Antar filed a motion for modification with the application for emergency ex-parte order of custody. Judge Grossman entered in a final order on the motion on 5/31/23 which stated the following: "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 7/25/22, Ms. Antar filed a motion for contempt regarding several instances where Mr. Lodice was wilfully violating the court orders. The motion was never heard. It was supposed to be heard on 9/8/22, then continued to October, February, and then April. Judge Grossman still never head the motion at all. She has never ruled on this motion.

- On 8/1/22, Ms. Antar filed another motion for contempt in regard to the fact that on multiple occasions nobody was at the paternal grandmother's home to retrieve Angelina when it was Mr. Lodice's scheduled parenting time. The motion was set for 9/8/22, then

---

[32] The application stated that a hearing shall be ordered pursuant to General Statutes §46b-56f(c), which states the following: "(c) Upon receipt of the application, the court shall order that a hearing on the application be held not later than fourteen days from the date of such order for hearing. If, prior to or after such hearing, the court finds that an immediate and present risk of physical danger or psychological harm to the child exists, the court may, in its discretion, issue an emergency ex parte order for the protection of the child and may inform the Department of Children and Families of relevant information in the affidavit for investigation purposes. The emergency ex parte order may provide temporary child custody or visitation rights and may enjoin the respondent from: (1) Removing the child from the state; (2) interfering with the applicant's custody of the child; (3) interfering with the child's educational program; or (4) taking any other specific action if the court determines that prohibiting such action is in the best interests of the child. If a postponement of a hearing on the application is requested by either party and granted, no ex parte order shall be granted or continued except upon agreement of the parties or by order of the court for good cause shown."

continued to October, then February, then April. The motion was never heard. On 5/30/23, without ever having heard the motion at all, Judge Grossman denied the motion and entered into a final order that stated the following: "The plaintiff has filed to prove, by clear and convincing evidence, that the defendant violated court orders. The motion for contempt is denied." Then, still having never heard the motion, on 5/31/23, Judge Grossman entered a second final order on the motion that stated: "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 8/4/22, Ms. Antar filed a Request to Bring audio/visual equipment into the courthouse to "show video/audio evidence pertaining to my case." Judge Grossman never ruled on the motion.

- On 8/18/22, Family Services Counselor Dennis Reilly provided a second notice to the court, in which they stated the following: "This matter is being returned to the court for further direction. On July 21, 2022, this matter was referred to Family Relations for a comprehensive evaluation relative to custody and access of the minor child. An initial joint meeting was scheduled with both parties for August 16th, 2022. Ms. Antar was present for the meeting while Mr. Lodice was not present for the meeting. Family Relations offered to reschedule the initial meeting, but Ms. Antar requested that her motion for a comprehensive evaluation be withdrawn as she does not wish to move

forward with the process. At this time, Family Relations is closing the comprehensive

evaluation, due to Ms. Antar's request[33] to withdraw."

- On 10/17/22, Ms. Antar's counsel at the time filed a motion for appointment of guardian

  ad litem. Judge Grossman never ruled on the motion for over seven months. Then, still

  having never heard the motion, on 5/31/23, Judge Grossman entered a final order on

  the motion that stated: "See Orders of the court re: Post Judgment Motions dated

  5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental

  rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 10/27/22, Family Relations reported to the court that as part of their resolution plan

  they are recommending no services at this time. They stated that "Counsel on record is

  seeking a continuance in an effort to propose an agreement." Ms. Antar's former

  counsel attempted to negotiate with Mr. Lodice on multiple occasions. Mr. Lodice

  refused to negotiate.

- From 10/18/22-10/19/22, Mr. Lodice filed another seven post-judgment motions

  including motions to modify and motions for contempt. None of those motions were ever

  ruled on, with the exception of 2 fee waivers that claimed he was making only $2300 a

  month, and motion# 232, post-judgment motion for modification of custody and

  visitation. On 5/31/23, Judge Grossman entered a final order on the motion that stated:

  "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced

---

[33] It should be noted that Dennis Reilly stated to Ms. Antar that, since she had just retained counsel, that she was not required to move forward with the process if she did not want to, and that she had the option of having her attorney handle everything instead. Ms. Antar said that since it was the second time in a row that she came at the scheduled time for a mediation and waited almost an hour for Mr. Lodice and he didn't show up, that she didn't want to keep missing days of work and school to come if Mr. Lodie wasn't going to be required to show up.

the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr.

Lodice no longer had to ever pay child support. All the motions were set to be heard on

12/1/22. Mr. Lodice never showed up on that date, and Judge Grossman still didn't

deny his motions.

- On 11/14/22, Ms. Antar's former counsel submitted a proposed parental responsibility

  plan that was fair and equitable to both parties and in the best interest of the minor child

  along with a motion for contempt detailing many instances in which Mr. Lodice willfully

  continued to violate the court orders. The motion was never heard. On 5/30/23, without

  ever having heard the motion at all, Judge Grossman denied the motion and entered

  into a final order that stated the following: "The plaintiff has filed to prove, by clear and

  convincing evidence, that the defendant violated court orders. The motion for contempt

  is denied." Then, still having never heard the motion, on 5/31/23, Judge Grossman

  entered a second final order on the motion that stated: "See Orders of the court re: Post

  Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all

  of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child

  support.

- On 12/1/22, after only Ms. Antar and her counsel appeared for the hearing on Mr.

  Lodice's seven post-judgment motions, Judge Grossman entered in an order in which

  she stated the following: "The Court held a resolution plan date on 12/1/2022 where the

  plaintiff and plaintiff's counsel were present and the defendant was not. The Court finds

  the following: The case is referred to family relations for case management. The parties

  are ordered to sign releases so that family relation can have access to DCF records and

  mental health records of the parties and minor child. Between now and trial date no

more resolution plan dates or case dates will be scheduled. All pending motions will be heard on February 1, 2023. The February 2, 2023 case date is marked OFF."

- On 12/5/22, Dennis Reilly submitted a Request for Referral by Family Services seeking General Case Management. The request was to "contact DCF, current and previous mental health providers for the plaintiff, defendant, and the minor child. Information gathered should include treatment dates, diagnoses, treatment compliance, and any information relating to each parent's ability to parent." Judge Grossman granted his request.

- On 12/21/2022, Ms. Antar's former counsel filed a Motion to Compel, asking that the court compel Mr. Lodice to comply with the discovery request that was served on him 90 days prior. Judge Griffin ruled on the motion on 1/8/23, and stated the following: "The defendant shall respond to the plaintiff's discovery requests and produce responsive documents no later than January 20, 2023[34]. All other requests for relief may be pursued at a future date."

- On 1/26/23, after Mr. Lodice failed to comply with Judge Griffin's court order to produce the missing documents no later than 1/20/23, Ms. Antar's former counsel filed a caseflow request in which he stated that he "would like to request the hearing of 2/1/23 be marked off and rescheduled for the next available date as the Defendant has not complied with the court order (Entry #240.01) of 01/08/23. As such, the Defendant has not provided the undersigned's office with the outstanding discovery needed to proceed

---

[34] It should be noted that Mr. Lodice did not comply with the order and did not provide the discovery by 1/20/23.

with the scheduled hearing." Judge Grossman granted the request to mark off the
2/1/23 hearing.

- On 1/26/23, Ms. Antar's former counsel filed a motion for contempt regarding Mr.
  Lodice's failure to produce the documents and failure to comply with the subsequent
  order. This motion was never ruled on.

- On 1/31/23, Family Relations Counselor Annamaria Baranowski filed a notice to the
  court that stated that they were informing the court that "The matter is being returned to
  court for further direction. On December 5th, 2022, the Court referred this matter for
  General Case Management. Family Services was tasked with contacting the
  Department of Children and Families, current and previous mental health providers for
  the plaintiff, defendant, and minor child. Information gathered should include treatment
  dates, diagnoses, treatment compliance, and any information relating to each parent's
  ability to parent. A final meeting was held with the parents and the Plaintiff's counsel of
  record on January 30, 2023 at 2:00PM. An agreement relative to a parenting plan was
  not reached. Thus, Family Services is returning this matter to Court for further
  direction."

- On 3/13/23, Ms. Antar's former counsel filed an application for emergency ex parte
  order of custody which was granted in part by Judge Griffin. Judge Griffin scheduled it
  for a hearing on 3/27/23 and stated that "Defendant shall not leave his minor child alone
  with her stepbrother. All other custody, access, and visitation orders remain in effect
  and are not disturbed by this order." After the hearing on 3/27/2023, Judge Grossman
  made the following order: "The Court held a remote hearing regarding the Application
  for Emergency Ex Parte (#245.00) with all parties and Plaintiff's counsel present. The

Application for Emergency Ex Parte (#245.00) is denied. The parties' regular access schedule remains in place. The mother is ordered to follow this regular schedule without exception. While DCF and or police department investigations are pending the father is ordered to ensure that the parties' child will not be left alone with her siblings." She only said that the mother was ordered to follow the schedule without exception, but did not hold the father up to that same requirement.

- On 3/13/23, Ms. Antar's former counsel filed a motion for modification with the emergency ex-parte motion for custody. Then, still having never heard the motion, on 5/31/23, Judge Grossman entered a final order on the motion that stated: "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 3/20/23, Ms. Antar's former counsel filed a motion for continuance stating the following: "Attorney Cretella would like to request a continuance as he will be out of the state on the scheduled date. We request said matter be heard at the scheduled hearing of 04/05/23. Alternatively, if necessary, said matter can be held remotely" Judge Grossman then denied the motion and stated the following in an order: "A hearing on the ex parte motion must[35] be conducted within 14 days. If the parties consent to another date the court will make efforts to accommodate that date."

- On 3/21/23, Ms. Antar's former counsel then filed a caseflow request stating the following: "Attorney Cretella would like to request the hearing on 3/27/23 to be held

---

[35] Judge Grossman acknowledged awareness of the law mandating that the ex-parte motion had to be heard within 14 days, however she denied Ms. Antar that right on numerous occasions by intentionally scheduling it for up to 60-90 days in the future.

remotely, as he will be out of the state on the scheduled date. In addition, there is a current protective order where Theodora is the protected party. As such, it is in the best interest of the Plaintiff for the hearing to be held remotely." Judge Grossman granted the request.

- After the 4/5/23 hearing, Ms. Antar appeared in front of Judge Grossman on 4/24/23 after she was served with a TRO application from Mark Wachter. The application and TRO was actually filed by Ashely Gray, the mother of his child, who became extremely angry and started to threaten Ms. Antar after she learned of a friendship between Ms. Antar and Mark. On 4/24/23, Ms. Antar showed up in court with all of the evidence needed to prove that everything alleged in the affidavit for the TRO was false. Judge Grossman saw that Ms. Antar was there, and when she heard that Mr. Wachter wasn't there, rather than dismiss the case like she did when Mr. Lodice was the respondant to an application that Ms. Antar filed that she didn't show up on a year prior, Judge Grossman instead passed that matter and forced Ms. Antar to wait until close to 11:00AM before dismissing it.

- On 5/18/23, after Ms. Antar terminated her attorney-client relationship with Attorney Cretella due to his malpractice and incompetence and ill treatement of her case, Attorney Cretella filed a motion for advice, claiming he needed court approval to release the mandatory disclosure/discovery that Mr. Lodice provided to Ms. Antar. Judge Grossman entered an order in on 5/25/23, which denied Ms. Antar her legal rights, by saying: "The Plaintiff indicated that she has retained substitute counsel. The file of former counsel may be released to new counsel upon their filing an appearance. New

counsel will not permit the Plaintiff to possess, copy or duplicate or photograph the financial records of the Defendant." On 5/31/23, she put in a second final order that stated "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 5/22/23, Ms. Antar filed a motion for order asking that her file be released to her, and a motion for continuance requesting more time since her file was being withheld by former counsel. Judge Grossman entered an order on 5/22/23 denying this motion. Her order stated "Motions 256 and 254 will be heard with all pending motions on May 25, 2023. Prior plaintiff's counsel should maintain, but not release, the contested portions of the file." Judge Grossman entered an order in on 5/25/23, which denied Ms. Antar her legal rights, by saying: "The Plaintiff indicated that she has retained substitute counsel. The file of former counsel may be released to new counsel upon their filing an appearance. New counsel will not permit the Plaintiff to possess, copy or duplicate or photograph the financial records of the Defendant." On 5/31/23, she put in a second final order that stated "See Orders of the court re: Post Judgment Motions dated 5/31/2023" which referenced the 5/31/2023 which removed all of Ms. Antar's parental rights and stated that Mr. Lodice no longer had to ever pay child support.

- On 5/52/23, Judge Grossman put in an order without agreement of the parties that Ms. Antar could only have supervised visitation with no visitation center with Angelina

- On 5/25/23, Ms. Antar filed a motion for a fee waiver and Judge Grossman denied it, claiming that it "didn't match financial records on file" when the only financial records she had for Ms. Antar were from 8 months prior in September.

- On 5/25/23, Ms. Antar filed an application for emergency ex parte order of custody. Judge Grossman denied it and set it down for a hearing three weeks away, rather than within the 2 week mandatory statutory timeframe.

- On 5/26/23, Ms. Antar filed a post-judgment motion for modification. Judge Grossman's response was to then, on 5/31/23, issue an 8 page long order that contained several lies and inaccuracies in regard to Ms. Antar, and terminated all of her parental rights permanently. She also entered it in as a final modification of the judgment, despite saying that the orders would be temporary and only last one week when she issued them on 5/25/23. They were then ordered to last three weeks, and then changed to permanent orders 5 days later without any further court appearances.

- On 5/31/23, Ms. Antar's mother filed a motion to intervene and third party appearance in the case asking for visitation in the case. Judge Grossman did not rule on or acknowledge the motion.

- On 06/05/23, Ms. Antar's sister filed a motion to intervene and third party appearance in the case asking for visitation in the case. Judge Grossman did not rule on or acknowledge the motion.

- On 6/6/23, out of concern for Angelina, Ms. Antar applied for two TROs in her JD of Milford on behalf of Angelina. Both were granted. When Ms. Antar attempted to get one for herself on Mr. Lodice, Judge Grossman immediately forced the Milford Court to vacate the granted TROS and demanded that they be heard in front of her on the 6/15/23 hearing instead. Judge Grossman has no jurisdiction or right to stop someone from filing a TRO against someone else when neither party are in her jurisdiction.

- On 6/7/23, Ms. Antar filed a request for leave and motion to transfer to the New Britain JD. Judge Grossman denied the motion on 6/19/23.

- On 6/7/23, Ms. Antar filed a request for leave and motion for contempt. Judge Grossman rejected the motion on 6/13/23.

- On 6/8/23, Ms. Antar filled out form jd-fm-295 for a request for remote testimony. Judge Grossman denied the request on 6/9/23, despite the clerk stating that she is legally obligated to approve it. She stated "The scheduled event is not a restraining order. It is the continuation of a hearing on financial matters and possibly parental access. All prior court dates were conducted in person. Witnesses are under subpoena to appear in person."

- On 6/8/23, Judge Grossman issued subpoenas for the detective Lisa Steeves and the DCF worker, in a clear attempt to try to have them testify negatively about Ms. Antar. Lisa Steeves, the detective from New Britain said she was "concerned about Ms. Antar's mental health" however she is not an expert witness in psychology or mental health, nor is the DCF worker. Judge Grossman order stated: "1) The Court shall issue a subpoena for Ms. LaRae Plummer of the Milford Department of Children and Families Office, 38 Wellington Road, Milford, CT 06461, to appear for the hearing on 6/15/23 at 2:00 PM. 2) Ms. Plummer shall produce for the court all DCF records, from March 2023 to present, regarding the parties' minor child, Angelina Lodice (DOB: 5/21/2019) and be prepared to aid the court through testimony. 3) The Court shall issue a subpoena for Detective Lisa Steeves, Badge Number #462 of the New Britain Police Department, 10 Chestnut Street, New Britain, CT 06051, to appear for the hearing on 6/15/23 at 2:00

PM. 4) Detective Steeves shall be prepared to aid the court through testimony. 5) All fees related to the subpoenas are to be paid by the State of Connecticut.

- On 6/9/23, Ms. Antar filed an application for issuance of subpoena to subpoena the DCF worker who substantiated neglect on Matthew and his prior mental health treatment provider that he refused to sign releases on. Judge Grossman denied the application on 6/11/23.

- On 6/9/23, Ms. Antar filed an application for issuance of subpoena for Angelina's therapist and the individual who conducted the forensic interview. Judge Grossman denied the application on 6/11/23.

- On 6/9/23, Ms. Antar filed a second jd-fm-295 request for remote testimony due to being the protected party of a protective order, as well as a caseflow request requesting that Judge Grossman follow laws set forth in Public Act 21-78 that give her the right to testify remotely. Judge Grossman denied the motion on 6/11/23.

- On 6/9/23, Ms. Antar filed a request for leave and a motion for disqualification of judicial authority on the basis of bias, prejudice, and harassment. Judge Grossman granted the request for leave on 6/16/23. The hearing for the motion for disqualification has yet to be scheduled.

- On 6/9/223, Ms. Antar re-filed the two TRO applications that Judge Grossman vacated and filed them in New Britain JD, except this time asked that her sister be given temporary custody. Both were scheduled for the 6/15/22 hearing and New Britain stated that Judge Grossman demanded they be transferred to New Haven JD. None of the parties in these actions reside in the New Haven JD. It is a clear example of Judge

Grossman trying to have sole control over every aspect of Ms. Antar's life. On 6/15/23, none were heard.

• On 6/9/23, Ms. Antar filed a motion for disqualification of judicial authority which was also accompanied by an affidavit in support of the motion for disqualification of judicial authority. In spite of this, Judge Grossman has not voluntarily recused herself from the case and has not scheduled a hearing in front of a different judge for the matter to be heard.

• On 6/12/23, Ms. Antar filed an appeal to the appellate court with all fees paid.

• On 6/13/23, Ms. Antar filed her third jd-fm-295 request for remote testimony due to being the protected party of a protective order, as well as a caseflow request requesting that Judge Grossman follow laws set forth in Public Act 21-78 that give her the right to testify remotely. Judge Grossman denied these requests on 6/14/23.

• On 6/13/23, Ms. Antar filed a caseflow request asking if her mother could appear remotely due to a disability so that she could testify as a witness and third party intervenor in the case. Judge Grossman denied the request on 6/14/23.

• On 6/14/23, Ms. Antar filed a motion to transfer to the proper jurisdiction under state law as the case is a IV-D SES case. The motion was rejected by the clerk on 6/16/23.

• On 6/15/23, Ms. Antar filed a Notice of Complaint or action filed against Judicial Authority notice.

• On 6/15/23, Ms. Antar filed her fourth jd-fm-295 request for remote testimony due to being the protected party of a protective order, as well as a caseflow request requesting that Judge Grossman follow laws set forth in Public Act 21-78 that give her the right to testify remotely. Judge Grossman denied these requests on 6/15/23. Ms. Antar called the clerk's office at the New Haven Superior Court to ask why Judge Grossman was denying her legal

rights under PA 21-78, and was told by the clerk that she would have to "take it up with the judge."

• On 6/15/23, Ms. Antar filed a motion for contempt. Judge Grossman denied the motion on 6/30/23 without it ever being heard and without giving any explanation as to why she was denying it.

• On 6/15/23, Ms. Antar appeared for the hearing in person and Judge Grossman completely denied her any right to due process and refused to allow any of the 5-6 motions that were set to be heard that day be heard and ended the hearing without modifying access to the child, even after hearing that it was causing the child psychological harm being forced to be away from her mother.

 • On 6/16/23, Ms. Antar filed a caseflow request asking that all of her pending motions that had never been heard before be scheduled for a hearing. Judge Grossman denied the request on 6/19/23.

• On 6/16/23, Ms. Antar filed a request for hearing on denied application for issuance of subpoena. Judge Grossman denied the request on 6/21/23.

• On 6/16/23, Ms. Antar filed a different request for hearing on a separate denied application for issuance of subpoena. Judge Grossman denied the request on 6/21/23.

• On 6/16/23, Ms. Antar filed a third request for a separate hearing on denied application for issuance of subpoena. Judge Grossman denied the request on 6/21/23.

• On 6/16/23, Ms. Antar filed her fourth request for the fourth subpoena application she was requesting a hearing on. Judge Grossman denied the request on 6/21/23.

• On 6/16/23, Ms. Antar filed her fifth request for the fifth subpoena application she was requesting a hearing on. Judge Grossman denied the request on 6/21/23.

• On 6/16/23, Ms. Antar filed her sixth request for the sixth subpoena application she was requesting a hearing on. Judge Grossman denied the request on 6/21/23.

• On 6/16/23, Ms. Antar filed her seventh request for the seventh subpoena application she was requesting a hearing on. Judge Grossman denied the request on 6/21/23.

• On 6/16/23, Ms. Antar filed another motion to transfer. The motion has never been acknowledged or ruled on.

• On 6/16/23, Ms. Antar filed a motion for change of venue. The motion has never been acknowledged or ruled on.

•  On 6/22/23, Judge Grossman issued a memorandum which contained several inaccuracies and showed further evidence of bias, prejudice, and abuse of power and judicial authority.

• On 6/29/23, Ms. Antar filed a caseflow request asking that some of the hearings that were scheduled without her knowledge be marked off. Judge Grossman denied the request on 6/29/23.

• On 6/29/23, Ms. Antar filed another caseflow request asking for a marking off one of the hearings. Judge Grossman denied the request on 6/29/23.

• On 7/3/23, Ms. Antar filed a motion for stay of trial court orders. Judge Grossman denied the motion on 7/5/23.

• On 7/3/23, Ms. Antar filed a caseflow request asking that the hearing for the 7/3/23 date be rescheduled and given a full day hearing. The request was not ruled on.

• On 7/3/23, Ms. Antar filed a motion for continuance. Judge Grossman marked it as "off" on 7/5/23, two days after the date occurred.

• On 7/3/23, Ms. Antar filed a motion to reargue/reconsider for some of the prior motions she filed. Judge Grossman rejected the motion on 7/5/23.

• On 7/5/23, Ms. Antar filed a motion to compel for the defendant to comply with orders for production of discovery that he never complied with. Judge Grossman rejected the motion on 7/5/23.

• On 7/5/23, Ms. Antar filed a motion to reargue/reconsider on prior motions that had never been heard yet. Judge Grossman rejected the motion on 7/5/23.

• On 7/5/23, Ms. Antar filed a motion for stay that was revised. Judge Grossman rejected the motion on 7/5/23.

• On 7/5/23, Ms. Antar filed a motion to reargue/reconsider on some of the motions that had been ruled on. Judge Grossman rejected the motion on 7/5/23.

• On 7/5/23, Child Support Enforcement Services entered in a contempt citation and application for income withholding against the defendant in anticipation of the 8/2/23 magistrate contempt hearing. Judge Grossman immediately put in a court order on 7/5/23 marking off all financial hearings and stating that they must be heard in family court with her being involved in them, despite those being separate matters that Ms. Antar did not want to mark off or have Judge Grossman involved in.


### Evidence of Bias, Harassment, and Prejudice of the 6/28/22 hearing

On June 28, 2022, the parties returned before Judge Jane Grossman for the second time. There were several motions pending that were set to be heard on that date. She immediately showed her bias toward the Defendant and against the Plaintiff, and it was also evident throughout the hearing, as well. She began the hearing by saying "I would say

that the last time that you were here, your performance in front of my courtroom was kind of disastrous. You were yelling at each other[36]. You were yelling at me. You were interrupting each other. You were interrupting me." **(See pg 1, lines 10-14 e-filed case exhibit 71)** She then continued to say that she intentionally scheduled them as the only case on her docket "because you were so disruptive the last time … But I will tell you right now, that if you do not follow the orders of the Court, your hearing will be terminated, and I will reschedule it, and we will try again on another day when perhaps you two are able to follow the rules of court. Under no circumstances, will you be permitted to talk out of turn, or talk over each other, or talk disrespectfully to each other or to me or to anybody else in the courtroom." (See pg 1, lines 10-27 e-filed case exhibit 71) She came off as condescending, demeaning, and as if she was attempting to intimidate the parties with her statements. Judge Grossman continued by saying that the motions that were being heard that day were #162 (Plaintiff's Application for Emergency Ex Parte Order of Custody filed 5/20/22), #163, (Plaintiff's contempt citation issued post judgment filed 5/20/22), and #165, (Plaintiff's post-judgment motion for modification-custody, visitation filed 5/20/22).

However, Judge Grossman failed to mention that motion #157 (Plaintiff's contempt citation issued post judgement filed 4/18/22) and 157.6 (Plaintiff's Post-Judgment Motion for Modification-child support, custody filed 4/19/22) were also pending motions that Ms. Antar had filed were scheduled to be heard on that date. Motion #157 was filed by Ms. Antar and cited that Mr. Lodice had failed to give Ms. Antar the right of first refusal on numerous occasions, did not comply with the phone calls on several occasions, and that he refused to bring Angelina to several religious and social events/activities. It also mentioned that Mr.

---

[36] This was an exaggeration as neither of the parties yelled at each other or at her during the 4/8/22 hearing.

Lodice refused to communicate with Mr. Antar in her attempts to plan their daughter's birthday party despite being court ordered. Ms. Antar also noted that Mr. Lodice was noncompliant with orders to pay child support or childcare, and that he refused to download or utilize the Our Family Wizard app by the deadline that Judge Maureen Price-Boreland gave him. The order to attend court event notice states that the event was set for 6/28/22 at 2:00PM. **(See motion #157 Antar v. Lodice)**

Plaintiff's motion #157.6 stated that "Matthew has refused to follow all parts of our agreement from 6/18/21 and judge's subsequent orders from 4/12/22. I ask the court to modify the order in the following ways: order current support, increase current support, find arrearage and order payment, contribute to child care, order immediate income withholding, modify custody to sole custody to mother, increase child support." The order for hearing notice on that motion stated that it was on the schedule for 6/28/22 at 2:00PM, as well. **(See motion #157.6 Antar v. Lodice)**

Judge Grossman intentionally ignored that Ms. Antar had these two motions pending that she scheduled and proceeded to go forward with the hearing only in regard to 162, 163, and 165 when Mr. Lodice questioned if any of his motions were pending. She said "So it looks to me, sir, like the motions that you filed in March were resolved by the agreement that you entered in April which agreement #153. So some changes--" **(See pg 4, lines 4-9 e-filed case exhibit 71)** Matthew then interrupted her and said "For the contempt." Judge Grossman did not scold, reprimand, or even mention the fact that he interrupted her, despite her warning at the start of the hearing. She then said to him "Well, you were here on that date, you entered into some orders changing custody. Though, the mother has some requests for custody. So you can certainly heard on her request. It doesn't matter

what motion I enter them on." **(See pg 4, lines 17-23 e-filed case exhibit 71)** She was very accommodating to him in that she was giving him an opportunity to be heard without going through the proper procedural channels. She at one point, while talking with Mr. Lodice in an effort to locate the motions he claimed he filed, brings up #157 by saying "And then there was a motion for contempt, 157—no, that's mom's. I'm not sure which one you're referring to." **(See pg 4, lines 24-27 e-filed case exhibit 71)** She never stated that she would be hearing that contempt motion or acknowledge that it was also on the schedule for that day.

Mr. Lodice then falsely claimed that the order from 4/12/22 was not a final order by saying "We set a temporary agreement just to get through to this court date." However, this was false, and Judge Grossman could easily see in the file that it was not temporary. Rather than correct Mr. Lodice for being wrong, she instead accepted his words as truth, and then asked Ms. Antar "All right. Is that your understanding, ma'am?" Ms. Antar said "No, your Honor. I just wanted to please clarify. So the contempt that he filed which was—" Judge Grossman then immediately interrupted Ms. Antar and said "All right. Answer my question. Are you trying to change the agreement that you entered into in April?" **(See pg 6, lines 8-18 e-filed case exhibit 71)**

Ms. Antar then brought up the fact that she was never served with Mr. Lodice's motion #142, and said "I've never even seen the motion. I was not served with that nor the contempt which was the motion that he filed. And I have the number as well. The one that he did was in March. It was number 142 on March 10, 2022, post judgment motion for modification. I was never served with that. And then the other one that he filed was also the contempt, which was number 140, which was resolved with the order of 4/12/22 with Judge

Price-Boreland. So that contempt was already resolved and the 142, I'm asking to be removed since I was never served, I was never given proper service at all." **(See pg 7, lines 1-7e-filed case exhibit 71)**

Judge Grossman then excused and ignored the fact that Mr. Lodice has not complied with procedural requirements and that he failed to serve the motion on Ms. Antar, and said "Well, I'll hear you both out about your general complaints about following the rules and following the court orders. And we'll see—we'll see what happens in terms of the motions. If—if Judge Price-Boreland took a temporary[37] agreement, then you both have the right to ask, number one, for that to be changed; or number two, for those motions to be heard. It's not clear to me if it was a temporary or not but I can listen to her transcript and indicate—and that should tell us what—what she intended." **(See pg 7, lines 8-18 e-filed case exhibit 71)** Judge Grossman, who clearly had the case open with the file and the agreement in front of her that showed that 153.11 was a court-entered modification of judgement, and that 153.10 was Judge Price-Boreland's court order which stated "ORDER: The Court finds the parties' Agreement, dated 04/12/2022, to be fair and equitable and in the best interest of the minor child. The Agreement is approved and made an order of the Court. The Agreement dated 06/16/2021 # (128.00), item number 12 is modified to be consistent with this agreement dated today, 04/12/2022. Both motions for contempt citation issued post judgment Plaintiff's (137.00) and Defendant's (140.00) are resolved through the agreement dated 04/12/2022." **(See entries 153.11 and 153.10 Antar v Lodice)**

---

[37] Despite this, Judge Grossman continued to pretend that she didn't have access to this information and insisted on allowing Mr. Lodice to argue motions that he didn't properly serve Ms. Antar with and argue motions that had already been resolved. She also did not question the fact that he lied about the order being temporary when it clearly was put in as a final order.

Ms. Antar, who could clearly see the bias that was being displayed, attempted to speak up for herself and said "I also wanted to say it was not temporary. It was never said to be temporary. And I just wanted to also ask because when were last in court on June 1st, the Judge stated that motion—motion number 148 or—hold on. I'm sorry." Judge Grossman then stepped in and said "It's 148" even though that was not the motion that Ms. Antar was talking about. Ms. Antar then said "152 which is motion for order of discovery he stated would be heard today. And that's why we rescheduled the date to July 11th for that modification of child support because it's—it's very dependent on that result of the motion for financial discovery. So the Judge on 6/1, at first they said on 6/1 we would hear that. But then on 6/1, the Judge stated we would hear that in front of family court today. **(See pgs 7-8, lines 20-27, 1-7 e-filed case exhibit 71)**

When Judge Grossman attempted to dismiss the fact that there were other motions that she was ignoring, Ms. Antar tried to bring that to her attention by saying "There's also several other motions that you didn't mention that I filed for contempt which—" at which point Judge Grossman interrupted her and said "Well, that's true. But they were filed recently and they're not before me today." **(See pg 8, lines 20-24 e-filed case exhibit 71)**

As of the hearing date of 6/28/22, there was a total of 10[38] total motions that had been scheduled to be heard in front of Judge Grossman on that date. Judge Grossman only provided the parties with a 2 hour hearing scheduled for 2:00PM and intentionally did

---

[38] The 10 outstanding motions that were pending that were never yet ruled on by that date included: 146.10 (**Plaintiff's Post-Judgment Motion for Modification- Custody, Visitation**), 148 **(Plaintiff's Motion to Modify- General),** 152 **(Motion for order re discovery motion or request pb ch 13),** 157 **(Plaintiff's contempt citation issues post judgment),** 157.6, **(Plaintiff's post-judgment motion for modification- child support, custody),** 162, **(Plaintiff's application for emergency ex parte order of custody),** 163, **(Plaintiff's contempt citation issued post judgment),** 165, **(Plaintiff's post-judgment motion for modification-custody, visitation),** 175, **(Plaintiff's motion to dismiss Defendant's motion for no proper service),** and 180, **(Plaintiff's contempt citation issued post judgment)**

not acknowledge that many of the motions were set for that date, and falsely claimed to Ms. Antar when she questioned her about that by saying "Well, that's true. But they were filed recently and they're not before me today." **(See pg 8, lines 20-24 e-filed case exhibit 71)** On multiple occasions during the hearing, Ms. Antar stated that she wanted to hire an attorney to represent her for the matter, and asked if just some of the 10 pending motions could be heard and if the rest continued to a later date. Judge Grossman denied Ms. Antar access to counsel and denied her reasonable time to seek proper counsel.

When asked if she spoke to possible counsel yet, Ms. Antar said "I have. And I'm trying to get enough money to come up with one … [Mr. Lodice] was incarcerated on 6/1 for—and a purge was set for—for the child support and he since has not made a single payment. Judge Price-Boreland ordered on 4/12/22 for him to make the payments; he hasn't. He only made the payment to get himself out of prison. And he's lying about his income which is why the financial discovery is crucial and getting the transcripts, police reports, other things that I'm also waiting for which I mentioned in my motion for continuance. And also, I have spoken to an attorney, but they want at least 6 to $7,000.00 as a retainer and I'm trying to get the money together, trying to see if family can help me and—that's why I asked for the date of August 9th to be able to come back to—to try my best to get counsel. And to get all the other things I'm waiting for, transcripts, which all are extremely relevant to the custody and, you know, as far as the contempt as well." **(See pg 10, lines 2-23 e-filed case exhibit 71)**

After Judge Grossman refused to allow Ms. Antar access to proper counsel, Ms. Antar asked "Do I have the right to get an attorney in this case because I feel that I need one." To which Judge Grossman replied "Well, if you felt like you needed one, you'd have

one standing next to you now. I set these hearing dates a while ago. I'm not gonna continue it the day of because you want counsel. You had the ability to get counsel up until now. So do you have a right to get an attorney, certainly. But you don't have a right to have the case continued indefinitely until you get one." **(See pg11, lines 6-15 e-filed case exhibit 71)**

Ms. Antar never asked for an indefinite continuance on the case and had already expressed that the reason why she didn't have one "standing next to [her] now" was because she was still trying to acquire the necessary funds to do so, while still receiving no support from Mr. Lodice. Ms. Antar attempted to say this by saying that "I haven't been able to afford it. I've been trying to pay all my bills receiving zero dollars in child support this whole time. And I do want to try to address most of the issues today." To which Judge Grossman ignored the request for counsel again and told Ms. Antar "Well, we're going to do that. So you two can have a seat." **(See pg11, lines 6-27 e-filed case exhibit 71)**

Judge Grossman then intentionally pretended that she didn't know which of the motions were scheduled for that day, and acted as if motion #145, Plaintiff's Application for Emergency ex-parte order of custody which she denied during the 4/8/22 hearing was something that Ms. Antar still wanted to pursue. She said "The emergency portion, the—the—the part where you file it and sent it to—give it to a Judge that day, that was denied. You have the right to a hearing to continue that request for emergency orders. If you want to be heard on it, you can. So is that something you're pursuing that today, the notion that the child is in immediate physical danger or at risk of physical injury[39] from the father? Is

---

[39] Judge Grossman made her bias and personal opinions regarding domestic violence evident by this comment because the law also allowed for emergency relief from emotional harm, not just physical as she implied.

that something that you're continuing today?" **(See pg11, lines 6-27 e-filed case exhibit 71)**

Ms. Antar attempted to point out that "So we had a hearing by—with that one—with you on April 8th and you denied it. And that was thrown out. So we're already passed that." She then asked about 146, which was Plaintiff's order to show cause.[40] When Ms. Antar attempted to say that it was her understanding that motion 146 had already been resolved by the 4/12/22 agreement, Judge Grossman again insisted on taking Mr. Lodice's word as truth without doing her own due diligence or checking in the file herself, and stated "Well, I think the father's indicating those orders were temporary." **(See pg12, lines 24-27 e-filed case exhibit 71)**

Despite the fact that she had already stated this repeatedly, and even though it was clearly in the case file and shown online where Judge Grossman could see it in front of her, Ms. Antar again said "No. They were not temporary. And it was never said to be temporary ever. The Judge stated if he did not comply for me to file motions for contempt, which I did." **(See pg13, lines 1-4 e-filed case exhibit 71)**

Judge Grossman then continued to tell the parties incorrect information regarding the status of the motions, the content of the motions, and information about when and how the motions would be heard, despite her having access to all of the information in front of her on the computer while she was saying this. She then incorrectly told the parties that

---

[40] It should be noted that the clerk's office at the New Haven Superior Court stated that any time that an application for emergency ex-parte order of custody filled out, that it was a requirement that a new motion for modification be attached to it, regardless of if there is already a pending court date or if there is already a pending motion for modification on that date. Motion #146 was the mandatory motion for modification that Ms. Antar attached to the ex-parte that was also denied by Judge Grossman on 4/8/12 at the hearing.

Ms. Antar's motion #148 was "being heard by magistrate court. And that's the—that's the motion on which you were requesting discovery. Is that right?" **(See pg13, lines 6-27 e-filed case exhibit 71)**

Ms. Antar, who at this point felt that the Judge was intentionally trying to confuse her, said "I was under the impression that 148[41] might have been the motion to transfer or—" when Judge Grossman then cut her off and said "No, it's not. No. The motion— motion 148 is a motion for modification asking to change the child support indicating that the father's making more money and a request for you to remove the father's visitation. So I think the removal of father's visitation was addressed in my orders regarding the emergency motion. But I don't know if you're still pursuing the change in the child support. Is that correct?" **(See pg13, lines 15-27 e-filed case exhibit 71).**

Judge Grossman then continued to act as if she didn't know how to look at the file correctly and pretended that she was unable to see each motion on the computer and then asked regarding motion 148: "And that's the motion that you want discovery on?" despite the motion for financial discovery clearly being a separate motion labeled 152. She then contradicted her previous statement and said "And your request for discovery, ma'am, is number 152. So we'll take that up. And you've got a motion for contempt regarding first refusal. Is that something you're pursuing?" **(See pg14, lines 12-14 e-filed case exhibit 71)** She then denies Ms. Antar due process again, by stating "Okay, theres another motion for contempt regarding child support. That was—that was just filed in May. I'm not sure that

---

[41] It should be noted that both motions 148 and motion 146 were the same identical motion that Ms. Antar submitted to the clerk's office, however the clerk's office coded it twice and put one in the magistrate docket regarding the child support modification request, and the other was attached to the emergency ex-parte motion of custody that Judge Grossman already ruled on during the 4/8/12 hearing.

we're gonna hear that today[42]. I think those more recent motions have—will have to be assigned some dates in the future. Hold on. You also filed a motion to dismiss in May. Oh, that's a motion to dismiss—it's a motion to dismiss your contempt motion. So maybe we will take that up. All right. Well, let's start with—I think those are the motions we're able to hear today. So let's start with you ma'am." **(See pg13, lines 1-4 e-filed case exhibit 71)**

Judge Grossman failed to mention that she scheduled Ms. Antar's contempt motion for that date, and failed to mention that it was not a contempt regarding child support, but was rather a contempt that was regarding multiple issues and instances in which Mr. Lodice willfully violated the custody/visitation/access orders. Judge Grossman intentionally gave the parties false information about which motions were being heard to deny Ms. Antar due process and deny her the opportunity to argue her motions properly and seek adequate relief before the court.

Ms. Antar recognized this and felt that Judge Grossman had made her bias evident and, in attempt to try to avoid miscommunications and denials of due process, once again spoke up for herself and asked "So are we—I'm just wondering, are we going to be doing it, like, by each motion or?" to which Judge Grossman quickly answered "Nope. I want you to tell me overall what it is that you think should be different about the existing custody and access orders and why. And you also have to tell me if you think that Judge Price-Boreland's orders were—were not—that agreement that you entered into, if you think it wasn't temporary, then you got to tell me what's happened since April that would justify a

---

[42]     It should be noted that the motion to contempt that Ms. Antar filed in May said on the motion that it was scheduled to be heard on that date by Judge Grossman. It was originally scheduled for 6/22/22, and then moved to 6/28/22 on 5/26/22 when Ms. Antar filed a motion for continuance which Judge Grossman granted, putting in her 5/26/22 order that "This matter is continued to 6/28/22 at 930AM".

change today. 'Cause that agreement was filed in April." **(See pg16, lines 15-25 e-filed case exhibit 71)**

In response to Judge Grossman's question as to why Ms. Antar felt she should have sole custody of the minor child, Ms. Antar stated:

*"I have sole custody of my other daughter. I've had primary residency of Angelina since birth. I do absolutely everything for her; schedule doctor's appointments, I take care of all of her needs. She has a very close bond with me. I've had a stable home for her for the last three years of her life. Matthew, on the other hand, he has moved around a lot. He has constant different women in and out of his life with their family—making a family and having them be around my children. In addition, he has substance abuse issues with alcohol and recreational drugs including marijuana and psilocybin which he stated multiple times on phone calls to me and emails and text messages that he does regularly as well as marijuana and alcohol. He also has not followed the custody agreement at all. From—as you can see the very first contempt that I filed after the 4/12 hearing was on 4/18. He didn't follow a single thing that the Judge asked him to do. He has disparaged the Court over and over again. He has caused a lot of emotional damage to our daughter who I've now been in the process of trying to get her in therapy. I've had her on a waitlist for over six months. I've spent hours calling different places trying to get her in treatment because she's had— showing signs of anxiety, showing signs of separation anxiety and just acting out and things like that. And, you know, I have a lot of evidence and I'd like to have a chance to be able to go over everything in detail before I say anything else, but, you know."* **(See pg17-18, lines 10-27, 1-15 e-filed case exhibit 71)**

Judge Grossman then told Ms. Antar that the only evidence she would permit was her testimony, and said "You have to tell me what you want me to know now. So that's why I'm asking you. What—what has happened since April that would require a change?" Despite there being clear explanations and instances spelled out in the pending motions that Ms. Antar had filed, Judge Grossman still acted as if she had no idea about why Ms. Antar was seeking relief through the court. Ms. Antar then gave an example saying that "One of the biggest ways that he's violated the agreement is regarding our court order which speaks about religious decisions for the child. And the order which was entered in the court June 18th, 2021, number 128. I just need to grab that." **(See pg19, lines 1-4 e-filed case exhibit 71)** Judge Grossman then said "I have it in the file. You don't need to give me a copy." When Mr. Lodice once again interrupted and spoke out of turn without any penalty and said "Your Honor I have that on my phone. Is it okay if I pull it up on my phone while we go through it?" Despite Judge Grossman typically demanding that no phones be allowed to be used or even turned on in her court room, she immediately accommodated Mr. Lodice and allowed him to remedy for being unprepared by saying "Yes. You can do that." **(See pg19, lines 12-17 e-filed case exhibit 71)**

Ms. Antar stated "So on number 4 of our agreement, page 1, #4, it states 'both parents are responsible for taking the child to all of her religious, educational, sporting, extracurricular and social activities included bu not limited to Sunday school, dance, swimming, and birthday parties in which the child is involved that occur during their parenting time. In addition, on page 2, #9, it states the mother shall make all religious decisions for the child. So on several occasions since April, I have asked him on multiple, multiple occasions to bring her to religious obligations that occurred during his visitation

time which usually happens on a Saturday or a Sunday since April. And I've told him in our Family Wizard parenting app, which—may I have permission to have the app out?" to which Judge Grossman, seemingly showing bias about the topic of religion and making it clear that she was only willing to allow Mr. Lodice to have access to his phone during the proceeding, replied: "All right. Well, just—I don't want you reading from something I can't—take into evidence. So—why don't you tell me what the events were. When they happened and—what it is that you're unhappy about since April." **(See pg19-20, lines 20-27,  e-filed case exhibit 71)**

Ms. Antar then cited a specific instance, stating that "On May 11th, I told him that she had a religious obligation that was going to be on that following Sunday at 10:00AM at the Greek church in Orange which she has been a member at since she—"  Judge Grossman then interrupted her again, showing that she was biased and prejudiced and perhaps disliked the religion and church that Ms. Antar was a member of, by saying "What—what was the obligation." Ms. Antar then responded "It was a church religious service. It was a church service. And our religion is extremely important to me. I've met with my priest recently and—" Judge Grossman then showed prejudice and bias against the religion and church by, once again, interrupting and cutting off Ms. Antar mid-sentence and rudely and angrily saying "All right. Hold—Stop. Stop. Stop. You have to tell me why the child had to go, like, why did the child—" to which Ms. Antar replied "For church. She had to attend church. It was scheduled from—the service was—the service was scheduled from the time that I stated, which was from 10 to 12." Judge Grossman then seemed more annoyed and prejudiced against the fact that Ms. Antar wanted to exercise her right to practice her religion and make all religious decisions for Angelina and asked "Why did the child need to

be at that service? Was there something going on, like, special for the child, or the children, or what?" **(See pg20-21, lines 20-27, 1-12 e-filed case exhibit 71)**

Ms. Antar felt that Judge Grossman was making her prejudice against her faith as a Greek Orthodox evident by her harsh criticism and doubts that the service warranted the child's attendance. She attempted to explain that the child needed to attend church the weekend of the 11th "because there was a church service and she needed to attend and—" when Judge Grossman continued to show that she disapproved of the child participating in Ms. Antar's religion, by again rudely cutting off and interrupting Ms. Antar and saying in a disapproving tone "That's what I'm trying to get you to tell me. Why did the child need to attend that particular church service?" Ms. Antar replied "Because attending weekly Sunday service is part of our religion. And it's our—it's one of our religious obligations as Greek Orthodox Christians. And it's extremely important to me and my faith. My mother is willing to be a witness[43], my sister[44], my priest[45] as well at the very significant importance of being in church every Sunday, especially as a family." Judge Grossman seemed to have a very clear bias against Ms. Antar's faith, even though §46b-56b cites that "one of the elements that has been used to illustrate proof as to which parent should be awarded custody of child include §14. Church attendance." Judge Grossman continued to show her distaste for and disapproval of Angelina attending the religious sacrament each Sunday by saying "All right. Does the child have to go, I mean, can't you meet this obligation by a different day of the week service?" to which Ms. Antar replied that "There is no other day of the week. In our

---

[43] See e-filed case exhibit #40 "Diamanto Antonellis letter to court re: religion
[44] See e-filed case exhibit #43 "Irene Antar, OD, letter to court re: religion"
[45] See e-filed case exhibit #14 "Letter from Father Peter J. Orfanakos to court re: religion"

faith, we go on Sundays. And Sundays are supposed to be the holy day for us." **(See pg22, lines 9-27 e-filed case exhibit 71)**

Judge Grossman continued to show her prejudice against Ms. Antar on the basis of her religion and Angelina's religion, and showed bias toward Mr. Lodice after Ms. Antar explained that she "wanted [her] children to be raised with the same faith that [she] was raised with." Judge Grossman's response was accusatory and in a condescending and disapproving tone said "So is it your expectation that the father take the child to—to that service every Sunday when the child is with him?" **(See pg23, lines 4-10 e-filed case exhibit 71)**

Ms. Antar, who had agreed with Mr. Lodice that she could make all religious decisions for Angelina, replied and said that she did and that she wished to have Mr. Lodice's schedule modified so that Sundays he would bring Angelina to church and then leave her with Ms. Antar for the remainder of the day. Judge Grossman showed that she disapproved of this suggestion, despite hearing about how Mr. Lodice was regularly refusing to follow the court order that stated he was responsible to bring the child to any religious events she is involved in.

Judge Grossman continued to show prejudice against the child being involved in her religion and continued to show that she was discriminating based on the religion that she disapproved of by then saying in a negative tone "So you want—you want him to have—him to never have the child Sunday morning. He—the child always goes to church Sunday morning?" to which Ms. Antar said "And then he can drop her off. So he has her from Friday until Sunday. And right now he just—the only difference is he brings her home Monday morning." **(See pg24, lines 3-14 e-filed case exhibit 71)**

Judge Grossman showed that she disapproved of this idea but, rather than allow the discussion to continue, abruptly demanded that Ms. Antar change the subject and asked "SO what other—you were telling me ways in which you think he has not followed the Court orders since April. Was there anything else?" to which Ms. Antar replied and said "Yes, So there, you know, in addition there was a religious service that he said that he was going to bring—it was around our Easter and he said he was going to be bringing her. He confirmed it. And then he texted my mother at six in the morning of the day of stating 'I can't bring her. If you want her to go to church, you can come pick her up. Even though it states in the agreement that if there is a religious event or anything birthday, social, whatever it is during his parenting time or my parenting time, we are supposed to bring her to it, not the other parent. And that's why we agreed on that when we sat down last year and came up with this agreement which he hasn't been following[46]." **(See pg24-25, lines 16-27, 1-11 e-filed case exhibit 71)**

Judge Grossman again showed personal bias[47] and prejudice concerning Ms. Antar on the basis of her religion by trying to shift the discussion away from the topic of religion for the second time and saying "And is there—was there—were there any other occasions in which you think the agreement was violated since April that would justify sole custody?" to which Ms. Antar replied "Yes. So on April 21st, I also told him about a religious event. I

---

[46] See e-filed case exhibit #39 "Refusal to bring to religious event"; See also e-filed case exhibit #48 "Refusal to bring to church on birthday"

[47] Judge Grossman showed clear bias and prejudice and made it clear that she did not care about the fact that Mr. Lodice had violated the order by refusing to bring Angelina to religious events on multiple occasions, despite the fact that under CGS §46b-56(b) that it states that the court must consider, among other factors "7. The willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders. And 14. The child's cultural background."

wrote a note in My Family Wizard, titled it Sunday's event. I asked him to confirm. He

stated, yes. And again, he didn't show up. He didn't bring her after confirming." **(See pg25,**

**lines 13-20 e-filed case exhibit 71)**

Judge Grossman showed prejudice against Ms. Antar's religion and bias toward Mr. Lodice

and in a distasteful tone immediately tried to change the subject again and dismiss Ms.

Antar's concerns regarding her religion and said "Okay. Is there any other reason why

you're requesting sole custody?"

Ms. Antar responded by saying

 *"Yes. The substance abuse issues. He is a very heavy drinker.[48] And he leaves my child*

*with people that I don't know.[49] On our agreement, number one, I believe, of our agreement*

*states that he is supposed to give me the right of first refusal. Since that agreement has*

*been in place, it's been a little over a year, he has never once asked me for—if I wanted the*

*right of first refusal. An during those instances, he has left his—left the child with his son*

*who is on medication for mental health issues that he actually was forced to comply with*

*because he was withholding the medication and his ex-wife had to get an emergency ex-*

*parte order[50] because he threatened the doctor to stop giving the child the meds. He leaves*

*him with her—with a child who's maybe fourteen years old. He's left her—he's left her with*

*his ex-wife and her boyfriend. And my child stated that she was left on—sleeping on a*

*couch and I wasn't given the right of first refusal. He's left her with other people including*

---

[48] See e-filed case exhibit #113 "Evidence of Matt alcoholism"; See also e-filed case exhibit
#92 "Cherish Sheehan alcoholism and instability evidence"
[49] See e-filed case exhibit #73 "New Britain Police report re Dominic keeping Angelina
away from me
[50] See e-filed case exhibit #30- Monica Lodice Emergency Ex-parte application against
Matthew Lodice

*his girlfriend that he lives with that I've never met. He's left her with several people that I have no knowledge of and when I ask him where she is, he says, it's none of your business. I can leave her with whoever I want and doesn't give me the right of first refusal."*

**(See pg. 25-26, lines 21-27, 1-21 e-filed case exhibit 71)**

Judge Grossman immediately showed bias against Ms. Antar and made it clear that she automatically distrusted Ms. Antar by default and accused her of lying and being dishonest by saying "All right. And how do you know these things occurred?" to which Ms. Antar replied "My child told me. And there was multiple times when he stated and admitted to me that his son watched the child and that he left her with his son who is a minor and, like I said, he has ADHD and he is unable to handle a young child who, at the time, was two years old. My daughter also told me and every time that my daughter says things and I question Matthew about it, he—he accuses my child of lying. My child does not lie. She's extremely smart for her age being three years old. She speaks and she tells you the truth about everything. And if it's something that she says that he doesn't want me to know about, he accuses her of lying. And that's not right. He gaslights my child. And he uses her as a pawn[51] against me." **(See p26-27, lines 22-27, 1-11 e-filed case exhibit 71)**

---

[51] See e-filed case exhibit #26 "Email from Angelina's school re: Matt withdrawing her"; See also e-filed case exhibit #34 "Police Report New Britain PD 11/12/2022"; See also e-filed case exhibit #38 "Chart re coercive control"; See also e-filed case exhibit #41 "TRO hearing transcript from March 2021"; See also e-filed case exhibit #42 "TRO hearing transcript from 11/23/22"; See also e-filed case exhibit #44 "Matthew income illustration"; See also e-filed case exhibit #45 "Messages with Peter Jones"; See also e-filed case exhibit #47 "Transcript from 3/9/22"; See also e-filed case exhibit #112 "Matt's texts/OFW exchange accusing me of being with other men"; See also e-filed case exhibit #99 "Documented list of coercive control instances"; See also e-filed case exhibit #98 "Matt coercive control texts 7/3/2021"; See also e-filed case exhibit #103 "Matt emails begging 4/11/22"; See also e-filed case exhibit #107 "Matt coercive control email exchange and litigation abuse from 3/16/2021"; See also e-filed case exhibit #110 "Matt emails saying he hates me and being abusive 2/8/2021"; See also e-filed case exhibit #109 "Matt emails admitting to signing agreement

Judge Grossman then, in a smug and sarcastic tone, asked Ms. Antar what she meant by that. Ms. Antar stated "So he tries to do things related to the child to hurt me. Whether it is—there's been instances where he said he was going to take her[52] and then he was upset because maybe I was dating somebody or something like that. And then he refused to take the child after already agreeing and committing. So we've gone through so much just to even get to the agreement that we had last year. And, you know, you will also see that we have had several pending motions before that June 2021 agreement was made because he was harassing me trying to get me to be with him. And I didn't want to. And then we finally came up with this agreement and he said—he kept stating that he was going to take me back to court and lower my child support to try to hurt me. He kept saying that if I didn't do what he wanted, he would take me to court and state that he has no income—" **(See p27-28, lines 15-27, 1-5 e-filed case exhibit 71)**

---

as coercive control and sending me porn in emails 6/24/2021"; See also e-filed case exhibit #108 "Matt emails continuing to beg for me and use coercive control 4/11/2022"; See also e-filed case exhibit #104 "Emails showing Matt's inconsistences March 2021"; See also e-filed case exhibit #105 "OFW message showing Matt begging and asking me out"; See also e-filed case exhibit #96 "Emails of Matt begging for me immediately after the March 2021 TRO hearing"; See also e-filed case exhibit #97 "Texts of Matt being verbally abusive"; See also e-filed case exhibit #87 "Emails showing Matt withholding Angelina again"; See also e-filed case exhibit #11 "6/1/2022 hearing transcript"; See also e-filed case exhibit #53 "Matt emails night before court 4/11/22 saying "what do you want from us?"; See also e-filed case exhibit #52 "Matt emails night before court 4/11/22 saying "I hope you're happy"; See also e-filed case exhibit #58 "11/18/2020 email from Matt threatening me with the police"; See also e-filed case exhibit #57 "2019 emails showing Matt mistreats us"; See also e-filed case exhibit #59 "12/10/2020 email from Matt saying there's a fake emergency"; See also e-filed case exhibit #56 "Matt emails before court in 2019 where he insists on going to court"; See also e-filed case exhibit #83 "Victim Statement about Matt"; See also e-filed case exhibit #51 "Matt emails before court on 4/12/22 when I asked him to stop"

[52] See e-filed case exhibit #80 "Matthew email contradicting himself"; See also e-filed case exhibit #82 "Matthew emails where he insists on calling me"

Judge Grossman continued to show her dislike and bias against Ms. Antar by interrupting her during her testimony again, stating "All right. Are you talking about something before your agreement or after? Because I—you—you have an—you have a—I have to consider things since April. So I can't go back to the beginning[53]." **(See p28, lines 6-10 e-filed case exhibit 71)**

Ms. Antar then said that "this is since—since June. So this is, like, since the last agreement besides April was made." To which Judge Grossman replied "All right. Well, you're asking me to change the April agreement. Right?" However, the April agreement was simply a modification to the 6/16/21 agreement that was still in effect. The April Agreement only modified the pick up/drop off location of the parties, and kept everything else virtually the same. Considering this, Ms. Antar responded by saying:

 *"I'm just asking to change it so that the visitation schedule will be that he brings her to the church every Sunday. And if for some reason the church is closed, then—which would rarely happen, but if it was, to bring her to my home instead which is in the same town. And for sole custody because I believe that he is not stable.[54] He was incarcerated for not paying child support. Almost missed his visitation. He withholds income. I ask him all the time, can we get the child set up in classes for—for soccer, for anything, he says no. I'm*

---

[53] It should be noted that, despite Judge Grossman stating on 6/28/22 that she only testimony she could consider had to be from 4/12/22 forward, that on the 4/5/23 hearing and the 5/25/23 hearing, she let Mr. Lodice testify and show evidence regarding incidents from 2019, 2020, and 2021.

[54] See e-filed case exhibit #29 "Financial docs from Lodice v Lodice case"; See also e-filed case exhibit #50 "Email showing he didn't sign up for family wizard by the court ordered date"; See also e-filed case exhibit #54 "Matt email saying 'you know I'm not good at all that stuff'"; See also e-filed case exhibit #55 "Matt emails before court from 2019"; See also e-filed case exhibit #76 "Hearing transcript from 12/29/2020 about TRO"; See also e-filed case exhibit #91- "Matt inability to provide school items"; See also e-filed case exhibit #114 "Matthew deposition 11/4/2022"; See also full exhibits from 6/1/2022 hearing

*sorry. I can't. But he has money for his apartment. He has money for an extravagant garden. He has money for going out all the time with his friends and his girlfriend[55]. And every time I'm calling to say goodnight to the child, he's at a party. He's, you know, his social life is his priority. And he does the child a great disservice by refusing to pay for anything that she needs. He hasn't given—he has violated the child support orders since April 12th. Judge Boreland stated in there and made it clear, start paying the child support every Friday no later than 6pm. He hasn't paid a single dollar besides the purge to get himself out of prison. And he stated in court that he doesn't think it hurts our child in any way for him to owe thousands of dollars."* **(See pg28-29, lines 11-27, 1-16 e-filed case exhibit 71)**

Judge Grossman immediately tried to again change the subject, rather than asking Ms. Antar to show evidence or asking any more questions regarding her statements. Judge Grossman did not care at all about a single thing that Ms. Antar testified, even though she gave several strong reasons as to why Mr. Lodice was unfit and how he was continuing to abuse the family financially, emotionally, and psychologically.

She then, in a smug and disinterested tone asked "Was there anything else based—that you wanted me to know about the sole custody or the parenting plan?" to which Ms. Antar replied and said "Yes. So this is related to the contempt that I filed on May 25th. Again, that the Judge ordered that I make all the religious decisions and that the defendant must bring the child to all the religious events regardless of what they are. And I notified him in Our Family Wizard app on 5/16 that the child had a religious obligation scheduled on 5/22 from 10 to 12. The defendant viewed the message in the app. I also sent a reminder to him

---

[55] See e-filed case exhibit #37 "Matthew photographer info"

about it on 5/21 as well as put it in the calendar on the app. He did not bring her to the scheduled religious event." **(See p29-30, lines 20-27, 1-7 e-filed case exhibit 71)**

Judge Grossman once again showed prejudice against Ms. Antar regarding her religion, seemingly saying that she had the authority to decide which religious events were obligatory and which weren't, despite the court order stating that Ms. Antar makes all religious decisions for the child and despite it being Ms. Antar and Angelina's constitutional right under the First Amendment to practice their religion freely. She rudely and in a sarcastic tone said "What was the event?" to which Ms. Antar replied "This was church. This was our—" and Judge Grossman immediately interrupted Ms. Antar and said "So—" and Ms. Antar attempted to finish her sentence and said "our weekly Sunday service." At this point, Judge Grossman appeared to be annoyed at the fact that Ms. Antar was holding value to the religious services, and clearly showed that she practiced a different religion, and made it known that she disrespected and did not value Ms. Antar and Angelina's religion. She then asked "All right. So is it your expectation that if he doesn't bring the child to Sunday service that he's violating this order?" **(See pg.30 , lines 8-14 e-filed case exhibit 71)**

Ms. Antar stated "Yes. Because it's part of her religion and it's extremely important. It's the one thing in the week that—that she needs to attend. And It's a two-hour thing. But that's why I said I don't expect him to sit through a service or drive there and have to pick her up and wait around. It would be so much easier if she just stays there, attends the service with the rest of me and my family, my other child, her sister, her grandmother, her godmother. All these people who—who are part of this." Judge Grossman then appeared to become angry and more annoyed and showed a disapproval of Ms. Antar and bias and prejudice

against her based on her religion by saying "All right. So ma'am, I'm not sure that the agreement[56] that you signed indicates that father has to bring the child to church every Sunday. Your—what your agreement says is that you would honor events, but not every Sunday service. That's not what this says." **(See 30-31, lines 15-27, 1-4 e-filed case exhibit 71)**

Ms. Antar felt that Judge Grossman was being extremely biased and prejudiced at this point against her based on her religious affiliation, and the statement that Judge Grossman made was false regarding what the agreement actually stated. To advocate and speak up for herself and correct the false statement, Ms. Antar replied "So it says that I make religious decisions for the child. So if I'm saying that the child is—" at which point Judge Grossman got angry and interrupted Ms. Antar in a rude tone and said "All right. So that— that means that you can decide what—what—what religion to raise the child in. But I don't think it means that every single week you get to decide that the child has to go to service and the father has to bring her. I'm not sure that that—that this says that." **(See pg31, lines 5-13 e-filed case exhibit 71)**

At this point, Ms. Antar could clearly see that Judge Grossman had a clear bias and prejudice against her on the basis of her religion, considering the fact that the agreement stated "Ms. Antar makes all religious decisions for the child" which would imply that any and all decisions relative to her religious upbringing would be reserved for Ms. Antar. Ms. Antar responded and said "I disagree. It says I make all religious decisions for the child. And the

---

[56] The agreement actually states the following: "Both parents are responsible for taking the child to all of her religious, educational, sporting, extracurricular, and social activities (including, but not limited to, Sunday School, Dance, Swimming, and Birthday Parties: in which the child is involved that occur during their parenting time. The mother shall make all religious decisions for the child."

Court—I feel that the Court is not able to determine how we practice our religion. Our religion is practiced in a specific way. And like I said, I'd—I'd like to be able to bring in my priest. I'd like to bring in my mother who's also the godmother of the child, my sister who has a heavy influence on her as well. To state—" at which point Judge Grossman once again showed disrespect and dislike to Ms. Antar by rudely, angrily, and sarcastically interrupting her mid-sentence again and saying "All right. They're—listen to me.—they're separate things. So I'm not saying that that's not how you practice the Greek Orthodox church. I'm sure you're an expert in that compared to me. But I'm looking at your agreement. And your agreement doesn't say that the father has to bring the child to church every Sunday. I don't think the father would have had any notice that that was what he was agreeing. So if—if you want to tell me about other, like, if there was a holiday or Sunday school. That's why I was asking you. Like, when does Sunday School start. I think your agreement does cover Sunday school. But if—if you're saying that he violated the agreement by failing to bring the child to church every Sunday when you asked him to, I think that may not be an accurate interpretation[57] of the agreement you two signed."**(See pg 31-32, lines 14-27, 1-7 e-filed case exhibit 71)**

Ms. Antar attempted to express that Judge Grossman was improperly and unconstitutionally interpreting and dictating the terms of the agreement by saying "It was

---

[57] Not only did the agreement state that Ms. Antar makes all religious decisions for the child, but it also stated that both parents had to bring her to religious events that occurred during their parenting time "including, but not limited to" Sunday school and other events. If something says "Including, but not limited to" it should theoretically cover any and all events, per Ms. Antar's discretion as the sole religious decision-maker for the child. Furthermore, Judge Grossman's analysis of the agreement somehow being interpreted as meaning that only Sunday School and holidays applied, was an example of her interpreting Ms. Antar's religion and dictating how and when she could practice her faith with her daughter.

my interpretation when I wrote the agreement, that that's what that means; given the fact that my religion is one of the most important things in my life." To which Judge Grossman then got very angry and once again interrupted Ms. Antar and said "I—I—" and Ms. Antar finished her sentence by saying "And my children's life. So—" when Judge Grossman then interrupted Ms. Antar again and said "—I understand your position. But I have to interpret the agreement based on what it says, and I'm not sure it says that. So why don't you tell me about some—if there are any other—like, are there holidays that you think he missed. Or was there Sunday School that you think he missed, or something like that. If all these are about just—just Sunday service, I'm not sure that will meet the standard[58]." Ms. Antar then said "Just because it says in there, it says—but not—" and Judge Grossman immediately interrupted her and cut her off mid-sentence again and said "Listen to me. Listen to me. Stop arguing with me. I know you don't like what I just told you, but that's my interpretation of this agreement. So tell me if there were things that were not just Sunday service that you asked him to bring the child to that he missed." Ms. Antar again tried to defend her position by pointing out that "There are several other things. However, in that agreement it states it's not limited to—" at which point Judge Grossman cut her off and interrupted her mid-sentence again and said "Okay" in a sarcastic tone. Ms. Antar then said "—the things that are in the parentheses. It states including but not limited to." Judge Grossman then rudely said "I read it, ma'am. So why don't you tell me about the other things." (**See pg 32-33, lines 14-27, 1-18 e-filed case exhibit 71**)

---

[58] For reference, CGS§46b-56 states that the court must consider "the rights and responsibilities of both parents" and that they must consider "the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests."

According to CGS§46b-56(b), the court must take into consideration the child's "religious upbringing" which would virtually be eliminated if Angelina was not permitted to partake in the religious saracament of Holy Communion which is typically only offered during Sunday services of the Divine Liturgy. Judge Grossman was attempting to mandate that Angelina not be permitted to partake in her religion, despite the standard being that her religious upbringing must be taken into consideration. This showed extreme bias against Ms. Antar, who practices a religion that conflicts with the one that Judge Grossman practices, and also showed evidence prejudice and discrimination based on religion. Furthermore, Judge Grossman would rudely refer to Ms. Antar repeatedly as ma'am, which is a word that can have a rude or negative connotation attached to it when being used toward a young unmarried woman like Mr. Antar.

Ms. Antar attempted to defend her and Angelina's constitutional right of free practice of religion once again and tried to defend the agreement that her and Mr. Lodice wrote and discussed together. She attempted to explain to Judge Grossman, that in her religion, the Divine Liturgy is considered as a celebration that takes place each week and is a key and major part of the practice of our religion. She said "So you can—in our religion we consider that the—the divine liturgy is a weekly celebration. It's like a holiday to us in our religion." To which Judge Grossman then got annoyed and snapped back at Ms. Antar and said "Okay. Listen to me." And Ms. Antar, in an attempt to defend her position further, said "We go by religious calendar so." When Judge Grossman, in a clearly prejudicial manner said "I want you to stop telling me about Sundays and tell me if there's anything else that—like, a special event or school, or anything else besides the regular Sunday service that you

think[59] you told him about that he didn't bring the child to."  (**See pg 33-34, lines 19-27, 1-2 e-filed case exhibit 71)**

Ms. Antar responded and said "Yes. There are. However, this is why I'm asking for an attorney 'cause I feel that I'm not given my legal right to—to approve the agreement that I made." Judge Grossman then ignored Ms. Antar's request for counsel and said "Let's—let's move on from that and why don't you tell me about some of these other things." (**See pg 34, lines 1-8 e-filed case exhibit 71)**

Ms. Antar went on to give other examples regarding Mr. Lodice willfully refusing to follow court orders that were unrelated to the religion, such as refusing to comply with an order to pay for and download Our Family Wizard by a specified date. Ms. Antar testified that "It's not that he got it late. He continued to refuse to get it and he said to me—he kept emailing me ten to twelve times a day stating to me that he was not going to get it and the only way that he would do a parenting app was if I did the free one that he was insisting that we use called AppClose. I told him I only use my email for business. I don't want to get harassed with multiple emails nonstop every day from him, please follow the court orders stating that you have to get this app, do what the judge said. He refused. He continued to refuse. He kept calling me on my phone and he kept emailing me." (**See pg 35, lines 13-26 e-filed case exhibit 71)**

---

[59] Judge Grossman's comment of "anything else besides the regular Sunday service that you think you told him about" was a direct insult toward Ms. Antar. By stating "that you think you told him about," Judge Grossman was insulting Ms. Antar's intelligence and mental capacity, especially given the fact that the agreement clearly stated that Mother makes all religious decisions and Father must bring to any religious events that occur, including but not limited to, Sunday school and other events. Ms. Antar could clearly see that Judge Grossman had a bias and prejudice against her and that she disliked Ms. Antar and that she disliked Ms. Antar's religious practices.

Ms. Antar then described how Mr. Lodice would not comply with the court order until he was given an ultimatum by the police. She told Judge Grossman that "I went to the police department because he wouldn't stop emailing me and calling me. I stated to the police that I—that I showed them the court order. I said to them, I want them to tell him not to contact me again unless it's in the parenting app only and please stop emailing me. The police had to call him and tell him that. He tried to say to the police that the app is $300 and he wasn't going to do it." At that point, Judge Grossman interrupted Ms. Antar during her testimony again and rudely said "All right. Hold on. Were you there? For his conversation with the police[60]?" to which Ms. Antar replied "yes, I was. The police officer told me." At this point, Judge Grossman then, in a condescending and prejudicial tone said "All right. So—all right.—so that's not the same thing. The police officer told you what he said?" Ms. Antar replied "Yes." Judge Grossman then said "Okay. So back up. Is he using Our Family Wizard now?" and Ms. Antar said "He is, only after the officer told him that if he didn't, he would be arrested for harassing me and contacted me—he said if he—" at which point Judge Grossman once again interrupted Ms. Antar and stopped her from testifying and said "All right." And Ms. Antar completed her sentence by saying "contacted—" to which Judge Grossman then snapped back and said "Stop. Stop. Okay. So when did he start using it?" Ms. Antar confirmed that he didn't activate it until 7 days after the deadline that Judge

---

[60] It should be noted that, on multiple occasions, Judge Grossman permitted and credited as truth hearsay testimony from Mr. Lodice when he described and explained things that were said to him by the police when it reflected negatively against Ms. Antar. However, she refused to allow Ms. Antar to testify in regard to the fact that the police gave an ultimatum to Mr. Lodice about downloading the app that he had been previously court ordered to download and pay for by the specified date on the order.

Price-Boreland ordered him to activated it by. (**See pg 36-37, lines 10-27, 1-18 e-filed case exhibit 71**)

Judge Grossman continued not to show any concern about any of the complaints that Ms. Antar was making in regard to Mr. Lodice's consistent violations of the court orders, and asked Ms. Antar to move on. Ms. Antar then referenced the standard in §46b-56(b) and stated that the court must consider "the character of the parent by reason of willful disobedience of court orders. So it's showing a pattern of him disobeying the court order by not downloading the app unless he was forced to by the police; shows that unless he's going to jail or unless he's force or—or given the ultimatum of being arrested, he will not follow a court order." (**See pg 27, lines 1-7 e-filed case exhibit 71**)

Ms. Antar attempted to explain another issue that Mr. Lodice caused regarding Angelina's joint birthday party celebration, and Judge Grossman was again impatient, rude, and disrespectful toward Ms. Antar. She cut off Ms. Antar mid-sentence again and said "What does this have to do with paying for the birthday party?" Ms. Antar, who wasn't saying that the payment was the issue, then said "Okay. I'm trying to get there. I'm trying to explain it." Judge Grossman showed no respect and said in a rude tone "Okay. Get there now." Ms. Antar continued to try to explain what the issue was, when Judge Grossman interrupted her again and said, in an arrogant and impatient tone, "Listen. Listen. Listen to me. You are complaining that he violated the order by not—that says that they share the cost—you share the cost of the birthday party." To which Ms. Antar replied "I'm not saying that he violated the part about the cost. That's the only part he didn't violate." (**See pg 41-42, lines 25-27,  e-filed case exhibit 71**)

Ms. Antar then explained that she filed her motion seeking relief from the court because Mr. Lodice told her that "I'm gonna have my own party. He says I booked my own celebration with her for me and my family. You're not allowed to come. I'm not going to let you see her. Don't show up at my house or I'll have you arrested. If you try to come retrieve the child or come anywhere near my house, I'll have you arrested and she's—we're gonna be away from the—the home all day." (**See pg 43, lines 3-10 e-filed case exhibit 71**) Ms. Antar went on to add in that "So on the 21st—" when Judge Grossman again interrupted her and cut her off and said "What—" and Ms. Antar said "On the 20th—I feel this is important.—on the 20th, that evening—" Judge Grossman then interrupted and cut off Ms. Antar mid-sentence again, completely uninterested in listening to what she had to say and said "I know what—I know you feel all this is important[61]. But I need to hear what I think is important. So tell me what happened on the 21st." (**See pg 45, lines 2-6 e-filed case exhibit 71**)

Ms. Antar then attempted to tell her what happened on the 21st by saying "Well after I—after I went to the police on the 20th and had the police make contact with him, only after the police again made contact with him, they went to his house, he refused to open the door." Judge Grossman then rudely interrupted Ms. Antar again, and said "All right" and Ms. Antar said "the police—" and Judge Grossman said in a demeaning and angry tone "Listen to me. Were you there?" and Ms. Antar, who was very intimidated at this point, said "This is what the officer told me." To which Judge Grossman immediately said "Okay. So—"

---

[61] Ms. Antar again felt that Judge Grossman was not giving her the respect, due process, or necessary docket time to be able to address all of the 10 pending motions that she scheduled for her 2:00PM hearing, and felt that she was being disrespected when she said that she didn't think anything that Ms. Antar was saying was important, despite all of it being directly related to her then three year old daughter.

and Ms. Antar said "And that's—" and Judge Grossman immediately stopped her from speaking again  and said "—I—Stop. Stop—I want you to tell me what you experienced. Because I can't really rely on what other people told you they experienced. So just tell me what you experienced. Okay. Don't tell me what other people said[62]. Don't tell me what other people told you he said. Just tell me what your experience was." Ms. Antar attempted to talk about her experience where she needed the police to get Mr. Lodice to follow the court order, but Judge Grossman seemed set out on blocking that testimony from coming into evidence. Ms. Antar said "So I called the police again. And after he had told the ones the night before I don't—" at which point Judge Grossman again angrily interrupted Ms. Antar and said in a condescending tone, "Okay. Listen. Tell me what you experienced and not what the police said[63] and not what he said to the police." (**See pg 45-46, lines 7-27, 1-4 22-27 e-filed case exhibit 71**)

Even after Ms. Antar explained that "I had to go to the Prospect Police Department at 10:00AM to get my child after having to call the police two days in a row because he was refusing [to bring her to the court ordered party], unless being threatened with a warrant." Judge Grossman still did not seem concerned at all and still seemed biased against Ms. Antar regardless of the severity of any of the claims she was making. Ms. Antar continued to explain that Mr. Lodice was further violating the order by saying "disparaging and

---

[62] During the 5/25/23 hearing, Judge Grossman permitted Mr. Lodice to give a long hearsay testimony that included information that he stated was told to him by the Orange Police Department. Judge Grossman scolded Ms. Antar when she objected to the testimony on the grounds of it being hearsay and perjury. This is a clear example of the double-standard bias treatment and her preference for Mr. Lodice.

[63] During the 5/25/23 hearing, Judge Grossman was adamant on asking Mr. Lodice what the police said when he was describing an inaccurate depiction of an interaction that took place a month prior. She not only permitted him to testify about what the police said, but she actually specifically instructed him to do so.

insulting things" to her. Ms. Antar testified that "During the party he was insulting me in front of my whole family. He was talking bad—I recorded the whole thing. He was—he was the entire time making negative mean comments to me in front of the child, in front of both my children actually, and my whole family." (**See pg 48, lines 9-16, e-filed case exhibit 71)**

Ms. Antar continued to describe the emotional abuse that Mr. Lodice was putting her through, and mentioned that "And…I feel that he is a dangerous person. He also was convicted of leaving both of his children alone—" when rather than show concern about such a serious charge, Judge Grossman once again stepped in to try to protect and favor Mr. Lodice, by saying "All right. Hold on. I—I am only concerned with what's happened since your Court orders entered." (**See pg 49, lines 24-27,  e-filed case exhibit 71)** In comparison, during the 4/5/23 and 5/25/23 hearings, she permitted Mr. Lodice to testify about things that were from 2019, 2020, and 2021, with almost all of his testimony and evidence being related to claims he was making about things that occurred prior to the 4/12/22 orders. Judge Grossman showed clear bias by mandating that only Ms. Antar had to speak only about things after 4/12/22 but allowed Mr. Lodice to go back all the way to 2019, which was three years before the agreement she said she had to go by.

Judge Grossman then insulted Ms. Antar again by saying "Okay. Why don't you—I want a little highlight about what it all is because it takes you a long time to explain things to me. So what else, like, why don't you hit the highlights for me. What else is there? Before you get into the details, just tell me what the things are." (**See pg 50, lines 8-15,  e-filed case exhibit 71)**

Ms. Antar also mentioned how Mr. Lodice had brought Angelina to daycare later than the agreed upon time of 9:00AM, and that Mr. Lodice refused to bring the child on one

occasion. Ms. Antar explained that "It was gonna be her first day of school" when Judge Grossman again rudely interrupted her and said again in an angry tone "Listen to me. You told me he brings the child late. What time did he bring the child?" to which Ms. Antar replied "That day he did not bring her." (**See pg 51, lines 18-23  e-filed case exhibit 71)**

When Ms. Antar tried to also explain that Mr. Lodice lied and claimed the child was sick, Judge Grossman showed strong bias toward Mr. Lodice and interrupted her again saying "So you don't—stop.—you don't think the child was sick?" to which Ms. Antar said " I don't." and explained that Mr. Lodice also refused to take the child to the pediatrician to be seen if she was sick. (**See pg 52, lines 10-12,  e-filed case exhibit 71)**

Ms. Antar also explained how Mr. Lodice was regularly violating the court order that said to drop the child off no later than 9AM at school, when Judge Grossman once again interrupted Ms. Antar and came to Mr. Lodice's defense and said "Has—has your child suffered in any negative way because the father is bringing the child late?" Rather than focus on the fact that he violated the order, Judge Grossman instead tried to defend Mr. Lodice's behavior, which is the opposite way that she treats Ms. Antar. (**See pg 53, lines 25-27,  e-filed case exhibit 71)**

Judge Grossman then continued to be critical of Ms. Antar, and upon learning that Angelina had been enrolled in a new school in Bethany, asked "So does this still make sense for you two to have the child dropped off in Bethany if you live in Orange and he lives in New Britain?" At that point, Mr. Lodice spoke out of turn and interrupted and said "Not at all" Judge Grossman did not scold him or reprimand him for speaking out of turn or interrupting. (**See pg 58-59 lines 27, 1-27,  e-filed case exhibit 71)**

Judge Grossman continued to show her preference and bias toward Mr. Lodice when Ms. Antar suggested that rather than Angelina wake up on Monday morning to get dropped off at school early on Monday morning, that she stay with Ms. Antar on Sunday evenings. Ms. Antar noted that "the only difference, is really, like her sleeping and waking up in the morning and getting dropped off." To which Judge Grossman snapped back and said "It's a whole day of Sunday with him. It's a whole week day—weekend day. It's half the weekend." (**See pg 60, lines 2-7,  e-filed case exhibit 71)**

When Ms. Antar continued to describe the aspects of the agreement that she was seeking to modify, Judge Grossman showed her bias again by saying "But—but isn't the agreement that you entered into?" making it seem that it was completely unreasonable that Ms. Antar was describing what she wanted modified during a hearing regarding a post-judgment motion for modification of that agreement. Ms. Antar said "It is. But I wanted to modify it to—that's why I'm back in court now trying to modify it a year later to make these changes and close these loopholes." (**See pg 61, lines 20-27,  e-filed case exhibit 71)**

Judge Grossman, who at the beginning of the hearing said it was perfectly fine that Mr. Lodice's motion for modification had never been properly served on Ms. Antar, then showed extreme bias by being concerned over whether or not Ms. Antar gave Mr. Lodice proper notice. She said "But—but did you give him notice that that's something you'd be asking for today? If you have to—when you—when you—All right. But when you make requests to modify custody, you have to kind of tell each other what you're asking for. So you can't—like, I can't let him come in and say well, I want to change it to say she never

goes to church[64]. Right? Like, you—you have to give each other notice about these things. So I have notice that you wanted to change the pickup and drop off times and that you wanted to change to sole custody. But I don't think I have notice you were trying to change the summer plans. Did you talk about this together?" (**See pg 62, lines 6-27,  e-filed case exhibit 71**)

After Ms. Antar expressed her desire to be able to do things with her children on the weekends occasionally, Mr. Lodice told Judge Grossman that he is employed as a Home Improvement Contractor and that he works a total of 50 hours a week[65] from the hours of 7:00AM to 5:00PM, Monday-Friday.

Judge Grossman then rudely tried to rush Ms. Antar and acknowledged that she had only allotted the parties two hours for their 10 pending motions and said "All right. So ma'am, why don't you wrap up what it is that you want to tell me because we have the two-hour hearing and I've been listening to you for an hour. So wrap up what you want to tell me about your requests. And then I'm gonna hear from dad." (**See pg 65, lines 18-23,  e-filed case exhibit 71**)

She then insisted that Ms. Antar "wrap up with whatever else you want me to—want me to know. Like, you know, five minutes or so and then we'll take a break." to which Ms. Antar said "I have a lot—it's going to take more than five minutes for me to wrap up." And Judge Grossman just said "Well, give it a try." Ms. Antar then mentioned that Mr. Lodice was once

---

[64] On 5/31/23, Judge Grossman issued a final order stating that Mr. Lodice had the authority to never allow Angelina to attend church again. He subsequently notified Ms. Antar and her family that Angelina would no longer be permitted to practice her religion.
[65] It should be noted that during the 6/1/22 hearing in front of magistrate when Mr. Lodice was incarcerated, that he reported that he was not working and that he had no regular schedule or income.

again lying about the arrangement he has with his ex-wife. She said "Okay. So I just wanted to say that he has no—he has no Court ordered custody arrangement or visitation arrangement with his other children. He can see them anytime he wants. He only started taking them on the weekends after we made an agreement last June to have him have Angelina every weekend. And since he has no set schedule[66] with his other children and I do have a set schedule with my other daughter … since Matthew is not following that, I don't feel comfortable with him having her on Sundays anymore because that's an important part of our faith." (**See pg 66, lines 2-26,  e-filed case exhibit 71)**

Ms. Antar went on to describe how Mr. Lodice was constantly being verbally abuse to her during phone calls and that she recorded the calls as evidence, and explained that "he says all these rude comments to me in front of the child. And not only that, but he refuses to let me speak to her. And on several occasions, like on this past Sunday, I tried to call….he refused to let me speak to her and I had to call multiple times." (**See pg 71 1-27,  e-filed case exhibit 71)** She also told Judge Grossman that "when he calls, [Angelina will] start crying and she'll have a meltdown crying, screaming, saying 'I don't want to talk to you, I don't want to talk to you' And, like, so I feel that this is like, upsetting to the child and it's causing her more anxiety and stuff. And he will—he's I feel is, like, trying to manipulate the child and trying to say don't talk to her, don't talk to her…I don't want him to be able to speak to me at all unless it's in the parenting app." (**See pg 73, lines 2-25, e-filed case exhibit 71)**

Judge Grossman then continued to try to rush Ms. Antar and demanded that she go fill up her parking meter. When Ms. Antar said "I don't want to lose an opportunity to say what I

---

[66] See e-filed case exhibit #93 "Matthew Court order with Monica"

have to say" Judge Grossman's response was "It's not a choice. I mean, you know, if you—why don't you go put. Money in the meter. We'll come back in fifteen minutes. And then you can finish up." (**See pg 74, lines 9-14,  e-filed case exhibit 71**)

After the recess, Judge Grossman made sure that she did not allow Ms. Antar the opportunity to finish up as she had promised. Instead, she said immediately started the hearing back up after the recess by stating "I'm going to hear from Mr. Lodice for—for a little while." She then allowed him to "tell her what changes to the current parenting plan" he wanted, despite him not properly serving Ms. Antar with his motion to modify. Mr. Lodice even brought up that, in regard to his motion that "earlier you guys said it wasn't served" and Judge Grossman still pretended that she wasn't able to verify that there was no return of service on file. Instead she continued to take Mr. Lodice's word for it when he said that he "gave it to a whatchamacallit; a marshal". Then, she stated "I don't see your return of service in the file for that." But she proceeded nonetheless to ignore all procedural rules as they applied to Mr. Lodice, and ask him "Why don't you tell me about some of the requests that the mother is making about changing the access schedule and the Sundays and—" At that point, Mr. Lodice interrupted her and said "Yeah. I don't—" and she did not scold him or reprimand him at al for interrupting her. He then interrupted her again and said "—I don't want to lose—I only have two days off a week[67] and I get to see my children on those days." (**See pg 77, lines 1-27,  e-filed case exhibit 71**)

Mr. Lodice continued to interrupt Judge Grossman while they had a back and forth dialogue that did not include any of the input from Ms. Antar in regard to the changes that Judge

---

[67] It should be noted that Mr. Lodice owns Whole House Remodeling Company LLC and is a home improvement contractor that runs his own company. He has full control of his work schedule and visitation/access schedule with his other children.

Grossman was proposing. He then interrupted her a total of 16 times (**See pg 78-83 e-filed case exhibit 71)** in a row and cut her off mid-sentence each time, and she did not once scold or reprimand him for doing so. She also was suggesting that she change the order drastically so that Angelina would be in 2 separate daycares, which would have been a huge and unnecessary adjustment for her. Finally, after 16 interruptions, she finally said in a nice, respectful tone to Mr. Lodice "But let me just—for my sake, one thing at a time." Mr. Lodice then continued to make false representations regarding the schedule with hit other children and claimed that he "had to drop them off at their school on Monday". Judge Grossman was completely accommodating with Mr. Lodice, and assumed that Ms. Antar would agree with all of these arrangements she was discussing based on Mr. Lodice's accomodations. When asked about why he didn't comply with court orders to bring the child to church services, Judge Grossman accepted Mr. Lodice's lies that "there was no events" and his excuses about how his "car is struggling right now" and how he "can't afford to drive" there, despite him showing no evidence to support those claims and despite him claiming minutes prior that he worked 50+ hours a week in one of the most lucrative fields in the last 3 years. (**See pg 85, lines 14-27,  e-filed case exhibit 71)** Mr. Lodice also lied regarding family wizard, claiming that Judge Price-Boreland told him "You can use AppClose or you can use Our Family Wizard" when that was never said. He also claimed that the price was $300 when it was nowhere near that price.

Rather than scold Mr. Lodice for failing to comply with the orders to download the app by the certain date so that the couple could communicate, she instead showed bias against Ms. Antar again and said "Why were you paying for her share?" despite it clearly stating on the order that Mr. Lodice was to pay the whole fee since he offered to do so. Rather than

telling the truth which was that he vehemently offered and insisted on paying for the entire fee during the 4/12/22 hearing, he instead lied again under oath and said "Because she won't pay it. She'll just say no." to which Judge Grossman falsely claimed "I think you were each supposed to pay your own share. Okay. All right. We'll get back to that." (**See pg 86, lines 9-27,  e-filed case exhibit 71**)

On page 88, she allowed him to interrupt her a total of three more times without scolding him. She then allowed him to enter in evidence that he did not give to Ms. Antar in advance or properly mark, and had not given Ms. Antar the opportunity to show evidence up until that point. Mr. Lodice did not offer the documents, and Judge Grossman specifically asked him "So you want me to look at them? You got to give mom copies. And then I'll look at them." Ms. Antar said "they are partial communications that don't have the full conversation" when Judge Grossman immediately cut her off and said "So—but they are what he says they are?" Ms. Antar again said "they are partial communications" and Judge Grossman, without giving Ms. Antar the opportunity to object, said "All right. So those can be entered as a full exhibit then." (**See pg 89, lines 6-27,  e-filed case exhibit 71**)

She also believed many of the lies that Mr. Lodice stated, including "I am behind on child support. My bank accounts are empty[68]. One is negative. The other one has, like $12 in it." Even though he admitted that "I am working" and had stated he works a minimum of 50 hours per week. He then testified under oath that he spends $31,200.00 a year on gas and groceries, without any explanation as to how he can afford that without any income.

---

[68] It should be noted that financial discovery records showed an excess of $300,000 in cash being deposited between Mr. Lodice's business and personal accounts during the 12 month period immediately before he made this statement.

Judge Grossman then reprimanded Ms. Antar for "choosing a daycare without his input" and when Ms. Antar asked if she may please speak, Judge Grossman said "Okay. No, you—I don't—I'm not interrupting him to get your side of the story. I want to understand does he pay—is he supposed to pay half the daycare?" She rudely said this, despite her having access to the entire file right in front of her which clearly showed he agreed to pay half the daycare in both 2019 and 2021. (**See pg 96, lines 1-14, e-filed case exhibit 71**)

On page 98 of the transcript, Judge Grossman asks Mr. Lodice why he can't "do his work on the weekends?" and Mr. Lodice said "Well then I'll have to lose time[69] with my other children."

Mr. Lodice further testified that "She's saying I moved around a lot. I didn't. I literally was at my mother's house until I got my own place[70]. And those are the only places I've lived. She's saying I'm having different women around my daughter all the time. I don't have any women around my daughter except for the one I've been currently seeing for a while now."

---

[69] It should be noted that, in subsequent hearings, Mr. Lodice claimed that he needed to work on the weekends, and that was his reasoning for having his 16-year-old son Dominic Lodice babysit Angelina regularly for the majority of his parenting time. He also testified on 5/25/23 that his intent was for Dominic to babysit Angelina for the entirety of the summer in lieu of her being in daycare.

[70] It should be noted that as of 6/1/23, Mr. Lodice has stated that he will be moving out of his residence at 23 Lyman st, #2, New Britain, CT, 06053 and moving back into his mother's house. He previously moved a total of seven times prior to that since his divorce. It should also be noted that the girlfriend he spoke of ended the relationship and moved her and her children out of his apartment one week after this hearing due to his substance abuse and infidelity. After living in New Britain from 12/1/22-6/1/23, he is moving back to his mothers house at 48 Quarry Hill Rd, Waterbury, CT, which is clear evidence of his inability to provide a stable residence for the minor child Angelina. It should be noted that both New Britain and Waterbury have some of the highest drug and crime rates of violent crimes in the state, along with some of the worst schools.

On page 99 of the transcript, Mr. Lodice continues to testify in a narrative and even gives false information during his testimony by claiming that Ms. Antar "ended up getting arrested for filing a false report and disorderly conduct[71]."

Judge Grossman then tried to send the parties on a lunch recess, when Ms. Antar said "Your Honor, I'm asking if due to all these false allegations he said just stated and the fact that I wasn't allowed to—I feel I'm being treated unfairly. I wasn't allowed to give any of my evidence, but you willingly took his evidence. And I asked for an attorney when this first began, and I was denied that right. I would like an attorney please. I don't feel that I'm being treated fairly. I'm feeling that this—this is unfair bias towards him on your end. And I feel like I'm being treated unfairly by this Court. And—and it's an unfair bias. I'd like an attorney. I have over—I have over 90 exhibits that I prepared for today's court date." Judge Grossman then said "Ms. Antar, number one, I've already addressed your request for an attorney. Number two, you didn't offer me any exhibits. So I didn't—it's not that I didn't take the, you didn't offer them. So if there's something that you want me to look at, then we'll do exactly the same thing that I did with the things that he wanted to look at. But he said I want you to look at this. You never said that to me. I didn't know you had exhibits." (**See pg 102, lines 1-21,  e-filed case exhibit 71)** This was completely inaccurate since she had asked Mr. Lodice if he wanted her to see any exhibits, and since she had told Ms. Antar that she could finish her testimony after putting money in the meter but then immediately went to Mr. Lodice upon her return.

---

[71] It should be noted that Ms. Antar was only arrested based on the perjury of Mr. Lodice in his sworn statement that he wrote to police in an effort to get Ms. Antar arrested. The charges were dismissed and no wrong-doing was found in court. Ms. Antar was never charged with disorderly conduct in relation to this incident, but rather a breach of peace. She was found not guilty.

Ms. Antar then said "I was—I was interrupted—" and Judge Grossman immediately said "Stop." And Ms. Antar continued "—multiple times by you." To which Judge Grossman angrily replied "Yes, ma'am. You were interrupted because you never stop talking. The only way that I could get you to listen to me is to interrupt you. I don't normally interrupt litigants. But this is the experience that I had with you the last time you were here and this is the experience I've had with you here today. I do listen to you. But you go off in different directions. You don't stay on the subject. And when I'm asking you questions, you don't answer them. So as a result, you get interrupted by me a lot because I've got to get certain information out of you and you're not volunteering it. So yeah, you're getting interrupted, and I know that's frustrating for you. But I've got to get certain information from you. And you're telling me a whole bunch of stuff that doesn't matter for the motions that you have on before me. So when he is done, and I have some questions for you, if there are things you want me to take a look at, we will go through the same exercise. What are they, are they admissible, we will do the same thing with the things you want me to look at. But we'll have to do that after the lunch recess. As for the attorney request, I already have addressed that."

Ms. Antar then asked "I just want to confirm. Am I being denied the right to any attorney?" to which Judge Grossman stated "Ma'am, I don't—we don't appoint attorneys in family court." Ms. Antar then asked "If I want an attorney, am I not—do I not have the legal right to hire an attorney to represent me in this case?" to which Judge Grossman rudely said "Ma'am, you can hire whoever you want. But you can't have your case continued because you want a lawyer because the case has been scheduled for many months." To which Ms. Antar replied "But why are we hearing his motion that he never served me on. I was never

served with that motion. No return—" to which Judge Grossman immediately interrupted Ms. Antar and said "Thank you. We're in recess." (**See pg 104, lines 1-12,  e-filed case exhibit 71)**

Upon returning from the recess, she then was respectful and allowed Mr. Lodice to pick up where he left off, the same opportunity that she denied Ms. Antar when she forced her to go put money in the meter mid-testimony. Then, after Ms. Antar stated that she "doesn't think that this [exhibit] is authentic", Judge Grossman allowed it to be entered in as a full exhibit with no explanation. (**See pg 107, lines 9-27,  e-filed case exhibit 71)**

When Mr. Lodice then tried to bring up incidents from "all the way from last year" Judge Grossman showed bias toward him by saying "You can hang on to those. They may be— they may be relevant for the overarching request to change custody. But it might not be relevant for the present motions." She previously told Ms. Antar during the same hearing that she could not bring up any incidents prior to 4/12/22 whatsoever, not even Mr. Lodice's conviction of 2 counts of reckless endangerment of DCF neglect record.

Mr. Lodice then continued to make false statements in his testimony by claiming that Ms. Antar "got Angelina kicked out of two daycares" which was not true. Mr. Lodice was the reason why Angelina had to leave the first daycare, and the second daycare Angelina had to leave because her pediatrician couldn't get her the flu shot by 12/31/21. Angelina then stayed out of daycare for the first few months of 2022 since state law mandates she must have the vaccine to attend or else would need to sit out from January-March.

Mr. Lodice then states, in direct contradiction to his statements in prior hearings that he "ended up seeing one of the daycare teachers." (**See pg 109, lines 12-27,  e-filed case exhibit 71)** In prior hearings, he testified on the record that it was Ms. Antar's imagination

that he was seeing the teenage daycare teacher Jessica Maybeck that was having an affair with him.

Mr. Lodice then continued to lie under oath and stated that the second daycare "wasn't a vaccine issue. The actual issue was that Theo kept showing up late and not on time past the time she's allowed. And then so the—the teacher had to drop her." (**See pg 110, lines 1-10,  e-filed case exhibit 71)** This is false, and Ms. Antar has evidence and text messages from the provider documenting that the reason was solely due to the vaccine and the state mandate.

Mr. Lodice continued to slander and make false statements regarding Ms. Antar while under oath, and then admitted he had no evidence that was after the April hearing.

Judge Grossman then said that although it wasn't relevant for *"today's hearing… I will tell you that—I'll tell you both that I heard enough between the two of you that I'm very concerned that the—the long-term custody orders for you—custody and access orders for your child are not working. I'm very concerned about that. That the level of conflict that you two have is not good for your child; that the number of—like, the time she goes back and forth, it seems stressful. The number of different daycares she's been in is not ideal. I don't think the schedule is, like there's a lot of things here that are just not good for you—either one of you—for both of your or your child. So I am going to make some temporary orders today. But the—I think the final orders regarding custody, you know, you both have requests to change custody and change the access schedule. I'm probably going to have you speak with family relations about that when we're done here at 3:30 and have them screen you for appropriate services. I told them that I think it might be appropriate for a full custody evaluation so that they really look into all the complaints you're both making, both*

*of your backgrounds and histories, what's been going on with the daycares, what's been going on with the doctors and the police, and DCF and really give some recommendation to the Judge who makes the custody decisions. I am very concerned that this is, like, too high conflict and that we need to make some orders that will—are definite and will last. So when we are done here today, I may issue temporary orders. The final orders will be pending the outcome of family relations, what they think, what services they think would—your family would be appropriate for and then when those services are done. So we may do temporary orders today. But that—I'm sorry. That's a long way of saying a lot of the materials you both brought with you today might be better suited for that process or that hearing or both. That's—that's what I'm trying to say."* (**See pg 113, lines 1-27,  e-filed case exhibit 71**)

Ms. Antar asked if Mr. Lodice's motion 142 that "I was never served with, is that gone now since I was never served properly?" and Judge Grossman said "Well, I'm not sure. I'm gonna have to take a little time to look at the file about that." Showing that she was not going to hold Mr. Lodice to the same procedural standards that she held Ms. Antar to. Judge Grossman then allowed Ms. Antar to speak about a pending criminal case freely without giving her any warning about her rights. In a subsequent hearing, she made sure to give Mr. Lodice legal advice in regard to his rights and instructed him not to comment on his pending criminal matter.

When Ms. Antar attempted to provide rebuttals to the false claims Mr. Lodice made in regard to the daycares that Angelina attended in 2019 and 2021, Judge Grossman said "I said April of 2022 and you're in another year." To which Ms. Antar said "But you're saying why is she changing so many daycares. It's extremely important that you understand this. I

did not—she did not get kicked out of the daycare. I have printed emails from the school."

(**See pg 121, lines 12-27,  e-filed case exhibit 71**)

Judge Grossman then said "Let me just point out to you that you want him to drop off the child at daycare exactly at 9. But you want an eight-hour window when you drive the child in?" Ms. Antar attempted to explain that the daycare mandated the children be there by 9 and that the prior agreement allowed Ms. Antar to keep Angelina until 5:30 on Fridays, which is why she agreed to change it to dropping her at grandma's on Friday's "any time after 8:30AM" to ensure that she had the flexibility to keep her until the early evening if she desired that time with Angelina.

Judge Grossman then said "I'm not gonna make one side do all the driving cause I don't think that's fair" however in her 5/31/23 order she had no issue with Ms. Antar being required thereafter to do all of the driving both ways to visit with Angelina per the demands of Mr. Lodice. Ms. Antar even pointed out that Mr. Lodice lied under oath regarding using Appclose and the payment of the app, and Judge Grossman acknowledged the perjury, and did nothing. She did the same on 4/8/22 when Mr. Lodice lied under oath about his address when he was intentionally withholding it from the courts and child support.

Judge Grossman then, in a huge display of bias in comparison to the way she spoke to Mr. Lodice on 3/27/23 regarding his arrest, did not inform Ms. Antar of her fifth amendment rights nor did she give her legal advice as she did to Mr. Lodice by instructing her not to answer. Instead, she intentionally asked her out of nowhere "Did you get arrested that day?" and then asked more details about the arrest. Ms. Antar stated that it was being "dropped on the 27th and the charge is being dismissed" when Mr. Lodice interrupted and said "Your Honor, I have a copy of that police report if you'd like to see it." Rather than

scold Mr. Lodice for interrupting or lecture him about how police reports don't come into evidence as they are hearsay, she instead instructed him to "hang on to that." (**See pg 138, lines 1-10,  e-filed case exhibit 71)**

Mr. Lodice then interrupted Judge Grossman again when Ms. Antar was trying to testify and she did not scold him at all. He said "She's going to be going to Hartford? That's, like, driving by where I live." Rather than scold him for his interrupting her and Ms. Antar, she said "Yes. I think that's probably true." (**See pg 139, lines 1-27,  e-filed case exhibit 71)**

During the hearing, she also told Ms. Antar multiple times that she was not allowed to "read to me from that 'cause it's not in evidence" but she allowed Mr. Lodice to read from his notes the entire time during the 5/25/23 hearing.

Ms. Antar said "You said after the break that I would have a chance to speak and show my evidence. And—and I was only able to give the one thing that you said related on that one issue. I have other things—these were all my motions for contempt. I want to be able to be heard. I feel like there's an extreme unfair bias toward him. I feel like I'm being treated unfairly. He was allowed to talk. At several instances, he even interrupted you and you didn't stop him. I just want to be able to show my evidence. I have so much evidence I've prepared for this. And I'd like to be able to speak my—for a fair trial and say what I have to say and show the evidence to go into the court. Because everything he said on the record was false. And I have evidence to prove it all."

Judge Grossman then rudely said "Okay. So Ms. Antar, we started this hearing with you testifying. And I appreciate that you got interrupted. But I—you got—mostly got interrupted with my questions about what you're trying to achieve here. I listened to you for almost two hours. And even in the last half an hour, which I devoted entirely to your rebuttal, I—you

spent a lot of time not answering my questions and not showing me the documents that you said you had. So I feel like we have really vetted these motions and I can't imagine what else there is to---to raise here." Ms. Antar then said "Your Honor, may I please show my evidence here—" and Judge Grossman interrupted her again and said "All right, So—" and Ms. Antar again said "—like he had the opportunity to." To which Judge Grossman replied "Ma'am, I've been listening to you for hours. And I do think that you have made clear your position. I think I understand your position. I don't agree with all the assumptions imbedded in your request, but I think I understand your position pretty well."  (**See pg 155-156, lines 16-27, 1-27 e-filed case exhibit 71)**

Ms. Antar then said "I feel I'm not being given a fair day in court. I want to be heard. I want to be able to show the evidence I've prepared. He's making allegations against me that are extremely serious and you're speaking about entering in orders on our behalf without us agreeing to it. I'd like to show—you said I'd have a chance to respond to what he said. May I atleast do that?" to which Judge Grossman replied "Ma'am, I have another case that I've pushed off until 3:30 so that I could talk to you folks for the last ninety minutes, and we have done that. But I still—I don't—his allegations are not—the things that he—he said a lot of things that don't matter. That—that you both have said a lot of things that don't matter. You have a lot of complaints against each other. You don't have to respond to every one. You have motions about the daycare. You have motions about the time change. You have motions about OFW. You have motions about the birthday. I—I think you have told me everything I need to know about those things. As for the access schedule and the changes, I'm not—any changes I make today are not going to be permanent. They're going to be temporary. I'm not entering final orders on your request to change the custody—the legal

custody or the schedule. That is not going to happen until after you talk to family. So if you don't agree with what happen—you know, if you don't agree with what family relations recommends, then at some point you'll have another hearing, another opportunity to tell, probably this Judge what you think the access schedule and the custody orders should be. But in terms of the motions for contempt, we've been at this for hours. And I think you have told me everything relevant." (**See pg 158, lines 1-12,  e-filed case exhibit 71)**

Ms. Antar attempted to ask about the pending motion for financial discovery, to which Judge Grossman also acted as if she didn't know was mandatory disclosure. When Ms. Antar stated she wanted the typical three years of financial records that constitute financial discovery, Judge Grossman angrily said "All right. Stop. Stop. Stop. Why do you need three years?" to which Ms. Antar replied "Because it's my legal right. And I looked it up—" at which point Judge Grossman got visibly angry and said "Okay. I don't—what—what makes you think you have the right to go back three years on a motion you just filed this year?" and Ms. Antar said "I didn't just file it this year. I filed the motion for modification of child support in November. And that's what this is regarding. And it's been continued several times. And the reason why I feel it's important is because we've been in court for the last three years since 2019. Mr. Lodice has lied several times about his income. He has stated in 2019—" at which point Judge Grossman made her bias toward Mr. Lodice more evident when she said "Okay. Stop. Listen. The way the law works is that once your case goes to judgment—well, let me put it this way. If you file a motion to. Modify something, the—like the child support, the furthest back the court can continue—can—can look is from the last order. So—so you have—you have a motion before the court today to modify the child support—or the magistrate court. I can't go back many, many years even if I wanted to. The

law only says that I can go back to the last child support order. So anything beyond the last child support order. So anything beyond the last—before the last child support order wouldn't be relevant. So that's why I'm asking you why you need three years because—"

(**See pg 160, lines 1-27,  e-filed case exhibit 71)**

At that point, Ms. Antar said "Well, an attorney advised me that I have my legal right to have the last three years of all this financial information because discovery was never done. So therefore, we never had an accurate idea of what his income is. And he stated to me that he made excessive amounts of money in the stock market in 2021. He stated to me that now since having Whole House Remodeling Company in April 2021 that he's making extravagant—" at which point, Judge Grossman, clearly in an effort to protect Mr. Lodice, interrupted Ms. Antar again and said "All right. Ms. Antar—did you hear anything I just said to you?" and Ms. Antar said "I did. So since—so since June 2021 was the last time the child support was ordered. Then—does that mean—" and she said "If that's the last child support order, then—then you can request discovery back to that date. But it can't go back before that date because nothing before that date would be relevant because the court wouldn't be allowed to consider it. It can go back to the last child support order. I need to take a look at when that was. And I just want to be clear that both of you have to produce financial information to each other. So it's not just one way. When—when a court orders child support, child support is—encompasses both of your incomes. So you would both be required to exchange financial information." (**See pg 161, lines 1-27,  e-filed case exhibit 71)**

She then stated she would include her ruling on the motion for discovery "in the orders that I issue on my your motion for discovery" and that "I will take a look at that motion. And I will

issue an order on that in writing as well as all these other issues…. I think we're done. Thank you. I'll issue some orders in writing as soon as possible including on your request for discovery." (**See pg 167, lines 1-5,  e-filed case exhibit 71**)

The parties were then sent to speak to Family Relations, who tried to encourage them to get along and encouraged the couple to try to go get lunch together and to make an off-the-record agreement regarding changes related to the schedule. The parties were told that they would be getting a date in the mail for a mandatory mediation that they both were required to attend. Mr. Lodice never attended the mediation, and it was subsequently rescheduled. He failed to attend the second mediation, and the matter was returned to the court.


**Evidence of Bias, Harassment, and Prejudice of Antar v. Viglione Hearing of 10/11/22**


On 10/11/22, Ms. Antar appeared before Judge Grossman again with her other child's father Gerald Viglione. During the hearing, Judge Grossman began by inquiring as to why Ms. Antar had filed for a motion for a continuance. Ms. Antar stated that she did so because she wanted "the opportunity to speak with counsel[72] and try to get an attorney in this matter." Judge Grossman then, similarly to how she acted in June, said "Well, Ms. Antar, you're welcome to do that but I don't think I can put the case off for you to do that unless you two agree about that. So I see that you made a request for a continuance. I— and, unfortunately, I can't grant those continuances when someone's served with a court

---

[72] It should be noted that at this point in time, Ms. Antar had already retained Attorney Cretella for approximately 2 months in the Lodice matter.

date because what you got was an order to show cause to appear on this date which is not something I can really continue unless people agree and I—I see there's not a lot of agreement on the continuances. So it looks to me like you were served with this paperwork about a month ago. Is there some reason why you couldn't obtain counsel between now and then?"

Ms. Antar responded by saying "Well, Mr. Viglione said that he wanted to try to work this out without having to go to court so I was thinking we were gonna just work it out. And then now, since today, our meeting with family relations, it's clear that there's some more issues and so I'd like to get legal counsel before I say or do anything further."

Mr. Viglione reiterated what Ms. Antar said and Judge Grossman then said "Well—I think— I think I would—we can probably accommodate both your requests in some ways. We—we have to let family relations get started on their work with your family. So it sounds to me like you left it with them that you weren't gonna do much today because you were requesting a continuance. Is that right?" to which Ms. Antar said "There was just no agreement." Judge Grossman then insinuated that she was aware and remembered the fact that Ms. Antar was in school, despite Ms. Antar not mentioning it. She said "you both missed school and work to be here so we might as well make good use of the day." When Mr. Viglione inquired about the magistrate hearing to increase child support that was scheduled for that Friday, Judge Grossman used it as an opportunity to bring up Ms. Antar's educational status, and divulge private information about her to an open court room in front of her ex who then used it against her repeatedly after the fact stating that it was clear that the judge "hated me", since Judge Grossman continued to put her bias and prejudice on display every time she saw Ms. Antar.

Ms. Antar then pointed out that the child support motion had to be heard in magistrate court and Judge Grossman acknowledged that she knew that. She then, in a clear attempt to embarrass and ridicule Ms. Antar in open court in front of her previously violent ex, said "Okay. If there's no agreement, I won't change it, all right, but, Ms. Antar, I think you have more than one case here, right? Like, you—don't you have two cases—two custody cases here and also two magistrate cases here? I get a lot of continuance requests from you. I'm just trying to—to get the cases consolidated a little so that you don't have so many court dates. I'm not trying to do anything nefarious, okay. I'm just trying to get your dates on the same day. So, if you don't—if there's no agreement, I'll keep it on Friday. Fine. But—but you can't complain to me that you have too many court dates and you can't be here if I'm trying when you're in front of me to—to schedule things a little more consolidated, okay. So just give it some thought. It can stay with the magistrate. The custody case can—can stay here. The financial case can stay with the magistrate. We will do it on a day when support enforcement is here so they have the--all those records but it doesn't have to be different days. It could be the same day because I have the ability to schedule things for the magistrates. So that's all I'm saying."

Judge Grossman's words were uncalled for and hurtful. Ms. Antar and Mr. Viglione went to family relations and reached an agreement without needing a hearing or future court date with Judge Grossman. They have not been back to court since and get along well and coparent well. Ms. Antar has sole legal and sole physical custody of their minor daughter Julianna. Mr. Viglione has stated repeatedly that he trusts Ms. Antar's abilities and decisions as a mother.

**<u>Evidence of Bias, Harassment, and Prejudice of the 12/1/22 hearing</u>**

At the start of the 12/1/22 hearing, Judge Grossman immediately once again tried to embarrass and shame Ms. Antar by pointing out that she had more than one case by saying "Antar and—" and even though Attorney Cretella already had said "Lodice" Judge Grossman continued in her attempt to embarrass Ms. Antar by saying "Who's on the other side?" as if she didn't know who Mr. Lodice was. Attorney Cretella then went on to say "Good morning, your Honor, Don Cretella for Miss Antar. Your Honor, this was the—I think he's the—defendant's motion—" At that point, in a smug and sarcastic tone, Judge Grossman said "Oh, it's Antar and Lodice" She clearly said this to point out that there was another possible family case it could have been, and continued to try to show bias and shame Ms. Antar despite her counsel repeatedly stating who the other party was. **(See pg 1, lines 1-8, e-filed case exhibit #72).**

Attorney Cretella stated that he told Mr. Lodice, who didn't show up, that "we would, you know, mark the—mark his motion off by agreement. Here—here's the thing, your honor, I—I think each side has probably, you know, I'm being facetious, but, you know, 11,000 or 12,000 motions for contempt each." To which Judge Grossman in an annoyed tone said "Feels like it" She then inquired about the status of things with Family Relations and Attorney Cretella said "I guess there was two—two different mediation dates he didn't show up for, the—Mr. Lodice didn't show up for, so it was returned to Court; they—I think they closed their file." At which point Ms. Antar clarified and said "Your Honor, if I may? On our last court date where we were in front of you it was June 28th and at that point you ordered us to go with Family Relations. It was ordered to do a custody evaluation and they gave us

two separate appointments with Family Relations in which I was present for both, the defendant was not present for either. And so Family relations referred it back to the Court."

Judge Grossman immediately accused Ms. Antar of lying, despite the file stating exactly what Ms. Antar said and replied "Well, my file doesn't reflect that, but it might just be slow in getting here. Who is it that you were meeting with in family?" **(See pg 3, lines 1-11, e-filed case exhibit #72).** She then went on to show bias even more by saying "Was it Dennis? Would you get Dennis up here please. This file has a lot of twists and turns, I'd like—to hear from Family directly."

Judge Grossman then crossed the line and made it obvious and clear to everyone in the room of her extreme bias, prejudice, and dislike of Ms. Antar. She then proceeds to shame and embarrass Ms. Antar even further by divulging more personal information in open court in an effort to ridicule her in front of her counsel by saying to attorney Cretella:

 *"There's something else that we're gonna need to address regarding—with—with you here which is that this week, the court conducted I think the fourth[73] restraining order hearing filed by Miss Antar against Mr. Lodice. In all of those restraining order hearings in which*

---

[73] Judge Grossman's claim that the court conducted "the fourth restraining order hearing filed by Miss Antar against Mr. Lodice was a blatant lie. At that point, there had been one remote hearing in 2020, one in person hearing in 2021(which Mr. Lodice began to harass Ms. Antar from the moment they walked out of the courthouse), and the one she referenced was the third.

*Miss. Antar represented herself[74], one of which I conducted[75] and the most recent of which Judge Griffin conducted, the—the court was not able to grant any relief after a lengthy—I think your last hearing was a three hour hearing, as was mine, in which I and a prior Court and Judge Griffin found that the evidence presented by Miss Antar simply did not say what she thought it said[76]. That situation has been troubling because we have brought Mr. Lodice here a number of times for lengthy hearings on serious matters; it's not like he can sit home and see what the court does about a restraining order. And the Court has not only been unable to grant any relief, but made a specific finding that what Miss Antar says is not true. So I am on the verge of issuing orders limiting Miss Antar's ability to file further restraining order applications, which troubles me because that kind of relief is very important. So it would be helpful if you would have a conversation with your client about those hearings and those proceedings. You are welcome as her counsel to take a look at the documents on the records and satisfy yourself that the difference between what Miss*

---

[74] Ms. Antar attended a presentation at her school at the University of Connecticut School of Law about Domestic Violence and the new laws that make coercive control domestic violence. She was refereed to New Haven Legal Aid, where she met with one of the staff attorneys who stated that they could not offer her representation even though the grant gave funding for that purpose. They advised Ms. Antar to represent herself and stated that her claims were clear examples of coercive control. Ms. Antar attempted to represent herself, but did not have a key witness with her during the hearing and was told that without the witness there was no way to prove what was said during the phone calls. It should also be noted that this same affidavit that Judge Griffin dismissed turned into a criminal arrest warrant and Mr. Lodice was arrested for his harassment on 1/30/23. His case is currently still pending.

[75] Judge Grossman's claim that she conducted one of the hearings is a blatant lie. She states that she conducted a "three-hour hearing" regarding a restraining order filed by Ms. Antar against Mr. Lodice, but this is a blatant lie and never happened. Judge Grossman completely fabricated her statement in an effort to belittle, shame, and embarrass/intimidate Ms. Antar in front of her new counsel.

[76] Judge Grossman's claim that the court "found that the evidence presented by Miss Antar simply did not say what she thought it said" is a blatant lie. Each of the TRO's were dismissed and the reason was because "Plaintiff failed to meet her burden of proof"

*Antar says the documents say, and what is happening and what the Court finds is actually happening are mutually exclusive, it's remarkable. I don't know what's going on with Miss Antar. We have been really trying very patiently to satisfy her concerns in this court and magistrate court and let's just say that hasn't happened yet. So I am on the verge of issuing orders that she can't file any more restraining orders against Mr. Lodice; I believe there's conflict between those people so I'm not excited about issuing an order like that, but I can't have this guy coming in here every two months for a three-hour hearing where the evidence doesn't reveal what she suggest it does, so."* **(See pg 3-5, lines 22-27, 1-27,  e-filed case exhibit #72).**

Judge Grossman showed so much concern for Mr. Lodice that she was willing to illegally deny Ms. Antar the legal right to seek relief from physical, mental, emotional, and psychological abuse and coercive control in an effort to protect Mr. Lodice from having to "come in here every two months for a three-hour hearing where the evidence doesn't reveal what she suggest it does, so." At that point, she was no longer trying to hide the fact that she disliked and was biased against Ms. Antar.

Attorney Cretella attempted to inquire about the motion for the guardian ad litem, to which Judge Grossman showed that she already considered the parties to be of a lower socio-economic status and treated them differently from parties who are represented by prominent counsel by saying "Well—I was trying to do the less expensive route because everybody on this case before you got here told me that was the preference[77], but let me see what Dennis has to say."

---

[77] Neither of the parties ever said that it was their preference. In fact, by this point Ms. Antar had previously filed her own motion for a GAL which Judge Grossman ignored.

Judge Grossman then completely misconstrues what Dennis wrote in his letter by saying "Dennis reported that his referral for an evaluation was closed out because his—because Miss Antar did not cooperate and mr. Lodice did not appear, which is completely unacceptable arrangement. So this matter is set for trial on February 1st. In advance of trial, I'm issuing the following orders; notwithstanding the fact that Mr. Lodice is not here, he'll be subject to them." **(See pg 7, lines 1-4, e-filed case exhibit #72).**

Judge Grossman then in a very accusatory tone said to Ms. Antar "All right. So, Miss Antar, you must provide Mr. Reilly, who is sitting right here, a list of all your present and past mental health providers; individuals, hospitals, agencies, everything; and you have to do that for the child if the child received any mental health treatment or evaluation as well; Mr. Lodice is ordered to do the same[78]. This information is important. We're having a hearing on custody of this child, and I need to know from some third parties, DCF, everybody, what is going on. If you or Mr. Lodice don't sign these order—these releases, the Judge who does the hearing, which right now I think is scheduled to be me, is allowed to make a—a default, or an assumption that if you didn't sign the releases or didn't provide the information, the information would've been harmful to your case. So if you do sign it, we'll get what happened; if you don't sign it, the Judge gets to assume that you didn't sign it 'cause there was information you didn't want the Judge to know, so please don't put the judge in that position. You need to provide a list and sign these releases so that we can find out what's going on; same for Mr. Lodice, he's gonna get the same order. I just wanna make sure you understand that." **(See pg 8, lines 1-15, e-filed case exhibit #72).**

---

[78] It should be noted that Mr. Lodice never complied with this order and was still awarded permanent sole legal and physical custody of Angelina.

Mr. Lodice refused to sign releases for the 2 individual therapists that he saw, and Judge Grossman never held it against him. She ignored the fact that all of the information was only from Ms. Antar's providers, and none of it was in regard to Mr. Lodice due to his refusal to sign the releases.

At the end of the hearing, Attorney Cretella noted that he wanted to ask for a full day for the trial, and Judge Grossman said "It's scheduled for a half day right now. I know that your client often feels like she doesn't get enough airtime in court; she's made that clear to me— multiple times. I'll see if we can expand it to a full day, otherwise we might have to pick some additional time if we need it. But I think that with a very experienced lawyer, Ms. Antar, helping you sift through the evidence that the Court is allowed to consider that the case might go a little faster, and I think that that will benefit you. When you were reperesenting yourself in front of me, I had to sift through all the evidence for you and that takes a lot of time; your lawyer's perfectly capable of doing that for you. So if I—the rest of my day frees up, you'll receive notice, otherwise it's possible that we might have to do it on a separate date." **(See pg 11, lines 1-15, e-filed case exhibit #72).**

**Evidence of Bias, Harassment, and Prejudice of the 5/31/23 order**

Judge Grossman's 5/31/23 Final post-judgment order titled **"Orders RE Post Judgment motions #142, #157, #157.6, #165, #254, #256, #225, #237, #148, #186, #187, #195, #2015, #210, #212, #232 #247"** consisted of clear evidence of her prejudice and bias against the Plaintiff, contained what she knew[79] or should have known were blatant lies and

---

[79] The order consisted of several flagrant inaccuracies and numerous claims that were not backed by any proof or evidence whatsoever. Her order contains reasoning which is not consistent with material facts or reality based on what she claims as her basis for making

attempts to slander and defame the Plaintiff, and what she knew or should have known were statements that contradicted the evidence, affidavits, and other related documentation contained in the statues and court files that she referenced as justification for her order.


## Evidence of Bias, Fabrications, Harassment, and Prejudice during 3/27/23 hearing

On the first page of Judge Grossman's 5/31/23 court order, she states that "The court conducted a hearing on motions to modify custody filed by both parties and other post judgment motions on March 27, April 5th, and May 25th of 2023."

This statement is inaccurate and fails to mention that the 3/27/23 hearing was set *solely* for the purpose of hearing the Plaintiff's motion #245 Application for Emergency Ex Parte Order of Custody that was filed by Attorney Cretella on 3/13/23.

The application stated many concerns on behalf of the Plaintiff, and mentioned the following regarding:

 *"numerous incidents of my minor daughter (almost 4 years old) making concerning comments and displaying behaviors sexual in nature of which she states her brother Dom, who is her step brother that resides in the respondents home, has done to her. My daughter has been acting sexually towards stuffed animals and when I question her as to what she is doing she states "I am doing what Dom does to me." I have captured many*

---

such a drastic, damaging, and punitive order that can be seen as a cruel and unusual punishment for her dislike of the Plaintiff Ms. Theodora F. Antar. Mr. Lodice, who has a long history of domestic violence, alcoholism, substance abuse, criminal convictions, and poor credit has been exhibiting legal abuse against Ms. Antar for years.[79] Furthermore, he has shown that he only seeks a change in custody only as a means of revenge, punishment, and continued control over Ms. Antar based on the pattern of filings and frivolous and inaccurate claims that he has made on both financial and custody related filings through the court.

*incidents on video of which my daughter references to the alleged abuse and/or mentions certain things she is asked to do or sees while at the respondent's home. The respondent has allowed his son, Dom only 16 years of age, to watch my daughter alone on numerous occasions despite many conversations with the defendant regarding that it is inappropriate and unsafe for her to be left alone with him given his age and that I do not agree to such. The respondent informs me that he will no longer leave the minor child in the care of his son, however, he continues to do so. Both DCF and the New Britain Police advised the respondent on 2/11/23 it would be in his best interest for the daughter to stay with the plaintiff and to suspend his visitation to which both the respondent and the plaintiff agreed to. As such the daughter had no visitation with the respondent from 1/30/23 to 03/10/2023. This past Friday, 3/10/23, the respondent arrived at my daughter's school and took her along with all of her belongings. I notified both State Police and New Britain Police Department of such at which time the police conducted the wellness check 03/11/2023, during which the respondent, again, refused to show the child to police. As such, the police could not confirm to me that my daughter was safe. The respondent further dropped the child off on Sunday morning to my mother at church. My daughter informed me on Sunday that she was left alone with Dom all day on Saturday (03/11/23) while the respondent was out of the home at work and that Dom had sexually abused her. I am very concerned for the wellbeing of my daughter when in the care of the respondent as he has made no efforts to monitor his son around our daughter but only continues to leave her in his care despite being aware of the ongoing investigation. No actions have been taken to inform the respondent of this application, but the court should consider the application on an ex parte*

*basis for the following reasons: The court should consider and grant this application due to the urgent nature of the detailed incident as well as DCF/Police involvement."*

Judge Christopher Griffin granted the order in part, and stated in his order that the "Defendant shall not leave the minor child alone with her stepbrother. All other custody, access, and visitation orders remain in effect and are not disturbed by this order."[80]

The 3/27/23 was not a "hearing on motions to modify custody filed by both parties and other post judgment motions", as Judge Grossman falsely claimed in her order from 5/31/23, but it was instead a virtual hearing conducted on Microsoft Teams during which the Plaintiff and Plaintiff's former counsel were not given any opportunity to show any exhibits or other evidence in support of the motion. Judge Grossman was not interested in seeing or hearing any of the evidence, but rather was more concerned with trying to accuse the Plaintiff of lying about the allegations, despite having no factual or legal basis to come to such a conclusion. During this hearing, Judge Grossman also made her extreme bias and prejudice against the Plaintiff evident for all to see.[81]

Judge Grossman knew or should have known that when she entered her 5/31/23 order that the 3/27/23 hearing was specifically set as an "emergency motion for custody, which was marginally granted, and we'll need to discuss that motion today" since it was her who stated

---

[80] The motion was then set for a hearing date which was scheduled for 3/27/23 at 9:30AM and was then changed to a remote hearing due to Plaintiff's request based on the protections available of the criminal order of protection that Defendant was the subject of.

[81] Ms. Antar had a witness, Anthony Zuppardi, who was also on the call, who stated that it seemed as if the judge "didn't like [Ms. Antar]" based on the way she spoke to her and dismissed Mr. Zuppardi so quickly during the hearing. Mr. Zuppardi also personally witnessed many of the disturbing statements and actions that Mr. Lodice made during FaceTime and regular calls that were supposed to be between him and the minor child. This was the basis of his harassment charge that he is currently still facing in Derby GA **(See e-filed case exhibit #23).**

that at the start of the hearing. **(See pg.1, lines 6-9 e-filed case exhibit #74).** Judge Grossman even acknowledged that there was an upcoming hearing set for 4/5/23 for all pending motions to be heard, and referenced it during the 3/27/23 date, when she said "Alright, so my first question, Attorney Cretella, is for you, and that is it looks to me like we have a hearing next week, April 5th, and I think Family Relations is in the middle of some work with the couple." Attorney Cretella said "Okay. That's true." **(See pg.1, lines 22-27 e-filed case exhibit #74).**

Judge Grossman then said "Let's see. So is this motion today something that is going to be consumed with what we're doing on April 5th, should we try and do it all together, or is this something discrete that you think we can—deal with today?"[82]

She then continued to show her bias based by the attitude[83] she showed regarding Plaintiff's request for relief from the court based on the ongoing concerns of sexual abuse. Attorney Cretella told her "I don't know if Ms. Antar wishes to defer to the 5th, but I guess that would be up to the—the Court." **(See pg.2, lines 1-11 e-filed case exhibit #74).** Judge Grossman's response was extremely biased toward Mr. Lodice, when she replied by saying "Well, I think the question really is for the person who this effects, which is Mr. Lodice. So—"

Judge Grossman then continued to show preferential treatment for the Defendant and bias against the Plaintiff by continuing to say "Because there are some kind of, not very

---

[82] This appears to show that she was being insensitive and biased about the situation, especially given the serious nature of the affidavit that was attached to the motion that she should have already read in advance of the hearing.

[83] Rather than looking at it from the lens of the best interest of the minor child Angelina, Judge Grossman insisted on viewing the application for emergency court intervention through the lens of protecting and favoring the Defendant, ignoring the fact that there is so much compelling and concerning evidence pointing to the fact that he is unfit as a father.

impactful, but temporary orders that say that while—while the orders remain in effect, the child won't be alone with the stepbrother, so that would have to remain in place until the 5th. So, Mr. Lodice, is that something that--" **(See pg.2, lines 16-20 e-filed case exhibit #74).** She then allowed Mr. Lodice to interrupt her mid-sentence with no objection[84], and he said "No, I'd—I'd like to address this now please, your Honor. I've been not able to see my daughter. She's been keeping my daughter from me. In the last nine weeks—In the last nine or 10 weeks I've only seen my daughter once, and I have not been able to talk to her, she's not letting me speak to her, so I would really like to address this right now." Judge Grossman also asked Attorney Cretella if he was aware that Angelina had remained with Ms. Antar during those weeks and he stated "Yes", as he had agreed as well that it was in the best interest of Angelina's safety. Judge Grossman also appeared so disinterested in the matter and so eager to push back another week to 4/5/23, that she seemed disappointed that the parties wanted to move forward with the hearing. She stated in a smug and annoyed tone, "Fine, we will—we will have the hearing. We'll do it today." **(See pg.3, lines 5-9 e-filed case exhibit #74).**

Judge Grossman also pretended that she didn't know why Ms. Antar wasn't sending Angelina to Mr. Lodice's house for the unsupervised full weekend visits during that time,

---

[84] Judge Grossman, on multiple occasions showed extreme aversion to even the slightest interruption by Ms. Antar, but would consistently allow the Defendant to interrupt her or the Plaintiff with no penalty. Mr. Lodice also committed perjury by stating under oath that he only saw his daughter "once in the last 9 or 10 weeks" when Ms. Antar had put in the application for emergency ex-parte that she had kept Angelina with her for seven weeks at that point, during which Mr. Lodice spent three days with her. Mr. Lodice regularly embellishes and fabricates things while under oath, using inaccurate exaggerations to try to make situations into something more than what they actually are. He failed to mention that he was in agreement with Angelina remaining with Ms. Antar during this time, and that he agreed that he would wait until the investigation ended.

despite it stating it clearly in the affidavit that was attached to the motion that she was

hearing that day by saying "Well I think Mr. Lodice is saying that the orders aren't—existing

orders aren't being followed … And I would like to—I'd like to understand why that is." **(See**

**pg.3, lines 18-23 e-filed case exhibit #74).** She was more concerned over Mr. Lodice's

exaggerated claims that Ms. Antar was withholding the child for no reason than trying to

hear from Ms. Antar, the moving party, regarding the emergency motion in front of her and

the affidavit that Ms. Antar included. She was more interested in trying to focus on Ms.

Antar's failure to follow her court orders. She arguably did this to exert more power and

control over Ms. Antar to intimidate and harass her further, which Attorney Cretella alluded

to when he responded by saying "Okay, we can—You know, you can do that, your Honor. I

mean, that's fine. I mean, but—listen, it's—it's—My name is not on the front door of the

courtroom." **(See pg.3, lines 24-27 e-filed case exhibit #74).**  She stated "I understand

your point that the only thing that's down for a hearing today is whether or not this

restriction is lifted, but if the restriction is the reason why your client's been withholding

access then we're going to tackle that. I don't need to tell you or your client, who I—I

believe has represented she is a law student[85], that when court orders are in place we

---

[85] Judge Grossman then also showed that she was acting with bias against the Plaintiff, by
bringing up irrelevant information such as the Plaintiff's educational status and continued to
ignore the affidavit that she had that clearly explained that Ms. Antar was advised by DCF,
Police, and Don Cretella to keep Angelina safe until the investigation concluded. Ms. Antar
acted in the best interest of Angelina, and Judge Grossman hyper focused instead on the
fact that Attorney Cretella opted not to file for an emergency ex-parte when the allegations
first came up and that the parties had decided to keep Angelina with Ms. Antar by
agreement. Judge Grossman's statements regarding Ms. Antar's status as a law student
were perceived as her mocking, shaming, and showing a bias against Ms. Antar. She has
commented on Ms. Antar being a law student on several occasions, and has been highly
critical of her as a result. She also showed zero concern or consideration for Angelina, the
minor child, who was the subject of the protection that Ms. Antar was asking the court to
grant in the form of relief. Her insinuating that Ms. Antar should have known that blindly

expect them to be followed. So it is, of course, disturbing to me that I would hear the court orders are not being followed." **(See pg.4, lines 1-17 e-filed case exhibit #74).**

She was focused on trying to shame and criticize Ms. Antar for not following her orders, and used these statements to further intimidate Ms. Antar, by reminding her that she was just a "law student" and not a Judge with the power to destroy someone's life like her. She has consistently shown abuse of power and there have been numerous complaints about her in that regard. **(See e-file case exhibit #46).** During the 3/27/23 hearing, her tone was demeaning, condescending, and accusatory toward Ms. Antar while showing respect, courtesy, and compassion for Mr. Lodice[86], the defendant who was once again being accused of being a domestic abuser and neglectful unfit parent, as he had been countess times before in the past by both women who he has children with. Judge Grossman showed that she didn't care at all about Angelina, but instead was more concerned about trying to discredit, slander, insult, and offend Ms. Antar. Ms. Antar stated to the court that her concerns were regarding the fact that "Since February 1st, my daughter disclosed to me that she was being abused while in the care of Matthew, I immediately reported it to DCF and the police. Subsequently we had investigations and I informed everybody form DCF and the police that I would, for her own safety, be planning to keep her with me throughout the remainder of those investigations for her own safety, and I was

---

obeying Judge Grossman's civil family order with no regard for the child's safety or wellbeing would have been a better choice for the child than listening to DCF, Police, and her hired counsel who instructed her to keep the child away from Mr. Lodice for the duration of the investigation.

[86] She also blatantly ignored clear and convincing evidence that showed that Mr. Lodice was lying about his income, lying about his court-ordered obligations concerning his other children, and lying about and intentionally withholding from the court information regarding his substance abuse, mental health, and medical history and status.

told that Matthew also agreed that it was in her best interest to remain with me throughout the investigations." **(See pg.8, lines 14-22 e-filed case exhibit #74).** Judge Grossman again, showed her preferential bias toward the Defendant when he, once again, interrupted Ms. Antar during her testimony and said "Could I object? Like, who told you that? Like, objection, hearsay. She's saying somebody said that I said something." Attorney Cretella attempted to tell Mr. Lodice that "it's not hearsay" and Judge Grossman intervened and came to Mr. Lodice's defense, once again showing her bias toward him.[87]

Judge Grossman said "well,--" and was interrupted by Mr. Lodice who said "She's—It is." Rather than get angry or scold him for interrupting her and going so far as to correct her and tell her that she was wrong about it not being hearsay, Judge Grossman was once again reasonable[88], nice, and compassionate toward Mr. Lodice. Her response was "Hold on. I'm just trying to figure out like—You will get a chance to ask her about these things. Let me see what the context is first, okay. And you can take notes if you want, sir, you'll be able to ask questions." **(See pg.9, lines 1-10 e-filed case exhibit #74).**

Judge Grossman continued to show a clear display of her bias and prejudice against Ms. Antar during the hearing, before either party even began to give any testimony whatsoever. When Ms. Antar's counsel asked permission to ask her some leading questions to help aid

---

[87] It should be noted that she did not scold or reprimand him for interrupting Ms. Antar during her testimony, nor did she scold or reprimand him when he interrupted her.

[88] She gave him procedural advice, instructed him that she would reserve time for him and told him that he would have a set opportunity to ask questions, all things that she never did in the past for Ms. Antar regardless of if she had counsel or not. This hearing was the first hearing that Judge Grossman presided over in which Ms. Antar's counsel was present when both of the parties were also present. The polar opposite and double-standard treatment that she consistently gave Mr. Lodice, a 40-year-old man who owns a large construction company and has shown that he is more than capable to represent himself, even going so far as to refuse counsel in his criminal case, is a blatant display of her bias and preferential treatment that she gives him.

in her testimony, Judge Grossman replied by stating "That's fine. I—you know—because there have been—Attorney Cretella, because there have been so many accusations leveled by your client against this father and the other father that she has cases with in this court, I'm going to need some details. You know, her vague assertions that the child is abused is not going to do it, I mean I need to understand what exactly she's talking about. So, yes, you can certainly ask some leading questions." **(See pg.9, lines 17-26 e-filed case exhibit #74).**

These comments were inappropriate, demeaning, and accusatory. They were also an example of Judge Grossman openly divulging unrelated information in front of witnesses during open court to shame and embarrass Ms. Antar for having children from two different fathers. She never once criticized Mr. Lodice for having children from two different mothers or for having 2 cases in Family Court and 2 cases in magistrate court, nor did she ever once bring up his case or the details in their file during any proceedings with Ms. Antar. Her statement that "there have been so many accusations leveled by your client against this father and the other father[89] that she has cases within this court" was harmful and inaccurate[90]. Judge Grossman's comments reflect her bias against women, and bias and prejudice against women who seek protection and relief from the courts based on domestic violence, and physical and/or emotional abuse. Judge Grossman's words also show that

---

[89] Judge Grossman claimed that there have been so many accusations in that case, when in that case the father admitted to being violent and physically abusive toward Ms. Antar, which is why she chose to end the relationship and seek protection for herself and their minor child who she maintained sole legal and physical custody for over the past 8 years.
[90] At that time, Ms. Antar had never made any false accusations about Mr. Lodice, nor had she made any false accusations regarding her older child's father. In fact, her and the other father had not had any issues or court involvement whatsoever in the four-year period from 2019-2023 except for making one schedule modification in 2019, one schedule modification in 2022, and an increase in the child support for 2022.

she has an overarching bias against Ms. Antar, in which she already believes that Ms. Antar is lying, and views her as lying by default, and views Mr. Lodice as being credible[91] by default. Furthermore, Judge Grossman never once presided over Ms. Antar's case with her other father and only saw them in court one time for a few minutes during which she also attempted to shame and embarrass Ms. Antar by bringing up the case with Mr. Lodice. **(See e-filed case exhibit )** Additionally, Judge Grossman claimed that Ms. Antar had made "vague assertions that the child is being abused" and that she "need[ed] to understand what exactly she's talking about" also show her bias and refusal to properly consider the serious or concerning nature of the case. Ms. Antar clearly put in detail the specifics of what she was concerned about in the motion that was filed for the emergency ex-parte order of custody, and in her affidavit gave specific details, dates, and explained clearly exactly what the abuse was and how it was being disclosed by the child. **(See Motion#245 Application for Emergency Ex-Parte Order of Custody)** Ms. Antar described in detail about the situation when questioned by her counsel. She stated that after Angelina disclosed possible sexual abuse that "I spoke about it to my therapist who then told me to call DCF and said she would call DCF if I would not, so I then reported it to DCF." She also testified that Angelina was alone with the two minor sons of Mr. Lodice "almost every time that she was with Matthew." **(See pg.11, line 15 e-filed case exhibit #74).**

---

[91] It should be noted that, unlike Ms. Antar, Mr. Lodice has a case with his ex-wife in which she claimed substantially that he was physically, mentally, financially, and psychologically abusive to her and their two children. Judge Grossman did not mention all of the accusations that had been leveled against Mr. Lodice by his ex-wife, and also did not mention that many of the claims made by his ex-wife were almost identical in nature to those made by Ms. Antar. Even with two women stating that the same man has abused them, Judge Grossman instead decided to shame and embarrass Ms. Antar and accuse her of leveling so many accusations when that was false.

Ms. Antar gave more specific details regarding the additional allegations that began on 2/1/23, and stated that on that date "she was making sexual motions on top of a stuffed animal, and I asked her what are you doing, and she stated I'm doing what Dom does to me, referring to her 16 year old brother. And I captured this on video. I captured her sexually humping the stuffed animal in what appeared to be a sexual manner that I recorded me speaking to her and our conversation, during which she stated this is what he does to me, and then proceeded to demonstrate. **(See pg.11-12, lines 23-27, 1-10 e-filed case exhibit #74).** Ms. Antar then described an incident that occurred 2 days later, on 2/3/23, where she says "It was the same type of scenario where the child was making sexual motions on top of a stuffed animal, and I asked her what she was doing, and she had said—she just told me that she's doing what the minor brother does to her." **(See pg.12, lines 23-26 e-filed case exhibit #74).**

Ms. Antar went on to describe another incident that occurred on 2/10/23, in which she said it was "the same scenario, I walked into my living room, I find the child humping her toy, I said to her what are you doing, the child stated doing what DL does to me while having her legs wide open in the air. I said show me, she stuff—puts the stuffed animal under her vagina, she starts humping and grinding it in a sexual manner saying that's what DL does to me. And I also recorded all of these interactions." **(See pg.13, lines 9-16 e-filed case exhibit #74).**

Ms. Antar then tried to look at her notes and find the next documented incident about the abuse, and Judge Grossman impatiently stepped in interrupted her testimony and said "Attorney Cretella, what's the question that's pending here? What—What I'd like to know is what happened with the DCF investigations, what happened with the police investigations."

**(See pg.14, lines 14-23 e-filed case exhibit #74).** She had no interest in what Ms. Antar had to say regarding the actual specific instances that she said she needed more details about and stopped Ms. Antar from testifying more about the specific times the child made allegations about the abuse, to then focus in on the investigations in an effort to try to portray Ms. Antar as a liar.

Ms. Antar continued with her testimony by saying that "The DCF investigation was closed" and Mr. Lodice immediately interrupted her during her testimony and said "Objection. She's saying it's closed, that doesn't state what was the result of the investigation. She just said it was closed, she didn't say whether it was substantiated or unsubstantiated." Not only did Mr. Lodice interrupt Ms. Antar, but he also failed to state a proper Federal Rule of Evidence to which he was applying his objection. Judge Grossman did not scold him, reprimand him, or correct him for interrupting or for failing to cite a rule of evidence for his objection. **(See pg.15, lines 8-16 e-filed case exhibit #74).**

Even after being told that that wasn't his question by Attorney Cretella, Mr. Lodice then continued to be disruptive and continued to argue with Ms. Antar's counsel while Ms. Antar was trying to testify. Mr. Lodice interrupted for the second time in a row and said "You said what was the results of the DCF investigation. That's not the results, the results were as unsubstantiated." Even though he interrupted[92] for the second time in a row and was arguing with counsel, Judge Grossman still never once scolded or reprimanded him, and showed her bias toward him by saying "If she knows—" and Mr. Lodice then interrupted her

---

[92] Even after he interrupted Ms. Antar and Attorney Cretella twice, and then interrupted Judge Grossman, she still did not say a word about his interruptions, disruptiveness, or argumentativeness during Ms. Antar's testimony, and instead agreed with him and told Attorney Cretella to ask Ms. Antar the specific things that Mr. Lodice was demanding. **(See pg.15, lines 16-22 e-filed case exhibit #74).**

by saying "Okay" and Judge Grossman said "—the outcome would be helpful." Judge

Grossman then seemingly divulged information that she possibly learned privately directly

from Attorney Cretella, by stating "Okay. Attorney Cretella, is it true that you want to ask

about the—the child's contact with father in—since these allegations. I would like to know

what's going on. You want me to ask? I'll ask." **(See pg.17, lines 16-21 e-filed case**

**exhibit #74).**

After taking complete control of Ms. Antar's testimony and making a clear effort to try to

hyperfocus in on the fact that Ms. Antar was keeping the child with her during that time due

to the advisement of DCF, the police, and Attorney Cretella, Judge Grossman then asked

Ms. Antar "So, ma'am, who is the DCF worker you're working with on these cases?" **(See**

**pg.17, lines 25-26 e-filed case exhibit #74).**

Ms. Antar stated the name of the DCF worker Larae Plummer and the detective from the

New Britain Police Department Lisa R. Steeves, and Judge Grossman immediately

changed the subject and began to ask questions about Ms. Antar keeping the child with her

during the investigations by stating "And is it—when is the last time that your daughter saw

her father?" Ms. Antar responded that "The last time that she saw him was on March 12th"

and Judge Grossman, in an accusatory tone responded by saying "He started this hearing

by alleging that you're not letting him see the child, is that true?" to which Ms. Antar replied

by saying "That's correct." Judge Grossman then immediately began to attempt to scold

and reprimand Ms. Antar by saying "All right. You're aware that there's court orders on your

application that say that he continues to see the child on a regular schedule? So you're not

following those court orders?" **(See pg.18, lines 4-18 e-filed case exhibit #74).** She

showed no concern for the fact that Ms. Antar was advised by her counsel, the police, and

DCF that it would be in the child's best interest to remain with Ms. Antar during the duration of the investigations, nor did she show any concern for the welfare or safety of the child. Instead, she focused solely on the fact that her orders were not being followed, and attempted to reprimand Ms. Antar for that, even though Mr. Lodice had not followed any of the respective orders at all and was not being reprimanded for that.

Ms. Antar attempted to say "I can explain if you—if you like" and Judge Grossman, rather than allowing her to explain said "Have you talked to any—Have you talked to Family Relations[93] about these new allegations?" to which Ms. Antar replied by saying "no." **(See pg.18, lines 21-24 e-filed case exhibit #74).**

Judge Grossman then stated she would issue new orders with Family Relations and said "Okay. I—I'm going to have the Family Relations Officer who is doing the custody evaluation review the file and call these—call the police officers, call the DCF workers, because obviously that's information that everyone would want her to have for next week." **(See pg.19, lines 1-3 e-filed case exhibit #74).**

Anthony Zuppardi, a witness who testified during the hearing, also stated that "I'm a trained firefighter, EMT, EMR, I mean I've went through child sex trafficking and many courses on this, and I was watching the child over the summer, and I said she exhibited many signs of abuse." **(See pg.21, lines 13-17 e-filed case exhibit #74).** Mr. Zuppardi also stated that "I just asked her what are you doing, you know, and she had told me that's what her brother did to her, and I was like it looked inappropriate, and I just let the child talk. And I reported it

---

[93] It should be noted that the assigned Family Relations worker Annamaria Baranowski specifically stated that she cannot take in any information from either party no matter what it is in regard to, unless it has been previously assigned and ordered to her as a direct order from Judge Grossman.

to Ms. Antar and I said, you know, I said this is not healthy. You know, I said—" **(See pg.22, lines 1-3 e-filed case exhibit #74).**

At this point, Mr. Lodice disrupted and interrupted the witness during his testimony again. He also did not state a proper rule of Federal Rule of Evidence to justify his objection and said "Objection, your Honor. He—The witness is not an expert in child sex issues in any way, shape, or form." To which Judge Grossman said "That is" and Mr. Lodice interrupted her again and said "I don't understand how this testimony is relevant."

And, although the fact that Mr. Zuppardi was testifying that he observed Angelina doing the same sexual behaviors that Ms. Antar mentioned, and despite the fact that he also stated the child said her brother did it to her, Judge Grossman showed such clear bias in her reply by saying "That objection is sustained." **(See pg.22, lines 6-12 e-filed case exhibit #74).**

She once again allowed[94] Mr. Lodice to be disruptive and interrupt witnesses during their testimony without citing proper reasoning for the objection when he objected.

Mr. Zuppardi then said that "I witnessed the child with a teddy bear spreading it's legs and humping the teddy bear in a sexual manner, and I—I said stop, stop, what are you doing? She goes it's okay, it's okay. You know,--she said a name, I don't remember which name, it was like her brother, and I was like who is that, and it's like my brother. And I—I didn't really know, I didn't know her other part of the family, I didn't know the history." He also stated that he observed this inappropriate behavior "A few times. Once at my house, once at her house." He also testified that "I mean, I've seen normal—yeah, I mean, I have a daughter—

---

[94] She once again allowed Mr. Lodice to interrupt her, and did not scold, reprimand, or get angry with him at all. She sustained his objection, making it clear that she had no interest in doing anything other than focusing in on the fact that Ms. Antar kept the child away from Mr. Lodice out of concern for her safety.

As a father, not as an EMT or not as an expert in any way." **(See pg.23, line 1-27 e-filed case exhibit #74).** Judge Grossman then chose not to ask Mr. Zuppardi a single question about what he testified that he witnessed, but instead only asked him "All right. So when is the last time you saw the parties' child?" and then became upset when he did not answer the way she wanted and said "Okay, Listen to my question. When is the last time you saw the child in person?" and "What's the nature of your relationship with Ms. Antar?" and "Okay. Well, are you in a romantic relationship or not?" **(See pg.24, lines 7-27 e-filed case exhibit #74).**

She then told him to leave the call and said she had no more questions for him before she made sure to give Mr. Lodice direction and turn the hearing over to him. She stated "Mr. Lodice, do you have any questions you want me to ask, or you want to ask Mr. Antar about what she testified to?" **(See pg.25, lines 12-15 e-filed case exhibit #74).** Attorney Cretella then reminded Judge Grossman that "just to let you know there is a full no contact between parties" to which she said "Oh, yeah, how did that come up? Anybody know? Who got arrested?" to which Mr. Lodice said "I—I---I was, your Honor." Judge Grossman then asked him "What were you arrested for?" and Mr. Lodice, in an attempt to deflect and shift the blame from him onto Ms. Antar said "Well, last time—Remember when I was in court a couple of months ago for—she had filed for—for her fourth protective order on me, which was thrown out, when Judge Martin said" **(See pg.26, lines 8-21 e-filed case exhibit #74).** At this point, Attorney Cretella stated "—he should maybe be advised, too, if he's going to speak about his criminal case." And Judge Grossman showed concern and a protective attitude toward Mr. Lodice, along with bias by saying "I know. I—just—just tell me—tell me what you got arrested for. Just tell me what—what—" to which Mr. Lodice responded with

"harassment. Harassment second degree." **(See pg.26, lines 22-27 e-filed case exhibit #74).**

Judge Grossman did not ask Mr. Lodice a single question about the details of his arrest or open criminal case for Harassment 2nd degree other than "And—And who arrested you, what department?" to which Mr. Lodice stated "The Orange Police Department" and she said "Okay. And there's a full no contact protective order?" to which Mr. Lodice replied by saying "there's a full no contact order with stipulations in there saying that we can contact via the app, and I'm allowed to make phone calls to her to—to talk to my daughter and to set up visitation in cases ther's any—like, you know, to initiate contact for visitation purposes."

Judge Grossman then did not ask any questions about the details of the arrest, the reason why he was arrested, or give Ms. Antar an opportunity to elaborate on the disturbing allegations that were part of the arrest. She then said "Okay. All right. You answered my questions. And I—Sorry I did this out of order. Why don't you ask Ms. Antar any questions that you have." **(See pg.27, lines 2-16 e-filed case exhibit #74).**

She did not allow Mr. Antar to freely give her testimony at the start of the hearing, and made sure to intentionally interrupt Ms. Antar and dismiss her witness and then give Mr. Lodice the full control over the remainder of the proceeding. She completely dismissed his arrest and pending criminal case, and treated him with respect and patience. She allowed him to interrupt her, Ms. Antar, Attorney Cretella, and Mr. Zuppardi multiple times, and never held it against him once.

Mr. Lodice then asked Ms. Antar "what was the result of that [October 2022] investigation?" to which Ms. Antar replied by stating "The child attended a forensic interview during which

she was not able to speak because she was not able to get past the first question, and then investigation was then closed at that time." **(See pg.29, lines 3-6 e-filed case exhibit #74).** Mr. Lodice then asked "For the—the allegation on February 1st did they do a forensic investigation on Angelina for that allegation?" and Ms. Antar replied and said "There was a forensic interview that took place. There was—" and Mr. Lodice interrupted her and said "Okay. And what were the results of that forensic interview?" and Ms. Antar replied and said "The child made disclosures about what happened to her, and it's currently still being investigated." Mr. Lodice then said "What—What was the results that DCF, Ms. Larae Plummer said that the results were?" to which Attorney Cretella said "objection, hearsay, objection." And Judge Grossman once again took Mr. Lodice's side and came to his assistance by saying "I let—I let her talk about this, I'm certainly going to let her talk about it again under his questioning. You can answer it. What did she say?" **(See pg.30, lines 6-27 e-filed case exhibit #74).**

Not only did Judge Grossman refuse to allow Attorney Cretella's objection based on the fact that it was hearsay, but she insisted that Ms. Antar answer Mr. Lodice's question, even asking it again herself. Ms. Antar said "The DCF worker did not say anything." And Mr. Lodice then said "So the DCF worker did not say it was being unsubstantiated?" and Ms. Antar said "She did not." To which Mr. Lodice then asked "And then was—So was there any arrests made after the—the invest—the initial investigation?" and Ms. Antar said "an arrest may be made; however, it's still under investigation." **(See pg.31, lines 1-6 e-filed case exhibit #74).**

Mr. Lodice then continued to say "So in the forensic investigation they have the social worker come in with the DC—and they have DCF and the detective standing outside the

room watching as the social worker works with Angelina to find out if there was anything that can be substantiated. Upon that investigation, was there any arrest made?" Ms. Antar then clarified and said "There's no forensic investigation, it's a forensic interview. And the child attended that interview, the—both investigations are now open and they're still pending." **(See pg.30, lines 16-25 e-filed case exhibit #74).**

Mr. Lodice then asked about if there was a third forensic interview done and Ms. Antar replied that "it's pending" and when he continued to ask "It's pending. So they're investigating, but they haven't set a date up to do the interview yet?" Ms. Antar then said "I feel like you're asking a lot of questions about an active criminal investigation that I don't feel comfortable telling all the details because it's actively being investigated." **(See pg.32, lines 1-10 e-filed case exhibit #74).** Judge Grossman then immediately stepped in to criticize Ms. Antar, even though she had just told Mr. Lodice not to speak about his pending criminal case and showed consideration for his privacy and rights. Although Ms. Antar did not object or say objection, Judge Grossman said "Ms. Antar, you don't get to object to his questions, your lawyer does. And there's nothing about that question that's inappropriate, so answer the question." **(See pg.32, lines 11-14  e-filed case exhibit #74).**

Ms. Antar said "Angelina will be having another forensic interview. It was scheduled for last week on Wednesday, it was then subsequently place on hold pending police activity, and now it will be rescheduled, and once it's rescheduled we will receive a new date." Mr. Lodice asked "Do you know why it was placed on hold?" and Ms. Antar said "I do not." **(See pg.33, line 1 e-filed case exhibit #74).**

Judge Grossman then allowed Mr. Lodice as much time as he needed to gather his notes and prepare his next question, the same courtesy she denied Ms. Antar at the start of the

hearing, after he said "Your Honor, --Let me see if there's anything else before I continue."

Judge Grossman was patient and did not say a word to him. Mr. Lodice then asked "You

stated that I saw Angelina that weekend of Friday, March 10th, the 11th, and then the 12th

when she was dropped back off to you, we won't go into specific details, but you stated I

did see her that weekend and she was with me and my sons; correct?" to which Ms. Antar

replied and said "yes, because you took her and violated the protective order and stole her

from the school." **(See pg.33, lines 5-11 e-filed case exhibit #74).**

Judge Grossman then allowed Mr. Lodice a privilege that she consistently denied Ms. Antar

the right to, by letting him object to his own question and the response that Ms. Antar was

giving. Mr. Lodice said "I—I guess objection because none of that's factual. I didn't violate a

protective order, I picked up my daughter on my day. I don't understand how that's violating

a protective order." Rather than scold him for interrupting Ms. Antar, objecting to her

response to her question, or not offering a proper rule of evidence for his objection other

than "none of that's factual", Judge Grossman once again showed her preferential bias

toward Mr. Lodice by ignoring all of the procedural rules he broke and agreeing with him

without hearing any of Ms. Antar's side of the story, by saying "Yeah, we'll be addressing

that later." **(See pg.33, lines 12-17 e-filed case exhibit #74).**

Mr. Lodice then asked in a demeaning tone in which he referred to Angelina as "his"

daughter "Now when—when—when I picked up my daughter what—what, if anything, did

you do when you found that out?" and Ms. Antar replied "I called 911 because I

immediately felt she was in danger." Mr. Lodice asked why and Ms. Antar said "The fact

that you had said to Detective Lisa Steeves on February 11, 2023 that you agreed that it

was in the child's best interest—to remain with me until further notice." **(See pg.33, lines 20-27 e-filed case exhibit #74).**

Judge Grossman then, once again, allowed Mr. Lodice to object to his own question and to Ms. Antar's testimony. She allowed him to interrupt Ms. Antar and to object when he said "Objection, hearsay. Shes saying—" and Attorney Cretella said "It's not hearsay, your Honor" and Ms. Antar said "It's not hearsay." And, rather than scold or reprimand Mr. Lodice for being so disruptive and interrupting and continuously objecting to his own questions and the replies that Ms. Antar was giving, Judge Grossman once again showed her bias and preferential prejudice toward Mr. Lodice by saying "Well, it's not responsive, so." **(See pg.34, lines 1-12 e-filed case exhibit #74).**

Ms. Antar then answered one of Mr. Lodice's questions and Mr. Lodice began to testify, and Judge Grossman said nothing. Attorney Cretella stepped in an said "Objection. That's—he's testifying now." To which Judge Grossman replied in a nice, calm, respectful manner "So, sir, you can ask questions now but—" and Mr. Lodice interrupted her and said "Okay" and she didn't reprimand him for interrupting her. She continued by saying "—you can't tell me things now,--okay—" and Mr. Lodice said "Okay. I'll—I'll have a chance to tell you after; correct? Okay." After Judge Grossman signaled to him that he would have a chance to testify reserved for him. **(See pg.35, lines 22-27 e-filed case exhibit #74).**

Mr. Lodice then asked Ms. Antar about if she felt he had agreed not to let his son around Angelina and asked who told her that he said that, to which Ms. Antar said "Detective Lisa Steeves from the New Britain Police Department." And Mr. Lodice said "She said that I agree that I wouldn't let Dominic be around Angelina alone at all?" and Ms. Antar said

*" Yes. Detective Lisa Steeves called you on February 11th, 2023 to warn you to stop harassing me and making disparaging statements during the calls. She also made it clear to you to stop telling Angelina that you would see her on Friday during the calls, and that she made it clear to you that I already told you as early as February 3rd, 2023 that I would not be sending her to your mother's on Friday until further notice, and I wasn't going to be getting any—filing emergency orders, I would just be keeping her with me until further notice due to the ongoing pending DCF and criminal investigations. I said if you have any questions, please follow up with DCF or New Britain PD. Which then she followed up with you after you called her, you left her a voicemail that day. She called you back February 11th, that was a Saturday, she spoke to you. She called me back immediately when she was done speaking to you and she stated I spoke to Matthew, Matthew knows that there's a current investigation, Matthew knows that him and his son are—are considered suspects and going to be interrogated and he agreed—and she said you said you know, Dominic's going to be a little nervous, but you agree that you'll let him talk to her. And she said you said I agree that it's in the best interest[95] of Angelina to stay with mom until further notice for her own safety."* **(See pg.39, lines 1-22 e-filed case exhibit #74).**

Mr. Lodice asked Ms. Antar if she was claiming that "Officer Steeves said that it's—that I should not be around Angelina—pending the investigation?" and Ms. Antar clarified "No. I claim that when you had a conversation with Detective Lisa Steeves on Feburary 11th when

---

[95] It should also be noted that Leah Smith, LCSW, the social worker who conducted the second forensic interview that took place on 3/3/23, put in her notes after the interview that Angelina disclosed during the interview that "Dominic 'sat on her' and 'she sat on him' and he 'tickled her belly'" and that she "recommend that Angelina have supervised contact with Dominic Lodice as this investigation proceeds. I also recommend that Angelina continue in outpatient mental health treatment with Jessica Mayo at the Yale Child Study Center." **(See e-filed case exhibits 20-21)**

she called you regarding your ongoing harassment during the phone calls that you had with the child, she warned you that you are on thin ice and you may be arrested for violating a protective order if you continue to keep harassing me and continue to keep saying to me and the child see you Friday, see you Friday, when you're fully aware that the child will not be going to grandma's on Friday. I told you I'm keeping her with me until further notice on February 3rd." Judge Grossman then showed her bias by interrupting Ms. Antar during her testimony and saying "Okay. Okay. Okay. Stop. Ms. Antar, there's court orders in place and I don't think it's a great idea for you to keep repeating vehemently about how you decided to violate those. So I'm going to—We're going to get back to that, but let's—let's switch out questions here, okay." **(See pg.40, lines 7-26 e-filed case exhibit #74).**

Judge Grossman showed no concern[96] for Angelina or the fact that the investigations were still pending, nor did she acknowledge the fact that Ms. Antar stated it was her belief that Attorney Cretella, Detective Lisa Steeves, Leah Smith, and Larae Plummer, all advised that

---

[96] The fact that Judge Grossman had zero concern for the welfare or wellbeing or safety of Angelina, and more concern over trying to shame/belittle/reprimand Ms. Antar for not following her court orders showed just how biased and prejudiced against Ms. Antar she truly is. On numerous occasions, Ms. Antar has been told by several different police departments that "civil/family orders are unenforceable by law enforcement" and that "only restraining orders and protective orders are enforceable". On numerous occasions, Ms. Antar has reported back to the court in a plea for relief that Mr. Lodice has violated court orders on a regular basis. Judge Grossman never once shamed/belittled/reprimanded Mr. Lodice for breaking any court orders, and instead accused Ms. Antar of lying and believed Mr. Lodice's excuses and lies when he would explain why he willfully violated the court orders. Judge Grossman was more concerned about "her court orders" not being followed, despite the fact that she had previously made it clear in the past that she would not grant any emergency ex-parte motions unless there was what she would warrant to be an "emergency" and Attorney Cretella said there was no emergency as long as Mr. Lodice was in agreement with her remaining with Ms. Antar. Ms. Antar had a valid reason that was supported by DCF, the police, and her counsel, yet Judge Grossman focused on nothing but the fact that one aspect of her very detailed orders were not being followed during an active DCF and criminal investigation involving allegations of abuse and neglect during Mr. Lodice's parenting time.

Angelina remain with her throughout the duration of the investigation. She also did not acknowledge how traumatic it was when she dropped Angelina off at school on 3/10/23 and Mr. Lodice went and took her unannounced[97] and intercepted and blocked her from attending her first scheduled therapy visit with Jessica Mayo, PhD, whom multiple providers had referred her to.

Toward the end of the 3/27/23 hearing, Judge Grossman asked Mr. Lodice if it was "possible for you to have your daughter with you and not have your—your sons alone with her?" to which Mr. Lodice said "I mean, yes.[98] But, like, if I have to go somewhere, like a grocery store or something, I mean typically I'll just leave Dominic home with Angelina, and then, you know, usually when she's napping I'll go, if anything.". **(See pg.43, lines 6-13 e-filed case exhibit #74).**

She then asked Mr. Lodice "So is—are they always with you when Angelina is with you?" and Mr. Lodice said "yes", even though he does not have any court ordered visitation schedule with his ex-wife regarding the boys, and that he has full control over when he sees them each week. **(See e-filed case exhibit #93)** Mr. Lodice chooses to have them with him when he has Angelina so that he always has a babysitter so he can work and go out with friends. Judge Grossman completely took his word for it and said "So is—Are they

---

[97] Angelina attended her school on multiple Fridays during the investigation, yet Mr. Lodice only intercepted her at her school on 3/10/23, intentionally stopping her from going to her mental health appointment, and then proceeded to leave her with his son unsupervised the following day. Angelina disclosed to Ms. Antar on 3/12/23 that she was sexually abused again on 3/11/23 while being babysat by Mr. Lodice's minor son, and Angelina said "He just started doing it. I didn't tell him to do it, he just started doing it" and "Dada was at work and took Sal with him for the day".

[98] Rather than ask Mr. Lodice why he couldn't just order groceries before his 2 days of visitation or use a service like Insacart, she accepted his answer that grocery shopping alone during his parenting time was a necessity

always with you when Angelina is with you?" and Mr. Lodice said "Yes." And she asked "Is

that how weekends work?" and Mr. Lodice said "Yep." At that point, Attorney Cretella

stepped in and asked "Can we switch the weekend?" and Judge Grossman then said

"Yeah. Is it possible for you to have Angelina with you when the boys aren't there until this

is done?" and Mr. Lodice, despite knowing that him and his ex-wife had no set court-

ordered schedule for visitation, said "Not really. It's kind of the only schedule that works out

with my ex and myself is I have Friday, Saturday, and Sunday, until Monday morning, with

all the children." **(See pg.43, lines 18-27 e-filed case exhibit #74).**

Judge Grossman showed clear bias by accepting Mr. Lodice's perjury regarding a

mandated schedule with his ex-wife as truth and deflecting and turning it around to blame

Ms. Antar and treat her as a scapegoat by saying "Is it possible that you can—Is—Is it

possible that either one of the parties could follow my court orders—or Judge Griffin's court

orders that say that when the children are with you they're not alone, and Ms. Antar, that

the—the—" and Mr. Lodice interrupted her by saying "I—" and she did not scold him or say

anything for his interruption before saying "—Angelina goes to her dad's on the regular

schedule; is it possible that that can happen?" to which Mr. Lodice said "Yes, I can make

sure that the children are not alone with Angelina. Absolutely." Judge Grossman then

showed her protective nature of Mr. Lodice again by saying "I want to tell you something.

You do not—Ms. Antar has made criminal allegations against you, both in relation to the

protective orders and in relation to Angelina. There's criminal cases pending—" **(See

pg.44, lines 1-27 e-filed case exhibit #74).**

She then continued to give him legal advice and look out for his best interest,

something she never did for Ms. Antar and continued to show her bias and prejudice

toward Mr. Lodice by saying "So, number one, nobody can force you to testify about things like that. But, number two, it's also a very bad idea to testify about things like that. So one is in relation to your Fifth Amendment Privilege, you have the right not to—to remain silent in the face of questions regarding pending criminal cases. Do you understand that?" to which Mr. Lodice replied "Of course."

Judge Grossman then put her bias on display and continued to give Mr. Lodice legal advice by saying "And it's also—I'm going to go a step further to say it's just a bad idea for you to talk about those things when you're under oath. Do you understand that? Okay. So I have some questions for you, Attorney Cretella has some questions for you, but they're not going to be about the accusations that Ms. Antar made against you and they're not going to be about the accusations she made about Angelina and D.L. You understand that? And if we're getting into those areas I don't want you to—I don't really want you to answer those questions without giving it some serious thought." **(See pg.45, lines 2-26 e-filed case exhibit #74).**

At the end of the hearing, Judge Grossman both confirms that her statement about the hearing of 3/27/23 being on "motions to modify custody filed by both parties and other post judgment motions" was inaccurate and displays her extreme bias and prejudice against Ms. Antar by saying:

 *"What's before the Court today is a very narrow issue, which is under the ex—emergency custody statute is the parties' minor child in immediate threat of physical harm or physical injury, or psychological harm, emotional harm, if she's left in the care of her father, and— and the evidence that I've heard before me indicates that's not true. The history of this case is important in making this decision. Ms. Antar has been leveling accusations against Mr.*

*Lodice that he doesn't care properly for their child throughout the very lengthy history of this case. This is one of the longest and—not longest, but most active cases in this district, it's got hundreds of pleadings, Ms. Antar has made many, many, many accusations against Mr. Lodice.*

*While there have been criminal issues, which—and Mr. Lodice has been arrested—both parties have been arrested I should say, on criminal matters between them, there has never been any credible evidence before this court that Mr. Lodice is an in—ineffective or unsafe parent.*

*The accusations that led to this latest request for emergency custody are the same accusations that were leveled and—by Ms. Antar and then apparently found unsubstantiated and not pursued by the police department in October, so I cannot say that there is a need for emergency orders. There's simply no credible evidence before me that would suggest that that's the case.*

*The only evidence I have is the testimony of a—let's call him a lay witness, current or former romantic partner of the moving party, whose testimony I'm just gonna say was not especially reliable. I have Ms. Antar's testimony which, on past occasions and today, I will find is simply not reliable before—before this Court because is mot—it's so obviously motivated by her dislike and distrust of Mr. Lodice."* **(See pg.54-55, lines 1-27, 1-8 e-filed case exhibit #74).**

She then goes on to accuse Ms. Antar of lying by saying "Referrals have not been made by any other source other than the sources that Ms. Antar has contacted, so those referrals, from this Court's perspective, are somewhat suspect." **(See pg.55, lines 14-17 e-filed case exhibit #74).**

She then focused on Ms. Antar again and said "So, Ms. Antar, I can't stress this enough, the child goes to her father on regular schedule, and the father is in charge of making sure that while these investigations are pending, both police and DCF, that the child—the child's not left alone with her brothers. So you have no authority, ma'am, zero, to withhold the child from the father on the regular schedule. I—I—We will have a hearing on April 5th, which I think is nextx week, and address some of these oth—regular custody concerns. But I want to be clear with you, Ms. Antar, that you understand that the child goes to her father on the regular access schedule. Do you understand that?" **(See pg.56, lines 17-27 e-filed case exhibit #74).**

Ms. Antar asked "Your Honor, may I please say something—" and Judge Grossman cut her off and said "No. I want you to tell me that you understand what I'm saying to you." She showed no regard for Ms. Antar's concern for the safety of Angelina and Ms. Antar said "I don't understand because you're saying that—it wasn't—you're saying I'm—I'm not credible, but you didn't allow me to show any evidence at all. And I—" As soon as Judge Grossman realized that Ms. Antar had a valid point, she interrupted her again and rudely said "Ms. Antar, I want you to understand—Tell me you understand that the child goes on the regular access schedule and that that is going to happen." **(See pg.57, lines 1-15 e-filed case exhibit #74).**

She continued to make false claims that she had presided over the case longer than she had and said "Ms. Antar, you are not the only person who—you are not the only parent, and you are not the only person who gets to decide this. I have listened to your case many, many, many, many times, and I am telling you now that the child goes to the father on the regular schedule and the child has—the father has to make sure that while these

investigations are pending the child is not left alone with the stepbrothers. And if you can't follow those orders that's going to be a problem for you in the relief that you're requesting from this court on your custody cases. So you need to follow the court orders, Ms. Antar. Those are the orders." **(See pg.58, lines 1-7 e-filed case exhibit #74).** She continued by saying "And—Listen to me, you are asking this Court for custody orders, and one of the things that the Court has to consider in custody orders is the ability of both parents to facilitate and value the relationship of the child with the other parent, and this is very problematic for you when you decide all on your own[99] that you're going to withhold the child from the father. It's not like you're making other arrangements, it's not like you're letting the father see the child anyplace else." Ms. Antar attempted to explain that Larae Plummer suggested supervised visits with Mr. Lodice and told her she would see if Mr. Lodice would agree to that, but Judge Grossman continued to interrupt her and wouldn't let her speak. **(See pg.45, lines 11-27 e-filed case exhibit #74).**

Ms. Antar attempted to say again "DCF said they were working on setting up supervised visits" and Judge Grossman continued to interrupt her and said "Ms. Antar, I've made my orders, I expect you to follow them. So those are the court orders. Everybody's—I'm telling you right now, these hearings are happening in person in the future because this video format is really too—too troublesome. So I understand, Attorney Cretella, that this hearing came up at the last minute and I appreciate your working on your vacation[100] to be

---

[99] Judge Grossman continued to display her prejudice, dislike, and bias against Ms. Antar by ignoring the fact that Ms. Antar repeatedly stated that DCF, New Britain Police, and Attorney Cretella all agreed that it was in the best interest of Angelina to remain with her and not go to Mr. Lodice's house for the duration of the investigation.

[100] Judge Grossman completely ignored the fact that the remote hearing was due to the protective order that Ms. Antar was a protected party of, and not because of Attorney Cretella's vacation. She also ignored the fact that it was an emergency motion, by

present for it; however, going forward we have to have these hearings in person the video proceedings are too difficult. So those are the court orders. The father needs to have his access time with the child, the father needs to follow the court orders about not leaving the child alone with the stepbrothers while these investigations finish, and that's it. I will see everyone for this hearing next week." **(See pg.60, lines 9-25 e-filed case exhibit #74).**

When Mr. Lodice attempted to complain about the case being continued, Attorney Cretella reminded Judge Grossman that "The reason that's happening, Mr. Lodice, is because you continually not give me the rest of the discovery. You still don't have—We still don't have all the discovery." **(See pg.63, lines 17-20 e-filed case exhibit #74).**

Judge Grossman told him that he needs to provide the documents and Mr. Lodice interrupted her and said "I have". She did not scold him for his interruption. She said "If you don't do that, you run the risk that the Court might make an adverse inference, that is to say I'm just going to assume that you didn't produce the documents because what Attorney Cretella was looking for is correct. So it doesn't help you." **(See pg.63, lines 6-12 e-filed case exhibit #74).** Despite saying this, Judge Grossman has still never held Mr. Lodice accountable for refusing to comply with the order to produce the missing documents, nor did she ever make any adverse inference that he was hiding something, despite him being ordered by Judge Griffin to produce all missing documents no later than 1/20/23. At the very end, she said "I can—Ladies and gentlemn, I can tell you that I am not going to grant any continuances. We're going to get started—at least on the custody case, and if we need

---

disrespectfully and sarcastically noting it as "came up last minute" and continued to show that she was ignoring that Ms. Antar was a victim of domestic violence at the hands of Mr. Lodice and the protected party in a protective order based on her statements.

to—some additional time to get the financial documents I'll certainly give you time to do that, Attorney Cretella, but we gotta get started on some of this." **(See pg.64, lines 19-27 e-filed case exhibit #74).**

She made it clear that the next court date of 4/5/23 would be a 2 hour hearing for the purpose of "get[ting] started on some of this stuff" and never stated that it was a trial, final hearing, or anything of that sort.


### Evidence of Bias, Fabrications, Harassment, and Prejudice during 4/5/23 hearing

During the hearing on 4/5/23, Annamaria Baranowski from Family Relations began by reading her report. She stated that "It should be noted that Mr. Lodice did not provide any of his respective treatment providers to family services, specifically, Mr. Lodice reports that he engaged in individual counseling once; however, he claims that he can not remember the name of the contact information for that treatment provider." Judge Grossman did not have anything to say about the fact that Mr. Lodice failed to comply with her court order, once again, showing her bias toward him.

Family relations also reported that Mr. Lodice prevented the child from attending and receiving therapy services by saying that "On September 29th, 2022, after the clinician explained her role and model and services, Mr. Lodice reported that he was not interested in the services." She also noted that one of Ms. Antar's treatment providers who she saw briefly from November 21, 2019 to May 2020 stated that Ms. Antar "expressed apprehensiveness to the recommendations made. Primarily the recommendation for a psychopharmacological intervention." Ms. Antar felt as if the provider was trying to pressure her to take antidepressants, when Ms. Antar had bad reactions and side effects from those

types of medications in the past, and wanted to try medication only as a last resort. Judge Grossman, who didn't bother to interrupt or step in when she heard that Mr. Lodice refused to sign releases and that he denied the child access to mental health services, made sure to step in when she heard that Ms. Antar chose not to continue with a male treatment provider who missed several of their sessions when they briefly met in November of 2021. Judge Grossman immediately interjected and said "what were the dates with this person" to which Family relations replied "From November 3rd, 2021 until January 4th, 2022." Family relations went on to say that they had received a letter from Ms. Antar's current provider that sated that "Ms. Antar has been receiving therapy from her since February 22nd, 2022. Ms. Antar is diagnosed with PTSD, chronic and attention deficit hyperactivity disorder per history. It is stated that Ms. Antar attends therapy sessions every two weeks for about 45 to 55 minutes. Ms. Antar is described to be consistent and makes good use of her time. It is noted that Ms. Antar rarely cancels but notifies if need be. The letter notes that Ms. Antar's treatment goals are to implement strategies for maintaining calm, such as practicing gratitude and mindfulness daily. Ms. Antar is described to be working on her goal objective diligently and making good progress."

Family relations then described several DCF reports, and said that "A forensic interview took place on October 31st, 2022, at the New Britain Police Department." This is inaccurate. The interview took place at the Yale Child Abuse Clinic at 1 Longwarf, in New Haven, CT. Family relations also said that "the minor child was able to answer most of the questions and articulate her answers to the interviewer" however Ms. Antar was told by the interview, Priscilla Westberg, that the interview was immediately stopped after Angelina answered that there are no parts of her body that nobody else is allowed to touch.

Family relations also falsely claimed that "It is noted that Angelina has participated in several forensic interviews as recently as March 3rd, 2023, via Yale Child abuse clinic with no findings." Angelina only participated in two, one was 10/31/22, the other was 3/3/23. The first one ended after less than a few minutes because Angelina answered the first question wrong and they were forced to stop the interview.

Family Relations also stated that "Ms. Plummer indicates that she intends to recommend Angelina remain in therapy at Yale Child Study, and that Ms. Antar and Mr. Lodice engage in mental health treatment"

They also reported that Detective Lisa Steeves said that "On March 22nd, 2023, Detective Steeves met with Mr. Lodice; the new allegations presented by Ms. Antar were denied. He provided video footage taken from the inside of his home. It was determined that Angelina was left alone with Mr. Lodice's son for approximately 30 minutes when Mr. Lodice went to the grocery store. It is noted that, while the time stamps on his video appear to be incorrect, Ms. Lodice also provided his phone GPS that confirmed he was out of his home for approximately 30 minutes. The video footage from inside the home also showed Angelina sleeping her room and Mr. Lodice was at the grocery store. Detective Steeves reports that with this evidence there is not a crime scene."

This makes no sense, since she admits that Mr. Lodice provided screen shots that didn't even have the correct time stamps, and a 30 minute long video from inside the home does not prove that Angelina was not sexually abused that day.

Detective Steeves also said that she had a "concern that if Angelina was interview for a third time and has a different disclosure, it will ruin Angelina's credibility. It was ultimately

decided by the multi-disciplinary team that it is not in Angelina's best interest to be reinterviewed for a third time."

During the hearing, there were several other instances where Judge Grossman showed that she was unable to remain impartial in the matter. For example, Judge Grossman's correction of the Attorney Cretella's confusion about who filed the initial motions: "THE COURT: No, no, you are. ATTY. CRETELLA: I thought he filed initially though, no? THE COURT: No, I think -- ATTY. CRETELLA: It was before? Okay." Judge Grossman's correction may indicate impatience or irritation on her end.

Furthermore, Judge Grossman's instruction to Ms. Antar at the start of the hearing not to interrupt her lawyer can be seen as an indication of impatience or a slightly dismissive tone. Attorney Cretella previously instructed Ms. Antar to write things down if she wanted to tell him something during the hearing.

She rudely said to Ms. Antar "Don't interrupt your lawyer while I'm trying to talk to him, okay? Don't do that. Okay. You'll have a chance to talk to him in a second."

Mr. Lodice interrupted Ms. Antar during her testimony on numerous occasions, saying things like "Objection. No evidence. Making false allegations." Judge Grossman did not demand he use the proper rule of federal evidence nor did she scold him.

Judge Grossman then wanted to question Ms. Antar herself, and heavily scrutinized her during the hearing. Judge Grossman asked if Ms. Antar having sole custody of her older daughter was due to a "temporary order" and showed that she didn't think Ms. Antar could possibly have sole custody of a child based on her tone. She then immediately began to ask Ms. Antar about her mental health, saying "So, who are you engaged in mental health

treatment with now?" She never once commented on Mr. Lodice's blatant refusal to sign releases for his providers or engage in subsequent treatment as DCF suggested he do. She then asked if Ms. Antar's current provider had the credentials to "conduct a psychopharmacological evaluation that this other person recommended" referring to the provider who recommended that Ms. Antar try antidepressants four years prior.

Ms. Antar replied and said "No, but I did since start on medication for ADHD with a different—" when Judge Grossman immediately cut off and interrupted Ms. Antar and said "Who did you do that—did you do that psychopharmacological evaluation?" Ms. Antar then said "Not in 2020, when I saw that woman"

Judge Grossman continued to ask Ms. Antar about the evaluation, asking if she "did you do anything like that, like a comprehensive evaluation?" to which Ms. Antar answered that she did and that she was currently taking medication for the ADHD.

Judge Grossman then demanded that Ms. Antar provide her the name of the provider without allowing Ms. Antar access to her phone to look it up. She then asked "Is that provider—did you give that—the name of that provider to Ms.—to Annamaria?" However, Judge Grossman had instructed Annamaria that she could only get information for a specified window of time and it was only limited to Judge Grossman's specific orders. Annamaria stated on multiple occasions that she can take in any information from any of the parties without Judge Grossman first entering it in as an order.

Judge Grossman then made it clear that she had memorized all of the information about Ms. Antar by asking her about school, and then saying "So, you're in Storrs for this?" The comment about Storrs implied that Judge Grossman had memorized that Ms. Antar was a student at the University of Connecticut School of Law. Judge Grossman falsely

thought that UConn law was in Storrs, because she associated Ms. Antar with UConn. This is more evidence of her bias and shows that she did not look at Ms. Antar in an unbiased or impartial way.

Judge Grossman then continued to criticize and scrutinize Ms. Antar, and even mentioned that "Annamaria from Family Relations said that DCF said there was a new report about your older child; do you know what that's about?" This was not what Annamaria said, nor was it true. Ms. Antar attempted to explain to Judge Grossman that the report was sent in error and that she only requested reports related to Angelina, Judge Grossman again accused Ms. Antar of lying, showing her clear bias against Ms. Antar and distrust of her. She continued to insist that she was right, when she was wrong by saying "So, Annamaria—you heard Annamaria say that DCF told her that there was DCF involvement about your oldest child in March of this year. So, last month. Did you know anything about that?"

Again, Ms. Antar attempted to point out that that was not what Annamaria said, nor was that the truth by saying "To my understanding from what Annamaria told me was that they gave her a report about—they just—in March they gave her that report about the child, but that it was sent to her in error, and that because it was given to her she said that she still had to say it, because she did see it."

Judge Grossman continued to accuse Ms. Antar of lying by saying in a rude tone "So, I'm asking you about it. Was DCF involved with your older child last month?" "Was the child involved with DCF and her father possibly?"

Judge Grossman could not stop questioning about the report that came over in error and could not stop accusing Ms. Antar of lying about it being a new report. No matter what Ms. Antar said, Judge Grossman did not believe her.

She asked again "So, you don't know what that's about?" in an intimidating tone.

Ms. Antar continued to state that there was no report, until finally Judge Grossman changed the subject.

During the hearing, Mr. Lodice began to ask Ms. Antar questions related to incidents he claimed occurred in 2019, 2020, and 2021. None of the things he asked about occurred prior to 2021. Judge Grossman did not once tell him that he had to only focus on things from the April 2022 agreement forward. She allowed him to intensely question Ms. Antar on irrelevant topics. Mr. Lodice brought up alleged text messages from 2020, and allowed them into evidence despite Attorney Cretella objecting to the relevance.

Judge Grossman said "Well, if youre client doesn't want her child with the older brother, I guess he's got the right to ask her about it" implying that the alleged messages that nobody could identify properly were somehow relevant to the issue about whether it was appropriate for Dominic to be a full-time caregiver for the minor child.

Later in the hearing, when Mr. Lodice asked Ms. Antar about DCF, she noted that "DCF substantiated neglect regarding you for leaving your two sons alone—" at which point Mr. Lodice immediately interrupted and said "No, that's not what I'm asking. We're asking about the DCF reports the sexual allegations against Dominic"

At that point, rather than inquire about the substantiated neglect of Matthew like she did when she thought that there was a new report about Ms. Antar's other child, she dismissed

and brushed it off by saying "I don't need her to answer this, because Annamaria already told me, they were not substantiated."

Judge Grossman was rude, impatient, and disrespectful toward Ms. Antar during her testimony. At one point she said "Please answer the question, I don't want to be here all day."

As Ms. Antar attempted to answer, Judge Grossman then cut her off again and said "Listen to me. I'm not going to let you testify in a narrative. Look at me. I ask you a question, you answer it." Ms. Antar again felt very intimidated by the way Judge Grossman was speaking to her, and never saw her speak to Mr. Lodice in that way.

Throughout the hearing, Mr. Lodice again tried to show more evidence that he said was from 2021, as well as police reports.

Judge Grossman then again accused Ms. Antar of lying when she testified that an alleged Facebook post with no name that had clearly been photoshopped poorly by Mr. Lodice was being presented as evidence.

Ms. Antar denied making the post, and Judge Grossman continued to accuse her of lying, even going so far as to say "I would just like to point out that Family relations told me that the police department followed up, received from your client a Facebook post that sounds a lot like this one and the myriad of factors that I have to consider in this custody statute, certainly people's ability to own up to their behavior and work with each other and tell each other the truth about what's going on and perceive what's going on about their child rationally is on the list." Ms. Antar did not ever send any Facebook posts to the New Britain Police Department, nor did she ever make that post.

Judge Grossman then seemed rude and tried to deny the parties due process, by saying that, even though she knew it was just a 2 hour hearing that "all pending motions are being heard today. All of them."

Judge Grossman continued to show her bias when Mr. Lodice asked Ms. Antar if she had ever filed a motion to transfer. Judge Grossman said "What are the odds I can get another JD to take this case? I think they are pretty low" and then Mr. Lodice asked about Ms. Antar's reasons for filing, to which Attorney Cretella objected as to relevance.

Judge Grossman then said, in a sarcastic tone "She can answer. I have no idea. I don't know why she might want to do that" to which Attorney Cretella, who was well aware of the fact that Judge Grossman disliked Ms. Antar replied and started laughing. Both of them were laughing and smiling together, and Judge Grossman then said "Well, I guess I could come up with some."

Mr. Lodice then continued to ask Ms. Antar questions about a year-old arrest that ended up getting dismissed, as he had brought it up almost every time during every proceeding over that past year.

Judge Grossman became angry during this and said to Ms. Antar "Listen, listen, listen. Any time anybody gets issued a summons or arrested on the spot for a matter relating to a case before the Court, in family court, the presiding Judge gets notified. So the court marshal, I think the chief did tell me that Ms. Antar was issued a summons for her arrest after a court date in this court. I don't know who she was before that day or what circumstances led to that, but I don't know if it turned out to be true …I think they were before Judge Price-Boreland on that day, but I really am not sure. So, I have a little extra judicial information about that. I don't know what happened after that or if it was even true."

Judge Grossman was well aware that she was the judge.

She then acknowledged that they wouldn't finish prior to 5pm and stated the matter would be continued. She told Mr. Lodice that "all the evidence you want to offer should go to Mr. Cretella in advance."

At the very end of the hearing, the matter was continued to 5/25/23, and Judge Grossman told Mr. Lodice that he needed to be sure to give Attorney Cretella all of his evidence ahead of time "so that he doesn't have to do it on the spot, because that takes too long, all right. And all the things in your testimony that you want me to look at, you got to give them to him. I see you have copies, fine. Just give him copies in advance okay."

Mr. Lodice then asked "And now will he do the same to me while I get his copies of evidence, he's going to present so I don't have to—" to which Judge Grossman replied: "You should, but I haven't gotten any so far."


### Evidence of Bias, Fabrications, Harassment, and Prejudice during 5/25/23 hearing

On the 5/25/23 hearing, Judge Grossman showed extreme bias and prejudice toward Ms. Antar. She started by saying "This is a continuation of a hearing that we started on April 5th. We are finishing that hearing today." She then denied Ms. Antar due process and did not respect her 5/22/23 order that stated that the motions about the file would be addressed at the hearing. She immediately said that she would be starting with Mr. Lodice's testimony. When Ms. Antar asked for a few minutes, and said "I just want to make sure I have in— evidence that I can provide to the Court to support the claims I'm making."

Judge Grossman said "Okay, well I'll remind you, Miss Antar, that you were represented by a lawyer on the first day of this hearing, that your lawyer put on most of your evidence,

called you on direct, put on that direct case. I have several hours worth of testimony from you. Now I am going to take testimony from Mr. Lodice. Unless you have things that are maybe in rebuttal, there's probably not gonna be additional direct evidence from you. That's how these trials work."

Ms. Antar pointed out that Attorney Cretella never offered any evidence to the court, and Judge Grossman proceeded to silence her.

She interrupted Ms. Antar and said "this hearing is ending today." She interrupted Ms. Antar repeatedly throughout the hearing, and demanded that the hearing had to end "today" despite the fact that Attorney Cretella had requested a full day trial and had told Ms. Antar that if everything wasn't finished on one day they could get another day to make sure everything is properly addressed.

Judge Grossman then started to show bias again and said "Listen to me. We've done this a couple times and every time you've been in front of me there's never enough time for you. You've always had hundreds of documents, hours of testimony you wanted to offer…. I want to be clear… your lawyer put on your case… so the case is gonna go like this: your evidence has already been presented to the court through your counsel. Additional objective evidence was presented through family relations. Mr. Lodice needs today to put on his evidence and then we're probably gonna be done. So that's how it's gonna be."

Judge Grossman devoted the entire hearing of 5/25/23 solely to Mr. Lodice, never once allowed Ms. Antar to be sworn in, nor did she allow Ms. Antar to testify or show any of her own evidence. Attorney Cretella never entered a single piece of evidence or exhibits, but Judge Grossman claimed he did. When Ms. Antar attempted to state this to Judge Grossman, she again interrupted her and continued to say that she had no right to say

anything at the hearing and that everything had already been offered at the prior hearing on 4/5/23.

She then continued to scold Ms. Antar and said "this is the last time I'm gonna say this to you. Your lawyer put on your portion of your case already."

When Ms. Antar attempted to address the file being withheld, Judge Grossman immediately deflected and became defensive and said "All right. Ms. Antar, we have done this a couple times before and I'm not—All right. Miss Antar."

Ms. Antar continued to try to say that she never had any evidence entered on the last hearing and that there were multiple motions that never were heard, but Judge Grossman continued to silence her and kept saying "ma'am, ma'am, listen to me. This is how this goes. You're not gonna interrupt me anymore. We're gonna conduct this hearing in an orderly fashion and, if I am missing information that I need to make decisions, I will let both of you know. But, for the last time, the lawyer you had last time put on your case. He did a very good job. I understand you're not satisfied with it but that's the way I received it. You will not be given an opportunity to redo what he did for you. So we are the point in this trial where Mr. Lodice testifies. I am going to let him do that and, when he is done, if you have questions that are relevant to these proceedings and not duplicative, I will let you answer— ask him them. And then, if I need any more information, I will ask it of the two of you. This is not a do-over. So no more interrupting and you are not going to do over what Attorney Cretella did. That's it. So Mr. Lodice, if you're gonna testify, you can do that now."

She then allowed Mr. Lodice to testify regarding duplicative topics and evidence, and even told him that he can use his notes if he needed.

During the hearing, she ignored the fact that Mr. Lodice still wasn't following orders to pay child support or child care. She allowed him to present evidence in the court room that he did not provide Ms. Antar in advance. Ms. Antar attempted to object, and Judge Grossman told her she wasn't allowed to object and said "Miss—we're not ready for objections yet." She claimed she would give both parties "a little latitude" since they were representing themselves, but then only gave latitutde to Mr. Lodice.

When Ms. Antar asked if she would have a chance to give her evidence to Mr. Lodice, Judge Grossman immediately began silencing her again telling her to "Could you stop interrupting. Miss Antar, I'm not gonna do this with you for two hours."

Ms. Antar said "I'd just like to know if I'll have an opportunity to give my evidence to him to review just like he did. He's been given the opportunity—"

At that point, Judge Grossman again interrupted and cut off Ms. Antar and rudely said "Stop talking. Stop. Stop. Listen to me. I need to make a record of the document which is gonna be marked for ID.. And Ms. Antar will have a time to take a look at it before the Court considers whether or not it will come into evidence."

Mr. Lodice then began to testify without any documentation to back up any of his claims, which consisted of numerous lies and inconsistencies. Mr. Lodice then went on to talk about the same duplicative points that he made in the last hearing. He then started to make vague assertions without any real substance or detail. Judge Grossman allowed him to enter his exhibits which were not properly marked or separated.

When asked what he thinks the schedule should be, Mr. Lodice did not even answer Judge Grossman's question, and she did not demand that he answer it. When Ms. Antar

attempted to object again, Judge Grossman said "Okay. You can object to questions but not testimony"

Ms. Antar, who had seen Mr. Lodice object to testimony at each of the previous hearings, then asked "And will I have a chance to ask him questions while he's testifying as well? Because I have questions for him I'd like to ask and evidence to go with it."

Rather than answer the question, Judge Grossman then said "All right. Ms. Antar, I asked you not to interrupt."

She then showed bias by saying she would give Ms. Antar "an opportunity to ask him questions but they will have to be relevant and limited to these motions and I am going to hold you to that because sometimes you have some trouble containing yourself. So we'll see how it goes. But, yes, you will have an opportunity. If you can't follow my rules then wer're gonna do it my way, that is, you tell me the subject that you want me to ask him about and I'll ask him the questions. So, if you can't follow the court rules, we're gonna revert to that version. So no more interrupting."

Ms. Antar asked if she would have a chance to address the motions that she had pending that weren't heard yet, and Judge Grossman said "Okay." She then claimed that "the list of motions that were down for today was very clearly posted on all the notices" which is also not true.

Ms. Antar tried to object again when Mr. Lodice was making false allegations and slandering her, and Judge Grossman said "Miss Antar, stop it. You cannot object to his testimony. Of course he's gonna say things you don't like."

Ms. Antar then asked "I'm not allowed to object at all, right?" and Judge Grossman then changed her story and said "Well, you're allowed to object on—based on the Rules of

Evidence which it—you know, what he—saying—him saying something you don't like is not a rule of evidence. All right. So, listen, the last time—I've talked to you about this before, Mr. Lodice, and—about whether or not you wanted to be the primary parent. In the past you have not been so sure about that. So what's the difference between then and now?"

Mr. Lodice then brings up the fact that Ms. Antar was arrested based on a statement that Mr. Lodice wrote on her that contained several lies. Judge Grossman allowed Mr. Lodice to tell his version of what happened, despite her warning him not to talk about his open case in a prior hearing. She had no problem when it was in regard to Ms. Antar's case. Ms. Antar again, after listening to Mr. Lodice blatantly lie about what happened, said "Objection" Judge Grossman then, holding Ms. Antar to a standard she never held Mr. Lodice to, demanded that Ms. Antar give the reason for her objection. Ms. Antar said it was hearsay, and Judge Grossman said "All right. It's overruled."

She then instructed Mr. Lodice to tell her about what happened related to the arrest. Mr. Lodice continued to lie about the events to make them seem worse than they actually were, and conveniently left out the fact that he failed to comply with the orders and created the problem in the first place.

She continued to ask Mr. Lodice more questions about the arrest, despite it being a pending case and only being allegations and Ms. Antar being innocent until proven guilty. She took Mr. Lodice's word on everything he said and did not question anything he alleged. Mr. Lodice, who is well aware of the fact that Ms. Antar teaches Sunday school, then goes on to say that Angelina only goes to church with "Miss Antar's mother" which is not true. Mr. Lodice went on to fabricate instances that happened "multiple times" in which he claimed that "There was a Fourth of July in 2021" where he describes an incident that

never happened. Ms. Antar was in Maine the entire weekend of fourth of July that year.

Judge Grossman continued to take Mr. Lodice's word as truth without seeing any police

report or other evidence to back up his claims.

She had also previously told him that he needed to only focus on instances that were after

April of 2022.

Mr. Lodice also testified during the hearing that he had no income and said he pays his bills

by "I'm falling behind." This is the same excuse he used consistently from 2021-present.

Judge Grossman never questioned him how "falling behind" pays the bills or how it can

suffice enough to provide for the sole care of a young child.

Mr. Lodice then discusses how he still does not have a functioning vehicle, stating that "My

car broke down a few times on me."

Even after hearing that Mr. Lodice owed over $20,000 in child support and child care to his

two exes, Judge Grossman still saw him as an upstanding individual.

She then allowed Mr. Lodice to read from something that was not entered into evidence,

and for him to bring up the same incidents he brought up on the 4/5/23 hearing. He then

proceeded to bring up false allegations regarding a daycare that Angelina attended three

years prior in 2020. Ms. Antar attempted to object as to relevance, and Judge Grossman

immediately said "That objection's overruled." And continued to allow Mr. Lodice to go on

about a false recollection of an event that occurred three years prior, before 2 subsequent

court agreements were made.

Mr. Lodice continued to testify in the narrative making hearsay statements about what he

heard was said and done by Ms. Antar. Ms. Antar objected and said "Objection. Hearsay."

Judge Grossman then said "All right. That's not hearsay. It's overruled." However, it was hearsay.

Mr. Lodice claimed Angelina was in six daycares, which is false. He also claimed that the child had been to three pediatricians, which was also false. He gave fake reasons as to why Ms. Antar allegedly "took Angelina from these doctors"

Mr. Lodice then said he was "very satisfied with the current place" despite him later admitting he did not know the name of the practice, location of the practice, or name of the doctor that Angelina sees there.

Mr. Lodice then said he "feels like Ms. Antar needs supervised visits and, like, our conversations need to be supervised temporarily until she can show good faith that she can do what's required to—to---to not have supervised visits and, like, supervised conversations."

Mr. Lodice then claimed that Ms. Antar said "terrible things to him when he was holding his daughter" but did not elaborate as to the date, location, or other details when these alleged statements were made.

He said the last time he heard something like that was "two years ago" but Judge Grossman said it was relevant.

Ms. Antar attempted to object in terms of speculation as Mr. Lodice continued to make false allegations and say what he thinks occurs at mom's house, and Mr. Lodice even acknowledged that it was speculation.

Judge Grossman ignored that, however, and said "All right. You—you are the parent. You can tell me what you think."

Mr. Lodice then continued to speculate, after stating he hadn't been to Ms. Antar's home in years, that "I think the environment in my household is a little bit more stable, a lot less hostile. There's not a lot of yelling in my house." However, Mr. Lodice has already been kicked out of his apartment and moving into his mom's basement, showing no stability at all.

He then testified that his son was 12, when he is actually 11, showing that he doesn't know his children's ages, pediatrician's, or any other details about the kids.

Judge Grossman then demanded that they take a 15 minute hearing so that Ms. Antar could look at the evidence that Mr. Lodice brought for the first time on that day. She did not allow Ms. Antar to give any exhibits to Mr. Lodice to review during this recess, nor was Ms. Antar allowed to take an actual break.

Ms. Antar pointed out that the exhibits were improperly marked, unlabeled, and not in the proper form, and Judge Grossman said "there is nothing wrong with the way they are labled" and then proceeded to take the whole stack of what Mr. Lodice submitted and instruct the clerk to put it in as all one exhibit.

She said "This is all—I'm all just—I'm just gonna make it one exhibit because there's to many moving parts here" showing that she was more than willing to accommodate Mr. Lodice. She was not willing to accommodate Ms. Antar when Ms. Antar did not know the proper rule of evidence to object, however.

When Ms. Antar said "I don't—I don't have enough time to actually look at this or—I mean, I'll—I thought the Rules of Evdience—he's supposed to show me this in advance."

Judge Grossman ignored her and said "It'll come into evidence." She then showed more bias by saying that Ms. Antar would be allowed to ask Mr. Lodice questions but "If you go

off the rails, I'm gonna stop you… This hearing is ending at 5:00PM. So—and then we're done. So I want you to use that time wisely, okay."

Ms. Antar then asked about a GAL and said that a new incident occurred of which she was concerned, and Judge Grossman said "All right. Ms. Antar, you're not sworn in." She intentionally never swore in Ms. Antar.

Judge Grossman then said "you're not offering me testimony" and Ms. Antar asked "will I have a chance to?" and Judge Grossman said "no."

When Ms. Antar mentioned that most of the motions never got addressed, yet, Judge Grossman lied and said "—that is simply not accurate. I listed all—at the start of that hearing all the motions that were pending. I heard evidence from your side about all of those motions. Now we are hearing from him. If you have questions about those motions, you can ask him. But this is not a do-over." Judge Grossman never listed any of the motions at the start of the 4/5/23 hearing.

At this point, Ms. Antar continued to ask for a GAL and Judge Grossman then tried to intimidate her and said in an angry tone" Ms. Antar. I'm going to issue orders before 5:00PM. Temporary—probably final orders on—on your daughter and where she's living as of tomorrow because I've been hearing evidence on this case for months and I got family relations involved for that very reason. So you can have from now until 4:45PM to ask Mr. Lodice questions if you want. I think that would be a better use than trying to get me to do a do-over all the other motions that I listed at the start of the hearing and that we heard evidence on but, if you don't, you don't. But I am going to change the custody and access orders by the end of the day today."

Judge Grossman then vehemently insisted that she listed the pending motions during the 4/5/23 hearing, and when Ms. Antar asked her to repeat what they were, Judge Grossman rudely said "I said I listed all the motions at the beginning of the hearing on April 5th." This was a blatant lie.

Judge Grossman proceeded to say that Ms. Antar had to move forward with asking Mr. Lodice questions, and refused to swear in Ms. Antar.

Mr. Lodice then objected as to relevance when Ms. Antar attempted to bring up statements he made in his deposition, and Judge Grossman immediately came to Mr. Lodice's defense and said "All right. Listen. Depositions don't come into evidence unless theyres a very particular set of circumstances which have not been met here. And his memory problems are not gonna help me decide where Angelina is living next week. So let's get focused."

Judge Grossman made it clear that she was planning to change where Angelina was living, which seemed harsh and unnecessary. She then said "If you have a question that relates to—parenting—listen to me. He's asked me to switch legal and physical custody entirely to him. Ms. Antar I'm considering doing that because of so many upsetting things that I have observed and heard in this case and you are not asking him anything about that."

She failed to mention that Ms. Antar had a motion for sole custody, as well. Ms. Antar then asked if Mr. Lodice was aware that their daughter had been seen at the ER and had a rape kit done at the advisement of the pediatrician, to which he said "No, but I'm not surprised. It's your fourth time you made this happen."

Ms. Antar then asked why he was accusing Angelina of lying, and he said he was only accusing Ms. Antar of lying.

Judge Grossman then also started to accuse Ms. Antar of lying, as well. She interrupted the testimony and said rudely "Ms. Antar, how many times have you made allegations like this? Is this the third time or the fourth time?" to which Ms. Antar said "Your Honor, I don't—" and she said "Answer—" and Ms. Antar said "—appreciate—" and Judge Grossman said "—answer my—" and Ms. Antar said "being told that I'm making these allegations. My daughter—"

At that point, Judge Grossman continued to interrupt Ms. Antar and accuse her of lying and said "Answer my question. How many—How many times has this happened? Is this—the third time? Listen to me. Is this the third time or the fourth time? Listen—All right So—" She then continued to get angry at Ms. Antar and accuse her of lying and said "where's—Where is—Stop. Stop. Attorney—Ms. Antar, stop talking. Where's your daughter right now?"' Ms. Antar said she was at school, and Judge Grossman snapped back saying "she doesn't go to school. She's four. Where does she—where is she—right now."

Ms. Antar stated the name of Angelina's school. Judge Grossman then said "Okay. And remind me again who's—who—who is supposed to have the child with them tonight?"

Ms. Antar stated that she felt the judge was being unfair  tried to explain that she had evidence to back what she was saying, and tried to defend her position. Judge Grossman then angrily said "Miss Antar, if you don't stop talking, you're gonna leave my courtroom. Stop it. Sit down."

She then asked Mr. Lodice if DCF or NBPD had contacted him, to which he said no. Judge Grossman then immediately assumed that Ms. Antar was lying. She then asked Mr. Lodice "All right. Is this—if this is true, is it the third time or the fourth time?" to which Mr. Lodice said "this is the fourth time, your honor."

Ms. Antar tried to mention the documentation she had regarding the prior disclosures, but Judge Grossman continued to silence her.

Ms. Antar continued to demand a full custody evaluation, a GAL, and the chance to dicuss the e-filed case exhibits that she had already put in prior to the hearing. Judge Grossman ignored all of her requests. She continued to make up lies by saying "That is enough. This is the eight time that I personally have presided over the dispute between the two of you in the last 18 months. I have heard countless hours of—" At which point, Ms. Antar said that was not true. She had only had the 4/8, 6/28, 3/27, 4/5, and now 5/25 hearing meaning that it was the 5th hearing she had, not the eighth.

Judge Grossman then continued to show extreme bias and said "All right. Stop. So these motions—there are a number of motions that have been pending before this court for nearly a year. This court has had multiple hearings on similar, many, many accusations that Ms. Antar has made against Mr. Lodice, against Mr. Lodice's adult—teenage children, and apparently she has continued to make those allegations. This is the continuation of a hearing that we started on April 4 or 5 in which Ms. Antar was represented by very capable counsel who she fired in between that day and today. Based on the evidence that I have heard so far in consideration of the relevant custody statutes, I'm making the finding— following findings and orders: That Ms. Antar is in very serious emotional and psychological distress that has been on flagrant display most of the time that she has been in front of me; that there's credible evidence that she's now engaged in a fourth accusation that the father has—turned out to be—"

At this point, Ms. Antar attempted to speak, and Judge Grossman threw her out of the court room and made her go in the hallway.

After removing Ms. Antar to the hallway, Judge Grossman then says "Whoo. In light of the testimony that I've heard, I have to find that Ms. Antar's testimony is not credible; her perceptions are not accurate; her behavior is alarming and distressing. It does match some of the information that we received from the office of family relations indicating that Ms. Antar has a history of psychological problems that perhaps she's not treating properly. The Court finds that Mr. Lodice's testimony as to the custody and care of his child is credible. The testimony about the finances perhaps a little less so but those motions are going to have to wait for another day. In light of all that, I have to find at this point that the child is no longer safe or secure or psychologically or emotionally safe in the care of the mother and I am ordering full legal and physical custody of the minor child to vest immediately in the father. The father's authorized to go retrieve the child from the daycare center immediately and keep him—keep the child in his sole care and custody without any unsupervised access with the mother until further order of the court. This matter is going to reconvene June 15th at 2:00PM at which time the court will be able to enter some more detailed orders. The time is now 4:45PM and I think it's not appropriate to keep anybody here any longer than that. So, from now until that date, sire, when you need to be back in court, you have sole physical and legal custody of the child. You're not to allow the mother to have any unsupervised access. It can be in the presense of whoever you think is appropriate and, of course, the child should be able to talk to her mother or FaceTime with her but the child's gonna be in your care and custody until that time.'

She then tells Ms. Antar that the temporary orders would only be "from now until next week, it's a week, he's gonna hve sole physical and legal custody of Angelina. Your—your time with her is gonna be monitored by whoever he chooses. I told him that you should see her

under circumstances that are arranged by him and that you should be able to talk with her and video with her. But this situation is much, much more serious that I think you understand. I'm extremely concerned for you. I've been having hearings with you for over a year and over the course of the year your—your behavior's become extremely disturbing. You're very—"

She then continued to insult Ms. Antar based on the lies of Mr. Lodice's testimony and said "But I—for—for—now, between now and then, that is going to be the case because you are falling apart before my eyes. You are totally disconnected from what we're doing."

Judge Grossman is not a psychiatrist or therapist, and has no business making expert witness decisions regarding litigant's mental health.

Ms. Antar continued to bring up the evidence she provided in the e-file, and Judge Grossman continued to silence her. Ms. Antar then said "you should recuse yourself form this case" at which point Judge Grossman had a huge smile on her face, as if she thought it was hilarious that Ms. Antar's child had just been taken from her. She accused Ms. Antar of having mental problems when Ms. Antar's provider stated otherwise. She then even lied and said "the evidence that I've received indicates from family relations that you have probably, likely, an untreated psychiatric disorder, perhaps an untreated personality disorder, untreated behavioral disorder… I'm concerned you made your third or fourth claim"

Ms. Antar attempted to explain that the pediatrician referred them to the ER and the ER called DCF, not Ms. Antar, however Judge Grossman continued to silence her. She then said that since "one of the investigations was closed in the last 60 days… it is quite disturbing that another identical allegation would be brought by you."

When Ms. Antar started to list all of the positive qualities about her, including being in law school, Judge Grossman sarcastically said "You're still in law school?!" as if she expected that Ms. Antar would have failed out by now.

Judge Grossman then started to ask Ms. Antar "Is it true that you got recently arrested at one of these visits—visitation transfers?" and Ms. Antar attempted to take the legal advice that Judge Grossman gave Mr. Lodice on the 3/27/23 hearing by saying she wasn't going to comment on any alleged charges because she was innocent."

She then asked if Ms. Antar was going to "come back here in a week at 2:00" despite the order saying that they were scheduled for a date in three weeks.

Judge Grossman then said it was 5:00 and her work day was done, and ended the hearing.


**Inaccuracies, evidence of bias, prejudice, and intimidation in 5/31/23 order**

Judge Grossman also included several fabrications in the 5/31/23 order. For example, she claims that the court "considered… the contents of this court file and related court files involving the parties" She then references in her footnotes two hearings that never took place (6/30/22 and 12/5/22) and claims to reference the 3/27/23 hearing, despite it being regarding concerning sexual abuse claims related to the minor child. She also stated that the orders of the family support magistrate were taken into consideration, when they showed Mr. Lodice willfully violating court orders and being incarcerated as a result.

Furthermore, she then mentions the case between Ms. Antar and Mr. Viglione, in which Ms. Antar has sole legal and sole physical custody and gets along well and coparents well with the father. There is nothing in that file that would suggest that Ms. Antar is unfit, and in fact, it shows the polar opposite. That file shows that Ms. Antar has held and maintained sole

legal and physical custody of her daughter Julianna since 2016, and that she has never abused or neglected her child in any way.

Moving along, Judge Grossman also stated in her order that she considered the dissolution action between Monica Perez and Matthew Lodice, which shows disturbing allegaitons and substantiations of Mr. Lodice being abusive and neglectful toward Ms. Perez and their children. It shows records that Mr. Lodice sexually, physically, emotionally, and psychologically abused Ms. Perez and involved the children regularly in their disputes, even going so far as to threaten not to give them medications unless she had sexual intercourse with him. This file has DCF reports showing that Mr. Lodice neglected his children, and records relevant to the 2 counts of Risk of Injury to a minor felony charges that he received and subsequently was convicted of for 2 counts of reckless endangerment for endangering his children. This is the file that Judge Grossman considered that aided her in making the decision to give Mr. Lodice sole custody.

Judge Grossman then also brought up a restraining order application that Ashley Gray and Mark Wachter applied for together and never showed up to the hearing for, and it was thrown out. She uses this as part of her "consideration" that she placed on the issue, however failed to consider the same regarding the TRO that Ms. Antar filed against Mr. Lodice the year prior that she did not show up to the hearing for and it was thrown out. This is further evidence of the fact that Judge Grossman strongly is biased against Ms. Antar, and that she will go so far as to lie in her orders to make it seem justified.

She also states that "The mother filed seven restraining order applications against the father in the last forty months" which is a blatant lie. There were only 4, one of which was withdrawn.

She shows her clear bias against women seeking relief from abuse, and shows no recognition of the laws that allow coercive control to be considered as domestic violence in this state. She also cited "applicable laws" which were also completely irrelevant to the case and to the orders.

She claimed that the "testimony of the father was credible" despite listening to him contradict and lie under oath on numerous occasions. She stated that the testimony of Family relations was credible, when they provided incomplete information due to Mr. Lodice's refusal to sign his releases. She stated that "the testimony of the mother was not entirely credible" when Ms. Antar is commissioned as a notary and is also a law student authorized to practice law under supervision of an attorney and has extensive training and credentials, as well as excellent credit.

Mr. Lodice does not honor his obligations, debts, or court orders. He has a 500 credit score, a prison and conviction record, and has not willfully paid child support in over 6 months to Ms. Antar or to Ms. Perez.

Judge Grossman then criticizes Ms. Antar for bringing substantial amount of evidence showing that the father is lying about his income to the hearing that she was forced to attend without counsel due to Judge Grossman's denial of her continuance, and claims that she "interrupted the court and the father many times" despite her being fine with Mr. Lodice interrupting both her and Ms. Antar on numerous occasions in the past. She claimed that Ms. Antar's statements were "often unrelated to the court process" when all of Ms. Antar's statements were relevant to the proceeding. She claims that the display of Ms. Antar in the courtroom after Judge Grossman announced she was putting her young vulnerable child in the sole control of a domestic abuser was "consistent with the testimony of the father who

indicated he has witnessed similar angry and uncontrollable outbursts" however Ms. Antar did not have any angry and uncontrollable outbursts in court, and the transcript reflects that. All Ms. Antar did was ask for a chance to be sworn in, to testify, to show evidence, and to be respected and heard as Mr. Lodice was awarded all of those rights.

She then cites an arrest, which was only made based on the lies in a statement written by Mr. Lodice, and uses it against the mother, while simultaneously blaming the mother for being the victim in Mr. Lodice's pending criminal matter.

She claimed that Ms. Antar failed to cooperate in the process of the comprehensive evaluation, when Ms. Antar attended every scheduled appointment on time, and Mr. Lodice was a no-show.

She also said that "at the request of the mother, the child was subjected to multiple forensic interviews" which is also false. Angelina had 2, both of which were scheduled by DCF. Ms. Antar had no knowledge of what a forensic interview was prior to DCF scheduling the initial one. She then goes on to falsely claim that "all the complaints and investigations were closed without any recommendations or additional concerns being raised about the father and that the child's pediatrician reported no concerns with the child." This was false, as well. The Yale Child Abuse clinic did make recommendations after the second forensic, which were that Angelina not have any unsupervised contact with Dominic. The pediatrician also expressed concern and was the one who referred the family to the ER on 5/23/23.

Judge Grossman also claimed that "DCF reported no concerns about the child but ongoing concerns regarding the mother's mental health." This is in direct conflict with the statement read by Ms. Baranowski on 4/5/23 when she stated DCF said they wanted both parents to engage in mental health treatment, which Mr. Lodice did not comply with.

She also claims that "upon learning that the father would not be charged the mother lashed out at the detective in charge or the investigation, calling her incompetent and neglectful and threatening her job. Her behavior was described as irate and rude. The New Britain Police Department had concerns about the mother's mental health."

These statements are also untrue. Ms. Antar never "lashed out upon learning father would not be charged" and all communications were done in writing with the exception of one phone call in which Ms. Antar expressed annoyance at the fact that it was scheduled for less than a 30 minute time slot to go over weeks of accumulated new evidence that she wanted to share with the Detective.

The New Britain Police Department has a reputation of negligence as well as being understaffed and overworked and underpaid. They have many lawsuits against them currently, and Ms. Antar feels that they did not do a thorough job investigating the matter of sexual abuse. Detective Steeves accepted photoshopped screen shots of an indoor camera that had the wrong date on it as "proof of no crime scene" and said she received six videos when Ms. Antar submitted close to 80.

Ms. Antar filed formal complaints in regard to Detective Steeves, who is also not an expert in mental health and her hearsay statement in no way is a tool to diagnose or assess Ms. Antar's mental health. Ms. Antar has treatment providers who she sees for ADHD medication and for her weekly therapy sessions for her PTSD.

Judge Grossman then falsely claimed that "In the last 14 months she has filed for five emergency applications for custody. All five were denied after court hearings. In March 2023, after one such denial, the father picked the child up from daycare per their regular

schedule. The mother posted flyers on social media claiming the child had been kidnapped."

Ms. Antar did not file for 5 ex-partes, and certainly did not get a denial prior to Mr. Lodice taking Angelina from the school on 3/10/23. On that day, he did not pick her up "per their regular schedule" which stated that his mother gets visitation on Friday's and not him. He intentionally took Angelina after being told that she could not have unsupervised contact with Dominic, then left her alone with Dominic for the majority of the day on 3/11/23. Judge Grossman claims that Ms. Antar posted flyers on social media when she never did, and she denied that in the hearing on 4/5/23 as well.

She then goes on to falsely claim that "the child has been subjected to at least three hospital visits and at least two forensic interviews" which is false. The child had one hospital visit that was transferred to a children's hospital in the same day and the two forensic interview were mandated by DCF.

She says Ms. Antar "claims" to have videos, but never once asked to see them or look at any of them herself. All videos have been previously sent to the New Britain Police Department.

She also accuses Ms. Antar of lying about the hospital notifying DCF, despite the hospital verifying that they did as mandated reporters. DCF chose not to take the report, which is not surprising as they typically do not do much to prevent children from being abused or neglected in this state, and are one of the most poorly rated organizations in the country. Judge Grossman claims that she thinks it is "unclear" as to why Ms. Antar would travel to Hartford, despite her making it clear on numerous occasions that she memorized Ms. Antar's educational status and location of her school, which happens to be in Hartford. Ms.

Antar missed class to take Angelina to the hospital, and hoped to be able to atleast make it to the 7:30Pm lecture. That never happened as they did not leave the hospital until 3:00AM.

Judge Grossman then claims that "prior closed complains were made to different hospitals and New Haven agencies" when this is also a lie. Both the October 2022 and February 2022 complaints were made directly to the DCF hotline. No hospitals or agencies had any involvement other than DCF and NBPD.

Judge Grossman also falsely claims that Ms. Antar was not "entirely cooperative in the process" or reporting mental health providers to Family Relations, when Ms. Antar was the only one who complied and gave her full list of prior providers.

Judge Grossman then attempts to call Ms. Antar a liar and discredit her further by saying that Ms. Antar "described herself to the court as a trauma survivor suffering from ADHD and PTSD." This is highly offensive as Ms. Antar was the victim in one of the most high-profile sexual assault cases in the last 15 years. **(See e-filed case exhibits 88, 125).**

She claims that Mr. Lodice, a convict, is an expert in psychiatry by citing that he "insists that she has been diagnosed with and treated for other illnesses" while failing to mention that Mr. Lodice refused to comply with orders to sign releases on any of his treatment providers, nor did he comply with DCF's suggestion that he engage in mental health treatment.

She also falsely claimed that "in 2019 she was recommended for a psycho-pharmacological evaluation and cognitive behavioral therapy. She did not act on these recommendations." This is also false. Ms. Antar did do CBT therapy and declined taking antidepressants four years ago because she disliked many of the antidepressants and the side effects they had on her in the past. She opted into more natural routes for treating

symptoms. Ms. Antar did eventually do a full comprehensive mental health evaluation in early 2023 and went on medication for ADHD after not using any medication for 10 years. Judge Grossman then falsely claims that "the child's experience with the mother is often tumultuous and chaotic. The mother has regular conflicts with those around her. She is repeatedly engaged with law enforcement (she calls the police herself or others call the police about her), DCF ( a recent referral involved her oldest child not of the parties) and she has been the subject of recent restraining order applications and criminal arrests. The child presently enrolled in her 6th daycare and seeing her 3rd pediatrician."

Everything in that statement is a lie based only on the lies that Mr. Lodice stated. Ms. Antar never has a tumultuous or chaotic experience with her child, and in fact has a strong bond and loving connection with her daughter. The claims that the mother has regular conflicts with those around her are also false and based only on Mr. Lodice's lies in his testimony. Her statement that Ms. Antar is repeatedly engaged with law enforcement is another effort for Judge Grossman to place blame on victims of domestic violence, as the majority of the time Ms. Antar has acted on the advisement of victim advocates who encouraged her to report violations of the terms of the protective order to law enforcement. She claims that others call the police on Ms. Antar, which is not true. She also claimed that there was a recent referral involving Ms. Antar's oldest child which is also a blatant lie, and Ms. Baranowski even said it was an old report from years ago that DCF sent them in error. She also claims that I was the subject of recent restraining order applications, when there was only one which was applied for by an unstable individual name Ashley Gray who was angry and forced Mark Wachter to write a fake affidavit that she typed that neither of them bothered to show up to court for to prosecute.

Judge Grossman was the judge who saw Mr. Lodice in court in February of 2022 when Ms. Antar applied for a restraining order and did not show up to prosecute, and she used this against Ms. Antar.

Judge Grossman was the judge who saw Ms. Antar in court in April of 2023 when Mr. Wachter and Ms. Gray applied for a restraining order and did not show up to prosecute, and she used this against Ms. Antar, as well.

She also said that Ms. Antar has had recent criminal arrests, when that is also false. Ms. Antar only had one arrest which was based solely on the the statement written by Mr. Lodice which consisted of lies.

The statement of "the child is presently enrolled in her 6th daycare and seeing her 3rd pediatrician" is also a lie. The child has only been enrolled in 5 daycares and was forced to leave 2 of those as a result of Mr. Lodice's sexual affairs with the teenage teachers and him immediately withdrawing Angelina from her new school on 5/25/23. The child has only had two pediatricians so far, not three like Mr. Lodice claimed in his false testimony.

The order goes on to state more clear lies such as "The child is also exposed to conflict when the parties exchange her and when the father tries to contact the child via phone or video call." This is a lie, and there was only conflict because the father refused to allow mother access to Our Family Wizard. The father also did not try to contact the child via video call since he is not allowed to do that since he has an active criminal protective order stating he can only call her on the phone and must only speak to Ms. Antar in the app. The child is never exposed to conflict when she is with Ms. Antar. The hearing in 2022 was not a day long nor was it only about the birthday.

Judge Grossman continues to show her bias by saying that she finds the mother "mostly at fault for the conflict" and also falsely claims that "they have been arrested many times since their daughter was born because of their disagreements." This is a blatant lie, and Ms. Antar has a clean record.

She also falsely claimed that "The father's arrests have been as a result of the mother's complaints. The mother's arrests have mostly, but not all, been initiated by the father's complaints." This is a lie. The mother was arrested only 2 times in the last 15 years, both of which were  as a result of the father's complaints, after Mr. Lodice wrote a statement that contained lies. She was found innocent and charges were dropped after the first arrest, and expects the same to happen with the second arrest.

Mr. Lodice has only been arrested one time for harassing Ms. Antar, and there are no multiple arrests that "have been as a result of the mother's complaints" as Judge Grossman falsely claims.

Judge Grossman then falsely claims that Ms. Antar has "primary custody of an older daughter" despite the fact that she actually has sole legal and sole physical custody of that child.

She also claims that Ms. Antar is a "graduate student" despite making it clear in every hearing over the last year that she knows that Ms. Antar is actually in law school, which much more difficult to get into than a simple graduate program.

She again tries to act as if she is an expert in psychology and attempts to psychoanalyze Ms. Antar by claiming that Ms. Anta's "circumstances might be temporary, but amenable to some type of treatment." She fails to mention that Ms. Antar has a provider for both therapy and medication treatment and that she has been already receiving treatment.

She claims that "The court did not receive any indication of what might be at the root of the behavior, as if the court is supposed to be able to be an expert in psychology that knows more than Ms. Antar's actual providers who showed documentation that Ms. Antar is fine. She also falsely claims that Mr. Lodice lives alone in New Britain, when he just recently announced that he is being evicted and will be moving back into the basement of his mother's house to live with his mother who is partially disabled and his stepfather who is a recovering alcoholic.

She also falsely claims that the father "was self-employed and is now looking for work" when he stated multiple times that he owns and runs a construction company called Whole House Remodeling Company LLC in which he makes a substantial income that he regularly underreports to both the IRS and the court. She also falsely claims that "he shares physical custody of two older children and has a good physical relationship with their mother." This is also false. Ms. Perez has taken Mr. Lodice back to court on numerous occasions, as recent as 5/30/23, and has complained about his abuse, neglect, and failure to pay child support. He also does not have shared custody and the children live with their mother, only going with Mr. Lodice for visits when he has time.

Judge Grossman also falsely claimed that Angelina is "bonded to him and he is an appropriate and attentive parent" despite nothing in the family relations report saying anything like this and despite her having zero evidence to support such a conclusion. Judge Grossman appears to potentially have a connection to Mr. Lodice outside of her judicial capacity given the amount of information that she states she knows that she wouldn't be able to know without having a personal relationship with Mr. Lodice. She states he is appropriate and attentive when he leaves the child alone with her brother that she has

been alleging is sexually abusing her, yet Judge Grossman thinks that as long as it is Ms. Antar who reports it, that it must be a lie. Instead she chooses to believe the person who can't pass a background check, credit check, or even be employed with Uber due to this extensive criminal record and multitude of history of violent crime.

She also falsely claims that Mr. Lodice "does a better job of insulating the child from the parents' conflicts, supports the child's relationship with mother and is a more stable and appropriate primary parent."

This could not be further from the truth. Mr. Lodice has been alienating and withholding the child from Ms. Antar and her family, has denied the child access to school, church, her family, and denied her access to medical follow up appointments and mental health treatement. Angelina has a diagnosis of adjustment disorder and taking her from the only home she ever knew to go into a home that has already deteriorated due to Mr. Lodice's eviction has caused so much unnecessary anxiety and pain on the child.

Judge Grossman then goes on to cite more lies such as that the "mother is unable or unwilling to facilitate or encourage the child's relationship with the father" despite the mother following all of the court orders.

She also falsely states again that the mother field 7 restraining orders on the father which is a blatant lie. She also stated that "In the last 8 months she initiated three identical claims that the child is being abused at the father's home. Related investigations resulted in concerns about the mother's ability to care for the child."

This is also a lie. Nobody ever ended an investigation with saying that they had concerns for the mother's ability to care for the child, nor were there 3 identical claims made. Each claim was unique.

The judge's statement that "the father fosters and encourages the relationship between the mother and child" is also a blatant lie, as he has done the polar opposite and has completely alienated Ms. Antar from her daughter.

Judge Grossman then continues to make false claims and conclusions as if she herself is an expert in psychology by claiming that "The mother's behavior and possibly her mental health is negatively impacting the child's stability, the child's relationships and the child's day-to-day wellbeing. The child's emotional and physical health is at risk from the mother's repeated conflict with others (including the child's day care providers and doctors) and from repeated exposure to doctors, forensic examiners and investigators."

This is also a lie. There is no indication that Ms. Antar has had any bad behavior that impacted the child nor that she has any mental health issues. There is no evidence to support any of the claims, and the child has not been repeatedly exposed to doctors, forensic examiners, and investigators. She never even saw or spoke to an investigator, nor was she repeatedly exposed to doctors or forensic examiners. She did 2 forensic interviews that DCF set up and they were done by a social worker. Ms. Antar has a wonderful relationship with Angelina's new school and with her doctor, as well as with her therapist.

Judge Grossman's ruling was done as a form of retaliation, harassment, and as a clear demonstration of her bias against Ms. Antar, and in the process violated several state and federal laws, as well as the Code of Judicial Conduct.

### **Evidence of Bias, Fabrications, Harassment, and Prejudice during 6/15/23 hearing**

On 6/15/23, there were 5 separate docket numbers on the schedule all set to be heard in New Haven Superior Court at 2:00PM. Judge Grossman started off the hearing by divulging false information and saying that, in regard to the requests for subpoenas that Ms.

Antar filed that were denied, "Miss Antar, those requests were denied because the Court subpoenaed those witnesses. So, I'd like to have those witnesses testify." (See 6/15/23 hearing pg 2 lines 1-3) Ms. Antar pointed out that "I didn't try to subpoena the same witnesses. I tried to subpoena the treatment provider that Mr. Lodice refused to sign a release for that you ordered him for him to sign a release—" At that point, Judge Grossman immediately interrupted and cut off Ms. Antar as she heard that Ms. Antar was stating that Mr. Lodice had violated court orders. In an effort to protect Mr. Lodice, Judge Grossman said "All right. Miss Antar, please—do not interrupt me. Resist the urge to correct me every time." Ms. Antar said she would file for a hearing on it, and the judge ended up denying the request for hearing on denied application for issuance of subpoena.

Judge Grossman then said "Okay. So, two of your subpoenas were denied because I felt that they related to witnesses that the Court had already subpoenaed on your behalf. And those witnesses are here and I am going to hear from them first because they have other jobs besides working in the courthouse. Then we will hear from the other Court witness which is the family relations counselor who I assigned to do some additional looking into the allegations that Miss Antar raised. So that's how we're going to proceed. First with the Court witnesses on the holdover issues—holdover custodial issues from the last court date, then we'll talk about the four cases that were ex parte—denied ex parte cases that were transferred here, and then, before you leave today, there are outstanding financial motions filed by Ms. Antar that need to be resolved as well as the financial issues between the two of you of child support now that the child is living primarily with the father. So, those have to get scheduled and they will get scheduled. We'll talk about that probably

at the end of the day. So that's how were' going to proceed." (See transcript pg 2-3 from 6/15/23 hearing)

The fact that Judge Grossman scheduled so many things on the same date and time, along with subpoenaing two witnesses who were no longer relevant to the case, was a demonstration of her denial of Ms. Antar's due process. She scheduled everything for a 2:00PM hearing date, when there was a required break in the proceedings and the court needed to be finished before 5:00PM. Realistically, she only allotted approximately two hours for the proceeding which did not start until close to 2:30PM.

Throughout the proceeding, Judge Grossman fixated on asking questions to the detective from the New Britain Police Department about the sexual assault allegations that had been raised. She showed clear bias in her questioning, asked the witnesses leading questions the entire time, and deprived Ms. Antar of her due process. The detective said that, when asked how the first investigation ended, "That ended—I had to close it after the—after Angelina had her forensic interview. I closed it no disclosure." The detective also told the judge that there is a current, active, open police investigation and that the results from a DNA sexual assault evidence collection kit are still pending. Judge Grossman did not have any concern about this.

Judge Grossman continued to show bias in the questions she asked, and her statements showed she clearly felt that Ms. Antar was lying about the sexual abuse. Some of her statements were clearly biased, including "So, we sometimes have this experience in family court where people make criminal complaints to get some kind of advantage in the family court process, and that's always a concern that family court has that that could be happening. Do you have any indication that that might be happening here?"

Judge Grossman tried to dismiss the witness without giving Ms. Antar due process or allowing her to cross-examine her. Ms. Antar said "Your Honor, I have some questions for the witness." Judge Grossman refused to allow Ms. Antar due process and attempted to control/screen the questions and denied her the right to ask the questions freely and said "All right. Well, what are those questions about, Ms. Antar?"

Ms. Antar said "They're about what she testified, so I'd like to—" At that point, Judge Grossman immediately interrupted Ms. Antar and said "Okay. Can you—can you narrow it down for me?" Ms. Antar tried to start asking the questions to the detective, and Judge Grossman again immediately stopped her and said "Like, what are the subjects that you wanna ask her about?" Ms. Antar then again tried to begin her questions and said to the detective "Why didn't you bring up the third police interview that we had at the New Britain Police?" Judge Grossman then immediately interrupted Ms. Antar and stopped her cross-examination and said "All right. Ms. Antar, you're talking to me for a minute. So—" Ms. Antar then said "Would you like me to go through each question one-by-one? Or why can't I just have my right—I have the right to cross-examine this witness. I have—I'm ready to ask her questions."

Judge Grossman immediately interrupted again and said "Ms. Antar—simmer down. Yes you have—My experience with you is that you will keep this witness here for two hours." Her comments were showing how biased she was, and Ms. Antar tried to say "Nope. I just have a few questions." The judge continued to go back and forth and try to argue and said "Okay. What's—" Ms. Antar, who desperately wanted to have her right to due process, said "It's gonna take maybe five minutes. You can set a timer if you'd like." At that point, Judge Grossman smirked, smiled, and said "I'm gonna take you up on that."

She was laughing and smiling and smirking throughout the entire proceeding. At one point, she couldn't even keep her head up because she was laughing so hard that she had to keep her head down and stare down at the floor because she could not control the laughter.

Ms. Antar replied and said "And it's my legal right, even if it's five—more than five minutes. I have the right to cross-examine the witness. So if I ask for more time –"

Judge Grossman then immediately interrupted Ms. Antar again and said "Ms.—Ms. Antar—" Ms. Antar said "I should be given that ability. But I could start. If I have five minutes, I'd like to start so."

Judge Grossman continued to try to intimidate Ms. Antar and said "Okay. Ms. Antar. Listen to me. Yes, you can ask this witness some relevant questions—for this proceedings. And, yes, I will certainly give you five minutes. But if the questions aren't relevant, then probably I'm going to limit your right to ask her anymore questions. And then I'm gonna—listen to me. And then I'm gonna say what are the subject matters, and I'll question her. Okay?"

This was a clear effort for Judge Grossman to block Ms. Antar from due process again. When Ms. Antar tried to ask the detective about her mental health credentials since she told the court she had major concerns for Ms. Antar's mental health, Judge Grossman immediately intervened and said "Okay. So this would be an excellent example of a question that's not relevant." Rather than allow Ms. Antar due process, Judge Grossman acted as if she was the personal attorney protecting the interests of the witnesses and instructing them as to what they could and could not answer.

During the hearing, the detective also admitted that the reports she made about Ms. Antar's mental health that Judge Grossman cited in her 5/31/23 order were "not correct" and stated that she never reported that she had a concern for Ms. Antar's mental heatlh.

As Ms. Antar continued to ask questions, Judge Grossman interrupted again and said "Okay. You can't—Miss Antar, you can't testify from documents—you can't—you can't offer facts that aren't in evidence." Ms. Antar was not reading from any documents, and there is no rule that you can't offer a "fact that is not in evidence" and Ms. Antar responded and said "I'm not offering any—" Judge Grossman then immediately interrupted her again and said "Stop." Ms. Antar said "I'm asking her a question." Judge Grossman then said "Stop. Well, it's an inappropriate question because none of those facts are in evidence. And—and— listen. That doesn't matter to this Court or this proceeding so much as the October and the February and the May allegations---and her interactions with you."

Judge Grossman failed to realize that the "May allegations" were the exact same thing that the question was asking about. She also said it didn't matter to the court or proceeding, when there was an emergency motion for ex-parte custody on the docket for that proceeding regarding these allegations.

Ms. Antar attempted to ask a question to the witness again, and the defendant interrupted and said "Objection, hearsay." Judge Grossman did not reprimand, scold, or say anything to him for his interruption. Instead, she agreed with him and backed him up and said "Okay. So, you can't ask—the witness a—Listen. Listen. You can't ask the witness a question about things that other people said."

Judge Grossman spent the entire time on 5/25/23 listening to Mr. Lodice give hearsay testimony and told Ms. Antar that she was not allowed to object to any of it or she

would be banished to a hallway. Judge Grossman once again protected Mr. Lodice and his interests and showed favoritism toward him.

Judge Grossman then forcibly stopped Ms. Antar from her cross-examination when she was asking questions that made sense and helped her case such as "Was Angelina ever asked in that forensic interview if anyone touched her in her private parts?" to which the detective said no. Ms. Antar then said "So, was she ever asked directly by anyone from the New Britain Police if she was sexually abused?" the detective said "Police don't interview our victims." Ms. Antar then asked, "And is it the state law that police are not allowed to interview child victims?" The detective then said "It's not that they're not allowed, it's just not our procedure." At this point, Judge Grossman immediately stepped in and angrily said "Okay. We're gonna stop. Stop. Ms. Antar—I let you go for ten minutes. You haven't asked this woman a single question that's relevant for my—Don't—don't—please don't interrupt me. You haven't asked this witness a single thing that's—Please don't interrupt me."

Ms. Antar tried to say that she had questions about the second interview and asked how it was not relevant. Judge Grossman refused to answer and kept saying "Please don't interrupt." She then denied Ms. Antar due process and said "So, why don't you tell me what it is broadly that you want to know about this witness—and I'll ask her about it. Put your questions down. Tell me what you think it is that this witness could offer this proceeding." Ms. Antar said "So, the witness failed to mention the fact—I'm sorry. Should I be sworn in first?" Judge Grossman then again admitted she was denying Ms. Antar due process and said "No. You're not gonna testify. I'm just trying to figure out what you think this witness—

listen—okay. What this witness has by information—that would help me decide this case. What does she—what do you think she knows that would be helpful?"

Ms. Antar attempted to speak and said "I wanted to make it clear to the court—" Judge Grossman immediately stopped her and said "—but, Ms. Antar, it doesn't matter."

Ms. Antar continued to try to state that nobody ever said or proved that the child wasn't abused and tried to explain when Judge Grossman immediately interrupted her again and said "Okay. So tell me—Stop. Ms. Antar—don't—" Ms. Antar said "She stated no disclosure. That doesn't mean that the abuse didn't happen."

Judge Grossman then got angry and said "Listen, if you—if you can't follow the rules of court, I'm going to have to put you in the hallway while these people testify." Ms. Antar said "Well, I have the right to cross-examine this witness."

Judge Grossman then angrily said "You don't have the right."

Ms. Antar said "I do have the right to cross-examine this witness and the other witness. I have the right. And I have questions. You're refusing to allow me to ask her questions. You said you want—you want a broad overview. I'd be happy to provide that to you. I wanted her to clarify that Angelina didn't say that she wasn't abused."

Judge Grossman continued to show that she believed that Ms. Antar was lying about the abuse and told her to stop repeatedly every time she tried to ask a question related to the fact that the child never denied being abused and was never asked directly if she had been abused.

Judge Grossman continued to laugh, mock Ms. Antar, and throw her head down uncontrollably during the proceeding. Every time Ms. Antar mentioned the sexual abuse,

Judge Grossman smiled, laughed, smirked, and said things like "Stop. Miss. Miss Antar stop."

Ms. Antar said "And you're laughing. I love how you think this is so funny." Judge Grossman then laughed and said "Stop. That's enough. The witness is excused. That's it. She's released from the subpoena. There isn't a single thing you've raised that this witness hasn't already told me."

Ms. Antar tried to ask questions to the second witness when she finished testifying, but Judge Grossman denied due process again and said "How many questions are there?" Ms. Antar said "Am I limited when I'm cross-examining a witness to how many questions I can ask?" Judge Grossman said "possibly."

During the cross-examination, Judge Grossman interrupted Ms. Antar repeatedly, even when the witness was trying to answer. She was rude and said things like "All right. Hold—hold on. You gotta—that's not a question. Like, what are you asking this person? That's got like six things in it. What are you asking her?"

Ms. Antar continued to ask questions and Judge Grossman continued to try to interrupt and block Ms. Antar and said things like "All right. Why—okay. You gotta ask—you gotta—she can't answer—" Then, when Ms. Antar asked the witness if she recalled something, Judge Grossman again interrupted and said "All right. Ms. Antar, that's not a question."

When Ms. Antar was mid-sentence trying to ask another question, Judge Grossman again interrupted and said "All right. You have to—you have to pick which question you want her to answer." When Ms. Antar asked anything about the sexual abuse allegations, Judge Grossman continuously intervened and interrupted and said "All right. That's not

what the witness—Stop. All right. Stop. That's not what the witness said, Ms. Antar. You can't recharacterize her testimony." Ms. Antar said "I know exactly what was said. She can answer the question." The witness said "I did" as her answer and Judge Grossman was enraged and said "Okay well. I get to decide that actually. And it's not a—it's not a question. You're—you're—you're mischaracterizing her testimony. Her testimony was that she told the father that the—his children could be unsupervised with Angelina, but that maybe it's a bad idea because there's these constant allegations coming up and that it might not be good for the—for the stepbrother. That's what she said." None of that is accurate.

Ms. Antar then asked her "So, you mentioned before—you stated that DCF said that they had concerns for my mental health?" She said "No." Ms. Antar said "Okay. So why is—why did Judge Grossman say in the order that DCF stated they had major concerns for the mother's mental health and no concerns for the father's mental health?"

Judge Grossman then immediately got enraged again and interrupted and said "All right. This—this witness can't answer that question."

Ms. Antar then said "According to you, you stated that DCF said that to family relations. She's saying that's a lie. So does that mean you're lying?"

Judge Grossman then denied Ms. Antar due process and said "Okay. This—we're all done with this witness."

Family relations then went on the record and read statements from Angelina's providers which had concerning information such as that her therapist said "Miss Mayo describes Miss Antar's relationship with Angelina to be warm. Miss Mayo explains that her interactions with Mr. Lodice have been minimal, thus making it difficult to describe Mr.

Lodice's relationship with Angelina. Miss Mayo notes that, given Angelina's age, a sense of Angelina not seeing Miss Antar would be hard for Angelina. Miss Mayo hoped to work with both parents in efforts to think of a way Angelina can expect to see her mom routinely by agreement of the parents. Angelina carries a diagnosis of adjustment disorder. Different than struggling with --different than struggling from a specific event, it appears Angelina is struggling to adjust to ongoing parental discord, which Miss Mayo describes to be notable and clinically relevant. Miss Mayo contacted family services on June 14th, 2023 via telephone. She reports that on June 8th, 2023, Mr. Lodice reported to her that he is not interested in pursuing treatment at Yale Child Study for Angelina. Miss Mayo reports that she provided Mr. Lodice with her clinical judgment that Angelina should continue in treatment given the recent separation from Miss Antar. Miss Mayo recommends that a third party be available to speak to Angelina's needs. She reports a concern about Angelina's voice getting lost."

When Ms. Antar attempted to speak on the hearing for the emergency ex-parte motion that was set to be heard, the judge again denied her due process and said "All right. So, Ms. Antar, this motion is the same allegation that I have been listening to throughout this case. So I am not inclined to treat it any differently than anything else I've already heard. This allegation doesn't raise anything new."

Ms. Antar said "I'm sorry, but this motion is nine pages long. I'm not sure how you read the whole thing in the two seconds you just took to look at it but my major concern is that you're not allowing me due process. My major concern is you keep trying to step on my federal and state and constitutional rights. Now, I filed this motion; I'm the moving party. And I'd like to address it. I'd like to be heard." Judge Grossman refused to let the motion be

heard and said she was going to deny it without hearing it. Ms. Antar continued to ask to be able to argue the motion and Judge Grossman said she could only speak about "things that are not in the affidavit and things I haven't heard before. Don't repeat anything you wrote in your affidavit because I read it." Mr. Lodice objected at least twice during the hearing and interrupted Ms. Antar. Judge Grossman never reprimanded him. Ms. Antar said "Objection" and Judge Grossman immediately said "All right. Please don't interrupt." After Ms. Antar said that she only got to see her child for 10 hours in a three week period, Judge Grossman told Mr. Lodice "So, I would like you try to make a regular schedule. I think that would be more appropriate but—that is all I'm gonna say about that." Ms. Antar then said how she can't make a schedule while having supervised visits that depends on other people and Mr. Lodice's discretion, and asked "Having supervised visitation makes no sense. Why do I need supervised visits?" Judge Grossman said "Okay. Well—" Ms. Antar said "We never had—why do I need supervised visits?" Judge Grossman then said "—that's—that's not my question." Ms. Antar said "No, I'm asking you. Why do I need supervised visits?" Judge Grossman said "I've—" Ms. Antar said "What in this—what in this could ever—" and Judge Grossman interrupted and said "I—" Ms. Antar said "Why would it be in—so you think it's in the best interest of my daughter for her to not see me? Because he uses that as a reason to keep her away. You give him—he controls who the supervisor is."

Judge Grossman continued to ignore Ms. Antar and said "Okay. Miss Antar, I've issued—" Ms. Antar said "So then why don't you appoint it? Then why can't you—you appoint it then." Judge Grossman said "I issued my orders about that." Ms. Antar said "So—okay. So you think that giving it to him is—" Judge Grossman continued to interrupt and said "And—and now you've told me that you would prefer a schedule. So I am saying

while you're here, if you propose one, I'll try and work it out." Ms. Antar said "I would propose the schedule to be that Angelina could be with me from Monday through Friday like she was." Judge Grossman immediately said "That's not—" Ms. Antar said "Then she can—" Judge Grossman said "I—that is not what I'm asking you." Ms. Antar said "You just asked me to propose a schedule and I just did." Judge Grossman then said "Because I am—I am not changing my prior court orders about—about the need for your supervision." Ms. Antar then asked "So, let me ask you, have my parental rights been permanently terminated? Yes or no."

Judge Grossman then said "All right. I guess—That's not how this works. Ms. Antar. Mr. Lodice, you're going to have to work out the schedule with the supervisors which sound like the maternal grandmother and the maternal aunt. You're gonna have to do that on your own."

Ms. Antar then said "So, you said today we would talk about modifying parental access. My daughter's been—she's been alienated from me." Judge Grossman said "Well, that's what I was trying to talk to you about and trying to make a schedule."

Ms. Antar said "Okay. So then why do I need supervised visits then? Why can't you answer that?" Judge Grossman said "I issued my orders about why that is necessary." Ms. Antar said "I understand you issued biased harassing orders against me, but I'd like you to say on the record one reason why I should have supervised visits. If you can't give me one reason why I deserve to have supervised visits—and it's so hilarious because how can you say that when there's no DCF involvement? And I have sole legal and physical custody of another kid. And he already lost his apartment. He's not even living in New Britain anymore. He says I told her you're gonna be at daddy's house. Now she's at mema's

house in mema's basement with alcoholic stepdad Roy Bowers. That's not concerning to you? Because in your order you said she lives alone in New Britain; she's gonna go to New Britain schools. How's she gonna do that when now she lives in Waterbury? How's she gonna do that when he doesn't even have a stable place to live or a car."

When asked if any of that concerned her, Judge Grossman's response was "I have issued my orders about legal and physical custody." Ms. Antar said "So why can't we modify it where it's not supervised? You can't give me one reason why it should be supervised." Judge Grossman's response was "Okay. So, now that we have established that you don't want to address a schedule--."

Ms. Antar said "I do want to address a schedule. I said I want her Monday through Friday. That's my proposed schedule. I also submitted with Attorney Cretella a proposed parenting plan, and Mr. Lodice gave a proposed parenting plan as well which included me having overnights. So if Mr. Lodice said that I should have overnights and he said he's okay with me continuing to make religious decisions, why are you going against what even the defendant's asking for? Because again, there's no reason—there's not one reason why I need supervised visitation. I don't have any untreated mental health. I never abused or neglected my child—" At this point, Judge Grossman started laughing, smirking, and loudly scoffed at Ms. Antar. Ms. Antar said "Excuse me? What was that?" Judge Grossman could not contain her laughter and said "All right, Ms. Antar." Ms. Antar said "Are you insulting me in open court on the record?" Judge Grossman said "Oh, my goodness. NO, I'm just a little exhausted with you." Ms. Antar said "If you're exhausted with me, why don't you recuse yourself from this case? Because clearly you shouldn't be sitting at this bench right now." Judge Grossman got angry and ended the hearing abruptly.

**Evidence of Bias, Fabrications, Harassment, in 6/22/23 order**

On 6/22/23, Judge Grossman entered in an order titled "Additional Findings and Orders Re:

Memorandum of May 31, 2023" in which she slandered, defamed, and showed extreme

bias against Ms. Antar. She claimed that "Between 5/31/23-6/15/23 the mother filed five

emergency motions alleging the same facts considered on the prior hearing dates and/or

scheduled for additional evidence on June 15, 2023" yet that is inaccurate, and each

motion was different. She also states that "All were denied on the papers, transferred to

New haven and scheduled with this proceeding on June 15, 2023." This is inaccurate, as

the two TROs that were filed in Milford were immediately granted until Jane Grossman

forcibly made Judge Erika Tindill vacate them and dismiss them.

Judge Grossman goes on to insult Ms. Antar, stating that "The mother's appearance

and demeanor were, as was the case on 5/31/23, remarkable. She was disheveled and

unorganized. She repeatedly interrupted witnesses and the court. Her commentary towards

the other party, the witnesses, and the court was combative. She threatened witnesses with

future legal action. She challenged the legitimacy of the court, made personal comments

about the court and threatened the court with additional legal proceedings. This behavior

was consistent with the mother's behavior on earlier dates. However, on this occasion she

was more confrontational and threatening. After two-and-one half hours the hearing was

terminated because she would not stop shouting, making it impossible to conduct orderly

proceedings." Based on the transcript, none of what Judge Grossman said in these

statements is true. Ms. Antar was never shouting and never even raised her voice once,

and did not do any of those things, and simply tried to ask for due process and to argue the

motions without her rights being violated. Ms. Antar had a witness with her as well who can testify that she was neat, organized, and put together during the hearing.

Judge Grossman then falsified a financial record for Ms. Antar and put in child support orders without giving Ms. Antar the opportunity to put in her own accurate and recent financial affidavit. She also intentionally misrepresented and added additional deductions for Mr. Lodice, even crediting him for paying child support for three children while he was supposed to be getting paid child support for one.

Judge Grossman accused Ms. Antar in writing of lying about allegations that are the basis of an open police investigation, and stated in her order that "the court has previously found, and maintains here, that the mother's testimony on this subject is not credible" and stated that "The court has previously found, and maintains here, that the father is a good custodian who keeps the child safe. There is no credible evidence that he allows the child to be sexually abused in his home." Judge Grossman took it upon herself to say that she can decide that allegations of sexual abuse are false based solely on her opinion, even in the face of a DNA rape kit that hasn't come back from the lab yet, multiple disclosures from the child, and an open police investigation.

Judge Grossman continued to slander Ms. Antar with inaccuracies in the order, and claimed that "The mother subjected the child to a third forensic interview, including an invasive physical exam. This occurred at Hartford Hospital. The initial reports from this physical examination are negative. The only test results not yet available were DNA testing." This is not true. Angelina never had a third forensic interview, and never had any invasive physical exams. Judge Grossman put this information in there and based it off of a

pure assumption, and not based on any fact or evidence. There were also no "initial negative reports" from any physical exams.

Judge Grossman then claims that a hearsay comment from the suspect's mother that he was at a "sleepover" are "proof that the alleged events could not have occurred as alleged by the mother because the people she accused of abusing the child were not in the home of the father on the date in question" when the hearsay comment means and proves nothing.

She goes on to say that Ms. Antar "coached and encouraged video statements" which is also a lie. Judge Grossman never once saw a single one of the videos and none of them are coached or encouraged. She also lies and says that the child was in therapy from "March to May" but the child was in therapy from January to May. She says the child made "no disclosures of abuse" but the child was just starting with therapy and was only going once a week and getting used to the initial space. The therapist's concerns were related to being separated from the mother, not from "stress, parental conflict, and separation."

Judge Grossman then says "the allegations made by the mother that the child is sexually abused in the home of the father are false" and accuses Ms. Antar of lying, even though she has no way of proving that they are false. This is proof of her bias and prejudice.

Judge Grossman then says "The court cannot determine if the mother's pursuit of these false allegations is a deliberate attempt to interfere with the father/child relationship or if they are sincerely rooted in her own misguided fears for the child. A thorough psychological evaluation by a PhD level professional with experience in family conflict would be necessary to resolve this question. The mother's access with the child remains as

stated in the 5/31/23 orders. The mother will pay child support to the father in the amount of $77 a week. Child support is effective 5/25/23 and payable by immediate wage withholding. The parties will share equally work-related day care and unreimbursed medical expenses. These are final orders on all motions regarding custody and access of the parties' minor child." She also included a worksheet for child support guidelines in which she put that Mr. Lodice has 4 kids instead of three, added additional deductions for him that he did not include on his financial affidavit, prepared the worksheet herself, and used an old financial affidavit from a year ago instead of allowing Ms. Antar the opportunity to provide her own like she stated she would on 6/15/23. She also said that the parties would split evenly childcare costs when the chart showed that Ms. Antar should only pay 20%.

Everything she has done has been abuse of power, bias, prejudice, and a violation of both Ms. Antar and her minor daughter's constitutional, state, and federal rights.

## **Argument and Authorities**

Parents have the right to:

1.      a free public school education for their child, from kindergarten until age 21, or receipt of a high school diploma, whichever comes first, as provided by law;

2.      an evaluation for their child with a disability and, if found to be in need of special education, receive a free, appropriate education from age 3 through age 21, in accordance with applicable laws and regulations;

3.      bilingual education or English as a Second Language services, for their child with limited English proficiency, as required by law and regulations;

4.      have their child receive his or her full instructional schedule in accordance with the Department of Education school year calendar;

5.      have their child learn in a safe and supportive learning environment, free from discrimination, harassment, bullying, and bigotry;

6.      have their child receive courtesy and respect from others and equal educational opportunities regardless of actual or perceived race, color, religion, age, creed, ethnicity, national origin, alienage, citizenship status, disability, sexual orientation, gender (sex) or weight;

7.      have a child accorded all the rights set forth in the Bill of Student Rights and Responsibilities found within the New York City Department of Education's Citywide Standards of Intervention and Discipline Measures. Access Information about Their Child The Department of Education and its schools are responsible for providing parents with access to their child's education records and any available information on educational programs and opportunities.

Parents have the right to:

1.      Translation and interpretation services if they require or request language assistance in order to communicate effectively with the Department, in accordance with Chancellor's Regulation A-663;

2.      Information regarding all policies, plans and regulations which require parent consultation at the school, district and/or borough level;

3.      Access to current information regarding services which are provided by the school system, eligibility requirements for these services, and how to apply for them (e.g., transportation, food services, health services, English Language Learner (ELL) instruction, remediation, special education services);

4.      Be informed about required health, cognitive and language screening examinations

5.      Information concerning expectations for their child with respect to their child's educational program, attendance and behavior;

6.      Written information regarding the grading criteria that will be used to evaluate their child's academic performance;

7.      Access to information concerning their child's instructional program, including but not limited to, course of study or curriculum;

8.      Be assured the confidentiality of their child's records,

9.      Access and review their child's education records no more than 45 days from receipt of the request;

10. Make an appointment to have their child's education records explained by designated school staff and to have such a meeting within a reasonable time after making such a request;

11. Request that their child's education records be released to an outside agency, in accordance with Chancellor's Regulation A-820, and to withhold their contact information from institutions of higher learning and/or military recruiters;

12. Have their child's education records sent in a timely manner to another school to which their child has transferred;

13. Consent to disclosures of personally identifiable information contained in their child's education records, except to the extent that Family Educational Rights and Privacy Act (FERPA) and Chancellor's Regulation A-820 authorize disclosure without consent. One exception permitting disclosure without consent is disclosure to school officials who need to review education records to fulfill their professional responsibility. Examples of school officials include employees (such as administrators, supervisors, teachers, other instructors, or support staff members, and people whom the has engaged to perform services or functions for which it would otherwise use its own employees (such as agents, contractors and consultants). Another exception permitting disclosure without consent is disclosure, upon request, to officials of another school district in which your child seeks or plans to enroll, or is already enrolled if made for purposes of your child's enrollment or transfer;.

 Parents have the right to actively Involved and Engaged In the Education of Their Children. Parents have the right to be given every available opportunity for meaningful participation in their child's education.

Whenever an action regarding custody of children is brought upon the court, "the guiding principle in determining custody is the best interest of the child." *Schult v. Schult, 241 Conn. 767, 777, 699 A.2d 134 (1995).* In this case, Judge Grossman did not consider anything

related to the best interest of the child, and based her decisions entirely on her dislike of the petitioner.

According to the CGS 46b-56a(b), "There shall be a presumption, affecting the burden of proof, that joint custody is in the best interests of a minor child where the parents have agreed to an award of joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child or children of the marriage. If the court declines to enter an order awarding joint custody pursuant to this subsection, the court shall state in its decision the reasons for denial of an award of joint custody." The reasons that Judge Grossman gave in her orders were based on inaccuracies, assumptions, bias, and prejudice. She failed to take into consideration any of the 22 factors of the Best Interest of the Child Standard.

In cases such as this where both parents are seeking sole custody as a modification of the order, the law states that "each fit parent's constitutional right neutralizes the other parent's constitutional right, leaving, generally, the best interests of the child as the sole standard to apply to these types of custody decisions. Thus, in evaluating each parent's request for custody, the parents commence as presumptive equals and a trial court undertakes a balancing of each parent's relative merits to serve as the primary custodial parent; the child's best interests tip the scale in favor of an award of custody to one parent or the other." *Fish v. Fish, 285 Conn. 24, 45, 939 A.2d 1040 (2008).*

Furthermore, parents have the right to:

1.      Feel welcomed, respected, and supported in their school communities.;

2.      Be treated with courtesy and respect by all school personnel, and to be accorded all rights without regard to race, color, creed, religion, national origin, sex, gender, age,

ethnicity, alienage/citizenship status, marital status, partnership status, sexual orientation, gender identity, or disability ;

3.      Participate in regular written or verbal communication with teachers and other school staff and share concerns regarding their child's academic, social and behavioral progress;

4.      Meet with their child's teachers and principal in accordance with established procedures;

5.      Participate in meaningful and productive parent-teacher conferences to discuss their child's progress in school and have access to other school staff, as appropriate, throughout the school year to discuss concerns;

6.      Be informed on a regular basis, both informally and through formal progress reports, of their child's academic and behavioral progress in school;

7.      Due process

8.      Participate in elections for the School Leadership Team at their child's school;.

9.      Be accompanied by a friend, advisor, or interpreter at hearings, conferences, interviews and other meetings concerning their child, in accordance with established procedures without pre- approval from staff or school administration;

10. An interpreter, if they are hearing impaired, at any meeting or activity which they attend which is specific to the academic and or disciplinary aspects of their child's educational program, provided a written request is made prior to the meeting or activity; if an interpreter is unavailable, other reasonable accommodations shall be made;

11. Have school staff make every reasonable attempt to ensure that parents receive important notices from the school, including notices about parent-teacher conferences,

Parent Association or Parent-Teacher Association meetings, School Leadership Team meetings, Community Education Council meetings, etc.;

12. Be a member of the Parent Association or Parent-Teacher Association of his or her child's school without the payment of dues;

13. Receive a copy of the "Parents' Bill of Rights and Responsibilities," the "Citywide Standards of Intervention and Discipline Measures", which includes the "Bill of Student Rights and Responsibilities" and copies of school- specific policies;

14. Participate on school committees (e.g., Safety, Nutrition, C-30 Level I), in accordance with the guidelines for participation which apply to those committees;

15. Attend and participate at meetings of the Community and Citywide Education Councils and of the Panel for Educational Policy which are open to the public, in accordance with the provisions of the Open Meetings Law ("the Sunshine Law") and established procedures.

Petitioner holds that her Due Process rights as protected by Fourteenth Amendment were violated. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.  The Court had an abundance of clear and convincing evidence that the Respondent father was violating court orders and were deliberately withholding Petitioner from her minor childnnecticut statutes provide that either parent has no automatic right to sole custody of the child. Only the best interests of the child are considered in determining custody. Connecticut cases have produced a wealth of jurisprudence on State criteria for an unfit parent. In recent cases, custody has been decided based on, not necessarily who is the unfit parent but, who is the less fit and more fit parent.

Connecticut courts decide custody issues, depending on the best interests of the child. Included in this "best interests" standard is whether a parent is unfit. Connecticut jurisprudence has provided criteria for determining who is an unfit parent. However, no single factor is controlling, and all factors are considered and used in evaluating the totality of circumstances to determine who the more fit parent is to have custody over the child. Petitioner has only been a loving supportive mother that is unlawfully withheld from her child and the Court Justice allowed this to happen by not exercising ministerial duties. Petitioner has never been found an unfit parent contradictory to Respondents long history of criminal activities.

If a parent fails to follow custody arrangement by refusing to allow the other parent to have custody of the child for a scheduled visit or by failing to return a child after visitation, that parent could face a charge of custodial interference. Under Connecticut Statue, you could be charged with custodial interference if you take a child from his or her legal custodian and you:

1.      Are a relative of a child who is less than 16 years old,

2.      Intend to keep the child permanently or for a protracted period of time, and

3.      Have no legal right to do so.

Petitioner submits that Respondent has willfully and deliberately violated Court Orders by keeping her child from her and thus is in violation, and the Justice still allows this behavior to continue by blatantly not exercising discretion and ministerial duty to force the Respondent to adhere to Court Orders.   Respondent's father has been getting away with this alienation and absolute disregard of Court Orders and it is Petitioners humble opinion that he will continue to do so in future.

Everything that has been done thus far by Judge Jane Kupson Grossman is in direct conflict with the "Best interest of the child" standard in Connecticut. Rather than think about the "ultimate welfare of the child which must control the decision of the court" Judge Grossman solely considered the "rights, wishes, and desires of the [defendant]" and took no consideration for the welfare of the minor child. *In re Appeal of Kindis, 162 Conn. 239, 242, 294 A.2d 316 (1972).*

Parental Alienation Syndrome occurs when "one parent uses his/her influence to undermine the relationship between the children and the other parent . . . It typically arises when the parents are engaged in divorce proceedings or a custody dispute. "See, People v. Loomis, 172 Misc.2d 265, 267. The Parental Alienation Syndrome theory was developed by Dr. Richard Gardner and is described by him as a disturbance in which "children are not merely systematically and consciously `brainwashed' but are also subconsciously and unconsciously `programmed' by one parent against the other." Wood, The Parental Alienation Syndrome: A Dangerous Aura of Reliability, 27 Loy.L.A.L.Rev. 1367, 1370 (June 1994) (quoting R.A. Gardner, M.D., The Parental Alienation Syndrome: A Guide For Mental Health and Legal Professionals (1992)). See, also, Niggemyer, Parental Alienation Is Open Heart Surgery: It Needs More than a Bandaid To Fix It, 34 Cal W.L.Rev. 567 (1998). The theory is controversial. The syndrome is not approved as a term by the American Psychiatric Society, and it is not in the DSM IV as a psychiatric diagnosis. Generally the Courts, in the context of a custody/visitation case, rather than discussing the acceptability of PAS as a theory, have discussed the issue in terms of whether the child has been programmed to disfavor the noncustodial parent, thus warranting a change in custody. Borris, Interference With Parental Rights of Noncustodial Parent As Grounds For

Modification Of Child Custody, 8 No. 1 Divorce Litig. 1, 9 (1997), citing Karen B. v. Clyde M., 151 Misc.2d 794,aff'd, 197 A.D.2d 753.  Thus, Courts does acknowledge parental alienation and Petitioner re-iterate that not only is Respondent actions that of alienating her child but he is plainly interfering with his parental rights as a fit parent to custody of Petitioner mother.

 Petitioner is convinced that the subject child has been alienated from her by the father. In fact, the Court has acknowledged this as such but still did absolutely nothing to hear Petitioners motion for contempt and various restraining orders and is therefore encouraging this behavior of the father as he gets away with this behavior for quite some time now.

The Petitioner has no evidence of any psychiatric disorder in the area of "thinking, affect, or behavior." There is no evidence that the mother had attempted to alienate the child from her father,

 Mother is painted in a highly derogatory and negative fashion, way out of proportion to any possible deficiencies that she may have. This is clearly a borderline mental device within the father's psychology. Petitioner acknowledges that although it may be traumatic to remove the child from Respondent's care, it would be more detrimental to her in the future if she remains in his care because she would not develop the psychological milestones or interpersonal skills essential to being a functioning adult.

Petitioner states there are a significant Change in Circumstances of the minor child

A change in circumstances may be demonstrated in a variety of forms, including but not limited to, changes concerning the financial, residential, educational, physical, mental, and emotional status in the life of a parent and/or child. It may also be demonstrated by evidence of the parties' inability or unwillingness to communicate resulting in a breakdown

or cessation of communication with each other concerning the welfare of a child, such that joint custody may no longer be feasible in promoting the child's best interests. G.D. v. D.D., 52 Misc 3d 1220[A], 43 N.Y.S.3d 767, 2016 NY Slip Op 51228[U], at 22 (Sup. Ct. Westchester Cty. 2016); Matter of Carter v. Carter, 111 AD3d 715, 974 N.Y.S.2d 545(2nd Dept. 2013); Fowler v. Rivera, 296 AD2d 409, 745 N.Y.S.2d 457 (2d Dept. 2002). For example, see Sequeira v. Sequeira, 121 AD3d 406, 993 N.Y.S.2d 309 (1st Dept. 2014 From all Petitioners exhibits attached hereto the total breakdown of communication is evident.

Evidence of interference by the custodial parent in the relationship between the subject child and non-custodial parent, can also constitute a change in circumstances sufficient to overturn / modify an existing order or to enforce an order. This type of interference is also known as "parental alienation" a highly controversial term in Family and Matrimonial Law. Parental alienation was first introduced as a diagnosis or syndrome (PAS), which focuses on the behaviors of the child.  Courts have embraced parental alienation as a concept. In recognizing that parental alienation can exist, some courts have loosely defined it as a custodial parent's active interference with or deliberate and unjustified frustration of the non-custodial parents' reasonable right of access to the child. In attempts to elaborate on the concept without accepting the syndrome, courts have held that as the custodial parent, one of the primary responsibilities "is to assure meaningful contact between the children and the noncustodial parent, and the willingness of a parent to assure such meaningful contact between the children and the other parent is a factor to be considered in making a custody determination." Alvarez v. Alvarez, 114 AD3d 889, 980 N.Y.S.2d 583 (2nd Dept. 2014); see also Matter of Vasquez v Ortiz, 77 AD3d 962, 909 N.Y.S.2d 155 (2nd Dept.

2010); Matter of Honeywell v. Honeywell, 39 AD3d 857, 835 N.Y.S.2d 327 (2nd Dept. 2007); Cuccurullo v Cuccurullo, 21 AD3d 983, 801 N.Y.S.2d 360 (2nd Dept. 2005). "[E]vidence that the custodial parent intentionally interfered with the noncustodial parent's relationship with the [children] is so inconsistent with the best interests of the [children] as to, per se, raise a strong probability that [the offending party] is unfit to act as custodial parent".) See In re Gerber, 133 AD3d 1133, 21 N.Y.S.3d 386 (3rd Dept. 2015). As explained in Young v. Young, supra:

"Interference with the relationship between a child and a noncustodial parent can take many forms, the obvious being the outright denial of visitation by making the child physically unavailable at the appointed time. However, the instant case involves a more subtle and insidious form of interference, a form of interference which, in many respects, has the potential for greater and more permanent damage to the emotional psyche of a young child than other forms of interference; namely, the psychological poisoning of a young person's mind to turn him or her away from the noncustodial parent." Id. at 2, 628 N.Y.S.2d at 929.

Parental alienation as a concept focuses on the actions of the custodial parent. Yet there are no guidelines or factors to assess when determining whether parental alienation exists. Courts have been proceeding on a case by case basis, enlisting their own factors and assessing the totality of the circumstances to determine if alienation exists. Overall, it appears that in analyzing the concept of parental alienation, when examining the actions of the parents,  Courts are also examining the resulting actions of the children, actions which are very similar to the "symptoms" For example: discounting any good times with or refusing positive comments about other parent without reason refusing to engage in normal

activities with the non-custodial parent adopting a negative view of non-custodial parent. child/children recalls incidents that never occurred or that occurred at a time when they were not or could not have been present, child has the belief that one parent is all good and the other is all bad.[\Given this analysis, courts should look at the combined actions of both the custodial parent and child to determine whether alienation exists and the extent to which it has disrupted the relationship between the non-custodial parent and child.

It is undisputed that despite an order the parties do not communicate in any manner, due to Respondent's bizarre refusal to acknowledge Petitioner. Since the entry of the orders, Respondent has not discussed with Petitioner or informed Petitioner of any decisions he has made concerning the child and has done everything in his power to unlawfully interfere with Petitioners right to parenting time.

What is more concerning is the Respondent's total disengagement from Petitioner's existence, his complete and utter refusal to communicate with her, and her unexplained refusal to acknowledge Petitioner in the flesh or as the mother in the absence of any abuse or traumatic event. The evidence further demonstrates that, the child is being gradually and systematically cut off from everything outside of her immediate residential family unit.Respondent's actions towards and view or lack thereof toward Petitioner are so inconsistent with the best interests of the child in raising her  to believe she does not need a mother, that this raises a strong probability that he is unfit to act as custodial parent and that sole custody should be awarded to the Petitioner to ensure the child's continued best interests." Schmitz v. Schmitz, 139 AD3d 1123, 31 N.Y.S.3d 295 (3rd Dept. 2016); Christopher H. v. Taiesha R., 166 AD3d 548, 88 N.Y.S.3d 181 (1st Dept. 2018).

Best Interests

Petitioner now turns to the best interest analysis. The factors to consider when conducting a best interest analysis are the same in any custody case, regardless of whether it is a modification or an initial custody petition, as there is "no prima facie right to the custody of the child in either parent." DRL § 70(a); see also Friederwitzwer, supra. Such factors include but are not limited to the quality of the home environment, financial status and ability of each parent to provide for the children, fitness of the parents, length of time current arrangement has been in effect, the effect an award of custody may have on the noncustodial parent, stability and the preferential wishes of the child.

See Young v. Young, 212 AD2d 114, 628 N.Y.S.2d 957 (2nd Dept. 1995).

Kerwin v. Kerwin, 39 AD3d 950, 833 N.Y.S.2d 694 (3rd Dept. 2007); Meyer v. Lerche, 24 AD3d 976, 807 N.Y.S.2d 151 (3rd Dept. 2005).

Friederwitzer v. Friederwitzer, 55 NY2d 89, 432 N.E.2d 765 (Ct. App. 1982). See also, Lew v. Sobel, 46 AD3d 893, 849 N.Y.S.2d 586 (2nd Dept. 2007). :See the mediated parenting agreement dated March 28, 2011 admitted into evidence as Court's Exhibit #2 Various admitted into evidence. See also Murphy v. Wells, 103 AD3d 1092, 958 N.Y.S.2d 560 (4th Dept. 2013)(change in circumstances found where the parents' relationship became so strained and acrimonious that communication between them was impossible, warranting modification of joint custody order). West v. Vanderhorst, supra (mother also prohibited contact between child and father); Murphy, supra.

Kelly Schwartz, The Kids Are Not All Right: Using the Best Interest Standard to Prevent Parental Alienation and A Therapeutic Intervention Approach to Provide Relief, 56 B.C. L. Rev. 803 (2015).

 J.F. v. D.F., 61 Misc 3d 1226(A) (NY Sup. Ct. 2018) ( In a recent decision, highlighting the absence of a firm definition of the concept of parental alienation, the court analyzed it by comparing it to the tort of intentional infliction of emotional distress [IIED], borrowing the elements of IIED to determine if alienation existed.)

 Kelly Schwartz, The Kids Are Not All Right: Using the Best Interest Standard to Prevent Parental Alienation and A Therapeutic Intervention Approach to Provide Relief, 56 B.C. L. Rev. 803 (2015); Palazzolo v. Mire, 2008-0075, 10 So. 3d 748, 772, [La. App. 4 Cir. 2009]. In re Gerber, supra; J.F. v. L.F., supra. :In re Gerber, supra. Greene v. Robarge, 104 AD3d 1073, 962 N.Y.S.2d 470 (3rd Dept. 2013); J.F. v. L.F., supra.

 Mark L. v. Gail S., 2006 NY Misc. LEXIS 4087, 235 N.Y.L.J. 103 (NY Sup. Ct. May 30, 2006).  J.F. v. L.F., supra. See Sequeira v. Sequeira, supra; see also West v. Vanderhorst, supra.  :Greene v. Robarge, supra.  West v. Vanderhorst, supra.  Mark L. v. Gail S., supra; Greene v. Robarge, supra.

 "Any court in considering questions of child custody must make every effort to determine 'what is for the best interest of the child, and what will best promote its welfare and happiness.'" Eschbach v. Eschbach, 56 NY2d 167, 436 N.E.2d 1260, 451 N.Y.S.2d 658 (1982) (quoting Domestic Relations Law § 70(a)).

Although stability is an important consideration in determinations as to change of custody and has been found to be in children's best interests, it cannot be the decisive factor; 'that change in custody may prove temporarily disruptive to children is not determinative, for all changes in custody are disruptive.'" J.F. v. L.F., 181 Misc 2d 722, 694 N.Y.S.2d 592 (Fam. Ct.1999) (quoting, Nehra v. Uhlar, 43 NY2d 242, 372 N.E.2d 4, 401 N.Y.S.2d 168 (1977); Young v. Young, supra.

While children may express their preference for living with one parent, this is but a factor to be considered and not determinative to the court's overall custody determination. Melissa C. D. v. Rene I. D., 117 AD3d 407, 985 N.Y.S.2d 28 (1st Dept. 2014); Young v. Young, supra.

The general rules regarding a change of custody have been long established in New York: [w]ith respect to any determination as to a change of custody, the paramount consideration must be the best interests of the children ( see, Eschbach v. Eschbach, supra; Friederwitzer v. Friederwitzer, 55 N.Y.2d 89; Keating v. Keating, 147 A.D.2d 675). Among the factors to be considered are the quality of the home environment and the parental guidance the custodial parent provides for the child ( see, Eschbach v. Eschbach, supra, at 172; Matter of Ebert v. Ebert, 38 N.Y.2d 700, 702), the ability of each parent to provide for the child's emotional and intellectual development ( see, Porges v. Porges, 63 A.D.2d 712, 713), the financial status and ability of each parent to provide for the child ( see, Eschbach v. Eschbach, supra), the relative fitness of the respective parents, and the length of time the present custody arrangement has been in effect ( Matter of Nehra v. Uhlar, 43 N.Y.2d 242) . . .

Krebsbach v. Gallagher, 181 A.D.2d 363, 364-5, lv denied, 81 N.Y.2d 701. (Note that in Kresbach, the Appellate Division, Second Department specifically stated that the treating therapist testified that he saw no signs of `parental alienation syndrome', and that he testified that there was no plot or plan to alienate the children from their father. Id. at 367). Another proper and relevant consideration is "the effect that an award of custody to one parent might have on the child's relationship with the other parent." Bliss v. Ach, 56 N.Y.2d 995, 998, Young v. Young, 212 A.D.2d 114, 118. With regard to the motherr's right of

visitation herein, the custodial parent has a duty to protect and to nurture the child's relationship with the noncustodial parent, and to ensure access by the noncustodial parent. Daghir v. Daghir, 82 A.D.2d 191, aff'd 56 N.Y.2d 938. Even though there is a difference in nomenclature, it is submitted that the principles in these cases apply herein. TheYoung v. Young, 212 A.D.2d 114, 115. See, also, Entwistle v. Entwistle, 61 A.D.2d 380, 384-5, app. dismissed 44 N.Y.2d 851;Leistner v. Leistner, 137 A.D.2d 499, 500.

As in Young, in this case, the mother's interference with the relationship between the children and the father is not an outright denial of visitation by making the children physically unavailable at the appointed time. Rather, the mother's interference here involves a more subtle and insidious form of interference, a form of interference which, in many respects, has the potential for greater and more permanent damage to the emotional psyche of a young child than other forms of interference; namely, the psychological poisoning of a young person's mind to turn him or her away from the noncustodial parent. Young v. Young, 212 A.D.2d 114, 115. See, also, Gago v. Gago, 214 A.D.2d 565, 566, leave to appeal denied, 86 N.Y.2d 706, which combined many types of interference with visitation, in which the Appellate Division, Second Department, gave custody to the father, where the mother "persistently interfered with the father's visitation rights by making unfounded allegations of child abuse against the father, by coaching the child to make false allegations of abuse, and by causing disruption to the child's visitation and vacation plans with his father."

In the instant matter, as in Young, if the children were to be left with the mother the children would have no relationship with their father given the mother's constant and consistent single-minded teaching of the children that their father is dangerous. She has demonstrated

that she is unable and unwilling to support the father's visitation . . .Id., at 115. Custody was changed to the father in Young. (See, also other Appellate Division, Second Department cases in which the custodial parent interfered with the noncustodial parent's right to visitation, which conduct led the Court to change custody: Matter of Muller v. Muller, 221 A.D.2d 635, 636; Carl J.B. v. Dorothy T., 186 A.D.2d 736; Matter of Sandra C. v. Christian D., 244 A.D.2d 551; Notley v. Schmeid, 2Petitioner submits that after a review of all of the evidence, and being in the unique position to observe the demeanor and credibility of the Respondent mother that her position in this matter cannot be accepted. The mother's view of the father has been completely adopted by the children and she has done nothing to promote their relationship with him. After having done the damage, she can now sit back and pretend that none of this is of her making. Neither parent communicates effectively with the other. If they did, these involved and constant proceedings before the Court would not have been necessary. The father has continued to keep fighting to have access to his children over the years, despite the clear attempts on the part of the mother to undermine his relationship with them. The Court recognizes that the father is not without faults. However, it is Petitioner's belief that with therapeutic assistance, any issues of parenting will be addressed and that sole custody of the parties' minor children should be awarded to Petitioner.

Thus, in light of the totality of the circumstances, Petitioner submits that the best interest of the child is served by awarding custody to Petitioner humbly submits that any other remedy other than awarding sole custody to Petitioner with supervised visitation to the Respondent would be ineffective.  The evidence presented herewith is clear that Respondent will just continue his custodial interference with Petitioner's fundamental right to have a relationship

with her child. Petitioner therefore humbly requests this Court to order, inter alia that sole custody of the parties' minor child be transferred to the mother, that the father's contact with the child be suspended until otherwise recommended by the child's therapist, that the mother expeditiously enroll the children in therapy with a therapist familiar with and experienced in treating cases involving parental interference or alienation, the choice of such therapist to be approved by the Law Guardian, that the parties' cooperate with the child's therapy and participate in such therapy to the extent recommended by the therapist and that both parties participate in their own individual therapy, if recommended, that the Law Guardian shall provide reports to the Court regarding the child and that the mothers motion to hold the father in contempt will be upheld.  Furthermore after due and proper therapy the Respondent can then approach the court to obtain supervised visitation with the child

The only remedy to avoid further alienation, psychological and emotional irrevocable harm to the minor child is to award sole custody to the Petitioner. Justice failure to comply with her judicial obligation also frustrates the right to a speedy determination guaranteed to petitioner(court must "issue the writ without delay"); People ex rel. Duryee v. Duryee, 440, 445-46 (1907).

The law mandates that "it is statutorily incumbent upon a court entering orders concerning custody or visitation or a modification of such order to be guided by the best interests of the child." *Wilson v Wilson, 38 Conn. App. 263, 269, 661 A.2d 621 (1995).*  It is imperative that the best interests of the minor child be taken into consideration in this case. My daughter Angelina Maria Lodice (DOB 05/21/2019) has been subjected to a continuous threat of present physical pain or physical injury, stalking, a pattern of threatening and/or

coercive control by her father Matthew J. Lodice (DOB 05/11/1983) which continues to escalate and worsen with each passing day. Currently, there is a clear and immediate and present physical danger of physical and psychological harm to Angelina.

Angelina is being abused, neglected, and alienated while under the care of her father Matthew Lodice. She is a victim of domestic violence, as defined in section 46b-1, and is eligible for relief pursuant to 53a-62 and 46b-15b.

Matthew has been using coercive control as defined under Public Act No. 21-78 and has been consistently and aggressively isolating and alienating Angelina from her family members, providers, and support system. In the last six weeks, since Matthew was given temporary sole legal and physical custody of Angelina, Matthew has withdrawn Angelina from her school, removed her from her church in which she was an active member and was baptized and stated he will never allow her to return to church again, withdrawn her from her mental health therapy services of which she was receiving care, withdrawn her from her pediatrician, and refused to allow her access to mental health, educational or medical care. Matthew has isolated Angelina from her church, from me as her mother, from her sister, from her aunts, grandmother, cousins, uncles, and several other extended family members and friends.

Angelina was scheduled to have a follow-up medical appointment on 5/31/23 as part of discharge instructions from an ER visit that took place on 5/23/23. Matthew neglected to bring her to this appointment.

A second appointment was scheduled for 6/9/23 as the follow-up that was ordered as part of the visit to the ER. Matthew neglected to bring her to this appointment. He then

contacted the pediatrician and requested that Angelina be removed as a patient from the practice and stated she would no longer be receiving pediatric care.

Angelina is due for her follow-up appointment from the ER visit, as well as for an annual four-year physical checkup exam. Matthew has refused to allow me to schedule either of these for her, and has neglected to schedule them on his own, and has stated he will not allow her to receive any access to medical care in the future.

Angelina also has special needs and carries a diagnosis of adjustment disorder. She was receiving services at the Yale Child Study Center since January 2023. Matthew has since terminated her services and has withdrawn her from having access to her mental health services, despite her provider, pediatrician, and DCF all stating that they strongly believed that it was medically necessary and in the best interest of Angelina to continue services.

At this time, Matthew has stated he will no longer allow Angelina to attend therapy, visit a doctor for any reason, or have access to medical care. He has refused to get her medical insurance, as well, and she currently has no health insurance.

I was able to take Angelina to be seen at the Suspected Child Abuse Network clinic on 6/19/23 for a previously scheduled appointment that Matthew hadn't canceled, and the provider also stated she strongly believes Angelina needs to receive therapy services and recommended it in the discharge paperwork.

Angelina has been struggling immensely as she is being psychologically abused by Matthew and he is using manipulation, coercive control, alienation and isolation, and other tactics in order to emotionally abuse her. Matthew was told that he needs to allow me to see Angelina regularly, yet in the past six weeks, he has only allowed me a grand total of 1.5 days with Angelina.

Angelina previously was living with me and her sister for four years, up until 5/25/23 when Matthew temporarily was given sole legal and sole physical custody. Matthew was told since then repeatedly that he needed to allow me regular access to Angelina. He was also told that he needs to allow me to FaceTime and call her regularly.

Matthew isolates Angelina from me and my family by refusing to respond to any of my messages in the OurFamilyWizard app in which I attempt to inquire about seeing/speaking to Angelina, denies all of my requests to see or speak to Angelina, and has stated that he will no longer allow me to see Angelina and that visitation is terminated, and has stated that he will not follow any court orders.

Matthew said repeatedly, in an effort to intimidate me, that he knows that the "courts won't do anything" and that the "police won't do anything" and has laughed when I said that I was going to report his abuse to the police or apply for a restraining order.

Matthew has also been psychologically abusive to Angelina, and has worked tirelessly to try to make it impossible for her to sustain a relationship with me. During FaceTime calls with the child, he repeatedly interferes, tries to have third-party contact with me, intimidates the child, threatens the child, and tries to gaslight her and scare her during the calls.

He tells her that she can not see me, that she can never go to my house again, and when I tell her that I miss her and want to see her and that I have been trying so hard to get a chance to see her, he tells her that I am trying to "confuse her" and tells her that I am lying.

Angelina has been begging daily to see me, and Matthew tells her no. I have also asked daily in the OurFamilyWizard app and have been told no or ignored. During FaceTime's, Matthew will force Angelina to sit in the dark and refuse to allow her to turn the light on,

threaten her and physically restrain her if she tries to turn it on so I can see her face during the calls, and has caused her psychological trauma by isolating her from me.

Matthew has been using coercive control and domestic violence to psychologically abuse Angelina. He has exposed Angelina to a constant, continuous threat of present physical pain and physical injury, a pattern of threatening and intimidating her, myself, and other family members and third parties, coercive control to her and family members in the form of a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty.

**Specifically, Matthews actions have included severe forms of coercive control, such as:**

1. **Matthew has been unreasonably engaging in isolating Angelina from family, friends, relatives, and other sources of support.**

   a. Matthew has not allowed Angelina to have access to her mother, 8-year-old sister, aunts, uncles, grandmother, godparents, cousins, or any of her other friends or extended family for more than 1.5 days in the last 6 weeks. Angelina has been begging daily to have phone calls, FaceTime calls, and visits with all her family, especially me as her mother, and Matthew has refused to allow it to happen. Angelina has continued to ask and beg repeatedly to see us, has cried and said she wants to come home and be with mommy and her sister and come back and play with her toys, has begged for more time, and Matthew has denied her that right. He has limited her to 1.5 days with me in the last 6 weeks, and has said that all visitation is terminated, has refused to provide me with a schedule or regular access to her, and has instructed his mother who he lives with to do the

same. He ignores any and all attempts that I make to see my child, and even when I comply with every one of his demands, finds any excuse he can to then still deny the visit, and forces me to spend hours each day trying to get an answer, only for him to then deny the access. He also tries to interfere with the FaceTime calls and has put his hand up during the call, kept the lights off during the call, and kept the camera off during the call to isolate Angelina from me so that I would be unable to see her face. He also holds the phone and takes full control of the conversation, speaks to me during the calls, and intimidates during the calls, even though there is a full no-contact protective order stating he cannot contact me outside of the OurFamilyWizard app. Angelina cries and begs to see me, and Matthew isolates and alienates her from me and the rest of my family and friends as a form of coercive control and psychological abuse.

b. Matthew has removed Angelina from her school/educational program in which she was able to see friends, teachers, and other support sources. He has not allowed her to contact or see any of her friends, has not allowed her to have any play dates with any of her friends, and has not allowed her to participate in any sport, educational program, or anything else similar. Angelina was thriving at her new program and had just started to adjust to the school before Matthew forcibly removed her from the school Angelina has asked repeatedly to go back to school and see her friends and teachers and Matthew has denied her that right.

c. Matthew has removed Angelina from her therapist at the Yale Child Study Center, where she was being treated for 6 months for her adjustment disorder and ongoing issues. He has neglected the fact that her pediatrician stated that

this was medically necessary and neglected the fact that multiple providers, including her therapist Jessica Mayo, PhD, have stated that there is necessity for Angelina to remain in therapy at this time. Angelina has asked repeatedly to attend therapy and see "Dr. Jessie" and Matthew has denied her that right.

d. Matthew has removed Angelina from her church, where she was able to attend Sunday School, participate in fellowship activities, see other family members and friends, partake in religious sacraments, and receive support from clergy and other members of the extended church community. Angelina has asked repeatedly to attend church and Matthew has denied her that right.

e. Matthew has removed Angelina from her pediatrician, which was also another source of support for her. He has stated that he will no longer allow her any access to the pediatrician, nor will he allow her to be evaluated for sick or well visits and has stated she does not need any access to any pediatric care.

2. **Matthew has been depriving Angelina of basic necessities.**

a. Matthew has not allowed Angelina to receive her medically necessary mental health therapy treatment in more than 6 weeks. She is struggling mentally and emotionally and psychologically. Her provider stated that she needs therapy now more than ever. Matthew is depriving her of the basic necessity of mental health treatment.

b. Matthew has not allowed Angelina to receive her medically necessary medical follow-up appointment. Angelina was told that she needed a follow up by 5/31/23. It is now 7/3/23 and she has not been seen. Matthew is depriving her of the basic necessity of a medical follow up appointment.

c.  Matthew has been depriving Angelina of food as a basic necessity. Since in Matthew's care, Angelina has lost almost 5 pounds, and Matthew typically has her on a strict diet that lacks protein and other nutrients. She is only four years old and typically is in a low percentile for height and weight. She now only weighs a little more than 30 pounds. He is depriving her of the basic necessity of food and nourishment.

d.  Matthew has been depriving Angelina of medically necessary physical check-ups. Angelina needs to have a physical now that her birthday was on 5/21/23. She is due for her physical and annual checkup. Matthew is depriving her of the basic necessity of an annual checkup at the doctor.

e.  Matthew has been depriving Angelina of the basic necessity of love, access, and visitation with me as her mother. Angelina desperately needs to see and spend time with me. Matthew is depriving her of the basic human necessity for a child to see and speak to their mother, hug and kiss their mother, or be in the presence of their mother for longer than 1-2 hours at a time.

3.  **Matthew has been controlling, regulating, and monitoring Angelina's movements, communications, daily behavior, and access to services.**

a.  Matthew has regulated, controlled, and monitored Angelina's movements by forcing her to remain at his mother's house for the majority of the time, and refusing to allow her to have any visitation or time with me as her mother. He has chosen to leave her with his ex-wife, his mother, his minor children, and others in lieu of allowing Angelina to exercise her free will to be able to spend time with me during the time that he is unavailable to parent her and when I am available.

b. Matthew has controlled, regulated, and monitored Angelina's communications by interfereing with phone calls, FaceTime calls, and other video calls between Angelina and myself and other family members, denied court-ordered access via phone or video calls and regulated Angelina's ability to speak to me and other members of our family, and has forcibly ended the calls at his leisure mid-call, and has refused to allow me to speak to Angelina on numerous occasions

c. Matthew will monitor, interfere with, and speak during the calls and instruct Angelina what to say, tell her that she will be punished and in trouble if she doesn't listen to him, and harasses/intimidates/threatens her when she tries to say she wants to speak to me or see me.

d. Matthew is controlling, regulating, and monitoring Angelina's access to services by denying her access to any educational, medical, mental health, religious, family/friend, or community services that she would otherwise choose to partake in and be part of.

4. **Matthew has compelled Angelina by force, threat, or intimidation, to engage in conduct from which she has a right to abstain and to abstain from conduct that she has a right to pursue.**

a. Matthew compelled Angelina by force, threat, and intimidation to sit in the dark with the blinds closed and the lights off against her will while he physically restrained her to stop her from turning on the light so that I could see her face during the FaceTime call. Angelina cried, begged, and stated he was hurting her when he physically restrained her from getting up. He threatened and intimidated her and told her she would be punished if she got up to turn on the light. He

denied her the right to have a normal FaceTime call with the light on and with her face visible. On another occasion he repeatedly kept turning the camera off, and on another he was putting his hand up to the screen to block the view so that Angelina was not visible during the call.

b. Matthew compelled Angelina to abstain from FaceTiming and speaking to me and other family members on the phone multiple times. Angelina has begged repeatedly to FaceTime and call me and my family, and it is in the court order that he must allow it. Matthew refuses to allow it, and compels Angelina to abstain from speaking to us, even though she has the right to pursue that phone contact.

c. Matthew compelled Angelina to abstain from seeing me and other members of my family for longer than a total of 1.5 hours in the last 6 weeks, even though she has the right to see us daily and has expressed that she wants to exercise that right and see us daily. She has repeatedly begged and cried to see us more, and he refuses to allow it, and compels her to abstain from seeing her mother regularly or other family regularly, despite both me and her begging Matthew to allow us to see each other pursuant to the right that it says we can on the court order.

d. Matthew has compelled Angelina to stop going to school, even though she has the right to go and was enrolled. She has repeatedly begged to return to school.

e. Matthew has compelled Angelina to stop going to church, even though she has the right to practice her religion freely and receive religious sacraments. She has repeatedly begged to return to church.

f.  Matthew has compelled Angelina to stop going to therapy. Angelina has begged repeatedly to go back. It is her right and in her best interest to go, and Matthew has denied her the right.

g.  Matthew has compelled Angelina to stop going to the doctor and receiving medical care. Angelina has asked repeatedly to be able to go to the doctor, it is in her right and best interest to go, and Matthew has denied her the right.

Matthew has continued to psychologically abuse me and Angelina and involve her in the custody dispute, withhold her from medical/mental health treatment and care, isolate/alienate her from me and the rest of our family, and has exposed her to an extreme risk of further psychological and/or physical harm. He has threatened, intimidated, restrained, and psychologically abused her, and has continued to escalate. Angelina deserves to be protected and deserves to be heard. She is at danger of further neglect and psychological harm if this is not granted.

I have been trying to get a GAL appointed for my daughter for the last year. I filed a motion for appointment of GAL in july 2022. That motion was never acknowledged, addressed, or ruled on by the judge. I was never given a hearing on it nor was I given the opportunity to speak on it. My former counsel filed another motion for appointment of GAL in November 2022, which was ignored for seven months and then ruled on in the last month and the ruling was entered in as "see orders from 5/31/23" and the orders from 5/31/23 stated that she was giving Matthew sole legal and sole physical custody and mandating that I only get supervised visitation. I have sole legal and sole physical custody of my 8.5 year old daughter, and have had that for her entire life, over 8 years. I have my own house in

Orange that is a single family house that has a bedroom and playroom for Angelina, along with all of her clothes, toys, and everything that she got for her birthday that now sits here and never gets used or acknowledged. In the last 6.5 weeks, Matthew has completely alienated me from Angelina and has only allowed me to see her for a total of 1.5 days in the last 6.5 weeks. On 6/15/23 ,when we went to our last court date, the judge told Matthew that he was required to allow me to see Angelina, that he needed to provide me a schedule for Angelina, and that it was important for him to allow me regular access/time with Angelina with visitation and calls.

During that hearing, testimony was also read from Angelina's provider, Jessica Mayo, PhD, who stated she strongly recommends Angelina be appointed a GAL and stated that due to Angelina's special needs and adjustment disorder that it was against her professional opinion for Matthew to remove her from therapy. Angelina's pediatrician, as well as Dr. Livingston from SCAN all also said that they strongly recommend she remain in therapy, and that it is medically necessary. Matthew has ignored all of this. His substance abuse and alcoholism is completely out of control. He regularly has Angelina with him at parties in which he smokes cigars and was blowing smoke in her face and excessively drinking in front of her before driving home while under the influence. He drinks and smokes every single day, and spares no expense when it comes to cigars, wine, marijuana, hard alcohol, psilocybin, and other substances that he has issues with. A police report was made. There have been several police reports made since then in which I have had to ask for wellness checks to be conducted. During phone calls, Matthew physically restrained Angelina, threatened her, intimidated her, and instructed her to lie. Matthew has been isolating, alienating, neglecting, and abusing Angelina. Since then, he has continued to

escalate with his abusive and concerning behaviors. He demands that in order to see Angelina, that I must go to his house. However, there are protective orders in place which mandate residential stay-aways. Every time i bring this up, he states that I can either meet him at the house in violation of protective order or that I can not see Angelina at all. I have only seen her for 1.5 days in 6.5 weeks. This is abuse, and parental alienation. He is also threatening, manipulating, and abusing her and I have all of the phone calls, facetimes, messages, and all of the other evidence.

As of now, Angelina has no GAL, no health insurance, lives in a home with Matthew's alcoholic stepfather and Matthew who is on the DCF neglect and abuse registry for abusing and neglecting his two sons. Matthew has multiple convictions of violent crimes including two convictions of reckless endangerment that he plead guilty to. Matthew removed Angelina from school, removed her from being able to see me and the rest of our family and her sister, took away her health insurance, removed her from the pediatrician, removed her from her therapy, removed her from her church, and eliminated any and all sources of support for her. What he is doing is abuse under PA 21-78 aka Jennifer's law, and many people are not versed or trained in DV matters, but Matthew is a domestic abuser, sociopathic narcissist and he is a danger to. himself, society, and to Angelina. She desperately needs a GAL immediately. I would like to be able to see my child immediately and speak to her immediately. I would like to be able to schedule and bring my child for a 4 year old check up, medical follow up, and dental appointment that she is past due on and needs to attend. What Matthew is doing is abuse. Angelina has lost over 5 lbs., and has been begging and crying daily to see me and come home. Rather than try to do what is in her best interest, Matthew tells me and her that I cannot see her. I ask daily in the

OurFamilyWizard app to see her or speak to her and Matthew 1. opens my message, reads it, and ignores it, 2. responds and says no, or 3. completely ignores my message altogether and refuses to open it.  He uses coercive control to abuse me further mentally and psychologically. I have never done anything to abuse, neglect, or harm my children, and have always tried to protect, love, and nurture my children and give them the best that I possibly can. I am trying to advocate for my child who has no voice and is being held hostage against her will and being forcibly kept from me when even the judge is saying he must let me see her.

## <u>Conclusion</u>

Mandamus is an extraordinary remedy, which should only be used in exceptional circumstances of peculiar emergency or public importance. LaBuy v. Howes Leather Co., 352 U.S. 249 (1957); United States v. McGarr, 461 F.2d 1 (7th Cir. 1972). The All Writs Act, 28 U.S.C. § 1651(a), confers the power of mandamus on federal appellate courts. LaBuy v. Howes Leather Co., supra. Mandamus may be appropriately issued to confine an inferior court to a lawful exercise of prescribed jurisdiction, or when there is an usurpation of judicial power. See Schlagenhauf v. Holder, 379 U.S. 104 (1964). Mandamus may be employed to require a lower court to enforce the judgment of an appellate court, or to keep such a court from interposing unauthorized obstructions to the enforcement of the judgment of a higher court. See United States v. District Court, 334 U.S. 258, 263 (1948) (to enforce obedience to court of appeals mandate). Where the right was clear and indisputable, mandamus issued to compel a lower court to release a boat under an assertion of the immunity of a foreign sovereign. Spacil v. Crowe, 489 F.2d 614 (5th Cir. 1974). It has been utilized to compel the issuance of a bench warrant. Ex parte United States, 287 U.S. 241, 248 (1932).

It is imperative that Judge Grossman immediately recuse herself from any and all matters that involve Ms. Antar, as it is impossible for Judge Grossman to ever look at Ms. Antar without the bias that she currently has, and she cannot and will not be impartial or look out for the best interest of the child.

## **Prayer for relief**

Petitioner has exhausted her remedies she has no other alternative but to bring this writ of mandamus on the basis of extraordinary emergency.  If this matter is not heard on an urgent basis further continuance custodial interference and child endangerment will just cause more harm to his minor child and such harm, being emotional and psychological harm constitutes child abuse and endangerment of a minor child.

The evidence as set out above clearly proves the Respondent custodial interference and consequently parental alienation causing irrevocable psychological and emotional harm to not only Petitioner but also the minor child. Emotional abuse is the core of all other kinds of child abuses and maltreatments. The significant and serious outcomes of other kinds of abuses are often due to the emotional aspects.

Moreover, emotional abuse has several forms, and each form may lead to different adverse outcomes for children and adolescents. As the current orders stand, Petitioner is virtually unable to see or speak to her minor child at all, and is subjected to constant abuse at the hands of the defendant.

Unfortunately, there is not a comprehensive instrument to assess all categories of emotional abuse.

## **Wherefore, I have proved:**

1. That I have a clear right to relief

2. That there is an undisputed duty on the lower court

3. That there is no adequate remedy at law; and

4. I have asked the lower court act first.

For the foregoing reasons, Petitioner respectfully requests that the Court grant the Petition for a Writ of Mandamus.

July 10, 2023 Respectfully submitted,

_____ /s/ Theodora F. Antar

*Petitioner, Pro Se*

856 Shagbark Drive

Orange, CT, 06477

theodoraantar@gmail.com

(203)273-8419

## **CERTIFICATION OF SERVICE**

I hereby certify that on July 10, 2023, I served a copy of the foregoing Petition for a Writ of Mandamus and Motion for temporary Mandamus to all counsel and parties on record as listed below:

Matthew John Lodice Pro, Se (Defendant in underlying action/Respondent #2)

48 Quarry Hill Rd, Waterbury, CT, 06706

T: (203) 919-9528 C: (860) 518-2388 matthewlodice@gmail.com

Honorable Judge Jane Kupson Grossman (Respondent #1) of the New Haven Superior Court, Presiding Judge, Post-Judgment Family Matters, New Haven, CT

Nancy.Sasser@jud.ct.gov

Support Enforcement Services (Juris 104033) SES New Haven

414-A Chapel street, 2nd floor, New Haven, CT, 06511

Attorney General (Family) 46b-55(a) AAG Gail M. Lawrence (401580)

AG-Collections/Child Supp 165 Capital Ave, 4th floor, Hartford, CT, 06106

Office of Child Support Services A (104016) Dept of Social Services

50 Humphrey St, New Haven, CT, 06513

July 10, 2023 Respectfully submitted,

_____ /s/ Theodora F. Antar

*Petitioner, Pro Se*

856 Shagbark Drive, Orange, CT, 06477

theodoraantar@gmail.com

(203)273-8419